**ORAL ARGUMENT NOT YET SCHEDULED**
No. 12-1398

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

AMERICAN PETROLEUM INSTITUTE; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA; NATIONAL FOREIGN TRADE COUNCIL,

*Petitioners,*

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

OXFAM AMERICA, INC.,

*Intervenor.*

---

Petition for Review of Final Rule of the
United States Securities and Exchange Commission

---

**BRIEF FOR PETITIONERS**


*Of Counsel*
Harry M. Ng
Peter C. Tolsdorf
American Petroleum Institute
1220 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 682-8500
*Counsel for American Petroleum Institute*

*Of Counsel*
Robin S. Conrad
Rachel Brand
National Chamber Litigation Center, Inc.
1615 H Street, N.W.
Washington, D.C. 20062
Tel.: (202) 463-5337
*Counsel for Chamber of Commerce of the United States of America*

Eugene Scalia
*Counsel of Record*
Thomas M. Johnson, Jr.
Ashley S. Boizelle
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
Tel.: (202) 955-8500
Facsimile: (202) 467-0539
EScalia@gibsondunn.com
*Counsel for Petitioners*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rules 26.1 and 28(a)(1), Petitioners state as follows:

**(A) Parties, Intervenors, and Amici:**

The parties in this case are Petitioner American Petroleum Institute ("API"), Petitioner Chamber of Commerce of the United States of America ("Chamber"), Petitioner Independent Petroleum Association of America ("IPAA"), Petitioner National Foreign Trade Council ("NFTC"), and Respondent United States Securities and Exchange Commission ("Commission"). Oxfam America, Inc., a nonprofit international development and relief organization, was granted permission to intervene in this action on November 1, 2012. *See* Order (Nov. 1, 2012), Doc. 1402603. There currently are no amici.

API is a national trade organization representing over 500 companies involved in all aspects of the domestic and international oil and natural gas industry, including exploration, production, refining, marketing, distribution, and marine activities.

The Chamber is the world's largest business federation. The Chamber represents 300,000 direct members and indirectly represents an underlying membership of more than three million businesses and organizations of all sizes, sectors, and regions. Its members include many of the leading public companies in the oil, natural gas, and mining industries. An important function of the Chamber

is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly participates in cases that raise issues of vital concern to America's business community.

IPAA has represented independent oil and natural gas producers for three-quarters of a century. It serves as an informed voice for the exploration and production segment of the industry, and advocates its members' views before the U.S. Congress, the Administration, federal agencies, and the courts.

NFTC is the premier business organization advocating a rules-based world economy. Founded in 1914 by a group of American companies that supported an open world trading system, NFTC and its affiliates now serve more than 300 member companies through offices in Washington and New York.

API, the Chamber, IPAA, and NFTC have no parent corporation, and no publicly-held company owns 10 percent or more of their stock.

**(B) Rulings Under Review:**

Under review in this case is a final rule promulgating regulations requiring public disclosure of payments to the U.S. or foreign governments by public companies engaged in the commercial development of oil, gas, or minerals. The Rule was adopted by the Commission at an open meeting on August 22, 2012. It was published in the Federal Register on September 12, 2012. *See* Disclosure of Payments by Resource Extraction Issuers, 77 Fed. Reg. 56,365 (Sept. 12, 2012)

(codified at 17 C.F.R. Parts 240 and 249). Petitioners also bring a constitutional challenge to the statutory provision pursuant to which the Rule was promulgated, Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank"), Pub. L. No. 111-203, § 1504, 124 Stat. 1376, 2220 (codified at 15 U.S.C. § 78m(q)).

**(C) <u>Related Cases</u>:**

Although Petitioners submit that this Court has jurisdiction to adjudicate their claims in the first instance, Petitioners also filed suit in the U.S. District Court for the District of Columbia relating to the same claims, out of an abundance of caution. *See Am. Petroleum Inst. v. SEC*, No. 12-1668 (D.D.C. filed Oct. 10, 2012).

## TABLE OF CONTENTS

Page

INTRODUCTION ..... 1

JURISDICTIONAL STATEMENT ..... 2

STATEMENT OF ISSUES ..... 2

STATUTES AND REGULATIONS ..... 4

STATEMENT OF THE CASE ..... 4

STATEMENT OF FACTS ..... 5

A. The Extractive Industries Transparency Initiative ..... 5

B. Congress Enacts Section 13(q) ..... 6

C. The Rulemaking Process ..... 8

1. The Proposed Rule ..... 8

2. The Comment Period ..... 9

D. The Final Rule ..... 11

1. The Commission Requires Company-Specific Public Disclosure ..... 13

2. The Commission Refuses Any Exemption For Disclosures Prohibited By Contract Or By Foreign Governments. ..... 14

3. The Commission Declines To Define The Term "Project." ..... 17

4. The Commission Makes No Finding Regarding The Benefits Of The Rule, And Estimates Billions Of Dollars In Costs, Using An Incomplete Economic Analysis That Was Not Disclosed For Public Comment. ..... 19

5. Commissioner Gallagher's Dissent ..... 22

**Table of Contents**
**(Continued)**


**Page**

STANDARD OF REVIEW .......... 24

SUMMARY OF ARGUMENT .......... 25

STANDING .......... 26

ARGUMENT .......... 27

I. JURISDICTION PROPERLY LIES IN THIS COURT. .......... 27

II. BOTH THE RULE AND SECTION 13(q) COMPEL SPEECH IN VIOLATION OF THE FIRST AMENDMENT. .......... 31

A. The Rule .......... 32

B. Section 13(q) .......... 35

III. THE COMMISSION IMPROPERLY FAILED TO DETERMINE THE RULE'S BENEFITS AND DRAMATICALLY UNDERESTIMATED ITS COSTS. .......... 37

A. The Commission Failed To Determine The Rule's Benefits, And Whether Its Costs Are Warranted In Light Of Any Benefits. .......... 39

B. The Commission Failed To Adequately Assess The Rule's Costs. .......... 42

IV. THE COMMISSION IMPROPERLY DECLINED TO SOLICIT ADDITIONAL COMMENT AFTER INTRODUCING ITS COST-BENEFIT ANALYSIS FOR THE FIRST TIME IN THE FINAL RULE. .......... 45

V. THE COMMISSION ARBITRARILY REJECTED ALTERNATIVES THAT WOULD HAVE SIGNIFICANTLY REDUCED THE RULE'S COSTS FOR COMPANIES AND INVESTORS. .......... 46

A. The Commission Erroneously Refused To Permit Confidential Submission Of Company-Specific Data .......... 47

**Table of Contents**
**(Continued)**


**Page**

B. The Commission Mistakenly Refused To Grant An Exemption Where The Required Disclosures Would Conflict With The Requirements Or Contracts Of Foreign Governments........................53

C. By Refusing To Define The Critical Statutory Term "Project," The Commission Abdicated Its Responsibilities And Needlessly Increased The Rule's Costs. ............................................59

VI. THE RULE'S DEFICIENCIES REQUIRE VACATUR..............................62

CONCLUSION .........................................................................................63

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Allied Local & Reg'l Mfrs. Caucus v. EPA*,
215 F.3d 61 (D.C. Cir. 2000) .....24

*Allied-Signal, Inc. v. NRC*,
988 F.2d 146 (D.C. Cir. 1993) .....62

*Am. Library Ass'n v. FCC*,
401 F.3d 489 (D.C. Cir. 2005) .....27

*Am. Petroleum Inst. v. EPA*,
906 F.2d 729 (D.C. Cir. 1990) .....47

*Am. Petroleum Inst. v. OSHA*,
581 F.2d 493 (5th Cir. 1978) .....41

* *American Equity Investment Life Insurance Co. v. SEC*,
613 F.3d 166 (D.C. Cir. 2010) ..... 30, 40, 60, 62

*Arizona v. Thompson*,
281 F.3d 248 (D.C. Cir. 2002) .....47

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677 (D.C. Cir. 1984) .....45

*Brown v. Entm't Merchs. Ass'n*,
131 S. Ct. 2729 (2011) .....34

*Buckley v. Valeo*,
424 U.S. 1 (1976) ..... 32, 33

* *Business Roundtable v. SEC*,
647 F.3d 1144 (D.C. Cir. 2011) ..... 30, 37, 40, 41, 44

*Cannon v. Univ. of Chi.*,
441 U.S. 677 (1979) .....29

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980) .....32

* *Chamber of Commerce v. SEC*,
412 F.3d 133 (D.C. Cir. 2005) (*Chamber I*) ..... 3, 25, 30, 37, 41, 50

* *Chamber of Commerce v. SEC*,
443 F.3d 890 (D.C. Cir. 2006) (*Chamber II*) ..... 30, 45, 46

**Table of Authorities**
**(Continued)**

**Page**

*Chevron U.S.A. Inc. v. NRDC*,
467 U.S. 837 (1984) .......... 47, 50

*Christopher v. SmithKline Beecham Corp.*,
132 S. Ct. 2156 (2012) .......... 61

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .......... 29

*Communist Party of the U.S. v. Subversive Activities Control Bd.*,
367 U.S. 1 (1961) .......... 33

*Covad Commc'ns Co. v. FCC*,
450 F.3d 528 (D.C. Cir. 2006) .......... 24

*Crowell v. Benson*,
285 U.S. 22 (1932) .......... 35

*De Vries v. Tower Semiconductor Ltd.*,
2004 U.S. Dist. LEXIS 29921 (S.D.N.Y. Aug. 19, 2004) .......... 55, 56

*Exportal Ltda v. United States*,
902 F.2d 45 (D.C. Cir. 1990) .......... 28, 31

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......... 54

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) .......... 27, 28

*Flemming v. Nestor*,
363 U.S. 603 (1960) .......... 31

*Ford v. Mabus*,
629 F.3d 198 (D.C. Cir. 2010) .......... 52

*Friedman v. Sebelius*,
686 F.3d 813 (D.C. Cir. 2012) .......... 52

*Full Value Advisors*, *LLC v. SEC*,
633 F.3d 1101 (D.C. Cir.) .......... 36

*Greyhound Corp. v. ICC*,
668 F.2d 1354 (D.C. Cir. 1981) .......... 59

*Heartland Reg'l Med. Ctr. v. Sebelius*,
566 F.3d 193 , (D.C. Cir. 2009) .......... 62

**Table of Authorities**
**(Continued)**

**Page**

*Indus. Union Dep't v. Am. Petroleum Inst.*,
448 U.S. 607 (1980) .....41

*Inv. Co. Inst. v. Bd. of Governors of Fed. Reserve Sys.*,
551 F.2d 1270 (D.C. Cir. 1977) ..... 28, 29

*McDonnell Douglas Corp. v. NASA*,
180 F.3d 303 (D.C. Cir. 1999) .....50

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ..... 33, 34

*Milk Train, Inc. v. Veneman*,
310 F.3d 747 (D.C. Cir. 2002) .....62

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ..... 24, 57

*Murray v. Schooner Charming Betsy*,
6 U.S. (2 Cranch) 64, 118 (1804) ..... 15, 56

*Nat'l Ass'n of Mfrs. et al. v. SEC*,
No. 12-1422 (petition filed Oct. 19, 2012) .....23

*Nat'l Auto. Dealers Ass'n v. FTC*,
670 F.3d 268 (D.C. Cir. 2012) .....28

*NetCoalition v. SEC*,
615 F.3d 525 (D.C. Cir. 2010) .....61

*NRDC v. Abraham*,
355 F.3d 179 (2d Cir. 2004) ..... 28, 62

*NRDC v. EPA*,
89 F.3d 1250 (D.C. Cir. 2007) .....62

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*,
494 F.3d 188 (D.C. Cir. 2007) .....45

*Paralyzed Veterans of Am. v. D.C. Arena L.P.*,
117 F.3d 579 (D.C. Cir. 1997) .....61

*Pharm. Care Mgmt. Ass'n v. Rowe*,
429 F.3d 294 (1st Cir. 2005) .....36

*Preseault v. ICC*,
853 F.2d 145 (2d Cir. 1988), *aff'd*, 494 U.S. 1 (1990) .....31

**Table of Authorities**
**(Continued)**

**Page**

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988) .......... 33

* *Schiller v. Tower Semiconductor, Ltd.*,
449 F.3d 286 (2d Cir. 2006) .......... 53, 55

*SEC v. Wall Street Pub'g Inst. Inc.*,
851 F.2d 365 (D.C. Cir. 1988) .......... 32, 33

*Sierra Club v. EPA*,
292 F.3d 895 (D.C. Cir. 2002) .......... 27

*Time Warner Entm't Co. v. FCC*,
93 F.3d 957 (D.C. Cir. 1996) .......... 31

*United Gas Pipeline Co. v. FPC*,
181 F.2d 796 (D.C. Cir. 1950) .......... 28

*United States v. Alvarez*,
132 S. Ct. 2537 (2012) .......... 34

*United States v. Playboy Entm't Grp., Inc.*,
529 U.S. 803 (2000) .......... 32, 33

*United States v. Storer Broad. Co.*,
351 U.S. 192 (1956) .......... 28

*W. Va. Bd. of Edu. v. Barnette*,
319 U.S. 624 (1943) .......... 36

*Wooley v. Maynard*,
430 U.S. 705 (1977) .......... 2, 31

*Zauderer v. Office of Disciplinary Counsel of the Supreme Ct. of Ohio*,
471 U.S. 626 (1985) .......... 32

**Statutes**

15 U.S.C. § 77 .......... 30

15 U.S.C. § 78 .......... 8, 14, 17, 19, 26, 27, 28, 30, 35, 37, 46, 47, 48, 49, 51, 53, 54, 55

15 U.S.C. § 80 .......... 30, 37

5 U.S.C. § 706 .......... 24, 62

Table of Authorities
(Continued)

Page

**Other Authorities**

155 Cong. Rec. S9746 (Sept. 23, 2009)....7

156 Cong. Rec. S3814 (May 17, 2010) ....7

Cass R. Sunstein, *Empirically Informed Regulation*, 78 U. Chi. L. Rev. 1349, 1387 (2011) ....38

Commission Response Brief (Oct. 23, 2012), Doc. 1401068 ....28

EITI Report 2011: Azerbaijan ....58

EITI Rules, Table of Contents, § 3 (2011) ....49

Exec. Order No. 13,609, Promoting International Regulatory Cooperation ....56

Global Witness Comment (Feb. 24, 2012) ....11

H.R. 6066, 110th Cong. § 3(a), (c) (2008)....6

No. 04-5295, SEC Letter Brief 10 (Jan. 10, 2006) ....55

Restatement (Third) of Foreign Relations Law § 403 cmt. g. ....56

Richard J. Pierce, *Administrative Law* § 18.2 (4th ed. 2002) ....27

Robert W. Hahn & Cass R. Sunstein, *A New Executive Order for Improving Federal Regulation? Deeper and Wider Cost-Benefit Analysis*, 150 U. Pa. L. Rev. 1489, App'x A, 1542 (2002) ....38

S. 3389, 110th Cong. § 3(a), (c) (2008)....6

Statement of Comm'r Gallagher (Aug. 22, 2012) ....23

Statement of Comm'r Paredes (Aug. 22, 2012)....24

**Regulations**

17 C.F.R. § 229 ....15

17 C.F.R. § 240 .... 14, 15, 49

17 C.F.R.§ 200 ....49

74 Fed. Reg 6,776. .... 14, 20, 51

77 Fed. Reg. 56,365 ....1, 2, 4, 9, 12, 13, 14, 15, 16, 17, 18, 19, 21, 22, 23, 30, 31, 34, 38, 39, 40, 42, 43, 44, 45, 49, 50, 51, 52, 54, 56, 57, 58, 59, 60, 61

*Authorities upon which we chiefly rely are marked with an asterisk.

## GLOSSARY

| | |
|---|---|
| API | American Petroleum Institute |
| EITI | Extractive Industries Transparency Initiative |
| IPAA | Independent Petroleum Association of America |
| NFTC | National Foreign Trade Council |
| PWYP | Publish What You Pay |
| SEC | Securities and Exchange Commission |

## INTRODUCTION

This case involves a challenge to one of the most expensive rules in the history of the Securities and Exchange Commission. The rule requires U.S. companies to publish what they pay foreign governments and the U.S. government in connection with the "extraction" of oil, gas, and minerals. The rule is intended, in the Commission's words, to "empower citizens of . . . resource-rich countries to hold their governments accountable for the wealth generated by those resources." Disclosure of Payments by Resource Extraction Issuers, 77 Fed. Reg. 56,365, 56,366/1 (Sept. 12, 2012) ("Extractive Industries Rule" or "Rule").

The Rule—and the statutory provision that authorized it—violate the First Amendment by compelling speech on a controversial matter in order to influence political affairs. Adoption of the Rule also violated the Administrative Procedure Act and the Commission's heightened responsibility under the Securities Exchange Act to consider its rules' effects on efficiency, competition, and capital formation. While estimating that the Rule could cost U.S. public companies and their investors more than $14 billion, the Commission made no determination regarding the Rule's benefits. The Commission therefore could not meaningfully assess less costly alternatives to the Rule, and arbitrarily spurned approaches that would have substantially reduced the Rule's unprecedented economic burden on U.S. companies and investors. The fact that Congress required adoption of *some* rule in

this area does not excuse such an abdication of the Commission's other statutory responsibilities.

## JURISDICTIONAL STATEMENT

This case is before the Court on a petition to review a final rule of the Securities and Exchange Commission, 77 Fed. Reg. 56,365. The Rule was adopted pursuant to Sections 3(b), 12, 13, 15, 23(a), and 36 of the Exchange Act. *Id*. at 56,417/3.

The Rule was published in the Federal Register on September 12, 2012, and the petition was filed on October 10th. The case concerns a final agency rule that disposes of all parties' claims, and is properly before this Court. Pursuant to this Court's Order, Petitioners brief the issue of jurisdiction more fully *infra* at 27-31. *See* Per Curiam Order (Nov. 1, 2012), Doc. 1402612.

## STATEMENT OF ISSUES

1. The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Section 13(q) of the Exchange Act and the Commission's Rule compel U.S. companies to engage in costly speech on a controversial matter in order to influence political affairs in other countries. Does that violate the First Amendment?

2. The Commission has a statutory obligation to "do what it can to apprise itself—and hence the public and the Congress—of the economic consequences of a proposed regulation." *Chamber of Commerce v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005) (*Chamber I*). In adopting the Rule, the Commission failed to determine whether the Rule would benefit investors or the public, and did not attempt an industry-wide estimate of the Rule's indirect costs. Was that arbitrary and capricious and a violation of the Commission's statutory duty to consider its rules' effects on efficiency, competition, and capital formation?

3. In adopting the Rule, the Commission relied on a cost-benefit analysis that was completely different from the analysis accompanying the proposed rule, and that used methodologies and extra-record evidence that were not previously disclosed to the public, were flawed, and significantly underestimated the Rule's costs. Did that violate the Administrative Procedure Act?

4. The Commission admittedly adopted a Rule that will require U.S. companies to publish company-specific payment information that could violate foreign law and contracts and reveal commercially sensitive pricing information, with resultant costs for U.S. companies and their shareholders of more than $12.5 billion. The Commission had the ability to write the Rule in a manner that would have substantially reduced these costs. By failing to do so, did the Commission act in a manner that was arbitrary and capricious and violated its statutory duty not to

place burdens on competition that are unnecessary to furthering the purposes of the Exchange Act?

## STATUTES AND REGULATIONS

The text of relevant statutes and regulations is set forth in the Addendum to this brief.

## STATEMENT OF THE CASE

This case concerns a Commission rule that was promulgated pursuant to Section 13(q) of the Exchange Act. The Rule was published in the Federal Register on September 12, 2012. 77 Fed. Reg. 56,365. Among other things, the Rule requires companies listed on a U.S. stock exchange to publicly disclose certain payments of more than $100,000 that are made to the U.S. or any foreign government for projects relating to the commercial development of oil, gas, or minerals. *Id.* at 56,367-56,368. The Rule became effective on November 13, 2012. *Id*. at 56,365/2.

Petitioners bring this lawsuit under the First Amendment to the United States Constitution, the Exchange Act, 15 U.S.C. § 78a *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq*., challenging the Commission's Rule and Section 13(q) of the Exchange Act. A copy of the final Rule is reprinted in the Addendum to this brief.

## STATEMENT OF FACTS

### A. The Extractive Industries Transparency Initiative

Oil, natural gas, and mining companies participate in a highly competitive sector of the economy that is essential to the financial health and national security of the United States. JA 164. These companies invest in foreign countries in myriad activities related to locating and extracting natural resources, "ranging from obtaining rights to explore, to the acquisition of seismic data, to the negotiation of agreements, to exploratory drilling, to development and production plans." JA 148.

In the past decade, key players in extractive industries—including companies, governments, investors, and civic organizations—have developed a voluntary international initiative to provide information on the money paid to those states by extractive-industry companies. *See* JA 86. Under this "Extractive Industries Transparency Initiative," or "EITI," each country works cooperatively with civil society groups and with the oil, natural gas, and mining industries to establish a protocol for reporting payments. JA 62. This multi-stakeholder group publishes a work plan, which provides for confidential submission of payment information by companies and the host government to an independent "reconciler," who compiles the information and publishes it in a report that must be "publicly accessible in such a way as to encourage that its findings contribute to public

debate." The EITI Requirements, http://eiti.org/eiti/requirements (last visited Dec. 3, 2012).

The EITI stakeholders decide on the level of specificity to be provided in the report, which can either be "aggregated" by company or revenue stream (*e.g.,* taxes, royalties, etc.) or "disaggregated" by the specific company, license, or revenue stream at issue. JA 62. An important "principle" to the EITI is that "achievement of greater transparency must be set in the context of respect for existing contracts and laws," and that "[p]articular care should be taken to balance the presumption of disclosure under the EITI with the concern of companies regarding commercial confidentiality." *Id.*

### B. Congress Enacts Section 13(q)

Starting in 2008, members of Congress began introducing legislation aimed at promoting extractive-industry disclosures and complementing the voluntary EITI regime. Companion bills introduced in the House and Senate in 2008 would have required public companies to disclose payment information in an annual report filed with the Commission via its online "EDGAR system," as well as in a "compiled format" accessible "from the website of the Commission." H.R. 6066, 110th Cong. § 3(a), (c) (2008); S. 3389, 110th Cong. § 3(a), (c) (2008). These bills died in committee.

In 2009, Senator Lugar introduced the Energy Security Through Transparency Act, which abandoned the requirement that companies file an annual report "on the EDGAR system," instead requiring that companies "file an annual report" with the Commission, which would then make available a "compilation of the information required to be submitted." S. 1700, 111th Cong. § 6(m)(1)(D), (3)(A) (2009). In a floor statement, Senator Lugar stated that he expected the Commission to "follow the reporting requirements established under EITI, which were developed in conjunction with the oil industry." 155 Cong. Rec. S9746 (Sept. 23, 2009). This proposal also died in committee.

On May 12, 2010, Senators Cardin and Lugar introduced a bill that ultimately was adopted as Section 13(q) and signed into law as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act. In proposing the bill, Senator Cardin emphasized that it was designed to provide the Commission with the "utmost flexibility in defining how these reports will be made so that we [] get the transparency we need without burdening the companies." 156 Cong. Rec. S3814 (May 17, 2010).

Section 13(q) required the Commission to adopt rules with a two-step process for the submission and publication of payment information. First, public companies in extractive industries must "include in an annual report" to the Commission information concerning "the type and total amount of . . . [non *de*

*minimis*] payments made for each project of the resource extraction issuer relating to the commercial development of oil, natural gas, or minerals," as well as "the type and total amount of such payments made to each government." 15 U.S.C. § 78m(q)(2)(A). Then, in a separate paragraph titled "Public availability of information," Section 13(q) provides that, "[t]o the extent practicable, the Commission shall make available online, to the public, a compilation of the information required to be submitted under the rules issued under paragraph (2)(A)." *Id.* § 78m(q)(3)(A).

This two-step process follows the EITI structure, which allows the multi-stakeholder group to compile and publish aggregated figures. Congress repeatedly indicated in Section 13(q) that it expected the Commission's rules to be "consistent with the guidelines of the Extractive Industries Transparency Initiative (to the extent practicable)." 15 U.S.C. § 78m(q)(1)(C)(ii); *see also id.* § 78m(q)(2)(E) (referring to "international transparency promotion efforts").

### C. The Rulemaking Process

#### 1. The Proposed Rule

The Commission issued a notice of proposed rulemaking in December 2010. JA 2. Its Proposing Release included approximately four pages' discussion of the proposal's economic consequences. The only cost estimate related to the time it would take companies to prepare the required annual report, which the Commission projected at $11,857,200 annually. JA 18. The Commission

acknowledged there might be additional "costs related to tracking and collecting information about different types of payments across projects," but did not quantify them. JA 20.

The Commission also noted concern that the rule might "harm the competitive position of issuers and be contrary to the interests of their investors" if it required disclosures in countries that prohibited them. JA 21. Yet, it made no attempt to analyze or quantify those anticompetitive effects. *Id.* The Commission did, however, solicit comment on whether it should grant an exemption for host countries that prohibit companies from disclosing payment information. JA 12.

### 2. The Comment Period

The Commission received more than 150 unique comment letters on the proposed rule, and nearly 150,000 form letters. 77 Fed. Reg. at 56,367/2. Many commenters emphasized the costs of the proposal, and the need for targeted exemptions to alleviate them. Several estimated that "[t]otal industry costs just for the initial implementation could amount to hundreds of millions of dollars." JA 211. Those costs include changes to companies' books and records and IT systems. *See* 77 Fed. Reg. at 56,408/3.

Other commenters, including shareholder groups, explained that the disclosure requirements would cause competitive injury by making commercially sensitive information available to other market participants, such as state-owned oil

companies. JA 493. "Over 90% of the world's oil reserves are owned or controlled by National Oil Companies (NOCs)," many of which are not subject to the Commission's jurisdiction, commenters noted. *Id.* The U.S.-listed companies covered by the Rule "represent a small percentage of the global energy market and are not afforded the market power to compel host countries to enter into agreements that are subject to disclosure and against their national interest." *Id.*

One commenter cited historical experience, empirical evidence, and reports of the State Department and other agencies regarding the effects of a single country taking "unilateral steps" in the global marketplace that "conflict with internationally agreed norms," such as EITI. JA 459. Constraints imposed only on U.S. companies have done "little to alter conditions in the global marketplace," the commenter stated, rather they "invite lax enforcement" by other states, since "inconsistency in implementation creates [a] . . . competitive advantage" for non-U.S. entities. JA 459, 461. Sanctions imposed by the U.S. in the 1980s "compelled U.S. companies to breach their contracts in energy-related projects, result[ing] in a permanent loss not just of the contracts, but [of] entire markets to foreign competitors," the commenter warned. JA 478. The commenter cited academic literature indicating that the Commission's implementation of the Sarbanes-Oxley Act imposed costs that reduced capital formation in the U.S. and benefited markets overseas by a variety of measures. JA 480-81.

Commenters warned that the proposed rule would cost them billions of dollars in certain countries that prohibit the disclosures that the proposal would require. One company estimated that its losses could exceed $20 billion. JA 538. API noted the "very real potential for tens of *billions* of dollars of existing, profitable capital investments to be placed at risk." JA 540.

In particular, commenters noted that Angola, Cameroon, China, and Qatar prohibit disclosures such as those required by the proposed rule. JA 192. Royal Dutch Shell submitted a legal memorandum indicating that China prohibits public disclosure of confidential business information in Chinese commercial contracts. JA 526-32. The same comment explains that Cameroon prohibits disclosure of all documents, reports, surveys, plans, data, and other information in petroleum contracts, absent government authorization. JA 517, 519-20.[1]

### D. The Final Rule

On August 22, 2012, by a 2-1 vote, with two recusals and a quorum barely present, the Commission approved a final Rule that compels covered companies to publicly disclose all payments exceeding $100,000 that are made to a foreign government or the U.S. government in connection with a "project" relating to the

---

[1] Several non-governmental organizations ("NGOs") submitted comments disputing the content of these countries' laws, but even these comments acknowledge evidence of the countries' historic opposition to disclosure. *See, e.g.*, Global Witness Comment at 1 (Feb. 24, 2012) (discussing Angola).

commercial development of oil, natural gas, or minerals. *See* 77 Fed. Reg. at 56,367-69. The Rule requires companies to make these disclosures publicly in a new "Form SD" that is filed on the Commission's online database (EDGAR) no later than 150 days after the end of each fiscal year. *Id*. at 56,368/2-3.

The Commission said the purpose of its Rule is "to help empower citizens of . . . resource-rich countries to hold their governments accountable for the wealth generated by those resources." *Id.* at 56,366/1. Professing that this was an area in which it did not "typically" regulate, *id.* at 56,397/3, the Commission made no determination that the Rule would actually produce those benefits; it stated only that it "*may* result in social benefits that cannot be readily quantified with any precision," *id.* at 56,398/2 (emphasis added). At the same time, the Commission estimated the Rule to be among the most costly in its history, with total costs that would quickly exceed $14 billion: initial compliance costs of $1 billion, annual compliance costs of $200 to $400 million, and potentially $12.5 billion in losses due to certain countries' prohibition on disclosures such as those required by the Rule. *See id.* at 56,398/1. These prohibitions could force companies to "sell their assets in . . . host countries at fire sale prices," or to keep the assets idle and "not use them in other projects." *Id*. at 56,412.

The Commission nonetheless rejected several suggestions by commenters to reduce the Rule's burdens.

### 1. The Commission Requires Company-Specific Public Disclosure.

The Commission acknowledged that Congress modeled Section 13(q) on existing EITI standards, and that its Rule should reflect those standards except where the statutory text "clearly deviates from the EITI." *Id*. at 56,367/3. Nonetheless, the Commission imposed a company-specific public disclosure requirement that differs significantly from EITI's reporting regime, under which parties submit payment information confidentially to a third party who "reconciles" the data and publishes a report where the data often is provided in an aggregated compilation.

Commenters noted that limiting public disclosure to the statutorily mandated "compilation" of data "would be consistent with EITI practice, and would eliminate many of the competitive harms that issuers face under the current proposal." JA 207. But the Commission said that approach was not possible, because the clear statutory language "requires resource extraction issuers to provide the payment disclosure publicly and does not contemplate confidential submissions of the required information." 77 Fed. Reg. at 56,401/2.

In reaching this conclusion, the Commission observed that the statute requires companies to submit an "annual report" to the Commission containing the required "disclos[ures]," and that the Commission typically requires annual reports to be filed publicly. 77 Fed. Reg. at 56,391/1. The Commission did not address

the fact that under the EITI framework companies provide their payment information in non-public "reports," JA 60, and that the Commission's own rules include procedures for companies to obtain confidential treatment for "reports" that contain commercially sensitive information, 17 C.F.R. § 240.24b-2(a). The Commission also noted that Section 13(q) requires companies to submit payment information to the Commission in an "interactive data format," and reasoned that this is to facilitate the public's review of companies' reports. 77 Fed. Reg. at 56,391/1. Previously, however, the Commission has said that it uses "interactive data" for its own internal evaluation of reports. *See* Final Rule*,* Interactive Data to Improve Financial Reporting, 74 Fed. Reg. 6,776, 6,793 (Feb. 10, 2009). The Commission also speculated: "*it is not clear* that having the information submitted confidentially . . . would *necessarily* address commenters' concerns," "because the information *may well be* subject to disclosure under the Freedom of Information Act," or "FOIA." 77 Fed. Reg. 56,391/2 (emphases added).

#### 2. The Commission Refuses Any Exemption For Disclosures Prohibited By Contract Or By Foreign Governments.

The Commission has authority to grant exemptions under Section 12 when it deems it "necessary or appropriate" and "finds . . . that such action is not inconsistent with the public interest or the protection of investors." 15 U.S.C. § 78l(h).

The Commission historically has used its "exemptive authority" to avoid conflicts with foreign law. One year after the Exchange Act was enacted, the Commission promulgated Rule AN18 (now codified as Rule 3a12-3), which exempts foreign private issuers from certain disclosure requirements. *See* 17 C.F.R. § 240.3a12-3. Similarly, the Commission has exempted certain foreign broker-dealers from disclosures that would violate local law. 17 C.F.R. § 240.15a-6. It also has made accommodations for requirements imposed by its own rules. Regulation S-K, Item 1202, which requires oil companies to disclose their "proved reserves" in foreign countries, does not require disclosure "if [a] country's government prohibits disclosure of reserves in that country." 17 C.F.R. § 229.1202.

Numerous commenters sought an exemption from disclosures that would violate foreign laws, or the confidentiality clauses in contracts with foreign governments. The Commission refused, stating that it would "frustrate the purpose of Section 13(q) to promote international transparency efforts." 77 Fed. Reg. at 56,373/1. The Commission did not distinguish this purported "frustrat[ion]" of statutory purpose from other circumstances where it has provided exemptions. Nor did it address the long-established principle that "an Act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804).

The Commission equivocated on the extent to which foreign countries actually prohibit the disclosures compelled by the Rule, but identified at most four countries that would be covered by an exemption (Angola, Cameroon, China, and Qatar), out of an estimated fifty countries covered by the Rule. JA 580. The Commission did not, however, address *the degree to which* reduced disclosures regarding just four countries would "frustrate" the purpose of Section 13(q). By the Commission's estimates, exempting those four countries could have saved more than $12.5 billion. *See* 77 Fed. Reg. at 56,412/3. But the Commission did not weigh the value of publishing information regarding those countries against the value to shareholders and the public of avoiding billions of dollars in competitive losses.

In denying an exemption for foreign law, the Commission also stated that "such an exemption . . . would undermine the statute by encouraging countries to adopt laws, or interpret existing laws, specifically prohibiting the disclosure required under the final rules." *Id.* at 56,372/3-73/1. The Commission did not reconcile this statement with its prediction elsewhere that "the widening global influence of the EITI" might be sufficient to "discourage governments in resource-rich countries from adopting new prohibitions on payment disclosure." *Id.* at 56,413/1-2. Moreover, the Commission's Proposing Release had invited comment on whether the exclusion for foreign law could be limited "to circumstances in

which such a prohibition on disclosure was in place prior to the enactment of the Act," 75 Fed. Reg. at 80,988/2. Commenters suggested the same, *see* JA 447, 501, but in its Adopting Release the Commission altogether ignored that alternative.

### 3. The Commission Declines To Define The Term "Project."

Section 13(q) requires companies to report each "project" for which payments were made, and each "government" that received payment. *See* 15 U.S.C. § 78m(q)(2)(A). "Most commentators" called for a definition of "project" in the final Rule to ensure clarity and reduce compliance costs. 77 Fed. Reg. at 56,383/3. The Commission nonetheless refused to define "project." It preferred giving issuers greater "flexibility," the Commission said, and provided only general "guidance" about the term's meaning in the Adopting Release. *Id.* at 56,406/1.

In refusing to define "project," the Commission explained in part that it is "a commonly used term whose meaning is generally understood by resource extraction issuers and investors." 77 Fed. Reg. at 56,385/2. But the Commission did not state what that "generally understood" meaning was, nor why a "generally understood" meaning should not be set forth in a rule. Earlier in the same sentence, the Commission said "there does not appear to be a single agreed-upon application in the industry." *Id.* The Commission did not explain how a definition could be "generally understood" if there is no "single agreed-upon application."

API and other commenters had suggested that "project" be defined as "technical and commercial activities carried out within a particular geologic basin or province to explore for, develop and produce oil, natural gas or minerals." JA 149, 252. If companies could aggregate payments under multiple contracts that pertain to the same geologic basin, API explained, it would "help reduce the potential harm to companies and their shareholders from the disclosure of commercially sensitive information, violation of local laws, or breach of contract." JA 149, 252.

The Commission did not dispute that this definition of "project" could substantially reduce the Rule's costs. However, it said, a "geological basin or mineral district may span more than one country, which would be counter to the country-by-country reporting required by Section 13(q)." 77 Fed. Reg. at 56,406/2. The Commission did not explain that statement, nor did it address the fact that the statute requires reporting by project *and* country. The Commission also said that the industry's proposed definition "may not reflect how resource extraction issuers enter into contractual arrangements for the extraction of resources, which define the relationship and payment flows between the resource extraction issuer and the government." *Id.* at 56,406/2-3. That statement—whose meaning is unclear—also was not explained by the Commission.

### 4. The Commission Makes No Finding Regarding The Benefits Of The Rule, And Estimates Billions Of Dollars In Costs, Using An Incomplete Economic Analysis That Was Not Disclosed For Public Comment.

The Commission is required to consider its rules' effects on "efficiency, competition, and capital formation" and "the protection of investors," and may not impose burdens on competition that are unnecessary to further the purposes of the Act. 15 U.S.C. §§ 78c(f), 78w(a)(2), 80a-2(c).

In adopting the final Rule, the Commission made no attempt to determine whether it would produce cognizable benefits. It speculated only that the Rule "*may* result in social benefits that cannot be readily quantified with any precision." 77 Fed. Reg. at 56,398/2 (emphasis added). The Commission also nowhere determined whether the Rule would benefit investors, although it did say that the disclosures "do not appear to be ones that will necessarily generate measurable, direct economic benefits to investors or issuers." *Id.* at 56,398/2.

As noted, the Proposing Release had contained virtually no analysis of the Rule's economic effects. In the Adopting Release accompanying the final Rule, the Commission provided approximately 20 pages of discussion, charts, and formulae setting forth its economic analysis. But despite introducing these methodologies for the first time in the final Rule, the Commission declined to provide an opportunity to comment. *See* 77 Fed. Reg. at 56,397/2 & n.495.

With respect to the Rule's compliance costs, the Commission "assess[ed] the economic impact of the final rules" by deploying what it called "two different methods" to identify a "range" of possible costs. *Id.* at 56,408/1-2, 56,409/1. One "Method" identified costs as a percentage of the average assets of all 1,101 companies covered by the Rule; the other "Method" separately calculated the costs for small and large companies, also based on percentage of assets, and then aggregated the two.

These two "methods" were actually mathematically the same, since the average costs across all companies should equal the sum of the average costs for small and large companies (when individual firm compliance costs are assumed to equal a percentage of assets). The Commission evidently reached different results because it used different data sets to determine the average assets of companies subject to the Rule—Method 2 postulated that the affected companies only had 44.9% of the total assets assumed for purposes of Method 1. Thus, the cost estimates each differ by 44.9%, as illustrated by the following chart:

| Method | Average Assets Per Issuer | Initial Compliance Costs (upper range) | Initial Compliance Costs (lower range) | Ongoing Compliance Costs |
|---|---|---|---|---|
| **1** | $4,422,000,000 | $1,022,410,620 | $97,372,440 | $384,621,138 |
| **2** | $1,987,150,000[2] | $459,448,952 | $43,757,043 | $172,840,320 |
| **Percentage Difference** | **44.9%** | **44.9%** | **44.9%** | **44.9%** |

The Commission did not explain its basis for assuming different pools of assets in Methods 1 and 2. And, when the Commission wrote that "these two methods suggest[] that the ongoing compliance costs are likely to be between $200 million and $400 million," 77 Fed. Reg. at 56,411/3, this range merely reflected the "methods'" different assumptions about companies' total assets.

The public was not given an opportunity to comment on these "two methods."

The Commission, which conceded that its estimates suffered from "limitations," 77 Fed. Reg. at 56,410/1, relied exclusively on data provided by two large issuers, Barrick Gold and ExxonMobil, to determine the percentage of each affected company's assets that would be spent on compliance. Besides assuming that these two companies are representative of the industry, the Commission also assumed that "compliance costs are a constant fraction of total assets," i.e., that all costs are variable and none are fixed. *Id.* at 56,410/1. But Barrick Gold's own data contradicted that assumption: It anticipated spending $100,000 (or 20% of

---

2 This number is the sum of the average assets identified by the Commission as held by large and small issuers in Method 2: ($509,000,000*63%) + ($4,504,000,000* 37%). *See* 77 Fed. Reg. at 56,409/1-3.

total costs) on "initial IT/consulting and travel costs." *Id.* at 56,408/3. Some costs of implementing new IT systems are plainly "fixed," that is, would need to be borne equally by all companies.

With respect to indirect costs, the Commission said that commenters' concerns "appear warranted" that the Rule "could add billions of dollars of costs," and "have a significant impact on their profitability and competitive position," due to certain "host country laws." *Id.* at 56,412/1. However, while observing that at least 51 public companies did business in the four countries identified by commenters, the Commission purported to quantify the costs for only three of those companies, estimating the combined lost cash flow for those companies at approximately $12.5 billion. *See id.* at 56,411/3-56,412/3. Losses throughout industry, which the Commission did not even attempt to quantify, would be much higher—Royal Dutch Shell, for example, estimated that it alone stood to lose $20 billion in investments. JA 538.

**5. Commissioner Gallagher's Dissent.**

Commissioner Gallagher dissented. The Commission, he said, had erred in rejecting commenters' request for confidential submission of payment information, "a plain language reading of section [13(q)] that would minimize the competitive risk and lower the costs of [the] rule." Statement of Comm'r Gallagher (Aug. 22, 2012), *available at* http://www.sec.gov/news/speech/2012/spch082212dmg-

extraction.htm. Commissioner Gallagher criticized his colleagues for failing to meaningfully consider the prospect of "forc[ing] companies that file Form SD . . . to risk violating host country law," and for relying upon "[c]onclusory policy statements" to decline to exercise their exemptive authority. *Id.* The Commission had erred as well, he said, in "accept[ing], untested, the benefits Congress seeks as justifying whatever . . . burdens [the Commission] impose[d]" and failing to "evaluate the various ways [the Commission] could try to achieve any intended benefit." *Id.* Likewise, the Commission disregarded the "significant costs [to] issuers—and thereby shareholders," imposed by the Rule. *Id.*

That same day, Commissioners Gallagher and Paredes expressed similar concerns in dissenting from the Commission's adoption of the "conflict-minerals" rule, which implements Section 13(p) of the Exchange Act and appears to be the only near competitor to this Rule for the title of most costly rule in SEC history, according to the Commission's estimates. Conflict Minerals, 77 Fed. Reg. 56,274 (Sept. 12, 2012).[3] Commissioner Paredes, who had been recused from the "extractive industries" rulemaking, said the Commission's exemptive authority is "a distinct source of discretion that the Commission can avail itself of to fashion what it believes is the appropriate final rule." Statement of Comm'r Paredes

[3] The "conflict minerals" rule has also been challenged in this Court. *See Nat'l Ass'n of Mfrs. et al. v. SEC*, No. 12-1422 (petition filed Oct. 19, 2012).

(Aug. 22, 2012), *available at* http://www.sec.gov/news/speech/2012/spch082212tap-minerals.htm.

## STANDARD OF REVIEW

Under the Administrative Procedure Act, this Court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] . . . in excess of statutory jurisdiction." 5 U.S.C. § 706(2)(A) & (C). An agency is arbitrary and capricious if it "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or [if it] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*State Farm*).

During a rulemaking, an agency "must respond in a reasoned manner to [rulemaking comments] that raise significant problems." *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 550 (D.C. Cir. 2006) (internal quotation marks omitted). Agencies must also "consider significant alternatives to the course it ultimately chooses." *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000) (citing *State Farm*, 463 U.S. at 48-51).

## SUMMARY OF ARGUMENT

By a bare 2-1 majority, the Commission promulgated one of the most expensive rules in its history, requiring U.S. companies to publish confidential and sensitive commercial information that will cause the companies—and ultimately their investors—billions of dollars in competitive injuries, lost business opportunities, and compliance costs. Remarkably, the Commission adopted this Rule without determining that it would benefit investors or the citizens of other nations, and without therefore determining whether the Rule could be written differently to yield comparable benefits without such crushing costs.

As this Court repeatedly has admonished, the Commission is required to "do what it can to apprise itself" of the costs and benefits of a rule—and of the available alternatives—before saddling U.S. public companies with billions of dollars in regulatory burdens. *Chamber I*, 412 F.3d at 144. But instead, the Commission deployed a flawed cost-benefit analysis, made regulatory choices that exacerbated the competitive harm to U.S. companies, and failed to properly consider less-costly alternatives that would effectuate the Act's purposes.

In two key areas, the Commission mistakenly believed that Congress prohibited it from reducing the burdens on competition. First, the Commission believed that Section 13(q) mandated company-specific disclosures, but that is wrong. Second, the Commission declined to grant any exemption to the Rule's

disclosure requirements, on the ground that exemptions would be inconsistent with Section 13(q), but the Commission has express authority to grant exemptions when consistent "with the public interest or the protection of investors." 15 U.S.C. § 78*l*(h). In a third area, the Commission admitted it had discretion to define the term "project," but arbitrarily declined to do so, even while acknowledging that a clear definition would enhance the Rule's transparency goals and reduce companies' costs.

In all of these ways, the Commission acted arbitrarily and capriciously and violated the APA and the Exchange Act. In addition, by compelling public companies to engage in costly speech on a controversial matter that they do not wish to make, Section 13(q) and the Rule violate the First Amendment to the U.S. Constitution.

## STANDING

Petitioners are business associations. Their members include public companies that must comply with the disclosure requirements of the Rule. For example, API's members include Chevron, ExxonMobil, and Shell, all of which submitted comments detailing the Rule's costs to them. *See* API Member Companies, http://www.api.org/globalitems/ globalheaderpages/membership/api-member-companies.aspx (last visited Dec. 3, 2012).

Because Petitioners' members are "object[s] of the action" under review, there is "little question" about standing. *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (citation omitted); *see also Am. Library Ass'n v. FCC*, 401 F.3d 489, 491 (D.C. Cir. 2005) ("petitioners reasonably believed their standing [was] self-evident," because their members "indisputably will be directly affected by the . . . rule").

## ARGUMENT

### I. JURISDICTION PROPERLY LIES IN THIS COURT.

This Court has jurisdiction pursuant to Sections 25(a) and (b) of the Exchange Act. *See* 15 U.S.C. § 78y(a), (b).

"Absent a firm indication that Congress intended to locate initial APA review of agency action in the district courts," courts "will not presume that Congress intended to depart from the sound policy of placing initial APA review in the courts of appeals." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 745 (1985). That is because "[p]lacing initial review in the district court [has] the negative effect . . . of requiring duplication of the identical task in the district court and in the court of appeals; both courts are to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review." *Id.* at 744; *see also* Richard J. Pierce, *Administrative Law* § 18.2 (4th ed. 2002). This Court has repeatedly followed the approach of *Lorion*.

*See, e.g.*, *Nat'l Auto. Dealers Ass'n v. FTC*, 670 F.3d 268, 270 (D.C. Cir. 2012) (quoting *Lorion*, 470 U.S. at 737); *Exportal Ltda v. United States*, 902 F.2d 45, 49 (D.C. Cir. 1990); *see also NRDC v. Abraham*, 355 F.3d 179, 191-93 (2d Cir. 2004).

The default rule in *Lorion* requires the exercise of jurisdiction in this case.

*First*, Petitioners and the Commission agree that jurisdiction lies in this Court under Section 25(a), which provides judicial review in the D.C. Circuit for any "person aggrieved by a *final order* of the Commission entered pursuant to this chapter." 15 U.S.C. § 78y(a)(1) (emphasis added); *see also* Commission Response Brief (Oct. 23, 2012), Doc. 1401068. Courts have repeatedly construed provisions like Section 25(a), which provide for appellate court review of "orders," to encompass agency rules. *See, e.g.*, *United States v. Storer Broad. Co.*, 351 U.S. 192 (1956); *Inv. Co. Inst. v. Bd. of Governors of Fed. Reserve Sys.*, 551 F.2d 1270, 1276 (D.C. Cir. 1977).

To be sure, Section 25(a) exists alongside Section 25(b), which provides for review in the court of appeals of "rules" issued under certain specified subsections of the Act. At the time Section 25(b) was enacted in 1975, however, this Court drew a sharp distinction between judicial review of provisions aimed at "rules" and those aimed at "orders." *See United Gas Pipeline Co. v. FPC*, 181 F.2d 796 (D.C. Cir. 1950). In enacting Section 25(b), Congress sought to ensure that rules issued

under the new statutory authorities it was adding *could be* reviewed directly in courts of appeals. Subsequently, this Court abandoned its distinction between the reviewability of "rules" and "orders" in *Investment Company Institute*, overruling *United Gas Pipeline* and holding that the term "orders" in a judicial review provision should apply to "any agency action capable of review on the basis of the administrative record." *Inv. Co. Inst.*, 551 F.2d at 1278.

Congress has acquiesced in this interpretation for 35 years: While it has amended Section 25 twice, in 1986 and 1990, and amended other provisions of the Exchange Act numerous times, at no point has it modified the provision for judicial review of "orders." *See, e.g.*, *Cannon v. Univ. of Chi.*, 441 U.S. 677, 696-703 (1979) (history of congressional acquiescence may be considered in determining legislative intent). Therefore, the Court has jurisdiction over Petitioners' challenge, which is "capable of review on the basis of the administrative record."[4]

This Court has repeatedly followed the approach in *Investment Company Institute* when reviewing rules of the Commission. The Court took jurisdiction of a rulemaking challenge in *Business Roundtable v. SEC*, where the petitioners and

---

[4] This interpretation would not provide for immediate review of *all* rulemaking challenges, and thus, would not render Section 25(b) superfluous. For example, the *Investment Company Institute* definition of "orders" would not apply where a rulemaking challenge required fact-finding by the district court. *See, e.g.*, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

Commission agreed that Section 25(a) was a basis for jurisdiction. 647 F.3d 1144, 1146 (D.C. Cir. 2011). In *Chamber I*, 412 F.3d 133, and *Chamber of Commerce v. SEC*, 443 F.3d 890 (D.C. Cir. 2006) (*Chamber II*), this Court exercised original jurisdiction over a challenge to a Commission rule pursuant to Section 43(a) of the Investment Company Act, 15 U.S.C. § 80a-42(a), which refers only to "orders." And, in *American Equity Investment Life Insurance Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2010), this Court reviewed a Commission rule under Section 9(a) of the Securities Act of 1933, which authorizes actions by "[a]ny person aggrieved by an order of the Commission." 15 U.S.C. § 77i(a).

*Second*, the Commission has jurisdiction under Section 25(b) of the Act, which provides direct review in the court of appeals where "[a] person [is] adversely affected by a rule of the Commission promulgated pursuant to section [6, 9(h)(2), 11, 11A, ***15(c)(5) or (6)***, 15A, 17, 17A, or 19] of [the Act]." 15 U.S.C. § 78y(b).[5] In adopting the Rule, the Commission stated that it was acting "under the authority set forth in Sections 3(b), 12, 13, ***15,*** 23(a), and 36 [of] the Exchange Act." 77 Fed. Reg. at 56,417/3 (emphasis added). Although the Rule invokes Section 15 generally, without identifying specific subsections, *Lorion* makes clear that this Court must resolve that ambiguity in favor of jurisdiction. *See Exportal*,

---

[5] Sections 15(c)(5) and (c)(6) authorize the Commission to promulgate rules regulating certain activities of brokers and dealers. *See* 15 U.S.C. § 78o(c)(5), (6).

902 F.2d at 49 (where it is necessary for courts of appeals to "recur to rules of statutory construction" to determine jurisdiction, the presumption applies).[6]

## II. BOTH THE RULE AND SECTION 13(q) COMPEL SPEECH IN VIOLATION OF THE FIRST AMENDMENT.

The First Amendment protects the right "to speak and the right to refrain from speaking." *Wooley v. Maynard*, 430 U.S. at 705, 714 (1977). Section 13(q) and the Commission's Rule violate this constitutional proscription on compelled speech by forcing companies to engage in costly speech in order to "empower citizens of . . . resource-rich countries to hold their governments accountable for the wealth generated by those resources." 77 Fed. Reg. at 56,366/1. This speech is non-commercial in nature and, unlike other disclosures under the securities laws, is not necessary to protect investors.

The Rule and Section 13(q) thus regulate the content of speech in a manner that is not narrowly tailored to achieve a compelling government interest, and that meets no recognized exception to the First's Amendment clear prohibition on governmental regulation of speech. Both the Rule and Section 13(q) must be struck down.

---

[6] This Court also has jurisdiction over Petitioners' First Amendment challenge to Section 13(q) because a party seeking judicial review of agency action may "draw in[to] question the constitutionality of [the underlying statute]" in the same proceeding. *Flemming v. Nestor*, 363 U.S. 603, 607 (1960); *see also Time Warner Entm't Co. v. FCC*, 93 F.3d 957, 965 (D.C. Cir. 1996) (per curiam); *Preseault v. ICC*, 853 F.2d 145, 149 (2d Cir. 1988), *aff'd*, 494 U.S. 1 (1990).

### A. The Rule

By the Commission's own assessment, the Rule forces U.S. companies to divulge sensitive, confidential information that may cause them substantial economic harm so that citizens of foreign countries can hold their governments accountable for wealth obtained through the extraction of natural resources. Although Petitioners support transparency in the resource-extraction industry, "significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest." *Buckley v. Valeo*, 424 U.S. 1, 64 (1976) (per curiam). Rather, the government mandate must be *narrowly tailored* to promote a *compelling* government interest. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). If a less restrictive alternative would serve the government's purpose, it must be taken. *Id.*[7]

---

[7] Because the compelled speech at issue does not "propose[ ] a commercial transaction" and, indeed, is not part of any commercial transaction between covered entities and foreign companies, it is subject to strict scrutiny, rather than the intermediate scrutiny sometimes applied to commercial speech. *Cf. Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562 (1980) (internal quotation marks omitted). The speech also cannot be characterized as commercial disclosures calculated to ensure that consumers are not misled by other speech that the regulated entities already are making. *See Zauderer v. Office of Disciplinary Counsel of the Supreme Ct. of Ohio*, 471 U.S. 626, 650-51 (1985). Finally, Section 13(q) and the Rule do not regulate "[s]peech relating to the purchase and sale of securities," *SEC v. Wall Street Pub'g Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988), and do not represent an

The Rule cannot survive strict scrutiny. *First*, while the Rule's objectives are laudable, they do not rise to the level of a "compelling" state interest. They do not, for example, address "a threat to public safety and to the effective, free functioning of our national institutions." *Communist Party of the U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 97 (1961); *see also Playboy*, 529 U.S. at 822-23 (compelling state interest must relate to a "pervasive, nationwide problem"). Compelled disclosure may serve a compelling interest when necessary to prevent corruption or the appearance of corruption in federal elections, the Supreme Court has held, *Buckley*, 424 U.S. at 66-67, but "[t]he simple interest in providing voters with additional relevant information," such as the identity of an anonymous pamphleteer, "does not justify a [ ] requirement that a writer make statements or disclosures she would otherwise omit." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 348 (1995); *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 798 (1988) (state interest in "informing donors how the money they contribute is spent" not sufficiently "weighty" to justify compelled speech).

---

attempt by the Commission to "prevent investor misunderstanding," *id*. at 374 n.9, and therefore Petitioners' challenge is not subject to whatever relaxed standard might be thought to ordinarily apply to government regulation of securities. *Cf. id*. at 372-74.

Just as the "informational interest" of U.S. voters was "plainly insufficient to support the constitutionality of [the] disclosure requirement" in *McIntyre*, 514 U.S. at 349, so "empower[ing] citizens of . . . resource-rich countries" does not justify the constitutional intrusion occasioned here. 77 Fed. Reg. at 56,366/1. The government's interest in promoting truthful discourse is not sufficiently compelling to warrant abridgment of First Amendment rights. *See United States v. Alvarez*, 132 S. Ct. 2537, 2547-48 (2012) (plurality op.); *see also id.* at 2554 (Breyer, J., concurring). Indeed, the government's interest in the Rule's disclosures is insufficiently compelling for the additional reason that the Commission made no finding that the required disclosures would actually benefit foreign citizens by increasing the accountability of their governments. *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738-39 (2011) (limiting children's exposure to violence is insufficiently compelling to warrant regulation of violent video games, when State offered no evidence of a causal connection between video games and violence).

*Second*, the Rule violates the First Amendment because it is not narrowly tailored. Commenters identified numerous less burdensome means of furthering extractive-industry transparency. *See infra* at 46-62. Indeed, each of these alternatives already is deployed—albeit voluntarily—under the leading international initiative on resource-industry transparency, the EITI, which

Congress directed the Commission to follow when implementing Section 13(q). 15 U.S.C. § 78m(q)(1)(C)(ii), 78m(q)(2)(E).[8]

**B. Section 13(q)**

The Commission erroneously concluded that Section 13(q) itself requires companies to disclose payment information directly to the public. If that were true (it is not, see *infra* at 47-53), the statute would violate the First Amendment for the reasons identified above. But even interpreting the statute properly to require disclosure initially only to the Commission, strict scrutiny still applies and Section 13(q) violates the First Amendment because it compels burdensome speech intended for the public without advancing compelling governmental interests in the most narrowly-tailored manner possible.[9]

Section 13(q) is an unusual statutory requirement that compels corporations to speak not for purposes of facilitating the administration of any governmental program, but for the sake of the speech itself. Speech—and its effect on political

---

[8] The Rule would fail for the reasons stated above even under intermediate scrutiny, because it does not "directly advance" a substantial government interest and is more extensive than necessary to serve the Commission's stated purpose. *Cent. Hudson*, 447 U.S. at 564. Indeed, the Rule provides "only ineffective or remote support for the government's purpose." *Id.*

[9] In the alternative, if the Court finds that Section 13(q) can avoid constitutional infirmity if interpreted to require disclosure to the Commission alone (which then produces a public, anonymous, aggregated "compilation"), then the Court should apply the doctrine of constitutional avoidance to interpret the statute in that manner and strike the Rule down on that ground, and on the other grounds identified in this brief. *See Crowell v. Benson*, 285 U.S. 22, 62 (1932).

and social arrangements—*is* the government program. Thus, the Rule is different in kind from the "thousands of routine regulations" that require "disclosure of economically significant information designed to forward ordinary regulatory purposes." *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (Boudin, J., concurring). It does not concern a "form[ ] of disclosure the Government requires for its 'essential operations,'" *Full Value Advisors*, *LLC v. SEC*, 633 F.3d 1101, 1109 (D.C. Cir.), *cert. denied*, 131 S. Ct. 3003 (2011) (quoting *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 645 (1943) (Murphy, J., concurring)), such as tax information or a range of other information the government collects to discharge regulatory responsibilities.

Applying strict scrutiny, it is plain that Section 13(q) is not narrowly-tailored to further a compelling governmental interest. Providing citizens of foreign countries information they may use to exercise their political rights, while laudable, is not on par with governmental purposes the courts have found sufficiently compelling to justify forced speech. *See supra* at 34-35. Nor is Section 13(q) narrowly tailored to further the U.S. interest in influencing social and political conditions in other nations. There are a range of other means the government ordinarily deploys for those purposes, including diplomacy, foreign aid, and support for NGOs. In this case, one obvious and widely-admired

alternative is EITI, an international effort that Congress could have supported through a variety of less intrusive, less costly means.

The Rule and Section 13(q) both violate the First Amendment.

## III. THE COMMISSION IMPROPERLY FAILED TO DETERMINE THE RULE'S BENEFITS AND DRAMATICALLY UNDERESTIMATED ITS COSTS.

The Commission is required to consider its rules' effects on "investors" and on "efficiency, competition, and capital formation," and is prohibited from adopting rules that have an adverse effect on competition that is not "necessary" to furthering the purposes of the Act. 15 U.S.C. §§ 78c(f), 78w(a)(2), 80a-2(c). These statutory duties, which require the Commission "to do what it can to apprise itself—and hence the public and the Congress—of the economic consequences of a proposed regulation," *Chamber I*, 412 F.3d at 144, have caused this Court repeatedly to invalidate Commission rules that the Court determined were arbitrary, capricious, "opportunistic[]," "contradict[ory]," and even "unutterably mindless." *Business Roundtable*, 647 F.3d at 1148-49, 1156.

The Commission's errors in this rulemaking were even more costly and fundamental. Having previously based rules on exaggerated benefits and unacknowledged costs, the Commission, in a peculiar about-face, has adopted a rule with admittedly billions in costs and *no* determined benefits. It is axiomatic, however, that "[r]egulatory policies should be based on a careful assessment of the

likely consequences of regulation, including an effort to assess and balance both costs and benefits." Robert W. Hahn & Cass R. Sunstein, *A New Executive Order for Improving Federal Regulation? Deeper and Wider Cost-Benefit Analysis*, 150 U. Pa. L. Rev. 1489, 1542 (2002). An "empirically informed" regulation—such as the Exchange Act requires—considers whether "the benefits justify the costs, and if so, [whether] the agency [has] chosen the approach that maximizes net benefits." Cass R. Sunstein, *Empirically Informed Regulation*, 78 U. Chi. L. Rev. 1349, 1387 (2011).

The Commission failed to perform this most fundamental task of rulemaking. Perhaps it believed less was expected of it—administering a program to aid foreign peoples is not what the Commission "typically" does, it demurred when discussing the Rule's benefits. *See* 77 Fed. Reg. at 56,397/3. That is no excuse: Congress entrusted the Commission with administering the world's most ambitious extractive-industry disclosure initiative, with profound consequences for U.S. energy companies and their shareholders. The Commission had the same responsibility as in any other area to exercise the utmost expertise and vigilance with regard to the Rule's consequences and alternatives.

Perhaps the Commission believed as well that it had a relaxed obligation to assess its rule's consequences because Congress had *required* it to adopt a rule. That, also, is false: The Commission was required to satisfy *all* its statutory

responsibilities, including those that required it to consider effects on efficiency, competition, and capital formation, and that barred it from adopting unnecessarily anti-competitive rules.

### A. The Commission Failed To Determine The Rule's Benefits, And Whether Its Costs Are Warranted In Light Of Any Benefits.

In its Adopting Release, the Commission made no determination that the Rule would benefit investors or anyone else.

With regard to investors and public companies, the Commission found that Section 13(q)'s objectives "do not appear to be ones that will necessarily generate measureable, direct economic benefits to investors or issuers." 77 Fed. Reg. at 56,398/2. The Commission reported claims by certain *commenters* that the Rule could "materially and substantially improve investment decision making," but it stopped short of adopting those conclusions as its own. *Id.* (internal quotation marks omitted). As well it should, for the Commission knows it is preposterous to claim that a rule that forces companies to compromise confidential information and abandon lucrative oil fields is beneficial to shareholders. *See id.* at 56,398/2-99/1 & nn. 505, 507. Indeed, elsewhere the Commission expressly found that "the cost of compliance for this provision will be borne by the shareholders of the company thus potentially diverting capital away from other productive opportunities which may result in a loss of allocative efficiency." *Id.* at 56,403/2.

The Commission also offered only passing, indeterminate observations regarding the Rule's effectiveness in achieving the goal the Commission attributed to it: enabling "citizens of . . . resource-rich countries to hold their governments accountable for the wealth generated by those resources." *Id.* at 56,366/1. The Commission stated only, for example, that "enhanced government accountability" under the Rule "*may* result in social benefits that cannot be readily quantified with any precision." *Id.* at 56,398/2; *see also id.* at 56,403/2 (noting that disclosures "*are intended to* achieve social benefits") (emphasis added). The Commission did not consider *at all* the Rule's benefits in the handful of countries where it would impose the lion's share of costs.

This Rule thus rests on an even flimsier consideration of benefits and effects on efficiency, competition, and capital formation than the rules struck down in the *Chamber of Commerce* cases, *American Equity*, and *Business Roundtable*. In those cases, the Commission at least found "some intangible, or at least less readily quantifiable, benefits" associated with its rules, but "relied upon insufficient empirical data" or other flawed bases for concluding that the Rule would produce the claimed benefits. *Business Roundtable*, 647 F.3d at 1149-51 (insufficient for Commission to rely on "two relatively unpersuasive studies"); *see also Am. Equity*, 613 F.3d at 177-79. Here, the Commission's description of the Rule's possible benefits is even more vague and indeterminate than in *Business Roundtable*, but

unlike in that case, the Commission relied on *no* empirical studies in support of the Rule, and did not even conclude that the Rule would actually produce the benefits commenters claimed.

To be sure, the Commission was more forthcoming than in the past about its action's immense *costs*. But the Commission's obligation to consider the "economic consequences of a proposed regulation" (*Chamber I*, 412 F.3d at 144) is not satisfied by tallying up a rule's costs and handing companies a multi-billion dollar invoice, with no attempt to fashion the rule in light of both costs and benefits. At no point in the Adopting Release—not even when considering the features of the Rule that will prove especially costly—did the Commission analyze "whether the benefits expected from the standard bear a reasonable relationship to the costs imposed." *Am. Petroleum Inst. v. OSHA*, 581 F.2d 493, 503 (5th Cir. 1978), *aff'd sub nom. Indus. Union Dep't v. Am. Petroleum Inst.*, 448 U.S. 607 (1980). An economic analysis that does not determine whether the means chosen will produce the ends desired, or consider whether lower-cost options would be comparably effective, is arbitrary and capricious. *See Business Roundtable*, 647 F.3d at 1151 ("[T]his type of reasoning, which fails to view a cost at the margin, is illogical and, in an economic analysis, unacceptable.").

### B. The Commission Failed To Adequately Assess The Rule's Costs.

The Commission also vastly underestimated the Rule's costs and used flawed methodologies to extrapolate industry-wide estimates from a miniscule subset of companies.

With respect to compliance costs, the Commission used "two different methods" that in fact were not "different." 77 Fed. Reg. at 56,408/1-2; *supra* at 20-21. These "methods" ought to have yielded the same answer, and the only reason they did not is because the Commission made sharply different assumptions about the total assets owned by companies subject to the Rule. *See supra* at 21. One of these "Methods" must be incorrect, but it is impossible to know which without understanding how the Commission retrieved and aggregated the data used in both calculations.

Even putting aside these flawed calculations, it is clear the Commission dramatically underestimated the Rule's costs. In calculating initial compliance costs as a percentage of companies' total assets, the Commission acknowledged that "there may be substantial fixed costs to compliance that are underestimated by using a variable cost analysis." 77 Fed. Reg. at 56,410/1. It nevertheless made the extreme assumption that 100% of each company's costs were variable. *Id.* at 56,408/2-3. And it made this assumption despite the fact that Barrick Gold, whose data it used to calculate the "lower bound" of compliance costs, reported that 20%

of its costs would be on "initial IT/consulting and travel costs." *Id.* at 56,408/3. Plainly, at least some (if not all) of these initial costs are fixed and will have to be spent by each affected company; if the Commission had assumed that only 10% of these costs were fixed, it would have increased its lower-bound estimate by 46% (from $97,372,440 to $142,423,077). *See id.* at 56,409/1-3.

With respect to indirect costs, the Commission equivocated on what foreign governments prohibited, but ultimately found "warranted" commenters' concerns that "host country" prohibitions could cost companies "tens of billions of dollars of capital investments," *id.* at 56,402/1, 56,412/1—losses that would extend "well beyond resource extraction issuers" themselves. *Id.* at 56,402/3 (citing comment from API). Yet the Commission purported to quantify costs for *only three issuers* affected by the Rule (at a total of $12.5 billion), even though it knew that at least 51 companies did business in the four countries identified by commenters, and knew the amount of at least 11 companies' assets in those countries. *See id.* at 56,411-56,412. In light of those facts, and the fact that one company alone estimated that it had more than $20 billion in investments in Qatar and China, JA 538, the Commission's $12.5 billion estimate grossly understates the Rule's true costs. The Commission committed clear error by failing to estimate the industry-

wide impact of the Rule on companies doing business in foreign countries that prohibit disclosure.[10]

With respect to other significant acknowledged costs, the Commission ventured no estimate at all. For example, it declined to provide an exemption for "commercially sensitive information," 77 Fed. Reg. at 56,368/1, 56,373/1, but undertook no analysis of the economic losses associated with the public availability of that information. *See also id.* at 56,410/1 n.620 (noting, without providing estimate, potential "costs of decreased ability to bid for projects in such countries in the future, or costs of decreased competitiveness with respect to non-reporting entities").

The Commission has "failed once again . . . adequately to assess the economic effects of a new rule." *Business Roundtable*, 647 F.3d at 1148. And because it failed to come to grips with its Rule's costs and benefits—its pros and

---

10 Recently, in denying Petitioners' request for a stay, the Commission questioned whether "*any* foreign government currently prohibits the Rule's disclosures," and suggested that Petitioners' evidence on this point was "unpersuasive." Order Denying Stay at 7 (emphasis added). That conflicts with the Adopting Release's statements that commenters' concerns over billions in losses "appear warranted," and that the foreign law prohibitions "could be very costly." 77 Fed. Reg. at 56,412/1, 77 Fed. Reg. at 56,413/1. And, of course, to the extent the Commission intends to impeach the only cost estimates it offered, that will present additional serious questions about the thoroughness of its economic analysis.

cons—the Commission was incapable of adequately assessing available regulatory alternatives, as shown below.

## IV. THE COMMISSION IMPROPERLY DECLINED TO SOLICIT ADDITIONAL COMMENT AFTER INTRODUCING ITS COST-BENEFIT ANALYSIS FOR THE FIRST TIME IN THE FINAL RULE.

Under the APA, "the most critical factual material that is used to support the agency's position on review . . . [must be] made public in the [rulemaking] proceeding and exposed to refutation." *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984). Thus, when an agency relies on new methodologies or previously undisclosed studies in a cost-benefit analysis of a rule, it must provide additional opportunity to comment. *See Chamber II*, 443 F.3d at 905; *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 193 (D.C. Cir. 2007).

Here, the Commission acknowledged the Rule's multi-billion dollar costs for the first time in the Adopting Release, where it relied on flawed cost methodologies, and extra-record data from a different industry—a survey of "fire sale" prices of airplanes. 77 Fed. Reg. at 56,412/2. The public was given no opportunity to comment on this new evidence and dramatic departure from the Proposing Release. This violated the APA. *See Chamber II*, 443 F.3d at 904-05.

Petitioners suffered prejudice from the denial of additional comment because a proper cost-benefit analysis would have shown the costs to be significantly

higher than the Commission estimated, *supra* at 42-44, making it even more imperative that the Commission make the discretionary decisions addressed below that would have reduced the Rule's costs and diminished its adverse effects on competition. *See Chamber II*, 443 F.3d at 904 (failure to solicit comment "cannot be considered harmless if there is any uncertainty at all as to the effect of that failure").

The Commission violated the APA by not allowing comment on its new, flawed analyses.

## V. THE COMMISSION ARBITRARILY REJECTED ALTERNATIVES THAT WOULD HAVE SIGNIFICANTLY REDUCED THE RULE'S COSTS FOR COMPANIES AND INVESTORS.

The Commission is prohibited from adopting "any . . . rule or regulation which would impose a burden on competition not necessary or appropriate in furtherance of the purposes of" the Exchange Act, 15 U.S.C. § 78w(a)(2), and "shall . . . consider, in addition to the protection of investors," whether its rules "will promote efficiency, competition, and capital formation, *id.* § 78c(f). The Commission violated these statutory responsibilities and the dictates of reasoned decisionmaking by repeatedly spurning regulatory choices that would have reduced the adverse effects for investors and industry of one of the most costly rules in SEC history, without causing any identified reduction in regulatory benefits. The Rule must be vacated.

### A. The Commission Erroneously Refused To Permit Confidential Submission Of Company-Specific Data

The Commission imposed a public, company-specific disclosure requirement that it erroneously concluded was compelled by statutory text. In fact, Congress had not "directly spoken to the precise question," *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842 (1984), and the Commission relied on a series of mistaken inferences to impose a public disclosure requirement that greatly increased the Rule's costs without any identified benefit.[11]

Section 13(q) contemplates a two-step process for disclosure of information. First, companies must provide the Commission an "annual report" that includes "the type and total amount of . . . payments [made to the U.S. and foreign governments] for each project" relating to the "commercial development of oil, natural gas, or minerals," as well as the "type and total amount of such payments made to each government." 15 U.S.C. § 78m(q)(2)(A). Then, as described in a separate section entitled "Public availability of information," the Commission shall, "[t]o the extent practicable," "make available online, to the public, a compilation of the information required to be submitted under the rules issued under paragraph (2)(A)." *Id.* § 78m(q)(3)(A).

---

[11] Because the Commission acted pursuant to what it mistakenly believed to be a clear statutory command, its interpretation of the statute receives no deference. *See, e.g.*, *Arizona v. Thompson*, 281 F.3d 248, 259 (D.C. Cir. 2002); *Am. Petroleum Inst. v. EPA*, 906 F.2d 729, 741 (D.C. Cir. 1990) (per curiam).

The requirements in Section 13(q) thus were properly satisfied by a rule requiring companies to provide an "annual report" confidentially to the Commission, and the Commission then making publicly available—"to the extent practicable"—an aggregated "compilation" of the companies' payment information. This two-step process is consistent with practice under the EITI, which Congress expressly identified as a model for Section 13(q). *Id.* § 78m(q)(1)I(ii), (q)(2)I, and *supra* at 7-8. And, such a two-step process—with confidential submission to the Commission—would have reflected the differences between Section 13(q), the prior "extractive industries" legislation that died in Congress, and the neighboring "conflicts minerals" provision enacted at the same time in the Dodd-Frank Act. The earlier legislation expressly required reports to be publicly filed via the SEC's online "EDGAR system." *See supra* at 7. Section 13(q) does not. And the conflict-minerals provision has a subsection about public disclosure that is titled almost identically to Section 13(q)'s—"Information available to the public"—but that subsection requires each covered *company* to "make available to the public on the Internet website of such person the information disclosed by such person" under that section. 15 U.S.C. § 78m(p)(1)I. By contrast, Section 13(q) places that publication responsibility on the SEC.

In nonetheless concluding that "Section 13(q) *requires* resource extraction issuers to provide the payment disclosure publicly," 77 Fed. Reg. at 56,401/2

(emphasis added), the Commission reasoned, *first*, that the statute's reference to companies providing "disclosure[s]" and "reports" mandated *public* disclosure. *Id.* at 56,391/2. However, Section 13(q) addresses the "*Public* availability of information" in a separate subsection (15 U.S.C. § 78m(q)(3) (emphasis added)) that appears after the requirement for companies to submit a "report" (*id.* § 78m(q)(2)). Moreover, the EITI uses the very same terms to refer to information that companies provide confidentially to the "reconciler," before it is aggregated and made public. *See, e.g.*, EITI Rules, Table of Contents, § 3 (2011), *available at* http://eiti.org/files/2011-11-01_2011_EITI_RULES.pdf (separately identifying requirements for "disclosure" to the reconciler and "dissemination" to the public); *id.* § 3.2(10) (referring to information "disclosed" by the company to the reconciler); *id.* § 3.2(12) (referring to "company reports" given confidentially to the reconciler). And the Commission's own regulations enable companies to seek confidential treatment of sensitive commercial information in a "report" that the Commission would otherwise publicly "disclos[e]." 17 C.F.R. § 240.24b-2(a); *see also id.* § 200.83 (person may seek confidential treatment of any "report" not covered by 17 C.F.R. § 240.24b-2).

*Second*, the Commission required public filing on the theory that FOIA "might" require public disclosure in any event. 77 Fed. Reg. at 56,401/2. Idle speculation is not a proper basis for multi-billion dollar regulatory decisions; the

Commission was obligated to determine "as best it can" whether its surmise about FOIA was correct. *Chamber I*, 412 F.3d at 143. And in fact, the Commission's speculation was plainly wrong: Its own rules permit confidential treatment for trade secrets and sensitive commercial or financial information, consistent with FOIA Exemption 4. *See supra* at 14; *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 306 (D.C. Cir. 1999) (prices under government contract confidential under FOIA where disclosure would "permit [requester's] commercial customers to bargain down . . . its prices more effectively, and . . . help its . . . competitors to underbid it").

*Third*, the Commission observed that companies were required to submit their reports in an interactive data format, which "suggests that Congress intended for the information to be available for public analysis." 77 Fed. Reg. at 56,391/1. S]uggest[ions]" about what Congress "intended" are not a clear statutory command that speaks "directly . . . to the precise question at issue." *Chevron*, 467 U.S. at 842. Elsewhere, moreover, the Commission has noted that receiving information in an interactive format facilitates performance of its own responsibilities; there is nothing about the format that mandates public disclosure. *See* Final Rule, Interactive Data to Improve Financial Reporting, 74 Fed. Reg. 6,776, 6,793 (Feb. 10, 2009) ("The availability of interactive data . . . may also enhance [the Commission's] review of company filings."). Congress may also have believed

that if companies submitted data in interactive formats, it would be easier for the Commission to post aggregated information in a similar format. Yet in its rulemaking, the Commission gave no separate consideration at all to "the content, form, or frequency of any . . . compilation" of data, even though Congress directed it to publish a "compilation" if practicable. 77 Fed. Reg. at 56,394/3.

*Fourth*, the Commission reasoned that its approach was compelled by the paragraph in Section 13(q) which states that the Commission is to publish a "compilation" "[t]o the extent practicable," and then adds: "Nothing in this paragraph shall require the Commission to make available online information *other than the information required to be submitted under the [Commission's] rules*." 15 U.S.C. § 78m(q)(3) (emphasis added); 77 Fed. Reg. at 56,391/2. This sub-clause *protects* U.S. companies by making clear that the Commission is not required to disclose anything beyond what it collects under Section 13(q). It does not, however, address the *form or manner* in which the submitted information is to be published. That is addressed in the preceding subparagraph, which says the information is to be published in a "compilation," and only "[t]o the extent practicable." 15 U.S.C. § 78m(q)(3)(A). A sub-clause saying that the "compilation" paragraph cannot be interpreted to require additional publication may not be wielded by the Commission to accomplish that very thing. Indeed, the

sub-clause does not speak at all to how *issuers* are to provide information; it only addresses the second step in Section 13(q)'s two-step process.

*Finally*, the Commission erred in interpreting Section 13(q) without giving any weight to the markedly different disclosure language of the conflict minerals provision, and by ignoring the sub-title of the paragraph which links the "Public Availability of Information" to the Commission's compilation, not to companies' reports. The Commission ought to have considered that "heading of [the] section" to "resol[ve any] doubt about statutory meaning." *Friedman v. Sebelius*, 686 F.3d 813, 821 (D.C. Cir. 2012) (internal quotation marks omitted). And "where [Congress] uses different language in different provisions of the same statute, [this Court] must give effect to those differences." *Ford v. Mabus*, 629 F.3d 198, 206 (D.C. Cir. 2010).

For all of these reasons, it was arbitrary and capricious for the Commission to declare that it would follow EITI except where Section 13(q) "clearly deviate[d]," 77 Fed. Reg. at 56,367/3, but then to require publication of company-specific information in a manner that significantly increased companies' costs and the intrusion on First Amendment rights, without *any* benefit identified by the Commission.

### B. The Commission Mistakenly Refused To Grant An Exemption Where The Required Disclosures Would Conflict With The Requirements Or Contracts Of Foreign Governments

When a regulatory agency finds itself imposing billions of dollars in costs with no clear benefit, it should use all available means to reduce that burden. Congress has vested the Commission with special authority in that regard: It may exempt issuers from requirements of Section 13 when doing so is consistent "with the public interest or the protection of investors." 15 U.S.C. § 78*l*(h).

The Commission may use this "exemptive authority" to reduce the burden of a statutory provision even if the purpose of that provision will, as a result, be achieved less fully. Thus, in *Schiller v. Tower Semiconductor, Ltd.*, 449 F.3d 286 (2d Cir. 2006), the plaintiff shareholder argued that the Commission could only grant an exemption if it "does not decrease the level of protection afforded investors in the absence of *any* exemptions." *Id.* at 296. The Second Circuit disagreed, holding that plaintiff's interpretation "finds support in neither the text nor in basic principles of logic," and would "substantially curtail, if not completely eviscerate, the Commission's exemptive authority." *Id.* at 296-97. Rather, the court concluded, the Commission could grant an exemption so long as it "determined that the exemption serves the public interest while at the same time leaving in place *adequate* investor protections." *Id.* at 297 (emphasis added).

In the rulemaking here, the Commission essentially concluded that it could save companies and investors billions of dollars by providing an exemption with regard to just four countries: Angola, Cameroon, China, and Qatar. *See* 77 Fed. Reg. at 56,412/3. The Commission nonetheless refused any exemption for when disclosure is prohibited by foreign governments or by the terms of foreign commercial contracts.

The Commission said that an exemption "would be inconsistent with Section 13(q) and would undermine Congress' intent to promote international transparency efforts." 77 Fed. Reg. at 56,413/1. As an initial matter, that rationale is inconsistent with the Commission's refusal to define "project," a decision that it admitted could impair "transparency." *Infra* at 59-62. Moreover, the reasoning was specious: It is tautological that an exemption from a statute's requirements will pose some "inconsistency" with those requirements; an exemption will invariably "promote" the provision's objectives some degree less than if no exemption were allowed, as *Schiller* recognized. Congress nonetheless gave the Commission authority to grant exemptions from the requirements of Section 13—including Section 13(q)—if consistent "with the public interest or the protection of investors," 15 U.S.C. § 78*l*(h), an authority Congress is presumed to have known when it enacted Section 13(q). *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (courts must "interpret [a] statute as a symmetrical and

coherent regulatory scheme and fit, if possible, all parts into an harmonious whole") (internal quotation marks and citation omitted). To deny an exemption because, in essence, it's an exemption, begs the question, is arbitrary and capricious, and fails the Commission's responsibility to consider whether an exemption will further "the public interest or the protection of investors." 15 U.S.C. § 78*l*(h).

The Commission's rationale for denying an exemption is also arbitrarily inconsistent with its past treatment of its exemptive authority, including its position in *Schiller* that exemptions can be appropriate even when they "render[ ] protections that would otherwise be in force inapplicable with respect to a particular class of securities or issuers." *Schiller*, 449 F.3d at 296; *see also id.*, No. 04-5295, SEC Letter Brief 10 (Jan. 10, 2006).

The Commission has a history of providing exemptions from statutory requirements that conflict with companies' obligations under foreign law: *Schiller* concerned a rule promulgated in 1935—shortly after the Exchange Act was passed—to relax the statutory disclosure requirements for foreign companies "in order to remain consistent with, *inter alia*, their own country's disclosure rules." *De Vries v. Tower Semiconductor Ltd.*, No. 03-civ-4999, 2004 U.S. Dist. LEXIS 29921, at *13 (S.D.N.Y. Aug. 19, 2004), *aff'd sub nom. Schiller*, 449 F.3d 286. The Commission has granted similar exemptions for foreign broker-dealers and for

attorneys licensed in foreign countries who practice before the Commission, and has noted the need for case-by-case evaluation of requests for exemptions in light of possible conflicts with foreign law. *See supra* at 15. In this rulemaking the Commission did not even acknowledge this precedent, much less distinguish it and explain why the exemption requested under the Rule must be handled differently.

The Commission also gave no weight to the principle that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Charming Betsy*, 6 U.S. (2 Cranch) at 118. "This rule of construction applies not only to courts, but also to Executive Branch officials and regulatory bodies in interpreting the authority granted to them in legislation." Restatement (Third) of Foreign Relations Law § 403 cmt. g. The President recently issued an Executive Order directing agencies to eliminate "differences between the regulatory approaches of U.S. agencies and those of their foreign counterparts [that] might not be necessary and might impair the ability of American businesses to export and compete internationally." Exec. Order No. 13,609, Promoting International Regulatory Cooperation, 77 Fed. Reg. 26,413, 26,413 (May 1, 2012). The Commission acknowledged that this Order requires agencies to accommodate foreign law "'to the extent feasible, appropriate, and consistent with law," 77 Fed. Reg. at 56,370/3 n.56, but concluded—mistakenly—that doing so was impossible here.

The Commission also rejected an exemption for foreign law because, it said, this would "undermine the statute" by encouraging additional countries to prohibit the Rule's disclosures. 77 Fed. Reg. at 56,372/3-73/1. But the Commission failed to square this prediction with its observation elsewhere in the Adopting Release that the "widening" global influence of EITI could make other countries *more* receptive to disclosure requirements. *Id.* at 56,413/1-2. Moreover, some commenters had suggested limiting the exemption to countries that currently prohibit disclosure, and the Commission raised that possibility when it proposed the Rule. *Supra* at 16-17. That was a full answer to concerns about "encouraging" other countries to bar disclosure, yet in violation of the most basic rulemaking requirements, in the Adopting Release the Commission simply ignored the alternative. *Cf. State Farm*, 463 U.S. at 48.

The Commission's (incomplete) analysis of potential losses due to foreign law estimated a combined lost cash flow of approximately $12.5 billion in just three countries. *See* 77 Fed. Reg. at 56,411-56,412. Having determined that billions in costs were associated with just a handful of countries, it was incumbent on the Commission to consider whether immediate coverage of those countries was so essential to Section 13(q)—and to the furtherance of U.S. competitiveness and the purposes of the Exchange Act as a whole—that no exemption could be provided. The Commission's consideration of this question would have included,

among other things, an assessment of the information on government revenues currently available in those countries; whether the people of those countries realize the benefits of extractive industries revenues to a lesser degree than the people of other countries; and the extent to which the citizens of Angola, Cameroon, China, and Qatar will be able to use the additional information made available under the Rule to change those governmental practices. The Commission's total failure to engage in any country-specific discussion, even after determining that most of the Rule's costs were associated with just a few countries, is a sharp contrast with the EITI, whose work is characterized by a sophisticated, nuanced assessment of the varying conditions and needs in "host" countries. *See, e.g.*, "EITI Report 2011: Azerbaijan," *available at* http://eiti.org/files/Azerbaijan-2011-EITI-Report.pdf.

These fundamental questions were neither asked nor answered in this rulemaking. Perhaps that's because Section 13(q) is outside the SEC's "comfort zone." It does not "typically" regulate in this area, the Commission lamented. 77 Fed. Reg. at 56,397/3. That is no excuse: The Commission is responsible for the most costly extractive industries program in the world, and is required to bring all appropriate expertise to bear; to give full consideration to *all* of it statutory responsibilities; and to exercise its discretionary authority "in a well-reasoned, consistent, and evenhanded manner." *Greyhound Corp. v. ICC*, 668 F.2d 1354,

1359 (D.C. Cir. 1981). Its consideration of its exemptive authority—a matter on which it invited comment—was arbitrary and capricious.

### C. By Refusing To Define The Critical Statutory Term "Project," The Commission Abdicated Its Responsibilities And Needlessly Increased The Rule's Costs.

During the rulemaking, commenters explained that if the Commission defined "project" broadly, it would reduce regulatory uncertainty, save companies "tens of millions of dollars in compliance costs," and prevent a "competitive imbalance" with non-listed companies caused by "hav[ing] to disclose disaggregated price and cost information." 77 Fed. Reg. at 56,384/1 (collecting comments). Indeed, the Commission itself recognized that failing to define "project" could increase costs for companies that interpret the term to require "more granular information," and could even reduce the transparency benefits of the Rule by reducing the comparability of company disclosures. *Id.* at 56,406/1. The Commission nonetheless refused to define the term "project."

In doing so, the Commission contradicted itself and offered opaque rationales. "Project," it said, is a commonly used term whose meaning "is generally understood by resource extraction issuers and investors." 77 Fed. Reg. at 56,406/2. But in the same sentence, the Commission said that there "does not appear to be a single agreed-upon application [of the term] in the industry." *Id.* at 56,385/2. Those statements are contradictory, and neither justified leaving

"project" undefined: When a term's meaning is "generally understood," there is no basis to reject commenters' request that the meaning be set forth in the rule. And when a critical term has no "agreed-upon" meaning, a regulatory definition is imperative.

A benefit of omitting a definition, the Commission said, was that it would give businesses "flexibility" to adapt the term to different contexts. *See id.* at 56,385/2, 56,406/2. That further contradicts the Commission's claim that "project" has a "generally understood" meaning. Moreover, the assurance of "flexibility" is cold comfort to issuers, who must follow the law on penalty of prosecution and must expect that Commission staff will develop their own views of what constitutes a "project" and will require companies to adhere to that definition, rather than defining a key statutory term as they wish. Finally, the Commission's claim that omitting a definition provides beneficial "flexibility" conflicts with its position in another recent rulemaking, where it claimed that *defining* a statutory term was more beneficial, because it provided "clarity" to business which promoted efficiency, competition, and capital formation. *See Am. Equity*, 613 F.3d at 177-78.

The Commission fared no better in explaining why it rejected the definition of "project" proposed by API and others, namely, "technical and commercial activities carried out within a particular geologic basin or province to explore for,

develop and produce oil, natural gas or minerals." JA 149, 252. API explained that under this definition, companies' reports would be less likely to disclose commercially-sensitive contract terms, which would "help reduce the potential harm to companies and their shareholders from the disclosure of commercially sensitive information, violation of local laws, or breach of contract." JA 149.

In rejecting that definition, the Commission reasoned, first, that basins or provinces can span more than one country, and therefore defining the term "project" as API and others proposed "would be counter to the country-by-country reporting required by Section 13(q)." 77 Fed. Reg. at 56,406/2. That makes no sense. Section 13(q) requires reporting by both project and country: If a project spanned two countries, a company would report the payment each country received in connection with the project. Second, the Commission noted that the definition "may" not reflect public companies' contractual relationships with foreign governments—a Delphic statement whose meaning, and relevance, the Commission failed to explain. *Id.*

Federal agencies "may not shirk a statutory responsibility simply because it may be difficult," *NetCoalition v. SEC*, 615 F.3d 525, 539 (D.C. Cir. 2010), nor "promulgate vague and open-ended regulations that they can later interpret as they see fit." *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2168 (2012); *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 585 (D.C. Cir. 1997)

(“It is certainly not open to an agency to promulgate mush and then give it concrete form only through subsequent less formal ‘interpretations.’”). In refusing to define project, the Commission committed both those errors, and arbitrarily rejected an opportunity to reduce this Rule’s intolerably high costs.

## VI. THE RULE’S DEFICIENCIES REQUIRE VACATUR

This Court “shall” vacate agency action when it is found inconsistent with the APA. 5 U.S.C. § 706(2)(A); *NRDC v. EPA*, 489 F.3d 1250, 1262 (D.C. Cir. 2007) (Randolph, J., concurring).

This Court occasionally determines whether to vacate by considering “the seriousness of the . . . deficiencies” of the agency’s action and the “the disruptive consequences” of vacatur. *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150 (D.C. Cir. 1993) (internal quotation marks omitted). The deficiencies discussed above go to the heart of the Rule, whereas factors that have caused this Court to remand without vacatur in other cases are absent: (1) No company has yet been required to make any disclosures, *Am. Equity*, 613 F.3d at 179; (2) the regulatory “egg has [not] been scrambled” and vacatur will maintain “the status quo ante,” *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 756 (D.C. Cir. 2002) (internal quotation marks omitted); (3) vacatur will not forfeit funds that the government could not recoup later, *Heartland Reg’l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009); and (4) public health and safety are not threatened, *NRDC*, 489 F.3d at 1265-67

(Rogers, J., concurring in part and dissenting in part). Moreover, vacatur is essential to protecting Petitioners' First Amendment interests.

## CONCLUSION

For the foregoing reasons, Petitioners request that their petition for review be granted, that the Extractive Industries Rule be vacated, and that Section 13(q) be struck down as a violation of the First Amendment.

Dated: December 3, 2012

Respectfully submitted,

*Of Counsel*
Harry M. Ng
Peter C. Tolsdorf
American Petroleum Institute
1220 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 682-8500
*Counsel for Petitioner American Petroleum Institute*

*Of Counsel*
Robin S. Conrad
Rachel Brand
National Chamber Litigation Center, Inc.
1615 H Street, N.W.
Washington, D.C. 20062
Telephone: (202) 463-5337
*Counsel for Petitioner Chamber of Commerce of the United States of America*

/s/ Eugene Scalia
Eugene Scalia
*Counsel of Record*
Thomas M. Johnson, Jr.
Ashley S. Boizelle
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
EScalia@gibsondunn.com
*Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7) because this brief contains 13,972 words, as determined by the word-count function of Microsoft Word 2003, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14-point Times New Roman font.

/s/ Eugene Scalia
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
(202) 955-8500
escalia@gibsondunn.com

# ADDENDUM

## TABLE OF CONTENTS


Page

Final Rule

Disclosure of Payments by Resource Extraction Issuers, Final Rule, 77 Fed. Reg. 56,365 (Sept. 12, 2012) .......... A-1

Pertinent Federal Statutory Provisions

15 U.S.C. § 78c(f) .......... A-56

15 U.S.C. § 78l(h) .......... A-57

15 U.S.C. § 78m(p) .......... A-58

15 U.S.C. § 78m(q) .......... A-61

15 U.S.C. § 78mm .......... A-65

15 U.S.C. § 78w(a)(2) .......... A-67

15 U.S.C. § 80a–2(c) .......... A-68

Pertinent Federal Regulations

17 C.F.R. § 240.24b–2 .......... A-69

sooner than eight months after the effective date of the acquisition.

(4) A registrant is not required to provide any information regarding its conflict minerals that, prior to January 31, 2013, are located outside of the supply chain, as defined by paragraph (d)(7) of this item.

(5) A registrant must provide its required conflict minerals information for the calendar year in which the manufacture of a product that contains any conflict minerals necessary to the functionality or production of that product is completed, irrespective of whether the registrant manufactures the product or contracts to have the product manufactured.

**Section 2—Exhibits**

**Item 2.01 Exhibits**

List below the following exhibit filed as part of this report.

Exhibit 1.01—Conflict Minerals Report as required by Items 1.01 and 1.02 of this Form.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the duly authorized undersigned.

____________________________________

(Registrant)

____________________________________

By (Signature and Title)*

____________________________________

(Date)

* Print name and title of the registrant's signing executive officer under his or her signature.

* * * * *

Dated: August 22, 2012.

By the Commission.

**Elizabeth M. Murphy,**

*Secretary.*

[FR Doc. 2012–21153 Filed 9–11–12; 8:45 am]

**BILLING CODE 8011–01–P**

---

## SECURITIES AND EXCHANGE COMMISSION

### 17 CFR Parts 240 and 249

**[Release No. 34–67717; File No. S7–42–10]**

**RIN 3235–AK85**

## Disclosure of Payments by Resource Extraction Issuers

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule.

**SUMMARY:** We are adopting new rules and an amendment to a new form pursuant to Section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act relating to disclosure of payments by resource extraction issuers. Section 1504 added Section 13(q) to the Securities Exchange Act of 1934, which requires the Commission to issue rules requiring resource extraction issuers to include in an annual report information relating to any payment made by the issuer, a subsidiary of the issuer, or an entity under the control of the issuer, to a foreign government or the Federal Government for the purpose of the commercial development of oil, natural gas, or minerals. Section 13(q) requires a resource extraction issuer to provide information about the type and total amount of such payments made for each project related to the commercial development of oil, natural gas, or minerals, and the type and total amount of payments made to each government. In addition, Section 13(q) requires a resource extraction issuer to provide information regarding those payments in an interactive data format.

**DATES:** *Effective date:* November 13, 2012.

*Compliance date:* A resource extraction issuer must comply with the new rules and form for fiscal years ending after September 30, 2013. For the first report filed for fiscal years ending after September 30, 2013, a resource extraction issuer may provide a partial year report if the issuer's fiscal year began before September 30, 2013. The issuer will be required to provide a report for the period beginning October 1, 2013 through the end of its fiscal year. For any fiscal year beginning on or after September 30, 2013, a resource extraction issuer will be required to file a report disclosing payments for the full fiscal year.

**FOR FURTHER INFORMATION CONTACT:** Tamara Brightwell, Senior Special Counsel, Division of Corporation Finance, Elliot Staffin, Special Counsel, Office of International Corporate Finance, Division of Corporation Finance, or Eduardo Aleman, Special Counsel, Office of Rulemaking, Division of Corporation Finance, at (202) 551–3290, U.S. Securities and Exchange Commission, 100 F Street NE., Washington, DC 20549–4553.

**SUPPLEMENTARY INFORMATION:** We are adopting new Rule 13q–1 [1] and an amendment to new Form SD [2] under the Securities Exchange Act of 1934 ("Exchange Act").[3]

[1] 17 CFR 240.13q–1.

[2] 17 CFR 249.448.

[3] 15 U.S.C. 78a *et seq.*

**Table of Contents**

I. Background
II. Final Rules Implementing Section 13(q)
A. Summary of the Final Rules
B. Definition of "Resource Extraction Issuer" and Application of the Disclosure Requirements
1. Proposed Rules
2. Comments on the Proposed Rules
3. Final Rules
C. Definition of "Commercial Development of Oil, Natural Gas, or Minerals"
1. Proposed Rules
2. Comments on the Proposed Rules
3. Final Rules
D. Definition of "Payment"
1. Types of Payments
2. The "Not De Minimis" Requirement
3. The Requirement To Provide Disclosure for "Each Project"
4. Payments by "a Subsidiary * * * or an Entity Under the Control of * * *"
E. Definition of "foreign government"
1. Proposed Rules
2. Comments on the Proposed Rules
3. Final Rules
F. Disclosure Required and Form of Disclosure
1. Annual Report Requirement
2. Exhibits and Interactive Data Format Requirements
3. Treatment for Purposes of Securities Act and Exchange Act
G. Effective Date
1. Proposed Rules
2. Comments on the Proposed Rules
3. Final Rules
III. Economic Analysis
A. Introduction
B. Benefits and Costs Resulting From the Mandatory Reporting Requirement
1. Benefits
2. Costs
C. Benefits and Costs Resulting From Commission's Exercise of Discretion
1. Definition of "Commercial Development of Oil, Natural Gas, or Minerals"
2. Types of Payments
3. Definition of "Not De Minimis"
4. Definition of "Project"
5. Annual Report Requirement
6. Exhibit and Interactive Data Requirement
D. Quantified Assessment of Overall Economic Effects
IV. Paperwork Reduction Act
A. Background
B. Summary of the Comment Letters
C. Revisions to PRA Reporting and Cost Burden Estimates
D. Revised PRA Estimate
V. Final Regulatory Flexibility Act Analysis
A. Reasons for, and Objectives of, the Final Rules
B. Significant Issues Raised by Public Comments
C. Small Entities Subject to the Final Rules
D. Reporting, Recordkeeping, and Other Compliance Requirements
E. Agency Action To Minimize Effect on Small Entities
VI. Statutory Authority and Text of Final Rule and Form Amendments

## I. Background

On December 15, 2010, we proposed rule and form amendments [4] under the Exchange Act to implement Section 13(q) of the Exchange Act, which was added by Section 1504 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (''the Act'').[5] Section 13(q) requires the Commission to ''issue final rules that require each resource extraction issuer to include in an annual report of the resource extraction issuer information relating to any payment made by the resource extraction issuer, a subsidiary of the resource extraction issuer, or an entity under the control of the resource extraction issuer to a foreign government or the Federal Government for the purpose of the commercial development of oil, natural gas, or minerals, including—(i) the type and total amount of such payments made for each project of the resource extraction issuer relating to the commercial development of oil, natural gas, or minerals, and (ii) the type and total amount of such payments made to each government.'' [6]

Based on the legislative history, we understand that Congress enacted Section 1504 to increase the transparency of payments made by oil, natural gas, and mining companies to governments for the purpose of the commercial development of their oil, natural gas, and minerals. A primary goal of such transparency is to help empower citizens of those resource-rich countries to hold their governments accountable for the wealth generated by those resources.[7] To accomplish this goal, Congress created a disclosure regime under the Exchange Act that would support the commitment of the U.S. Federal Government to international transparency promotion efforts relating to the commercial development of oil, natural gas, or minerals.[8]

Section 13(q) provides the following definitions and descriptions of several key terms:

- ''resource extraction issuer'' means an issuer that is required to file an annual report with the Commission and engages in the commercial development of oil, natural gas, or minerals; [9]
- ''commercial development of oil, natural gas, or minerals'' includes exploration, extraction, processing, export, and other significant actions relating to oil, natural gas, or minerals, or the acquisition of a license for any such activity, as determined by the Commission; [10]
- ''foreign government'' means a foreign government, a department, agency or instrumentality of a foreign government, or a company owned by a foreign government, as determined by the Commission; [11] and
- ''payment'' means a payment that:
- Is made to further the commercial development of oil, natural gas, or minerals;
- Is not de minimis; and
- Includes taxes, royalties, fees (including license fees), production entitlements, bonuses, and other material benefits, that the Commission, consistent with the guidelines of the Extractive Industries Transparency Initiative (to the extent practicable), determines are part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals.[12]

Section 13(q) specifies that ''[t]o the extent practicable, the rules issued under [the section] shall support the commitment of the Federal Government to international transparency promotion efforts relating to the commercial development of oil, natural gas, or minerals.'' [13] As noted above, the statute explicitly refers to one international initiative, the Extractive Industries Transparency Initiative (''EITI''),[14] in the definition of ''payment.'' Although a separate provision in Section 13(q) regarding international transparency

[4] *See* Exchange Act Release No. 63549 (December 15, 2010), 75 FR 80978 (December 23, 2010), *available at http://www.sec.gov/rules/proposed/2010/34-63549.pdf* (''Proposing Release'').

[5] Public Law 111–203 (July 21, 2010).

[6] 15 U.S.C. 78m(q)(2)(A). As discussed further below, Section 13(q) also specifies that the Commission's rules must require certain information to be provided in interactive data format.

[7] *See, e.g.,* statement by Senator Richard Lugar, one of the sponsors of Section 1504 (''Adoption of the Cardin-Lugar amendment would bring a major step in favor of increased transparency at home and abroad * * *. More importantly, it would help empower citizens to hold their governments to account for the decisions made by their governments in the management of valuable oil, gas, and mineral resources and revenues * * *. The essential issue at stake is a citizen's right to hold its government to account. Americans would not tolerate the Congress denying them access to revenues our Treasury collects. We cannot force foreign governments to treat their citizens as we would hope, but this amendment would make it much more difficult to hide the truth.''), 156 Cong. Rec. S3816 (May 17, 2010).

[8] *See* 15 U.S.C. 78m(q)(2)(E).

[9] 15 U.S.C. 78m(q)(1)(D).

[10] 15 U.S.C. 78m(q)(1)(A).

[11] 15 U.S.C. 78m(q)(1)(B).

[12] 15 U.S.C. 78m(q)(1)(C).

[13] 15 U.S.C. 78m(q)(2)(E).

[14] The EITI is a voluntary coalition of oil, natural gas, and mining companies, foreign governments, investor groups, and other international organizations dedicated to fostering and improving transparency and accountability in countries rich in oil, natural gas, and minerals through the publication and verification of company payments and government revenues from oil, natural gas, and mining. *See Implementing the Extractive Industries Transparency Initiative* (2008) (''*Implementing the EITI*''), *available at http://eiti.org/document/implementingtheeiti.* According to the EITI, ''[b]y encouraging greater transparency and accountability in countries dependent on the revenues from oil, gas and mining, the potential negative impacts of mismanaged revenues can be mitigated, and these revenues can instead become an important engine for long-term economic growth that contributes to sustainable development and poverty reduction.'' *EITI Source Book* (2005), at 4, *available at http://eiti.org/files/document/sourcebookmarch05.pdf.* Announced by former UK Prime Minister Tony Blair at the World Summit on Sustainable Development in Johannesburg in September 2002, the EITI received the endorsement of the World Bank Group in 2003. *See* History of EITI, *http://www.eiti.org/eiti/history* (last visited August 15, 2012).

Currently 14 countries—Azerbaijan, Central African Republic, Ghana, Kyrgyz Republic, Liberia, Mali, Mauritania, Mongolia, Niger, Nigeria, Norway, Peru, Timor Leste, and Yemen—have achieved ''EITI compliant'' status by completing a validation process in which company payments are matched with government revenues by an independent auditor. *See http://eiti.org/countries/compliant* (last visited August 15, 2012). Some 22 other countries are EITI candidates in the process of complying with EITI standards, although one of the countries, Madagascar, recently had its EITI candidate status suspended. *See http://eiti.org/candidatecountries* (last visited August 15, 2012). Several other countries have indicated their intent to implement the EITI. *See http://eiti.org/othercountries.* Implementation of the EITI varies across countries—the EITI provides criteria and a framework for implementation, but allows countries to make key decisions on the scope of its program (*e.g.,* degree of aggregation of data, inclusion of subnational or social or community payments). *See Implementing the EITI,* at 23–24.

On September 20, 2011, President Obama declared that the United States will join the global initiative and released a National Action Plan stating that the Administration is committing to implement the EITI. *See http://www.whitehouse.gov/the-press-office/2011/09/20/opening-remarks-president-obama-open-government-partnership* and *http://www.whitehouse.gov/sites/default/files/us_national_action_plan_final_2.pdf.* The U.S. Department of the Interior (''DOI'') is responsible for implementing the U.S. EITI. *See* ''White House Announces Secretary Ken Salazar as Senior Official Responsible for Oversight of Implementation of Extractive Industries Transparency Initiative,'' White House Statements and Releases (October 25, 2011), *available at http://www.whitehouse.gov/the-press-office/2011/10/25/white-house-announces-secretary-ken-salazar-administrations-senior-offic.* After soliciting comment on and evaluating comments regarding the formation of the multi-stakeholder group for the U.S. EITI, the DOI announced that the assessment phase of the U.S. EITI implementation was complete, and the next phase of the U.S. EITI implementation will involve establishing the multi-stakeholder group. *See* ''U.S. Department of the Interior Announces Results of USEITI Implementation Assessment,'' U.S. Department of the Interior News Release (July 10, 2012), *available at http://www.doi.gov/EITI/index.cfm. See also* letter from Batirente Inc. and NEI Investments (February 10, 2012) (''Batirente and NEI Investments'') (submitting a copy of a statement by 17 Canadian investment institutions calling on the Canadian government to become an EITI implementing country). One commentator indicated that the final rules should be ''aligned and coordinated'' with the process being developed by the DOI to fulfill the United States' commitment to implementing the EITI. *See* letter from NMA 3.

efforts does not explicitly mention the EITI, the legislative history indicates that the EITI was considered in connection with the new statutory provision.[15] The United States is one of several countries that supports the EITI.[16]

The Commission's rules under Section 13(q) must require a resource extraction issuer to submit the payment information included in an annual report in an interactive data format [17] using an interactive data standard established by the Commission.[18] Section 13(q) defines ''interactive data format'' to mean an electronic data format in which pieces of information are identified using an interactive data standard.[19] The section also defines ''interactive data standard'' as a standardized list of electronic tags that mark information included in the annual report of a resource extraction issuer.[20] The rules issued pursuant to Section 13(q) [21] must include electronic tags that identify:

- The total amounts of the payments, by category;
- The currency used to make the payments;
- The financial period in which the payments were made;
- The business segment of the resource extraction issuer that made the payments;
- The government that received the payments and the country in which the government is located; and
- The project of the resource extraction issuer to which the payments relate.[22] Section 13(q) further authorizes the Commission to require electronic tags for other information that it determines is necessary or appropriate in the public interest or for the protection of investors.[23]

Section 13(q) provides that the final rules ''shall take effect on the date on which the resource extraction issuer is required to submit an annual report relating to the fiscal year * * * that ends not earlier than 1 year after the date on which the Commission issues final rules[.]'' [24]

Finally, Section 13(q) requires, to the extent practicable, the Commission to make publicly available online a compilation of the information required to be submitted by resource extraction issuers under the new rules.[25] The statute does not define the term compilation.

The Commission received over 150 unique comment letters on the proposal as well as over 149,000 form letters (including a petition with 143,000 signatures).[26] These letters came from corporations in the resource extraction industries, industry and professional associations, United States and foreign government officials, non-governmental organizations, law firms, pension and other investment funds, academics, investors, a labor union and other employee groups, and other interested parties. Commentators generally supported transparency efforts and offered numerous suggestions for revising certain aspects of the proposal in the final rules.

We have reviewed and considered all of the comments that we received and the rules we are adopting reflect changes made in response to many of the comments. Generally, as adopted, the final rules track the language in the statute, and except for where the language or approach of Section 13(q) clearly deviates from the EITI, the final rules are consistent with the EITI.[27] In instances where the language or approach of Section 13(q) clearly deviates from the EITI, the final rules track the statute rather than the EITI because in those instances we believe Congress intended the final rules to go beyond what is required by the EITI. We believe this approach is consistent with Section 13(q) and furthers the statutory goal to support international transparency promotion efforts relating to the commercial development of oil, natural gas, or minerals because the EITI is referenced in Section 13(q) and is well-recognized for promoting such transparency.[28]

## II. Final Rules Implementing Section 13(q)

### *A. Summary of the Final Rules*

Consistent with the proposal, we are adopting final rules that define the term ''resource extraction issuer'' as defined in Section 13(q). As proposed, the final rules will apply to all U.S. companies and foreign companies that are engaged in the commercial development of oil, natural gas, or minerals, and that are required to file annual reports with the Commission, regardless of the size of the company or the extent of business operations constituting commercial development of oil, natural gas, or minerals. Consistent with the proposal, the final rules will apply to an issuer, whether government-owned or not, that

[15] *See, e.g.,* statement by Senator Lugar (''This domestic action will complement multilateral transparency efforts such as the Extractive Industries Transparency Initiative—the EITI—under which some countries are beginning to require all extractive companies operating in their territories to publicly report their payments.''), 111 *Cong. Rec.* S3816 (daily ed. May 17, 2010). Other examples of international transparency efforts include the amendments of the Hong Kong Stock Exchange listing rules for mineral companies and the London Stock Exchange AIM rules for extractive companies. *See* Amendments to the GEM Listing Rules of the Hong Kong Stock Exchange, Chapter 18A.05(6)(c) (effective June 3, 2010), *available at http://www.hkex.com.hk/eng/rulesreg/listrules/gemrulesup/Documents/gem34_miner.pdf* (requiring a mineral company to include in its listing document, if relevant and material to the company's business operations, information regarding its compliance with host country laws, regulations and permits, and payments made to host country governments in respect of tax, royalties, and other significant payments on a country by country basis) and Note for Mining and Oil & Gas Companies—June 2009, *available at http://www.londonstockexchange.com/companies-and-advisors/aim/advisers/rules/guidance-note.pdf* (requiring disclosure in the initial listing of ''any payments aggregating over £10,000 made to any government or regulatory authority or similar body made by the applicant or on behalf of it, in regards to the acquisition of, or maintenance of its assets.'').

[16] *See* the list of EITI supporting countries, *available at http://eiti.org/supporters/countries* (last visited August 15, 2012).

[17] 15 U.S.C. 78m(q)(2)(C).

[18] 15 U.S.C. 78m(q)(2)(D).

[19] 15 U.S.C. 78m(q)(1)(E).

[20] 15 U.S.C. 78m(q)(1)(F).

[21] 15 U.S.C. 78m(q)(2)(D)(i).

[22] 15 U.S.C. 78m(q)(2)(D)(ii).

[23] 15 U.S.C. 78m(q)(2)(D)(ii).

[24] 15 U.S.C. 78m(q)(2)(F).

[25] 15 U.S.C. 78m(q)(3).

[26] The letters, including the form letters designated as Type A, Type B, and Type C, are available at *http://www.sec.gov/comments/s7-42-10/s74210.shtml.* In addition, to facilitate public input on the Act, the Commission provided a series of email links, organized by topic, on its Web site at *http://www.sec.gov/spotlight/regreformcomments.shtml.* The public comments we received on Section 1504 of the Act, which were submitted prior to the Proposing Release, are available on our Web site at *http://www.sec.gov/comments/df-title-xv/specialized-disclosures/specialized-disclosures.shtml.* Many commentators provided comments both prior to, and in response to, the proposal. Generally, our references to comment letters refer to the comments submitted in response to the proposal. When we refer to a comment letter submitted prior to the proposal, however, we make that clear in the citation.

[27] A country volunteers to become an EITI member. To become an EITI member country, among other things, a country must establish a multi-stakeholder group, including representatives of civil society, industry, and government, to oversee implementation of the EITI. The stakeholder group for a particular country agrees to the terms of that country's EITI plan, including the requirements for what information will be provided by the governments and by the companies operating in that country. Generally, as we understand it, under the EITI, companies and the host country's government submit payment information confidentially to an independent administrator selected by the country's multi-stakeholder group, which is frequently an independent auditor. The auditor reconciles the information provided to it by the government and by the companies and produces a report. The information provided in the reports varies widely among countries. A country must complete an EITI validation process to become a compliant member. The EITI Source Book and Implementing the EITI provide guidance regarding what should be included in a country's EITI plan, and we have looked to those materials and to the reports made by EITI member countries for guidance as to EITI requirements. *See* the EITI's Web site at *http://eiti.org.*

[28] *See* Exchange Act Sections 13(q)(2)(C)(ii) and 13(q)(2)(E) [15 U.S.C. 78m(q)(2)(C)(ii) and 78m(q)(2)(E)].

meets the definition of resource extraction issuer.

Consistent with the proposal and in light of the structure, language, and purpose of the statute, the final rules do not provide any exemptions from the disclosure requirements. As such, the final rules do not include an exemption for certain categories of issuers or for resource extraction issuers subject to similar reporting requirements under home country laws, listing rules, or an EITI program. The final rules also do not provide an exemption for situations in which foreign law may prohibit the required disclosure. In addition, the final rules do not provide an exemption for instances when an issuer has a confidentiality provision in an existing or future contract or for commercially sensitive information.

Consistent with Section 13(q) and the proposal, the final rules define ''commercial development of oil, natural gas, or minerals'' to include the activities of exploration, extraction, processing, and export, or the acquisition of a license for any such activity.

Consistent with Section 13(q) and the proposal, the final rules define ''payment'' to mean a payment that is made to further the commercial development of oil, natural gas, or minerals, is ''not de minimis,'' and includes taxes, royalties, fees (including license fees), production entitlements, and bonuses. After considering the comments, under the final rules and in accordance with Section 13(q)(1)(C)(ii), we also are including dividends and payments for infrastructure improvements in the list of payments required to be disclosed. The final rules include instructions to clarify the types of taxes, fees, bonuses, and dividends that are covered. In addition, after considering the comments, we have determined to define the term ''not de minimis.'' Unlike the proposed rules, which left the term ''not de minimis'' undefined, the final rules define ''not de minimis'' to mean any payment, whether a single payment or a series of related payments, that equals or exceeds $100,000 during the most recent fiscal year.

Consistent with Section 13(q) and the proposal, after considering the comments, we have decided to leave the term ''project'' undefined.

Consistent with the proposal, the final rules require a resource extraction issuer to disclose payments made by the issuer, a subsidiary of the issuer, or an entity under the control of the issuer to a foreign government or the U.S. Federal Government for the purpose of commercial development of oil, natural gas, or minerals. A resource extraction issuer will be required to disclose payments made directly, or by any subsidiary, or entity under the control of the resource extraction issuer. Therefore, a resource extraction issuer must disclose payments made by a subsidiary or entity under the control of the resource extraction issuer where the subsidiary or entity is consolidated in the resource extraction issuer's financial statements included in its Exchange Act reports, as well as payments by other entities it controls as determined in accordance with Rule 12b–2. A resource extraction issuer may be required to provide the disclosure for entities in which it provides proportionately consolidated information. A resource extraction issuer will be required to determine whether it has control of an entity for purposes of the final rules based on a consideration of all relevant facts and circumstances.[29]

We are adopting the definition of ''foreign government'' consistent with the definition in Section 13(q), as proposed. A ''foreign government'' includes a foreign national government as well as a foreign subnational government, such as the government of a state, province, county, district, municipality, or territory under a foreign national government. As proposed, the final rules clarify that ''Federal Government'' means the United States Federal Government. The final rules do not require disclosure of payments made to subnational governments in the United States. Consistent with the proposal, the final rules clarify that a company owned by a foreign government is a company that is at least majority-owned by a foreign government.

After considering the comments, the final rules we are adopting require resource extraction issuers to provide the required disclosure about payments in a new annual report, rather than in the issuer's existing Exchange Act annual report as proposed. We are adopting amendments to new Form SD to require the disclosure.[30] Similar to the proposal, the Form SD will require issuers to include a brief statement in the body of the form in an item entitled, ''Disclosure of Payments By Resource Extraction Issuers,'' directing users to detailed payment information provided in an exhibit to the form. As adopted, in response to comments, the final rules require resource extraction issuers to file Form SD on EDGAR no later than 150 days after the end of the issuer's most recent fiscal year. The final rules will require resource extraction issuers to present the payment information in one exhibit to new Form SD rather than in two exhibits, as was proposed. The required exhibit must provide the information using the XBRL interactive data standard.[31] Because the XBRL exhibit will be automatically rendered into a readable form available on EDGAR, we are not requiring a separate HTML or ASCII exhibit in addition to the XBRL exhibit. Under the final rules, and as required by the statute, a resource extraction issuer must submit the payment information using electronic tags that identify, for any payments made by a resource extraction issuer to a foreign government or the U.S. Federal Government:

- The total amounts of the payments, by category;
- The currency used to make the payments;
- The financial period in which the payments were made;
- The business segment of the resource extraction issuer that made the payments;
- The government that received the payments, and the country in which the government is located; and
- The project of the resource extraction issuer to which the payments relate.[32]

In addition, a resource extraction issuer must provide the type and total amount of payments made for each project and the type and total amount of payments made to each government in interactive data format. Unlike the proposal, in response to comments we received, the final rules require resource extraction issuers to file rather than furnish the payment information.

Under the final rules, a resource extraction issuer will be required to comply with the new rules and form for fiscal years ending after September 30, 2013. For the first report filed for fiscal years ending after September 30, 2013, a resource extraction issuer may provide

[29] *See* Exchange Act Rule 12b–2 for the definition of ''control.'' *See also* note 315.

[30] In another release we are issuing today, we are adopting rules to implement the requirements of Section 1502 of the Dodd-Frank Act and requiring issuers subject to those requirements to file the disclosure on Form SD. *See* Conflict Minerals, Release 34–67716 (August 22, 2012) (''Conflict Minerals Adopting Release''). Because of the order of our actions, we are adopting Form SD in that release and we are amending the form in this release, but we intend for the form to be used equally for these two separate disclosure requirements and potentially others that would benefit from placement in a specialized disclosure form.

[31] As proposed, an issuer would have been required to submit two exhibits—one in HTML or ASCII and the other in XBRL. As discussed below, we have decided to require only one exhibit for technical reasons and to reduce the compliance burden of the final rules.

[32] *See* Item 2.01(a) of Form SD (17 CFR 249.448).

a partial year report if the issuer's fiscal year began before September 30, 2013. The issuer will be required to provide a report for the period beginning October 1, 2013 through the end of its fiscal year. For any fiscal year beginning on or after September 30, 2013, a resource extraction issuer will be required to file a report disclosing payments for the full fiscal year.

*B. Definition of ''Resource Extraction Issuer'' and Application of the Disclosure Requirements*

1. Proposed Rules

In accord with Section 13(q), the proposed rules would have applied to issuers meeting the definition of ''resource extraction issuer'' and would have defined the term to mean an issuer that is required to file an annual report with the Commission and that engages in the commercial development of oil, natural gas, or minerals. Consistent with Section 13(q), the proposed rules would not have provided any exemptions from the disclosure requirements for resource extraction issuers. The Proposing Release further clarified that the proposed rules would apply to companies that fall within the definition of resource extraction issuer whether or not they are owned or controlled by governments.

2. Comments on the Proposed Rules

We received a variety of comments regarding the proposed rules and the application of the disclosure requirements. Numerous commentators supported the Commission's proposed definition and application of the disclosure requirements, including that the rules should not provide any exemptions from the disclosure requirements.[33] Noting an absence of statutory language regarding exemptions, several commentators stated that the legislative intent underlying Section 1504 was to provide the broadest possible coverage of extractive companies so as to create a level playing field.[34]

Most commentators that addressed the issue supported including issuers that are owned or controlled by governments within the definition of resource extraction issuer, as proposed.[35] Commentators favored such inclusion because it would be consistent with the intent of the statute to hold all resource extraction issuers accountable for payments to governments,[36] would adhere to EITI's universality principle that payment disclosure in a given country should involve all extractive industry companies operating in that country,[37] and would avoid anti-competitive effects because many government-owned companies are the largest in the industry.[38] Another commentator stated that, while it did not believe government-owned entities should be exempt from the payment disclosure rules, it opposed requiring a government-owned entity to disclose payments made to the government that controls it. According to that commentator, such payments are not ''made to further commercial development,'' but rather are ''distributions to the entity's controlling shareholder (or to itself), and requiring them to be disclosed is inappropriate as a matter of comity.'' [39] Another commentator sought an exemption for payments made by a foreign government-owned company to a subsidiary or entity controlled by it.[40]

Several other commentators supported exemptions for certain categories of issuers or for certain circumstances.[41] For example, while opposing a general exemption for smaller reporting companies, some commentators supported an exemption for a small entity having $5 million or less in assets on the last day of its most recently completed fiscal year.[42] Other commentators opposed an exemption for smaller companies because of their belief that those companies generally face greater equity risk from their

[33] *See* letters from Association of Forest Communities in Guatemala (March 8, 2012) (''Guatemalan Forest Communities''), Batirente (February 28, 2011), BC Investment Management Corporation (March 2, 2011) (''bcIMC''), Bon Secours Health System (March 1, 2011) (''Bon Secours''), California State Teachers' Retirement System (March 1, 2011) (''CalSTRS''), Calvert Investments (March 1, 2011) (''Calvert''), Catholic Relief Services and Committee on International Justice and Peace (February 9, 2011) (''CRS''), Derecho Ambiente y Recursos Naturales DAR (March 23, 2012) (''Derecho''), EarthRights International (December 2, 2010) (pre-proposing letter) (''ERI pre-proposal''), EarthRights International (January 26, 2011), (September 20, 2011), (February 3, 2012), (February 7, 2012) (respectively, ''ERI 1,'' ''ERI 2,'' ''ERI 3,'' and ''ERI 4''), Earthworks (March 2, 2011), Extractive Industries Working Group (March 2, 2011) (''EIWG''), Global Financial Integrity (March 1, 2011) (''Global Financial 2''), Global Witness (February 25, 2011) (''Global Witness 1''), Global Witness (February 24, 2012) (with attachments) (''Global Witness 2''), Global Witness (February 24, 2012) (''Global Witness 3''), Greenpeace (March 8, 2012), Grupo FARO (February 13, 2012), Philippe Le Billon (March 2, 2012) (''Le Billon''), Libyan Transparency Association (February 22, 2012) (''Libyan Transparency''), National Civil Society Coalition on Mineral Resource Governance of Senegal (February 14, 2012) (''National Coalition of Senegal''), Newground Social Investment (March 1, 2011) (''Newground''), Nigeria Union of Petroleum and Natural Gas Workers (July 8, 2011) (''NUPENG''), ONE (March 2, 2011), ONE Petition (February 23, 2012), Oxfam America (February 21, 2011) (''Oxfam 1''), Petroleum and Natural Gas Senior Staff Association of Nigeria (June 27, 2011) (''PENGASSAN''), PGGM Investments (March 1, 2011) (''PGGM''), PricewaterhouseCoopers LLP (March 2, 2011) (''PWC''), Publish What You Pay U.S. (November 22, 2010) (pre-proposing letter) (''PWYP pre-proposal''), Publish What You Pay U.S. (February 25, 2011) (''PWYP 1''), Railpen Investments (February 25, 2011), Representative Barney Frank, Representative Jose Serrano, Representative Norman Dicks, Representative Henry Waxman, Representative Maxine Waters, Representative Donald Payne, Representative Nita Lowey, Representative Betty McCollum, Representative Barbara Lee, Representative Jesse Jackson, Jr., Representative Alcee Hastings, Representative Gregory Meeks, Representative Rosa DeLauro, and Representative Marcy Kaptur (February 15, 2012) (''Rep. Frank *et al.''*), Revenue Watch Institute (February 17, 2011) (''RWI 1''), Peter Sanborn (March 12, 2011) (''Sanborn''), Senator Benjamin Cardin, Senator John Kerry, Senator Patrick Leahy, Senator Charles Schumer, and Representative Barney Frank (March 1, 2011) (''Sen. Cardin *et al.* 1''), Senator Benjamin Cardin, Senator John Kerry, Senator Patrick Leahy, Senator Carl Levin, and Senator Charles Schumer (January 31, 2012) (''Sen. Cardin *et al.* 2''), Senator Carl Levin (February 1, 2011) (''Sen. Levin 1''), Social Investment Forum (March 2, 2011) (''SIF''), George Soros (February 23, 2011) and (February 21, 2012) (''Soros 1'' and ''Soros 2'', respectively), Syena Capital Management LLC (February 17, 2011) (''Syena''), Ta'ang Students and Youth Organization (''TSYO''), TIAA–CREF (March 2, 2011) (''TIAA''), U.S. Agency for International Development (July 15, 2011) (''USAID''), United Steelworkers (March 29, 2011) (''USW''), WACAM (February 2, 2012), and World Resources Institute (March 1, 2011) (''WRI''), and letters designated as Type A and Type B. Other commentators generally voiced their support for strong rules under Section 1504. *See* letters from Cambodians for Resource Revenue Transparency (February 7, 2012) (''Cambodians''), Conflict Risk Network (February 7, 2012), Bill and Melinda Gates Foundation (February 9, 2012) (''Gates Foundation''), Global Witness 2, Barbara and Richard Hause (February 24, 2012), Network for the Fight Against Hunger in Cameroon (February 20, 2012) (''RELUFA 3''), Oxfam America (March 7, 2012) (''Oxfam 3''), Gradye Parsons (February 15, 2012), Representative Raul M. Grijalva (November 15, 2011), Reverend Jed Koball (February 10, 2012), and letters designated as Type C.

[34] *See, e.g.,* letters from Calvert, Global Witness 1, Oxfam 1, PWYP 1, Sen. Cardin *et al.* 1, Sen. Levin 1, and WRI.

[35] *See* letters from American Petroleum Institute (January 28, 2011) (''API 1''), Chevron Corporation (January 28, 2011) (''Chevron''), Exxon Mobil (January 31, 2011) (''ExxonMobil 1''), Le Billon, PWYP 1, and Royal Dutch Shell plc (January 28, 2011) (''RDS 1'').

[36] *See* letter from PWYP 1.

[37] *See* letters from API 1 and ExxonMobil 1.

[38] *See* letters from Chevron and RDS 1.

[39] *See* letter from Cleary Gottlieb Steen & Hamilton (March 2, 2011) (''Cleary'').

[40] *See* letter from Statoil ASA (February 22, 2011) (''Statoil'').

[41] *See, e.g.,* letters from API 1, API (August 11, 2011) (''API 2'') and API (May 18, 2012) (''API 5''), ExxonMobil 1, Cleary, New York State Bar Association, Securities Regulation Committee (March 1, 2011) (''NYSBA Committee''), PetroChina Company Limited (February 28, 2011) (''PetroChina''), Petroleo Brasileiro S.A. (February 21, 2011) (''Petrobras''), Rio Tinto plc (March 2, 2011) (''Rio Tinto''), RDS 1, and Statoil.

[42] *See* letters from API 1 and ExxonMobil 1. Those commentators otherwise supported the application of the payment disclosure requirements to all classes of issuers.

operations in host countries than larger issuers.[43]

In addition, some commentators supported an exemption for circumstances in which issuers were subject to other resource extraction payment disclosure requirements, such as host country law, stock exchange listing requirements, or an EITI program.[44] Commentators believed that issuers should be able to satisfy their obligations under Section 13(q) and the related rules by providing the disclosure reported under applicable home country laws, listing rules, or the EITI.[45] Commentators asserted that this would minimize an issuer's burden of having to comply with multiple transparency standards and avoid potentially confusing duplicative disclosure.[46] Other commentators, however, opposed providing an exemption for issuers based on other reporting requirements because such an exemption would result in an unlevel playing field and loss of comparability.[47] Some commentators asserted that because there are not currently any other national extractive disclosure regulatory regimes equivalent to Section 13(q), providing such an exemption would be premature.[48] In addition, several commentators maintained that Section 13(q) was intended to go beyond the disclosure provided under the EITI.[49]

Many commentators supported an exemption from the disclosure requirements when the required payment disclosure is prohibited under the host country's laws.[50] Some commentators stated that the laws of China, Cameroon, Qatar, and Angola would prohibit disclosure required under Section 13(q) and expressed concern that other countries would enact similar laws.[51] Commentators stated that without an appropriate exemption, Section 13(q) would become a ''business prohibition'' statute that would force issuers to choose between leaving their operations in certain countries or breaching local law and incurring penalties in order to comply with the statute's requirements.[52] Either outcome, according to commentators, would adversely affect investors, efficiency, competition, and capital formation.[53] Some commentators further suggested that failure to adopt such an exemption could encourage foreign issuers to deregister from the U.S. market.[54] Other commentators maintained that comity concerns must be considered when the Section 13(q) disclosure requirements conflict with foreign law.[55] One commentator suggested that an exemption would be consistent with Executive Order 13609, which directs federal agencies to take certain steps to ''reduce, eliminate, or prevent unnecessary differences in [international] regulatory requirements.'' [56]

Other commentators opposed an exemption for host country laws prohibiting disclosure of payment information because they believed it would undermine the purpose of Section 13(q) and create an incentive for foreign countries that want to prevent transparency to pass such laws, thereby creating a loophole for companies to avoid disclosure.[57] Commentators also disputed the assertion that there are foreign laws that specifically prohibit disclosure of payment information.[58] Those commentators noted that most confidentiality laws in the extractive industry sector relate to the

---

[43] *See* letters from Global Witness 1, PWYP 1, Sen. Cardin *et al.* 1, and Soros 1.

[44] *See, e.g.,* letters from API 1, British Petroleum p.l.c. (February 11, 2011 and July 8, 2011) (respectively ''BP 1'' and ''BP 2''), Cleary, ExxonMobil 1, NYSBA Committee, Petrobras, Rio Tinto, RDS 1, Royal Dutch Shell (July 11, 2011) (''RDS 3''), Statoil, and Vale S.A. (March 2, 2011) (''Vale''). In addition, two commentators requested that the Commission align the rules with the reporting requirements to be adopted by the DOI for the U.S. EITI. *See* letters from NMA (June 15, 2012) (''NMA 3'') and Northwest Mining Association (June 29, 2012) (''NWMA'').

[45] *See, e.g.,* letters from API 1, ExxonMobil 1, and RDS 1 (suggesting such an approach if home country requirements are at least as rigorous as Section 13(q)); AngloGold Ashanti (January 31, 2011) (''AngloGold''), BHP Billiton Limited (July 28, 2011) (''BHP Billiton''), and Vale (suggesting such an approach if disclosure is made based on EITI principles); BP 2 and RDS 3 (supporting a global common standard for transparency disclosure and, alternatively, suggesting such an approach if disclosure is made in a broadly similar manner based on EITI principles); Cleary, NYSBA Committee, Petrobras, Rio Tinto, and Statoil (suggesting such an approach if disclosure is made pursuant to home country requirements regardless of whether those requirements follow EITI principles); and Cleary, NYSBA Committee, and Statoil (suggesting alternatively such an approach if disclosure is made based on EITI principles if the company is a participant in an EITI program).

[46] *See, e.g.,* letters from Cleary, Rio Tinto, and Statoil.

[47] *See, e.g.,* letters from ERI 1, Global Witness 1, PWYP 1, Rep. Frank *et al.,* Sen. Cardin *et al.* 1, and Sen. Levin 1.

[48] *See, e.g.,* letter from PWYP 1. In this regard, after noting that the European Commission (''EC'') is developing legislative proposals for extractive industry reporting rules in the European Union (''EU''), one commentator stated that ''it is critical that country-by-country and project-by-project disclosure regulations are adopted across other major markets to ensure a level playing field and consistent reporting across countries.'' Letter from Publish What You Pay U.K. (April 28, 2011) (''PWYP U.K.''). The EC subsequently published proposals for extractive industry payment disclosure requirements. *See* discussion in note 82. After the EC published the proposals, PWYP urged the Commission to take the initiative and promptly adopt final rules so that the EC can harmonize its extractive disclosure requirements with the Section 13(q) rules. *See* letter from Publish What You Pay (December 19, 2011) (''PWYP 2''). The EC proposals are currently pending.

[49] *See* letters from Global Witness 1, PWYP 1, and Sen. Benjamin Cardin (December 1, 2010) (pre-proposal letter) (''Cardin pre-proposal'').

[50] *See* letters from API 1, API 2, API 5, AngloGold Ashanti (January 31, 2011) (''AngloGold''), Spencer Bachus, Chairman of the U.S. House of Representatives Committee on Financial Services, and Gary Miller, Chairman of the U.S. House of Representatives Subcommittee on International Monetary Policy, Committee on Financial Services (March 4, 2011) (''Chairman Bachus and Chairman Miller''), Barrick Gold Corporation (February 28, 2011) (''Barrick Gold''), BP 1, Chamber of Commerce Institute for 21st Century Energy (March 2, 2011) (''Chamber Energy Institute''), Chevron, Cleary, ExxonMobil 1, ExxonMobil (March 15, 2011) (''ExxonMobil 2''), International Association of Oil and Gas Producers (January 27, 2011) (''IAOGP''), NMA 2, NYSBA Committee, Nexen Inc. (March 2, 2011) (''Nexen''), PetroChina, Petrobras, PWC, Rio Tinto, RDS 1, Royal Dutch Shell (May 17, 2011) (''RDS 2''), Royal Dutch Shell (August 1, 2011) (''RDS 4''), Senator Lisa Murkowski and Senator John Cornyn (February 28, 2012) (''Sen. Murkowski and Sen. Cornyn''), Split Rock International, Inc. (March 1, 2011) (''Split Rock''), Statoil, Talisman Energy Inc. (''Talisman'') (June 23, 2011), and Vale. *See also* letter from Cravath, Swaine & Moore LLP, Cleary Gottlieb Steen & Hamilton LLP, Davis Polk & Wardwell LLP, Shearman & Sterling LLP, Simpson Thacher & Bartlett LLP, Skadden, Arps, Slate, Meagher & Flom LLP, Sullivan & Cromwell LLP, and Wilmer Cutler Pickering Hale and Dorr LLP (November 5, 2010) (pre-proposal letter) (''Cravath *et al.* pre-proposal'').

[51] *See* letters from API 1 and ExxonMobil 1. *See also* letter from RDS 1 (mentioning China, Cameroon, and Qatar).

[52] *See* letters from Barrick Gold, Cleary, NYSBA Committee, Rio Tinto, and Statoil; *see also* letter from API 5.

[53] *See, e.g.,* letters from API 1, ExxonMobil 1, and RDS 1; *see also* letter from API 5. Several commentators noted that the Commission has a statutory duty to consider efficiency, competition, and capital formation when adopting rules. *See* letter from American Petroleum Institute (January 19, 2012) (''API 3''), Cravath *et al.* pre-proposal, Senator Mary L. Landrieu (March 6, 2012), and Sen. Murkowski and Sen. Cornyn.

[54] *See* letters from Cleary, Royal Dutch Shell (October 25, 2010) (pre-proposal letter) (''RDS pre-proposal''), Split Rock, and Statoil. *See also* letter from Branden Carl Berns (December 7, 2011) (''Berns'') (maintaining that some foreign issuers subject to Section 13(q) with modest capitalizations on U.S. exchanges might choose to delist in response to competitive advantages enjoyed by issuers not subject to Section 13(q)).

[55] *See* letters from API 5 and NMA 2.

[56] *See* letter from API 5. We note that the responsibilities of federal agencies under Executive Order 13609 are to be carried out ''[t]o the extent permitted by law'' and that foreign regulatory approaches are to be considered ''to the extent feasible, appropriate, and consistent with law.'' *See* Proclamation No. 13609, 77 FR 26413 (May 4, 2012).

[57] *See, e.g.,* letters from Cambodians, EG Justice (February 7, 2012) (''EG Justice 2''), Global Witness 1, Grupo Faro, Human Rights Foundation of Monland (March 8, 2011 and July 15, 2011) (respectively, ''HURFOM 1'' and ''HURFOM 2''), National Coalition of Senegal, PWYP 1, Rep. Frank *et al.,* Sen. Cardin *et al.* 1, Sen. Cardin *et al.* 2, Sen. Levin 1, Soros 2, U.S. Agency for International Development (July 15, 2011) (''USAID''), and WACAM.

[58] *See, e.g.,* letters from ERI 3, Global Witness 1, PWYP 1, Publish What You Pay (December 20, 2011) (''PWYP 3''), and Rep. Frank *et al.*

confidentiality of geological and other technical data, and in any event, contain specific provisions that allow for disclosures to stock exchanges.[59]

Many commentators also sought an exemption from the disclosure requirements for payments made under existing contracts that contain confidentiality clauses prohibiting such disclosure.[60] According to commentators, while some contracts may permit the disclosure of information to comply with an issuer's home country laws, regulations, or stock exchange rules, those contractual provisions only allow the contracting party, not its parent or affiliate companies, to make the disclosure.[61] Some commentators also sought an exemption from the requirements for payments made under future contracts containing confidentiality clauses.[62]

Other commentators opposed an exemption based on confidentiality clauses in contracts on the grounds that such an exemption was not necessary.[63] Commentators maintained that most contracts include an explicit exception for information that must be disclosed by law, and, in cases where such language is not explicit, it generally would be read into any such contract under judicial or arbitral review.[64] Commentators further stated that an exemption based on contract confidentiality would undermine Section 13(q) by creating incentives for issuers to craft such contractual provisions.[65]

Several commentators supported an exemption for situations when, regardless of the existence of a contractual confidentiality clause, such disclosure would jeopardize commercially or competitively sensitive information.[66] Other commentators expressed doubt that disclosure of payment information would create competitive disadvantages because much of the information is already available from third-party service providers or through the large number of joint ventures between competitors in the extractive industries.[67] Commentators also expressed concern that providing an exemption for commercially or competitively sensitive information would frustrate Congress' intent to achieve payment transparency and accountability.[68]

Some commentators believed that the disclosure of detailed payment information would jeopardize the safety and security of a resource extraction issuer's operations or employees and requested an exemption in such circumstances.[69] Other commentators believed that detailed payment disclosure was critical for workers and their communities to achieve benefits from investment transparency, including a decrease in unrest and conflict and increased stability and safety.[70]

Some commentators requested that the Commission extend the disclosure requirements to foreign private issuers that are exempt from Exchange Act reporting obligations but publish their annual reports and other material home country documents electronically in English pursuant to Exchange Act Rule 12g3–2(b).[71] Those commentators asserted that requiring such issuers to comply with the disclosure requirements would help ameliorate anti-competitive concerns. Other commentators, however, opposed extending the disclosure required under Section 13(q) to companies that are exempt from Exchange Act registration and reporting because it would discourage use of the Rule 12g3–2(b) mechanism [72] and because such an extension would be inconsistent with the premise of Rule 12g3–2(b).[73]

3. Final Rules

Consistent with the proposal, we are adopting final rules that define the term ''resource extraction issuer'' as it is defined in Section 13(q). The final rules will apply to all U.S. companies and foreign companies that are engaged in the commercial development of oil, natural gas, or minerals and that are required to file annual reports with the Commission, regardless of the size of the company or the extent of business operations constituting commercial development of oil, natural gas, or minerals.[74] Consistent with the proposal, the final rules will apply to a company, whether government-owned or not, that meets the definition of resource extraction issuer.[75] Any failure to include government-owned companies within the scope of the

[59] *See* letters from Global Witness 1, Susan Maples, J.D., Post-Doctoral Research Fellow, Columbia University School of Law (March 2, 2011) (''Maples''), Network for the Fight Against Hunger in Cameroon (March 14, 2011 and July 11, 2011) (respectively, ''RELUFA 1'' and ''RELUFA 2''), and PWYP 1.

[60] *See* letters from API 1, AngloGold, Barrick Gold, Chairman Bachus and Chairman Miller, BP 1, Chamber Energy Institute, Chevron, Cleary, ExxonMobil 1, IAOGP, NMA 2, NYSBA Committee, Nexen, PetroChina, Petrobras, PWC, Rio Tinto, RDS 1, Split Rock, Statoil, and Vale.

[61] *See* letters from API 1 and ExxonMobil 1.

[62] *See* letters from AngloGold and NMA 2. AngloGold suggested conditioning the exemption on an issuer having made a good faith determination that it would not have been able to enter into the contract but for agreeing to a confidentiality provision.

[63] *See* letters from Global Witness 1, Maples, Oxfam (March 20, 2012) (''Oxfam 3''), and PWYP 1.

[64] *See, e.g.,* letters from Oxfam 3 and PWYP 1. *See also* letter from SIF citing the ''official Production Sharing Contract of the government of Equatorial Guinea'' and noting that it explicitly states that companies are permitted to share all information relating to the Contract or Petroleum Operations in the following instances: ''To the extent that such data and information is required to be furnished in compliance with any applicable laws or regulation'' (Article 20.1.1c) and ''[i]n conformity with the requirements of any stock exchange having jurisdiction over a Party[.]'' (Article 20.1.1d)).

[65] *See, e.g.,* letters from Global Witness 1 and Oxfam 1.

[66] *See* letters from American Exploration and Production Council (January 31, 2011) (''AXPC''), API 1, Chamber Energy Institute, Chevron, ExxonMobil 1, IAOGP, Local Authority Pension Fund Forum (January 31, 2011) (''LAPFF''), NMA 2, Rio Tinto, RDS 1, and United States Council for International Business (February 4, 2011) (''USCIB'').

[67] *See* letters from PWYP 1 and RWI 1; *see also* letter from Global Witness 1 (noting a study finding that the majority of disclosures that would be required pursuant to Section 13(q) would already be known to actors within the industry).

[68] *See, e.g.,* letter from Global Witness 1. Another commentator stated that ''to the extent that Section 13(q)'s reporting obligations result in some competitive disadvantage to regulated issuers, Congress already accepted this risk when it determined that pursuing the goals of promoting transparency and good governance was of paramount importance—even at the cost of an incidental burden on issuers * * * As with the Foreign Corrupt Practices Act, Congress made the affirmative choice to set a higher standard for global corporate practice. Other countries have already started to follow Congress' lead in this area * * * Strong U.S. leadership with respect to transparency in the extractive industries will make it easier for foreign governments to adopt similar reporting requirements, which in turn will serve to level the playing field. Letter from Oxfam 1.

[69] *See* letters from API 1, Spencer Bachus, Chairman of the U.S. House of Representatives Committee on Financial Services (August 21, 2012) (''Chairman Bachus''), Chevron, ExxonMobil 1, NMA 2, Nexen, PetroChina, and RDS 1.

[70] *See* letters from NUPENG, PENGASSAN, PWYP 1, and USW.

[71] *See* letters from API 1, Calvert, ExxonMobil 1, Global Witness 1, RWI 1, and RDS 1.

[72] *See* letter from NYSBA Committee.

[73] *See* letter from NMA 2 and NYSBA Committee.

[74] *See* new Exchange Act Rule 13q–1.

[75] As discussed below, a resource extraction issuer, including a government-owned resource extraction issuer, will be required to provide the payment disclosure if the other requirements of the rule are met. Contrary to some commentators' suggestions, we are not providing a carve-out from the rules for payments made by a government-owned resource extraction issuer to its controlling government because we believe it would be inconsistent with the purpose of the statute. We note a government-owned resource extraction issuer would only disclose payments made to the government that controls it if those payments were made for the purpose of commercial development of oil, natural gas, or minerals and the payments are within the categories of payments that would be required to be disclosed under the rules.

disclosure rules could raise competitiveness concerns.[76]

Although some commentators urged us to provide exemptions for certain categories of issuers,[77] in light of the statutory purpose of Section 13(q),[78] we have decided not to adopt exemptions from the disclosure requirement for any category of resource extraction issuers, including smaller issuers and foreign private issuers. We believe the transparency objectives of Section 13(q) are best served by requiring disclosure from all resource extraction issuers. In addition, we agree with commentators that providing an exemption for smaller reporting companies or foreign private issuers could contribute to an unlevel playing field and raise competitiveness concerns for larger companies and domestic companies.[79] We also note that some commentators opposed an exemption for smaller companies because of their belief that those companies generally face greater equity risk from their operations in host countries than larger issuers.[80]

The final rules also do not permit resource extraction issuers to satisfy the disclosure requirements adopted under Section 13(q) by providing disclosures required under other extractive transparency reporting requirements, such as under home country laws, listing rules, or an EITI program. Section 13(q) does not provide such an accommodation and, as noted by some commentators, in some respects the statute extends beyond the disclosure required under other transparency initiatives.[81] In addition, we note that transparency initiatives for resource extraction payment disclosure are continuing to develop.[82] Therefore, we believe it would be premature to permit issuers to satisfy their disclosure obligation by complying with other extractive transparency reporting regimes or by providing the disclosure required by those regimes in lieu of the disclosure required by the rules we are adopting under Section 13(q).[83]

Consistent with Section 13(q) and the proposed rules, we also are not providing an exemption for any situations in which foreign law may prohibit the required disclosure. Although some commentators asserted that certain foreign laws currently in place would prohibit the disclosure required under Section 13(q), other commentators disagreed and asserted that currently no foreign law prohibits the disclosure.[84] Further, as noted above, some commentators believed that we should adopt final rules providing an exemption from the disclosure requirements where foreign laws prohibit the required disclosure, including laws that may be adopted in the future,[85] while others believed that providing such an exemption would be inconsistent with the statute and would encourage countries to adopt laws specifically prohibiting the required disclosure.[86] While we understand commentators' concerns regarding the situation an issuer may face if a country in which it does business or would like to do business prohibits the disclosure required under Section 13(q),[87] the final rules we are adopting do not include an exemption for situations in which foreign law prohibits the disclosure. We believe that adopting such an exemption would be inconsistent with the structure and language of Section 13(q) [88] and, as some commentators have noted,[89] could undermine the statute by encouraging

[76] *See* note 38 and accompanying text.

[77] *See* note 41 and accompanying text.

[78] *See* note 7 and accompanying text.

[79] *See* notes 33 and 34 and accompanying text.

[80] *See* letters from Global Witness 1, PWYP 1, Sen. Cardin *et al.* 1, and Soros 1.

[81] *See* note 49 and accompanying text.

[82] One recent development is the European Commission's issuance in October 2011 of proposed directives that would require companies listed on EU stock exchanges and large private companies based in EU member states to disclose their payments to governments for oil, gas, minerals, and timber. *See* the European Commission's press release concerning the proposal, which is available at: *http://europa.eu/rapid/pressReleasesAction.do?reference=IP/11/1238&format=HTML&aged=0&language=EN&guiLanguage=en.* The EU proposal differs from the final rules we are adopting in several respects. For example, the EU proposal would apply to large, private EU-based companies as well as EU-listed companies engaged in oil, natural gas, minerals, and timber, whereas the final rules apply only to Exchange Act reporting companies engaged in oil, natural gas, and mining. The EU proposal would require disclosure of payments that are material to the recipient government, whereas the final rules require disclosure of payments that are not de minimis. Further, the EU proposal would apply to exploration, discovery, development, and extraction activities, whereas the final rules apply to exploration, extraction, processing, and export activities. In addition, while both the EU proposal and final rules require payment disclosure per project and government, the EU proposal would base project reporting on a company's current reporting structure whereas, as discussed below, the final rules leave the term ''project'' undefined. *See also* letter from PWYP 2. Other jurisdictions have introduced, but have not adopted, transparency initiatives. *See* letter from ERI 4 and note 14 and accompanying text.

[83] In this regard, we are not persuaded by comments suggesting that we should align our rules with any reporting requirements that may be adopted by the DOI as part of U.S. EITI. DOI is continuing its efforts to develop a U.S. EITI program and is currently working to form the stakeholder group. In addition, the scope of EITI programs generally differs from the scope of the requirements of Section 13(q). An EITI program adopted by a particular country generally requires disclosure of payments to that country's governments by companies operating in that country, but does not require disclosure of payments made by those companies to foreign governments. The disclosure requirements are developed country by country. In contrast, Section 13(q) requires disclosure of payments to the federal and foreign governments by resource extraction issuers. As noted elsewhere in this release, the requirements of the statute differ from the EITI in a number of respects.

[84] *Compare* letters from API 1, Barrick Gold, Cleary, ExxonMobil 1, NMA 2, NYSBA Committee, Rio Tinto, RDS 1, and Statoil with letters from EarthRights International (February 3, 2012) (''ERI 3''), Global Witness, PWYP, Publish What You Pay (December 20, 2011) (''PWYP 2''), Maples, and Rep. Frank *et al.* Several of the comment letters from issuers and industry associations assert that existing laws in Angola, Cameroon, China, and Qatar prohibit, or in some situations may prohibit, disclosure of the type required by Section 13(q). One commentator submitted translations of Despacho 385/06, issued by the Minister of the Angola Ministry of Petroleum, as amended by Despacho 409/06 (the ''*Angola Order*'') and a letter dated December 23, 2009, from the Deputy Premier, Minister of Energy & Industry, of the State of Qatar (the ''*Qatar Directive*''). *See* letter from ExxonMobil 2. Another commentator submitted a translation of certain sections of Decree No. 2000/465 relating to the Cameroon Petroleum Code, a copy of a legal opinion from Cameroon counsel, and a copy of a legal opinion from Chinese counsel. *See* letter from RDS 1. We are not aware of any other examples submitted on the public record of foreign laws purported to prohibit disclosure of payments by resource extraction issuers. Other commentators have submitted contrary data, arguing that the laws of Angola, Cameroon, China, and Qatar do not prohibit a resource extraction issuer from complying with Section 13(q) and the final rules, and providing examples of companies that have disclosed payment information relating to resource development activities in Angola, Cameroon, and China. *See* letter from ERI 3. One commentator submitted a legal opinion stating that ''[n]othing in Cameroonian law prevents oil companies from publishing data on revenues they pay to the state derived from oil contracts signed with the government.''

[85] *See, e.g.,* API 1, ExxonMobil 1, and RDS 1.

[86] *See, e.g.,* letters from Cambodians, EG Justice (February 7, 2012) (''EG Justice 2''), Global Witness 1, Grupo Faro, HURFOM 1 and HURFOM 2, National Coalition of Senegal, PWYP, Rep. Frank *et al.,* Sen. Cardin *et al.,* Sen. Cardin *et al.* 2, Sen. Levin 1, Soros 2, US Agency for International Development (July 15, 2011) (''USAID''), and WACAM.

[87] *See, e.g.,* API 1, ExxonMobil 1, and RDS 1.

[88] As noted by some commentators, Section 23(a)(2) requires us, when adopting rules, to consider the impact any new rule would have on competition. *See, e.g.,* letters from API 1, API 3, Chairman Bachus, Cravath et al pre-proposal, and ExxonMobil 1. Specifically, Section 23(a)(2) requires us ''to consider * * * the impact any such rule or regulation would have on competition'' in making rules pursuant to the Exchange Act. Further, the section states that the Commission ''shall not adopt any such rule * * * which would impose a burden on competition not necessary or appropriate in furtherance of [the Exchange Act].'' As discussed further below, we recognize the final rules may impose a burden on competition; however, in light of the language and purpose of Section 13(q), which is now part of the Exchange Act, we believe the rules we are adopting pursuant to the provision and any burden on competition that may result are necessary in furtherance of the purpose of the Exchange Act, including Section 13(q) of the Exchange Act.

[89] *See, e.g.,* letters from Cambodians, EG Justice (February 7, 2012) (''EG Justice 2''), Global Witness 1, Grupo Faro, HURFOM 1 and HURFOM 2, National Coalition of Senegal, PWYP, Rep. Frank *et al.,* Sen. Cardin *et al.,* Sen. Cardin *et al.* 2, Sen. Levin 1, Soros 2, USAID, and WACAM.

countries to adopt laws, or interpret existing laws, specifically prohibiting the disclosure required under the final rules.

Consistent with Section 13(q) and the proposed rules, the final rules do not provide an exemption for instances when an issuer has a confidentiality provision in a relevant contract, as requested by some commentators.[90] We understand that contracts typically allow for disclosure to be made when required by law for reporting purposes.[91] Although some commentators maintained that those types of contractual provisions only allow the contracting party, not its parent or affiliate companies, to make the disclosure,[92] the final rules we are adopting do not include an exemption for confidentiality provisions in contracts because we believe this issue can be more appropriately addressed through the contract negotiation process.[93] As noted by some commentators, a different approach might encourage a change in practice or an increase in the use of confidentiality provisions to circumvent the disclosure required by the final rules.[94] In addition, including an exemption from the disclosure requirements for payments made under existing contracts that contain confidentiality clauses prohibiting such disclosure, as suggested by some commentators,[95] would frustrate the purpose of Section 13(q).

Although some commentators sought an exemption for commercially or competitively sensitive information, regardless of the existence of a confidentiality provision in a contract,[96] the final rules do not provide such an exemption. We note that commentators disagreed on the need for an exemption for commercially or competitively sensitive information.[97] While we understand commentators' concerns about potentially being required to provide commercially or competitively sensitive information,[98] we also are cognizant of other commentators' concerns that such an exemption would frustrate the purpose of Section 13(q) to promote international transparency efforts.[99] We note that in situations involving more than one payment, the information will be aggregated by payment type, government, and/or project, and therefore may limit the ability of competitors to use the information to their advantage.

We note that some commentators sought an exemption for circumstances in which a company believes that disclosure might jeopardize the safety and security of its employees and operations,[100] while other commentators opposed such an exemption and noted their belief that increased transparency would instead increase safety for employees.[101] We understand issuers' concerns about the safety of their employees and operations; however, in light of commentators' disagreement on this issue, including the belief by some commentators that disclosure will improve employee safety, and the fact that the statute seeks to promote international transparency efforts, we are not persuaded that such an exemption is warranted and we are not including it in the final rules. We also note that neither the statute nor the final rules require disclosure regarding the names or location of employees.

The final rules do not extend the disclosure requirements to foreign private issuers that are exempt from Exchange Act registration pursuant to Rule 12g3–2(b). Foreign private issuers relying on Rule 12g3–2(b) are not required to file annual reports with the Commission and thus, they do not fall within the plain definition of resource extraction issuer provided in the statute. In addition, we believe that such an extension would be inconsistent with the premise of Rule 12g3–2(b).[102] Issuers that are exempt from Exchange Act registration pursuant to Rule 12g3–2(b) are not subject to reporting requirements under the Exchange Act, including any requirement to file an annual report.

*C. Definition of ''Commercial Development of Oil, Natural Gas, or Minerals''*

1. Proposed Rules

Consistent with Section 13(q), the proposed rules defined ''commercial development of oil, natural gas, or minerals'' to include the activities of exploration, extraction, processing, export and other significant actions relating to oil, natural gas, or minerals, or the acquisition of a license for any such activity. In proposing the definition, we intended to capture only activities that are directly related to the commercial development of oil, natural gas, or minerals, but not activities that are ancillary or preparatory, such as the manufacture of a product used in the commercial development of oil, natural gas, or minerals. In the Proposing Release, we noted that commercial development would not include transportation activities for a purpose other than export. In addition, we noted, as an example, that an issuer engaged in the removal of impurities, such as sulfur, carbon dioxide, and water, from natural gas after extraction but prior to its transport through the pipeline would be included in the definition of commercial development because such removal is generally considered to be a necessary part of the processing of natural gas in order to prevent corrosion of the pipeline.

2. Comments on the Proposed Rules

Commentators supported various aspects of the proposed definition[103] while suggesting clarifications or alternative approaches to the definition of commercial development. For example, numerous commentators suggested defining commercial development to include upstream activities (exploration and extraction of resources) only.[104] Commentators noted that Section 13(q) is entitled ''Disclosure of Payments by Resource Extraction Issuers,'' and as such, the statute ''is directed toward those issuers who are engaged in extractive activities, or what are commonly referred to as 'upstream activities.' ''[105] Commentators also noted that the EITI focuses on upstream activities[106] and that the statute directs the Commission ''to consider consistency with EITI guidelines in the rules it develops.''[107] Several commentators noted they believed defining commercial development to include only upstream activities would be consistent with the Commission's existing definition of ''oil and gas producing activities'' in Regulation S–X Rule 4–10.[108] In addition, commentators

[90] *See, e.g.,* letters from API 1, Chevron, Cleary, ExxonMobil 1, NMA 2, and RDS 1.

[91] *See* letters from Global Witness 1, Maples, and PWYP 1.

[92] *See* letters from API 1 and ExxonMobil 1.

[93] *See* letter from Maples.

[94] *See* letters from Global Witness and Oxfam.

[95] *See* note 60 and accompanying text.

[96] *See* note 66 and accompanying text.

[97] *See* notes 66 and 67 and accompanying text.

[98] *See* note 66 and accompanying text.

[99] *See* note 68 and accompanying text.

[100] *See* note 69 and accompanying text.

[101] *See* note 70 and accompanying text.

[102] *See* note 73 and accompanying text.

[103] *See, e.g.,* letters from API 1, AngloGold, BP 1, CRS, Global Financial Integrity 2, NMA 2, and PWYP 1.

[104] *See* letters from API 1, AXPC, Barrick Gold, BP 1, Chevron, ExxonMobil 1, NMA 2, Petrobras, PWC, RDS 1, and Statoil.

[105] *See* letters from API 1 and ExxonMobil 1.

[106] *See, e.g.,* letters from API 1 and NMA 2.

[107] *See* letters from API 1 and ExxonMobil 1.

[108] *See, e.g.,* letters from API 1, Chevron, ExxonMobil 1, and RDS 1. Rule 4–10(a)(16) defines ''oil and gas producing activities'' to include:

(A) The search for crude oil, including condensate and natural gas liquids, or natural gas (''oil and gas'') in their natural states and original locations;

Continued

noted that adopting a definition of commercial development that is based on the definition of ''oil and gas producing activities'' in Regulation S–X would align it with a widely understood and accepted industry definition.[109] According to commentators advocating this approach, ''commercial development of oil, natural gas, or minerals'' would include ''exploration, extraction, field processing and gathering/transportation activities to the first marketable location.''[110] Some commentators suggested clarifying, either in the regulatory text or in the adopting release, that the definition would include field processing activities prior to the refining or smelting phase, such as upgrading of bitumen and heavy oil and crushing and processing of raw ore, as well as transport activities related to the export of oil, natural gas, or minerals to the first marketable location.[111] In focusing exclusively on mining activities, one commentator stated that the definition of ''commercial development'' should include exploration, extraction, and production, and activities of processing and export to the extent that they are associated with production.[112] Under that approach, the definition would include steps in production prior to the smelting or refining phase, such as crushing of raw ore, processing of the crushed ore, and export of processed ore to the smelter, but would not include the actual smelting or refining. Several commentators stated that the definition should exclude transportation and other midstream or downstream activities, including export.[113] According to some of those commentators, '' 'export' activities are not always directly associated with oil and gas producing activities, and can often be undertaken by issuers that are not engaged in 'resource extraction' at all.''[114] They believed that requiring the reporting of payments by such issuers goes beyond the intended scope of the statute. One commentator urged us to state explicitly that ''commercial development'' does not include transportation activities and that transportation activities include the underground storage of natural gas.[115] Another commentator stated that an issuer should be allowed to choose whether to include transportation in the definition of ''commercial development'' as long as it discloses the basis for its definition.[116]

Other commentators stated that, at a minimum, the definition of ''commercial development'' must include the activities of exploration, extraction, processing, and export.[117] One commentator argued that, although the EITI does not include processing and export activities in its minimum disclosure requirements, the definition of ''commercial development'' must include those activities to be consistent with the plain language of Section 13(q) and because Congress intended the statute to go beyond the EITI's requirements.[118] Another commentator suggested expanding the proposed definition to include not just upstream activities, but also midstream activities (activities involved in trading and transport of resources), and downstream activities (activities involved in refining, ore processing, and marketing of resources).[119] The commentator agreed with the proposal that the definition should not include activities of a manufacturer of a product used in the commercial development of oil, natural gas, or minerals.

Some commentators requested further clarification that covered transport activities include not just those related to export, but those related to the processing or marketing of resources, whether intra-country or cross-border, and whether by pipeline, rail, road, air, ship, or other means.[120] Two commentators requested that the Commission define ''transportation activities'' to include pipelines and security arrangements associated with a pipeline within a host country.[121]

Some commentators agreed with the proposal that ''commercial development'' should exclude activities that are ancillary or preparatory to commercial development.[122] One commentator suggested that the term focus on activities that ''directly relate to, and provide material support for, the physical process of extracting and processing ore and producing minerals from that ore, including the export of ore to the smelter.'' [123] The commentator further noted that activities that ''do not directly and materially further this process, such as development of infrastructure and the community, as well as security support, generally would fall outside this definition, unless they include payments to governments that are expressly required by concession, contract, law, or regulation.'' [124] Another commentator requested that we provide further detail about the extractive activities to which the rules would apply.[125]

3. Final Rules

Consistent with Section 13(q) and the proposal, the final rules define ''commercial development of oil, natural gas, or minerals'' to include the activities of exploration, extraction, processing, and export, or the acquisition of a license for any such activity. As we noted in the Proposing Release, the statutory language sets forth a clear list of activities in the definition and gives us discretionary authority to include other significant activities relating to oil, natural gas, or minerals under the definition of ''commercial development.'' As described above, the final rules we are adopting generally track the language in the statute, and except for where the language or approach of Section 13(q) clearly deviates from the EITI, the final rules are consistent with the EITI. In

(B) The acquisition of property rights or properties for the purpose of further exploration or for the purpose of removing the oil or gas from such properties;

(C) The construction, drilling, and production activities necessary to retrieve oil and gas from their natural reservoirs, including the acquisition, construction, installation, and maintenance of field gathering and storage systems, such as:

*(1)* Lifting the oil and gas to the surface; and

*(2)* Gathering, treating, and field processing (as in the case of processing gas to extract liquid hydrocarbons); and

(D) Extraction of saleable hydrocarbons, in the solid, liquid, or gaseous state, from oil sands, shale, coalbeds, or other nonrenewable natural resources which are intended to be upgraded into synthetic oil or gas, and activities undertaken with a view to such extraction.

(ii) Oil and gas producing activities do not include:

(A) Transporting, refining, or marketing oil and gas;

(B) Processing of produced oil, gas or natural resources that can be upgraded into synthetic oil or gas by a registrant that does not have the legal right to produce or a revenue interest in such production;

(C) Activities relating to the production of natural resources other than oil, gas, or natural resources from which synthetic oil and gas can be extracted; or

(D) Production of geothermal steam. (Instructions omitted.)

[109] *See* letters from API 1 and ExxonMobil 1.

[110] *See, e.g.,* letter from API 1.

[111] *See* letters from AXPC, API 1, Barrick Gold, BP 1, Chevron, ExxonMobil 1, NMA 2, Petrobras, PWC, RDS 1, and Statoil.

[112] *See* letter from NMA 2.

[113] *See* letters from API 1, Barrick Gold, ExxonMobil 1, National Fuel Gas Supply Corporation (March 1, 2011) (''National Fuel''), and NMA 2.

[114] *See* letter from API 1. *See also* letter from ExxonMobil 1.

[115] *See* letter from National Fuel.

[116] *See* letter from Rio Tinto.

[117] *See* letters from CRS and PWYP 1.

[118] *See* letter from PWYP 1.

[119] *See* letter from Calvert.

[120] *See* letters from Calvert, CRS, Earthworks, EIWG, HURFOM 1, PWYP pre-proposal, PWYP 1, and WRI.

[121] *See* letters from PWYP 1 and Syena; *see also* letter from Le Billon (suggesting coverage of transportation in general, security services, and trading).

[122] *See* letters from NMA 2 and Statoil.

[123] Letter from NMA 2.

[124] Letter from NMA 2.

[125] *See* letter from Syena.

instances where the language or approach of Section 13(q) clearly deviates from the EITI, the final rules track the statute rather than the EITI. The definition of ''commercial development'' in Section 13(q) is broader than the activities covered by the EITI and thus clearly deviates from the EITI; therefore, we believe the definition of the term in the final rules should be consistent with Section 13(q).

As noted above, we received significant comment on this aspect of the proposal. Some commentators sought a more narrow definition than proposed, while other commentators sought a broader definition. We are not persuaded that we should narrow the scope of the definition in Section 13(q) by re-defining ''commercial development'' to only include upstream activities [126] or using the definition of ''oil and gas producing activities'' in Rule 4–10.[127] Nor are we persuaded that we should expand the covered activities [128] beyond those identified in the statute.[129] Under the final rules, the definition of commercial development includes all of the activities specified in the statutory definition, even though the statute includes activities beyond what is currently contemplated by the EITI.[130]

Section 13(q) grants us the discretionary authority to include other significant activities relating to oil, natural gas, or minerals under the definition of ''commercial development.'' [131] In deciding whether to expand the statutory list of covered activities, we have considered both commentators' views and the need to promote consistency with EITI principles. We are not persuaded that we should extend the rules to activities beyond the statutory list of activities comprising ''commercial development'' because we are mindful of imposing additional costs resulting from adopting rules that extend beyond Congress' clear directive.

As noted in the Proposing Release, the definition of ''commercial development'' is intended to capture only activities that are directly related to the commercial development of oil, natural gas, or minerals. It is not intended to capture activities that are ancillary or preparatory to such commercial development. Accordingly, we would not consider a manufacturer of a product used in the commercial development of oil, natural gas, or minerals to be engaged in the commercial development of the resource. For example, in contrast to the process of extraction, manufacturing drill bits or other machinery used in the extraction of oil would not fall within the definition of commercial development.

In response to commentators' requests for clarification of the activities covered by the final rules, we also are providing examples of activities covered by the terms ''extraction,'' ''processing,'' and ''export.'' We note, however, that whether an issuer is a resource extraction issuer will depend on its specific facts and circumstances.

As we noted in the Proposing Release, ''extraction'' includes the production of oil and natural gas as well as the extraction of minerals. Under the final rules, ''processing'' includes field processing activities, such as the processing of gas to extract liquid hydrocarbons, the removal of impurities from natural gas after extraction and prior to its transport through the pipeline, and the upgrading of bitumen and heavy oil. Processing also includes the crushing and processing of raw ore prior to the smelting phase. We do not believe that ''processing'' was intended to include refining or smelting,[132] and we note that refining and smelting are not specifically listed in Section 13(q). In addition, as some commentators noted, including refining or smelting within the final rules under Section 13(q) would go beyond what is currently contemplated by the EITI, which does not include refining and smelting activities.[133]

We believe that ''export'' includes the export of oil, natural gas, or minerals from the host country. We disagree with those commentators who maintained that ''export'' means the removal of the resource from the place of extraction to the refinery, smelter, or first marketable location.[134] Adopting such a definition would be contrary to the plain meaning of export,[135] and nothing in Section 13(q) or the legislative history suggests that Congress meant ''export'' to have such a meaning; [136] thus, we believe such a definition would be contrary to the intent of Section 13(q). We also are not persuaded by the argument presented by some commentators [137] that the final rules should be limited only to upstream activities because the reference in the title of Section 13(q) to ''Resource Extraction Issuers'' demonstrates Congressional intent that the statute should apply only to issuers engaged in extractive activities.[138] Accordingly, under the final rules, ''commercial development'' includes the export of oil, natural gas, or minerals and, therefore, the definition of

[126] *See* note 104 and accompanying text.

[127] *See* note 108 and accompanying text.

[128] *See* note 119 and accompanying text.

[129] We believe the phrase ''as determined by the Commission'' at the end of the definition of ''commercial development'' in Section 13(q) requires the Commission to identify any ''other significant actions'' that would be covered by the rules. *See* 15 U.S.C. 78m(q)(1)(A). As noted above, we are not expanding the list of activities covered by the definition of ''commercial development.'' Therefore, to avoid confusion as to the scope of the activities covered by the rules, the final rules do not include the phrase ''and other significant actions relating to oil, natural gas, or minerals.''

[130] In the Proposing Release, we noted our understanding that the EITI criteria primarily focus on exploration and production activities. *See, e.g., Implementing the EITI,* at 24. We note that although export payments are not typically included under the EITI, some EITI programs have reported export taxes or related duties. *See* the 2005 EITI Report of Guinea, the 2008–2009 EITI Report of Liberia, and the 2006–2007 EITI Report of Sierra Leone, *available at http://eiti.org/document/eitireports.*

[131] *See* 15 U.S.C. 78m(q)(1)(A).

[132] The Commission's oil and gas disclosure rules identify refining and processing separately in the definition of ''oil and gas producing activities,'' which excludes refining and processing (other than field processing of gas to extract liquid hydrocarbons by the company and the upgrading of natural resources extracted by the company other than oil or gas into synthetic oil or gas). *See* Rule 4–10(a)(16)(ii) of Regulation S–X [17 CFR 210.4–10(a)(16)(ii)] and note 108. In addition, we note that in another statute adopted by Congress, the Sudan Accountability and Divestment Act of 2007 (SADA), relating to resource extraction activities, the statute specifically identifies ''processing'' and ''refining'' separately in defining ''mineral extraction activities'' and ''oil-related activities.'' 110 P.L. No. 174 (2007). Specifically, Section 2(7) of SADA defines ''mineral extraction activities'' to mean ''exploring, extracting, processing, transporting, or wholesale selling of elemental minerals or associated metal alloys or oxides (ore) * * *.'' Section 2(8) of SADA defines ''oil-related activities'' to mean in part ''exporting, extracting, producing, refining, processing, exploring for, transporting, selling, or trading oil * * *.'' The inclusion of ''processing'' and ''refining'' in SADA, in contrast to the language of Section 13(q), suggests that the terms have different meanings. Absent designation by the Commission, we do not believe that ''refining'' was intended to be included in the scope of the express terms in Section 13(q).

[133] *See, e.g.,* letters from API and NMA 2.

[134] *See* notes 111 and 112 and accompanying text.

[135] For example, Merriam-Webster dictionary defines ''export'' to mean ''to carry or send (as a commodity) to some other place (as another country).'' Merriam-Webster Dictionary, *http://www.merriam-webster.com/dictionary/export* (last visited August 15, 2012). *See also* letters from CRS, Global Financial Integrity 2, and PWYP 1 (stating that exclusion of export activities would be inconsistent with plain language of statute).

[136] *See* note 118 and accompanying text.

[137] *See* note 105 and accompanying text.

[138] The statutory definition of ''commercial development'' includes activities, such as processing and export, that go beyond mere extractive activities. In this regard, we note that ''the title of a statute and the heading of a section cannot limit the plain meaning of the text * * *. For interpretative purposes, they are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain.'' *Brotherhood of Railroad Trainmen* v. *Baltimore & Ohio Railroad Co.,* 331 U.S. 519, 528–29 (1947); *see also Intel Corporation* v. *Advanced Micro Devices, Inc.,* 542 U.S. 241, 256 (2004) (quoting *Trainmen*).

''resource extraction issuer'' will capture an issuer that engages in the export of oil, natural gas, or minerals. We note that these definitions could require companies that may only be engaged in exporting oil, natural gas, or minerals and that may not have engaged in exploration, extraction, or processing of those resources to provide payment disclosure.

Consistent with the proposal, the definition of ''commercial development'' in the final rules does not include transportation in the list of covered activities.[139] Section 13(q) does not include transportation in the list of activities covered by the definition of ''commercial development.'' In addition, including transportation activities within the final rules under Section 13(q) would go beyond what is currently contemplated by the EITI, which focuses on exploration and production activities and does not explicitly include transportation activities.[140] Thus, the final rules do not require a resource extraction issuer to disclose payments made for transporting oil, natural gas, or minerals for a purpose other than export.[141] As recommended by several commentators, transportation activities generally would not be included within the definition[142] unless those activities are directly related to the export of the oil, natural gas, or minerals. For example, under the final rules, transporting a resource to a refinery or smelter, or to underground storage prior to exporting it, would not be considered ''commercial development,'' and therefore, an issuer would not be required to disclose payments related to those activities.

In an effort to emphasize substance over form or characterization and to reduce the risk of evasion, as discussed in more detail below, we are adding an anti-evasion provision to the final rules.[143] The provision requires disclosure with respect to an activity or payment that, although not in form or characterization of one of the categories specified under the final rules, is part of a plan or scheme to evade the disclosure required under Section 13(q).[144] Under this provision, a resource extraction issuer could not avoid disclosure, for example, by re-characterizing an activity that would otherwise be covered under the final rules as transportation.

Consistent with the proposal, the definition of ''commercial development'' in the final rules would not include marketing in the list of covered activities. Section 13(q) does not include marketing in the list of activities covered by the definition of ''commercial development.'' In addition, including marketing activities within the final rules under Section 13(q) would go beyond what is currently contemplated by the EITI, which focuses on exploration and production activities and does not include marketing activities.[145] Thus, the final rules do not include marketing in the list of covered activities in the definition of ''commercial development.''[146]

*D. Definition of ''Payment''*

Section 13(q) defines ''payment'' to mean a payment that:

- Is made to further the commercial development of oil, natural gas, or minerals;
- Is not de minimis; and
- Includes taxes, royalties, fees (including license fees), production entitlements, bonuses, and other material benefits, that the Commission, consistent with EITI's guidelines (to the extent practicable), determines are part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals.

1. Types of Payments

a. Proposed Rules

In the Proposing Release, we explained that we interpret Section 13(q) to provide that the types of payments that are included in the statutory language should be subject to disclosure under our rules to the extent the Commission determines that the types of payments and any ''other material benefits'' are part of the ''commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals.'' Consistent with Section 13(q), we proposed to require resource extraction issuers to disclose payments of the types identified in the statute because of our preliminary belief that they are part of the ''commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals.'' We noted that the types of payments listed in Section 13(q) generally are consistent with the types of payments the EITI suggests should be disclosed and expressed our belief that this is evidence that the payment types are part of the commonly recognized revenue stream. As noted above, Section 13(q) provides that our determination should be consistent with the EITI's guidelines, to the extent practicable. Therefore, we are including all the payments listed above in the final rules because they are included in the EITI, which indicates they are part of the commonly recognized revenue stream. Guidance for implementing the EITI suggests that a country's disclosure requirements might include the following benefit streams:[147] Production entitlements; profits taxes; royalties; dividends; bonuses, such as signature, discovery, and production bonuses; fees, such as license, rental, and entry fees; and other significant benefits to host governments, including taxes on corporate income, production, and profits but excluding taxes on consumption.[148]

We did not propose specific definitions for each payment type, although we stated that fees and bonuses identified as examples in the EITI would be covered by the proposed rules. In addition, we provided an instruction to the rules to clarify the taxes a resource extraction issuer would be required to disclose. Under the proposal, resource extraction issuers would have been required to disclose taxes on corporate profits, corporate income, and production, but would not have been required to disclose taxes levied on consumption, such as value added taxes, personal income taxes, or sales taxes, because consumption taxes are not typically disclosed under the EITI. We did not propose any other ''material benefits'' that should be disclosed. Thus, we did not propose to require disclosure of dividends, payments for infrastructure improvements, or social or community payments because those types of payments are not included in the statutory list of payments. We recognized that it may be appropriate to

[139] Adopting a definition of ''commercial development'' that does not include transport activities other than in connection with export is consistent with the EITI, which generally does not require the disclosure of transportation-related payments. *See Implementing the EITI,* at 35.

[140] *See* letters from API 1, ExxonMobil 1, and NMA 2.

[141] In addition, we note that Section 13(q) does not include transporting in the list of covered activities, unlike another federal statute—the SADA—that specifically includes ''transporting'' in the definition of ''oil and gas activities'' and ''mineral extraction activities.'' The inclusion of ''transporting'' in SADA, in contrast to the language of Section 13(q), suggests that the term was not intended to be included in the scope of Section 13(q).

[142] *See, e.g.,* letters from API, Barrick Gold, National Fuel, and NMA 2.

[143] *See* Section II.D.1.c.

[144] *See* Instruction 9 to Item. 2.01 of Form SD.

[145] *See* letters from API 1 and ExxonMobil 1.

[146] For similar reasons, the definition of ''commercial development'' does not include activities relating to security support. *See* Section II.D. below for a related discussion of payments for security support.

[147] Under the EITI, benefit streams are defined as being any potential source of economic benefit which a host government receives from an extractive industry. *See EITI Source Book,* at 26.

[148] *EITI Source Book,* at 27–28.

provide more specific guidance about the particular payments that should be disclosed. We requested comment intended to elicit detailed information about what types of payments should be included in, or excluded from, the rules; what additional guidance may be helpful or necessary; and whether there are ''other material benefits'' that should be specified in the list of payments subject to disclosure because they are part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals.

b. Comments on the Proposed Rules

Several commentators supported the proposal and stated that it was not necessary to provide further guidance regarding the types of payments covered or to define ''other material benefits'' that are part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals.[149] Those commentators noted that the proposed types of payments were largely consistent with the benefit streams listed in the EITI Source Book and represented the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals. Another commentator agreed the payment types should be based on the benefit streams outlined in the EITI Source Book, and suggested that we provide some limited guidance on the types of payments that should be disclosed to ''ensure consistency of presentation and to facilitate the interpretation of the rules.'' [150]

Several other commentators, however, urged the Commission to adopt a broader, more detailed, and non-exhaustive list of payment types.[151] For example, in addition to the statutory list of payments, some commentators suggested the rule specify as fees required to be disclosed a wide range of fees, including concession fees, entry fees, leasing and rental fees, which are covered under the EITI, as well as acreage fees, pipeline and other transportation fees, fees for environmental, water and surface use, land use, and construction permits, customs duties, and trade levies.[152] Other commentators opposed the disclosure of any fees or permits that are not unique to the resource extraction industry or that represent ordinary course payments for goods and services to government-owned entities acting in a commercial capacity.[153]

Some commentators agreed that, as proposed, resource extraction issuers should have to disclose taxes on corporate profits, corporate income, and production, but should not be required to disclose taxes levied on consumption.[154] Commentators expressed concern, however, that because corporate income taxes are measured at the entity level, it would be difficult to derive a disaggregated, per project amount for those tax payments.[155] A couple of those commentators noted that compounding this difficulty is the fact that the total amount of income tax paid is a net amount reflecting tax credits and other tax deductions included under commercial arrangements with the host government. Tax credits and deductions may result from offsetting results from one set of projects against credits and deductions of other projects, according to some commentators, and therefore deriving an income tax payment by individual project would be very difficult.[156] Other commentators opposed requiring the disclosure of payments for corporate income taxes because those payments are generally applicable to any business activity and are not specifically made to further the commercial development of oil, natural gas, or minerals.[157] Still other commentators believed that issuers should have to disclose payments for consumption and other types of taxes, including value added taxes, withholding taxes, windfall or excess profits taxes, and environmental taxes.[158] One commentator believed consumption and other taxes should be disclosed to the extent they are ''discriminatory taxes targeted at specific industries, as opposed to taxes of general applicability.'' [159]

Several commentators requested expansion of the proposed list of payment types to include specifically at least those types typically disclosed under the EITI, such as signature, discovery, and production bonuses, and dividends.[160] With regard to dividends, commentators noted that a government or government-owned company often owns shares in a holding company formed to develop and produce resources.[161] In those situations, an issuer may pay dividends to the government or government-controlled company in lieu of royalties or production entitlements.[162] One commentator further stated that, unlike the equity share that a private operator would enjoy, in those situations the government participates on a preferential basis not available to other entities.[163] According to commentators, dividends paid to the government or government-owned company in those situations would be a material benefit, reportable under the EITI, and part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals.[164] Focusing on the mining industry, one commentator explained that ''[o]wnership in the share capital of a holding company that owns a mine is an alternative structure to a production entitlement or royalty interest, and dividends paid are part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals.'' [165]

Other commentators, however, opposed requiring disclosure of dividend payments.[166] According to one commentator, dividends are indirect payments that are outside the core elements of the revenue stream for the commercial development of oil, natural gas or minerals, and therefore should be excluded.[167] Another commentator opposed the inclusion of dividends because of its belief that dividend payments are not generally associated with a particular project.[168] A third commentator believed that, because ''the term 'dividends' relates to amounts received by the host country government as a shareholder in a state enterprise[,]'' dividend payments ''essentially are inter-governmental transfers'' and therefore are more

[149] *See* letters from API 1, Chevron, ExxonMobil 1, NMA 2, PetroChina, RDS 1, and Statoil.

[150] *See* letter from BP 1.

[151] *See* letters from Calvert, CRS, Earthworks, Global Witness 1, Le Billon, ONE, PWYP 1, TIAA, and WRI.

[152] *See* letters from Earthworks (supporting PWYP), CRS, Global Witness 1, Le Billon, ONE, PWYP pre-proposal, and PWYP 1.

[153] *See* letters from Cleary and Vale.

[154] *See* letters from API 1, ExxonMobil 1, NMA 2, and RDS 1.

[155] *See* letters from API 1, BHP Billiton, BP 1, ExxonMobil 1, IAOGP, Petrobras, Statoil, and Talisman.

[156] *See* letters from API 1 and ExxonMobil 1.

[157] *See* letters from Akin Gump Strauss Hauer & Feld LLP (March 2, 2011) and Cleary.

[158] *See* letters from Barrick Gold, Earthworks, and PWYP 1.

[159] Letter from AngloGold.

[160] *See* letters from AngloGold, Barrick Gold, ERI 1, Earthworks, ExxonMobil 1, Global Witness 1, ONE, and PWYP 1.

[161] *See* letters from API 1, AngloGold, ERI 1, and ExxonMobil 1.

[162] *See* letters from AngloGold and ERI 1.

[163] *See* letter from ERI 1. This commentator noted that a significant portion of the revenue recognized by the government in such cases comes from its ''equity stake in the operation—often known as the production share—or from dividends.''

[164] *See* letters from API 1, AngloGold, ExxonMobil 1, and PWYP 1.

[165] *See* letter from AngloGold.

[166] *See* letters from NMA 2, RDS 1, and Statoil.

[167] *See* letter from Statoil.

[168] *See* letter from RDS 1.

appropriately reported by the government in an EITI reporting country.[169]

Many commentators supported the inclusion of in-kind payments, particularly in connection with production entitlements.[170] A couple of commentators requested that the Commission add language to the rule text to make explicit that issuers would be permitted to report payments in cash or in kind.[171] Another commentator stated that the Commission should provide instructions concerning how to disclose a production entitlement in kind, including which unit of measure to use, whether to provide a monetary value, and, if so, which currency to use.[172] A couple of commentators suggested allowing companies to report the payments at cost or, if not determinable, at fair market value.[173]

Some commentators did not believe that we need to further identify ''other material benefits'' that are part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals.[174] Other commentators, however, either urged us to provide a broad, non-exclusive definition of ''other material benefits'' or to specify that certain types of payments should be included under that category because they are part of the commonly recognized revenue stream.[175]

Some commentators suggested that ''other material benefits'' should include payments for infrastructure improvements because natural resources are frequently located in remote or undeveloped areas, which requires resource extraction issuers, particularly mining companies, to make payments for infrastructure improvements that are generally viewed as part of the cost of doing business in those areas.[176] One commentator stated that payments for infrastructure improvements should be considered part of the commonly recognized revenue stream to the extent that they constitute part of the issuer's overall relationship with the government according to which the issuer engages in the commercial development of oil, natural gas, or minerals, while voluntary payments for infrastructure improvements should be excluded.[177] Another commentator believed that payments for infrastructure improvements should be disclosed even if not required by contract if an issuer undertakes them to build goodwill with the local population.[178]

Other commentators opposed requiring the disclosure of payments for infrastructure improvements.[179] One commentator maintained that voluntary payments for infrastructure improvements should not be covered by the rules because they do not constitute part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals.[180] Other commentators acknowledged that infrastructure improvements are often funded by issuers as part of the commercial development of oil and gas resources, but those commentators nevertheless believed that such payments should be excluded because they are typically not material compared to the primary types of payments required to be disclosed under Section 13(q).[181] Another commentator stated that payments for infrastructure improvements are of a de minimis nature compared to the overall costs of the commercial development of oil, natural gas, or minerals and, in many cases, are paid to private parties and not to government agencies.[182]

Several commentators recommended defining ''other material benefits'' to include social or community payments related to, for example, improvements of a host country's schools, hospitals, or universities.[183] While some commentators believed that, at a minimum, social or community payments should be included if required under the investment contract or the law of the host country,[184] other commentators suggested that voluntary social or community payments should be included as ''other material benefits'' because they represent an in-kind contribution to the state that, given their frequency, constitute part of the commonly recognized revenue stream of resource extraction.[185] One commentator noted that the Board of the EITI approved a revision to the EITI rules that would encourage EITI participants to disclose social payments that are material.[186] Some commentators also sought to include within the scope of ''other material benefits'' other types of payments, such as payments for security, personnel training, technology transfer, and local content and supply requirements, if required by the production contract.[187]

Several other commentators, however, maintained that social or community payments or other ancillary payments are considered indirect benefits under EITI guidelines, are typically not material, and therefore are not part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals.[188] Another commentator stated that payments for social and community needs and ancillary payments should be excluded from the final rules unless they are expressly required by the concession contract, law, or regulation.[189]

c. Final Rules

While we are adopting the list of payment types largely as proposed, we are making some additions and clarifications to the list of payment types in response to comments. Specifically, the final rules are consistent with the definition of payment in Section 13(q) and state that the term ''payment'' includes:

- Taxes;
- Royalties;
- Fees;
- Production Entitlements;
- Bonuses;
- Dividends; and

[169] Letter from NMA 2.

[170] *See* letters from API 1, AngloGold, Barrick Gold, ERI 1, EG Justice (March 29, 2011), ExxonMobil 1, HURFOM 1, Le Billon, NMA 2, Petrobras, RDS 1, TIAA, and WRI. One commentator noted that payments in kind for ''infrastructure barter deals'' have greatly increased over the past decade. *See* letter from Le Billon.

[171] *See* letters from ERI 1 and NMA 2.

[172] *See* letter from Petrobras.

[173] *See* letters from AngloGold and NMA 2. NMA also suggested requiring companies to report in-kind payments in the currency of the country in which it is made and not requiring conversion of all payments to the reporting currency.

[174] *See* letters from API 1, ExxonMobil 1, PetroChina, and RDS 1.

[175] *See, e.g.,* letters from AngloGold, Barrick Gold, ERI 1, Earthworks, Global Witness 1, ONE, PWYP 1, Sen. Levin 1, and WRI.

[176] *See, e.g.,* letters from ERI 1, Global Witness 1, and PWYP 1.

[177] *See* letter from AngloGold.

[178] *See* letter from ERI 1.

[179] *See* letters from API 1, ExxonMobil 1, NMA 2, RDS 1, and Statoil.

[180] *See* letter from NMA 2.

[181] *See* letters from API 1 and ExxonMobil 1. *See also* letter from Statoil (stating that payments for infrastructure improvements are indirect payments that are not part of the core elements of the revenue stream for the commercial development of oil, natural gas, or minerals).

[182] *See* letter from RDS 1.

[183] *See* letters from AngloGold, Barrick Gold, ERI 1, Earthworks, EG Justice, ONE, PWYP 1, Sen. Levin 1, and WRI.

[184] *See* letters from AngloGold, EG Justice (noting that in at least one country, Equatorial Guinea, companies engaged in upstream oil activities are required by that country's hydrocarbons law to invest in the country's development), ONE, and PWYP 1.

[185] *See* letters from Barrick Gold, ERI 1, Earthworks, and WRI.

[186] *See* letter from PWYP 1.

[187] *See, e.g.,* letters from ERI 1, Global Witness 1, and PWYP 1.

[188] *See* letters from API 1, ExxonMobil 1, PetroChina, RDS 1, and Statoil.

[189] *See* letter from NMA 2.

• Payments for infrastructure improvements.[190]

As we noted in the Proposing Release and above, we interpret Section 13(q) to provide that the types of payments that are included in the statutory language should be subject to disclosure under our rules to the extent that the Commission determines that the types of payments and any ''other material benefits'' are part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals. As noted, the statute provides that our determination should be consistent with the EITI's guidelines, to the extent practicable. Therefore, we are including all the payments listed above in the final rules because they are part of the commonly recognized revenue stream. We do not believe the final rules should include a broad, non-exhaustive list of payment types or category of ''other material benefits,'' as was suggested by some commentators,[191] because we do not believe including a broad, non-exclusive category would be consistent with our interpretation that the Commission must determine the ''material benefits'' that are part of the commonly recognized revenue stream. Thus, under the final rules, resource extraction issuers will be required to disclose only those payments that fall within the specified list of payment types in the rules, which include payment types that we have determined to be material benefits that are part of the commonly recognized revenue stream, and that otherwise meet the definition of ''payment.''

We agree generally with those commentators who stated that it would be appropriate to add the types of payments included under the EITI but not explicitly mentioned under Section 13(q) to the list of payment types required to be disclosed because their inclusion under the EITI is evidence that they are part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals.[192] Accordingly, the final rules add dividends to the list of payment types required to be disclosed.[193] The final rules clarify in an instruction that a resource extraction issuer generally need not disclose dividends paid to a government as a common or ordinary shareholder of the issuer as long as the dividend is paid to the government under the same terms as other shareholders. The issuer will however be required to disclose any dividends paid to a government in lieu of production entitlements or royalties.[194] We agree with the commentators that stated ordinary dividends would not comprise part of the commonly recognized revenue stream because such dividend payments are not made to further the commercial development of oil, natural gas, or minerals,[195] except in cases where the dividend is paid to a government in lieu of production entitlements or royalties.

The final rules also include, in the list of payment types subject to disclosure, payments for infrastructure improvements, such as building a road or railway. Several commentators stated that, because resource extraction issuers often make payments for infrastructure improvements either as required by contract or voluntarily, those payments constitute other material benefits that are part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals.[196] We further note that some EITI participants have included infrastructure improvements within the scope of their EITI program, even though those payments were not required under the EITI until recently.[197] In February 2011 the EITI Board issued revised EITI rules[198] that require participants to develop a process to disclose infrastructure payments under an EITI program.[199] Thus, including infrastructure payments within the list of payment types required to be disclosed under the final rules will make the rules more consistent with the EITI, as directed by the statute.

Under the final rules, consistent with the recommendation of some commentators,[200] a resource extraction issuer must disclose payments that are not de minimis that it has made to a foreign government or the U.S. Federal Government for infrastructure improvements if it has incurred those payments, whether by contract or otherwise, to further the commercial development of oil, natural gas, or minerals. For example, payments required to build roads to gain access to resources for extraction would be covered by the final rules. If an issuer is obligated to build a road rather than paying the host country government to build the road, the issuer would be required to disclose the cost of building the road as a payment to the government to the extent that the payment was not de minimis.[201]

The final rules do not require a resource extraction issuer to disclose social or community payments, such as payments to build a hospital or school, because it is not clear that these types of payments are part of the commonly recognized revenue stream. We note commentators' views on whether social or community payments should be included varied more than their views on whether payments for infrastructure improvements should be included. Further, this treatment of social or community payments is consistent with the EITI, which encourages, but does not require, EITI participants to include social payments and transfers in EITI

[190] Under Section 13(q) and the final rules, the term ''payment'' is defined as a payment that is not de minimis, that is made to further the commercial development of oil, natural gas, or minerals, and includes specified types of payments. Thus, in determining whether disclosure is required, resource extraction issuers will need to consider whether they have made payments that fall within the specified types and otherwise meet the definition of payment.

[191] *See* note 175 and accompanying text.

[192] *See, e.g.,* letter from AngloGold.

[193] The EITI describes dividends as ''dividends paid to the host government as shareholder of the national state-owned company in respect of shares and any profit distributions in respect of any form of capital other than debt or loan capital.'' *EITI Source Book,* at 27–28.

[194] *See* Instruction 7 to Item 2.01.

[195] *See* letters from Cleary and Statoil.

[196] *See* letters from AngloGold, Barrick Gold, ERI 1, Earthworks, EG Justice, Global Witness 1, ONE, and PWYP 1.

[197] *See* the 2009 EITI report for Ghana (reported under Mineral Development Fund contributions), the 2008 EITI report for the Kyrgyz Republic (reported under social and industrial infrastructure payments), the 2008–2009 EITI report for Liberia (reported under county and community contributions), and the 2008 EITI report for Mongolia (reported under donations to government organizations).

[198] *See EITI Rules 2011, available at http://eiti.org/document/rules.*

[199] *See* EITI Requirement 9(f) in *EITI Rules 2011,* at 24 (''Where agreements based on in-kind payments, infrastructure provision or other barter-type arrangements play a significant role in the oil, gas or mining sectors, the multi-stakeholder group is required to agree [to] a mechanism for incorporating benefit streams under these agreements in to its EITI reporting process * * *.''). The EITI Board has established a procedure to implement the new rules. According to the procedure, any country admitted as an EITI candidate on or after July 1, 2011 must comply with the new rules. Compliant countries are encouraged to make the transition to the new rules as soon as possible. The procedure also establishes a transition schedule for countries that are implementing the EITI but are not yet compliant. *See* the EITI newsletter, *available at http://eiti.org/news-events/eiti-board-agrees-transition-procedures-2011-edition-eiti-rules.*

[200] *See* note 176 and accompanying text.

[201] For a discussion of the treatment of in-kind payments under the final rules, see the text accompanying note 212. We note some commentators suggested infrastructure payments are usually not material compared to the other types of payments required to be disclosed under Section 13(q) and that infrastructure payments are of a de minimis nature compared to the overall costs of commercial development. *See* API 1, ExxonMobil 1, RDS 1, and Statoil. As discussed further below, the not de minimis requirement applies to all payment types, not just infrastructure payments.

programs if the participants deem the payments to be material.[202]

Consistent with the proposal and Section 13(q), the final rules will require a resource extraction issuer to disclose fees, including license fees, and bonuses paid to further the commercial development of oil, natural gas, or minerals. In response to requests by some commentators,[203] we are adding an instruction to clarify that fees include rental fees, entry fees, and concession fees, and bonuses include signature, discovery, and production bonuses.[204] As commentators noted,[205] the EITI Source Book specifically mentions these types of fees and bonuses as payments that are typically disclosed by EITI participants.[206] We believe this demonstrates that these types of fees and bonuses are part of the commonly recognized revenue stream, and therefore the final rules include an instruction clarifying that disclosure of these payments is required. The fees and bonuses identified are not an exclusive list, and there may be other fees and bonuses a resource extraction issuer would be required to disclose. A resource extraction issuer will need to consider whether payments it makes fall within the payment types covered by the rules.

Consistent with the proposal and Section 13(q), the final rules will require a resource extraction issuer to disclose taxes. In addition, the final rules include an instruction, as proposed, to clarify that a resource extraction issuer will be required to disclose payments for taxes levied on corporate profits, corporate income, and production, but will not be required to disclose payments for taxes levied on consumption, such as value added taxes, personal income taxes, or sales taxes.[207] This approach is consistent with the statute, which includes taxes in the list of payment types required to be disclosed, and with the EITI.[208] In response to concerns expressed about the difficulty of allocating certain payments that are made for obligations levied at the entity level, such as corporate taxes, to the project level,[209] the final rules provide that issuers may disclose those payments at the entity level rather than the project level.[210]

We are not persuaded that there are other types of payments that currently constitute material benefits that are part of the commonly recognized revenue stream. Therefore, the final rules do not include any additional payment types in the list of payment types resource extraction issuers must disclose.

As previously noted, many commentators supported the inclusion of in-kind payments, particularly in connection with production entitlements.[211] Under the final rules, resource extraction issuers must disclose payments of the types identified in the rules that are made in kind.[212] Because Section 13(q) specifies that the final rules require the disclosure of the type and total amount of payments made for each project and to each government, issuers will need to determine the monetary value of in-kind payments.[213] Consistent with suggestions we received on disclosing these types of payments,[214] the final rules specify that issuers may report in-kind payments at cost, or if cost is not determinable, fair market value, and provide a brief description of how the monetary value was calculated.[215]

Finally, a resource extraction issuer may not conceal the true nature of payments or activities that otherwise would fall within the scope of the final rules, or create a false impression of the manner in which it makes payments, in order to circumvent the disclosure requirements. As suggested by one commentator,[216] to address the potential for circumvention of the disclosure requirements, the final rules include an anti-evasion provision. This provision is intended to emphasize the substance over the form or characterization of an activity or payment. For example, a resource extraction issuer that typically engages in a particular activity that otherwise would be covered under the definition of commercial development of oil, natural gas, or minerals, and that changes the way it categorizes the same activity after the issuance of final rules to avoid disclosing payments related to the activity may be viewed as seeking to evade the disclosure requirements. Similarly, a resource extraction issuer that typically makes payments of the type that would otherwise be covered under the final rules and that changes the way it categorizes or makes payments after issuance of the final rules so that the payments are not technically required to be disclosed may be viewed as seeking to evade the disclosure requirements. The final rules will require disclosure with respect to activities or payments that, although not in form or characterization of one of the categories specified under the final rules, are part of a plan or scheme to evade the disclosure requirements under Section 13(q).[217]

2. The ''Not De Minimis'' Requirement

a. Proposed Rules

Section 13(q) and the proposal define payment, in part, to be a payment that is ''not de minimis.'' Neither the statute nor the proposed rules define ''not de minimis.'' Under Section 13(q) and the proposal, if the other standards for disclosure are met, resource extraction issuers would be required to disclose payments made that are ''not de minimis.''

Under the EITI, countries are free to establish a materiality level for disclosure.[218] Section 13(q) established

[202] *See* EITI Requirement 9(g) in *EITI Rules 2011,* at 24. Resource extraction issuers could, of course, voluntarily include information about these types of payments in their disclosure on Form SD.

[203] *See* note 160 and accompanying text.

[204] *See* Instruction 6 to Item 2.01 of Form SD.

[205] *See, e.g.,* letters from API 1 and ExxonMobil 1.

[206] *See* the *EITI Source Book,* at 28.

[207] *See* Instruction 5 to Item 2.01 of Form SD.

[208] The EITI Source Book specifically mentions the inclusion of taxes levied on income, production or profits and the exclusion of taxes levied on consumption, such as value-added taxes, personal income taxes or sales taxes. *See* the *EITI Source Book,* at 28.

[209] *See* note 155 and accompanying text.

[210] *See* discussion in Section II.F.2.c below.

[211] *See* note 170 and accompanying text. In-kind payments include, for example, making a payment to a government in oil rather than a monetary payment.

[212] We note that this is consistent with the reporting of production entitlements under the EITI. *See* the *EITI Source Book,* at 27.

[213] Although a couple of commentators suggested that issuers be permitted to report payments in cash or in kind, we note that Section 13(q) requires the type and total amount of payments made for each project and to each government, and total amount of payments by category. In order for issuers to provide a these total amounts, we believe it is necessary to provide a monetary value for any in-kind payments. Thus, the final rules require that issuers provide a monetary value for payments made in kind. In addition, in light of the requirement in Section 13(q) to tag the information to identify the currency in which the payments were made, the final rules instruct issuers providing a monetary value for in-kind payments to tag the information as ''in kind'' for purposes of the currency tag.

[214] *See* note 173 and accompanying text.

[215] *See* Instruction 1 to Item 2.01 of Form SD.

[216] *See* letter from Sen. Levin (February 17, 2012) (''Sen. Levin 2'').

[217] *See* Instruction 9 to Item 2.01 of Form SD.

[218] For example, countries may establish a materiality level based on the size of payments or the size of companies subject to disclosure. *See Implementing the EITI,* at 30. The EITI Source Book notes that a benefit stream is material ''if its omission or misstatement could distort the final EITI report'' for the country. *EITI Source Book,* at 26. Because there is no pre-determined materiality level prescribed for all countries implementing the EITI, the multi-stakeholder group in each EITI-implementing country determines the threshold for disclosure that is appropriate for that country. *See Implementing the EITI,* at 31. The EITI recommends the following alternatives for considering a benefit stream to be material:

''Alternative 1: [if it is] more than A% of the host government's estimated total production value for the reporting period;

Alternative 2: [if it is] more than B% of the company's estimated total production value in the host country for the reporting period; or

the threshold for payment disclosure as ''not de minimis'' rather than requiring disclosure of ''material'' payments. Given the use of the phrase ''not de minimis,'' we stated in the Proposing Release our preliminary belief that ''not de minimis'' does not equate with a materiality standard. In doing so, we noted that that the term ''de minimis'' is generally defined as something that is ''lacking significance or importance'' or ''so minor as to merit disregard.'' [219] We also noted that we preliminarily believed that the term is sufficiently clear and that further explication was unnecessary.

b. Comments on the Proposed Rules

We received significant comment on this aspect of the proposal. Some commentators agreed that it is not necessary to define ''not de minimis.'' [220] Two of those commentators suggested that an issuer should be required to disclose the methodology used to determine what is ''not de minimis.'' [221] One commentator noted that ''not de minimis'' is a commonly-understood term.[222]

Most commentators that addressed the issue urged the Commission to define ''not de minimis.'' [223] Several commentators stated that the Commission should avoid adopting a definition that uses one or more quantitative measures and, instead, should define ''not de minimis'' to mean material.[224] According to those commentators, a definition based on materiality would be consistent with the EITI and the Commission's longstanding disclosure regime.[225] One commentator stated that adopting a definition of ''not de minimis'' based on materiality would encourage ''reasonable consistency of disclosure across all issuers'' and result ''in the disclosure of all material facts necessary for investors'' without the Commission having to provide further guidance on how to determine materiality.[226]

Other commentators, however, agreed with our belief that ''not de minimis'' does not equate with material.[227] Several commentators noted that a provision of the U.S. federal tax code includes the following definition of ''de minimis'': ''[a] property or service the value of which is * * * so small as to make accounting for it unreasonable or administratively impracticable.'' [228] One commentator stated that if we were to adopt a qualitative, principle-based standard when defining de minimis, it should be based on ''the relevance of a payment in relation to a country's size'' rather than with regard to a company's overall payments, assets or similar metric.[229] A few commentators requested ''that a reasonable minimum threshold for payments to be reported should be set'' without suggesting a particular minimum threshold.[230]

Several commentators urged us to adopt a definition of ''not de minimis'' based on one or more quantitative measures.[231] Commentators stated that such a definition was necessary to provide clarity regarding the disclosure requirements.[232] Two commentators suggested using an absolute dollar amount in the definition because they believed that such a standard would be easier to apply than a percentage, would reduce compliance costs, and would help ensure consistent disclosure and comparability.[233] Another commentator similarly believed that the use of an absolute dollar amount would help level the playing field among issuers.[234]

Commentators offered various suggestions for a quantitative threshold. Some commentators suggested requiring the reporting of payments above $10,000.[235] In addition, numerous commentators signed a petition supporting a de minimis threshold ''in the low thousands (U.S. dollars) to prevent millions of dollars from going unreported.'' [236] Several commentators suggested that we should define ''not de minimis'' using a standard similar to a listing standard of the London Stock Exchange's Alternative Investment Market (''AIM''), which requires disclosure of any payment made to any government or regulatory authority by an oil, gas, or mining company registrant that, alone or as a whole, is over £10,000, or approximately $15,000.[237] One commentator suggested a reporting threshold ''in the tens of

Alternative 3: [if it is] more than USD C million [or local currency D million].''

*EITI Source Book,* at 27.

[219] *See* the definition of ''de minimis'' in Merriam-Webster Dictionary, *available at http://www.merriam-webster.com/dictionary/deminimis.* We note, in contrast, that Rule 12b–2 under the Exchange Act [17 CFR 240.12b–2] defines ''material'' when used to qualify a requirement for the furnishing of information as to any subject, as limited to information required to those matters to which there is a substantial likelihood that a reasonable investor would attach importance in determining whether to buy or sell the securities registered. *See also* Rule 405 under the Securities Act [17 CFR 230.405]. In addition, the U.S. Supreme Court has held that, in a securities fraud suit, an omitted fact is material if there is a substantial likelihood that its disclosure would have been considered significant by a reasonable investor. *See Basic Inc.* v. *Levinson,* 485 U.S. 224 (1988) and *TSC Industries. Inc., et al.* v. *Northway, Inc.,* 426 U.S. 438 (1976).

[220] *See* letters from Cleary, Global Witness 1, NMA 2, PetroChina, and Rio Tinto.

[221] *See* letters from NMA 2 and Rio Tinto.

[222] *See* letter from Global Witness 1. This commentator suggested that, in the alternative, we should define the term as an amount that meets or exceeds the lesser of (1) $1,000 for an individual payment or $15,000 in the aggregate over a period, or (2) a particular percentage of the issuer's per project expenditures. It also noted that it believes ''not de minimis'' should be assessed relative to the total expenditures on a project and not relative to the size or valuation of the entity making the payments.

[223] *See, e.g.,* letters from AngloGold, Barrick Gold, BP 1, CalSTRS, Calvert, CRS, Earthworks, Harrington Investments, Inc. (January 19, 2011) (''HII), RDS 1, Sen. Levin 1, and SIF.

[224] *See* letters from API 1, BP 1, Chevron, ExxonMobil 1, RDS 1, and Statoil.

[225] *See, e.g.,* letters from API 1 and Chevron. According to one commentator, adopting a definition based on specific quantitative measures rather than existing materiality guidance would ''substantially increase the likelihood of overburdening issuers and users with large volumes of unnecessary and immaterial detail * * * and significantly increase the regulatory burden and cost of compliance.'' *See* letter from Chevron. *See also* letters from API 1 and ExxonMobil 1. Other commentators believed that an issuer should be able to rely on materiality principles for guidance when determining whether a payment is ''not de minimis,'' but did not think that a definition of ''not de minimis'' was necessary. *See* letters from Cleary, NMA 2, PetroChina, and Rio Tinto.

[226] *See* letter from API 1.

[227] *See, e.g.,* letters from Barrick Gold, Calvert, ERI 1, Global Witness 1, HURFOM 1, PWYP 1, and TIAA.

[228] Letter from Calvert (quoting 26 U.S.C. § 132(e)(1)); *see also* letters from Global Witness 1, PWYP 1, and TIAA.

[229] *See* letter from PWYP 1.

[230] *See* letters from Derecho, Greenpeace, and Guatemalan Forest Communities.

[231] *See* letters from AngloGold, Barrick Gold, CalSTRS, CRS, Earthworks, HII, PWYP 1 (suggesting both qualitative and quantitative standards), RWI 1, Sen. Levin 1, and SIF. Another commentator noted that we have adopted objective standards in other contexts and requested that we do so for the definition of ''not de minimis.'' That commentator further suggested that we may need to adopt different quantitative standards for large-cap and small-cap companies, but it did not recommend particular standards. *See* letter from AXPC.

[232] *See* letters from Barrick Gold and Talisman.

[233] *See* letters from AngloGold (recommending defining ''de minimis'' to mean ''any payment or series of related payments made at the tax-paying entity level which in the aggregate is less than U.S.$1,000,000'') and CRS (recommending an amount ''significantly less than $100,000'' and as an aggregate of payments of the same type during the reporting period covered).

[234] *See* letter from Talisman (noting that it currently reports payments in excess of one million dollars and supporting a minimum level of reporting of one million dollars).

[235] *See* letters designated ''Type B'' (suggesting $10,000 threshold without elaboration) and letter from Le Billon (stating that a ''minimal value of $10,000 would be consistent with many legislations seeking to track financial flows, e.g. for the purpose of money laundering'').

[236] ONE Petition.

[237] *See* letters from CalSTRS, HII, RWI 1, Sen. Levin 1, SIF, and WACAM. Several commentators suggested defining the term further to require disclosure of any individual payment that exceeded $1,000 as well as payments of the same type that in the aggregate exceeded $15,000. *See* letters from Earthworks, Global Witness 1, Global Witness 3, and PWYP 1.

thousands.'' [238] Another commentator believed that we should provide a specific threshold and that it should be significantly less than $100,000.[239] The commentator further stated that the threshold should be defined as an aggregate of payments of the same type during the reporting period covered. Another commentator suggested using an absolute dollar amount that would vary depending on the size of an issuer's market capitalization.[240]

One commentator suggested defining ''de minimis'' to mean ''any payment or series of related payments made at the tax-paying entity level which in the aggregate is less than U.S.$1,000,000.'' [241] Another commentator similarly suggested using an absolute dollar amount threshold of $1,000,000 while noting that it currently reports payments in excess of that amount. According to that commentator, its ''experience supports [$1,000,000] as the minimum level of reporting to ensure that the objectives of revenue transparency are met while not clouding the data with largely irrelevant information.'' [242] One commentator, however, opposed a ''not de minimis'' threshold of $1,000,000 because it believed such a threshold would exclude many payments made in the extractive industry.[243] Another commentator similarly cautioned against setting the ''not de minimis'' threshold too high because it would leave important payment streams undisclosed and could encourage companies and governments to structure payments in future contracts in a way that would avoid the disclosure requirement.[244]

Other commentators suggested adopting a quantitative definition of ''not de minimis'' that uses a relative measure, either alone or with an absolute dollar amount.[245] One commentator suggested defining ''not de minimis'' to mean five percent or more of an issuer's upstream expenses or revenues.[246] Another commentator suggested defining ''not de minimis'' as the lesser of two percent of the issuer's consolidated expenditures and $1,000,000.[247] According to that commentator, using a standard based on the lesser of a dollar amount or a percentage of expenses would reflect the size of a company but still ensure the disclosure of significant payments by a larger company.[248]

c. Final Rules

We have determined to adopt a definition of ''not de minimis'' to provide clear guidance regarding when a resource extraction issuer must disclose a payment.[249] We have considered whether to define the term using a materiality standard, as some commentators have recommended.[250] We continue to believe that given the use of the phrase ''not de minimis'' in Section 13(q) rather than use of a materiality standard, which is used elsewhere in the federal securities laws and in the EITI,[251] ''not de minimis'' was not intended to equate to a materiality standard.

More fundamentally, for purposes of Section 13(q), we do not believe the relevant point of reference for assessing whether a payment is ''not de minimis'' is the particular issuer. Rather, because the disclosure is designed to further international transparency initiatives regarding payments to governments for the commercial development of oil, natural gas, or minerals, we think the better way to consider whether a payment is ''not de minimis'' is in relation to host countries. We recognize that issuers may have difficulty assessing the significance of particular payments for particular countries or recipient governments and, as explained below, are adopting a $100,000 threshold that, we believe, will facilitate compliance with the statute by providing clear guidance regarding the payments that resource extraction issuers will need to track and report and will promote the transparency goals of the statute. In addition, we believe the threshold we are adopting will result in a lesser compliance burden than would otherwise be associated with the final rules if a lower threshold were used because issuers may track and report fewer payments than they would be required to report if a lower threshold was adopted.

Of the suggested approaches for defining ''not de minimis,'' we believe that a standard based on an absolute dollar amount is the most appropriate because it will be easier to apply than a qualitative standard or a relative quantitative standard based on a percentage of expenses or revenues of the issuer,[252] or some other fluctuating measure, such as a percentage of the host government's or issuer's estimated total production value in the host country for the reporting period. Using an absolute dollar amount threshold for disclosure purposes should help reduce compliance costs and may also promote consistency and comparability.[253]

The final rules define ''not de minimis'' [254] to mean any payment, whether made as a single payment or series of related payments, that equals or exceeds $100,000 during the most recent fiscal year.[255] The final rules provide that in the case of any arrangement providing for periodic payments or installments (*e.g.,* rental fees), a resource extraction issuer must consider the aggregate amount of the related periodic payments or installments of the related payments in determining whether the payment threshold has been met for that series of payments, and accordingly, whether disclosure is required.[256] As discussed further below, we considered a variety of alternatives when considering what, if any, definition would be appropriate for ''not de minimis.''

We believe that a $100,000 threshold is more appropriate than, and an acceptable compromise to, the amounts

238 *See* letter from Global Movement for Budget Transparency, Accountability and Participation (March 30, 2012) (''BTAP'').

239 *See* letter from CRS. *See also* letter from PWYP 1 (stating that $100,000 would not be an appropriate de minimis threshold because $100,000 could exceed the annual payments, such as lease rents or license fees, in some projects).

240 *See* letter from AXPC. That commentator, however, did not specify any particular dollar amount or corresponding size of market capitalization.

241 *See* letter from AngloGold.

242 Letter from Talisman.

243 *See* letter from ERI 3 (referring to disclosure in Sierra Leone's 2010 EITI Report and noting that a $1,000,000 threshold would exclude payments for half of the companies reporting in Sierra Leone). *See also* ONE Petition (urging the Commission to adopt a final rule that ''sets the de minimis threshold in the low thousands (U.S. dollars) to prevent millions of dollars from going unreported'').

244 *See* letter from Rep. Frank *et al.*

245 *See* letters from Barrick Gold and RDS 1 (RDS suggested a quantitative definition if the Commission determines not to define the term as ''material'').

246 *See* letter from RDS 1.

247 *See* letter from Barrick Gold (suggested ''consolidated expenditures'' but did not provide an explanation of the term).

248 *See* letter of Barrick Gold.

249 *See, e.g.,* letters from Barrick Gold and Talisman.

250 *See* note 224 and accompanying text.

251 *See* note 218 and accompanying text.

252 *See* notes 231–233 and accompanying text.

253 *See* note 233 and accompanying text. Furthermore, some commentators who suggested a relative standard did not provide definitions, or suggested a standard based on upstream payments only even though the required disclosure includes additional payments.

254 *See* Item 2.01(c)(7) of Form SD.

255 For example, a resource extraction issuer that paid a $150,000 signature bonus would be required to disclose that payment. As another example, a resource extraction issuer obligated to pay royalties to a government annually and that paid $10,000 in royalties on a monthly basis to satisfy its obligation would be required to disclose $120,000 in royalties.

256 *See* Item 2.01(c)(7) of Form SD. This is similar to other instructions in our rules requiring disclosure of a series of payments. *See, e.g.,* Instructions 2 and 3 to Item 404(a) of Regulation S–K (17 CFR 229.404(a)).

suggested by commentators.[257] Commentators supporting an absolute dollar amount differed widely on the amount best suited for the threshold, with commentators suggesting an amount in the ''low thousands'' of U.S. dollars,[258] $10,000,[259] $15,000,[260] an amount less than $100,000,[261] and $1,000,000.[262] We are not adopting a threshold in the low thousands of U.S. dollars, $10,000, or $15,000 threshold. In light of the comments received, we are concerned that those amounts could result in undue compliance burdens and raise competitive concerns for many issuers. While supporters of a $15,000 threshold noted its similarity to the AIM listing requirement, we do not believe that applying the threshold used in that listing requirement is appropriate for purposes of Section 13(q) because that threshold was designed to apply to the smaller companies that comprise the AIM market.[263]

Although a few commentators suggested we use $1,000,000 as the threshold,[264] including one commentator that stated it reports payments to governments in excess of $1,000,000,[265] we do not believe that $1,000,000 would be an appropriate threshold. While many EITI-reporting companies have reported payments in excess of $1,000,000,[266] we note that the EITI provides that countries may establish a ''materiality'' level for disclosure, which, as noted, is different from the ''not de minimis'' standard in Section 13(q). We agree with those commentators that cautioned against setting the threshold too high so as to leave important payment streams undisclosed.[267] Adopting $100,000 as the ''not de minimis'' threshold furthers the purpose of Section 13(q) and will result in a lesser compliance burden than would otherwise be associated with the final rules if a lower threshold were used.

Although adoption of a $100,000 threshold may be viewed as somewhat high by some commentators [268] and may result in some smaller payments not being reported, we believe this threshold strikes an appropriate balance between concerns about the potential compliance burdens of a lower threshold and the need to fulfill the statutory directive that payments greater than a ''de minimis'' amount be covered. We acknowledge that a ''not de minimis'' definition based on a materiality standard, or a much higher amount, such as $1,000,000, would lessen commentators' concerns about the compliance burden and potential for competitive harm.[269] We believe, however, that use of the term ''not de minimis'' in Section 13(q) indicates that a threshold quite different from a materiality standard, and significantly less than $1,000,000, is necessary to further the transparency goals of the statute.

In adopting the final rules, we believe an absolute, rather than relative, threshold may make the requirement easier for issuers to comply with and allow for increased comparability of payment disclosures. We considered adopting a threshold that would have required disclosure of the lesser of a specific dollar amount or a percentage of expenses, as suggested by commentators.[270] We determined not to adopt such an approach because we agree with other commentators that noted such an approach would be more difficult for issuers to comply with, could raise the compliance costs associated with tracking and reporting the information, and would make comparability of disclosure more difficult.[271] For similar reasons, we decided not to adopt a threshold that exclusively used a percentage threshold based on an issuer's expenses or revenues, or some other fluctuating measure. We note that exclusively using a percentage threshold based on an issuer's expenses or revenues could result in larger companies having a higher payment threshold for disclosure than contemplated by the ''de minimis'' language in the statute.

3. The Requirement To Provide Disclosure for ''Each Project''

a. Proposed Rules

As noted in the proposal, Section 13(q) requires a resource extraction issuer to disclose information regarding the type and total amount of payments made to a foreign government or the Federal Government for each project relating to the commercial development of oil, natural gas, or minerals, but it does not define the term ''project.'' [272] Consistent with Section 13(q), the proposed rules would have required a resource extraction issuer to disclose payments made to governments by type and total amount per project. The proposed rules did not define ''project'' in light of the fact that neither Section 13(q) nor our current disclosure rules include a definition of the term. In addition, the EITI does not define the term or provide guidance on how it should be defined.

b. Comments on the Proposed Rules

Two commentators supported the proposed approach of leaving the term ''project'' undefined to allow flexibility for different types and sizes of businesses.[273] Most commentators that addressed the issue supported defining the term ''project,'' [274] but they disagreed as to the appropriate definition, with recommendations ranging from defining a ''project'' as each individual lease or license to defining it as a country. One commentator stated that leaving the term undefined ''would create significant uncertainty for issuers and

[257] The Proposing Release solicited comment on a wide range of absolute dollar amounts for the ''de minimis'' threshold, and requested data to support the definitions suggested by commentators. *See* Part II.D.2. of the Proposing Release. We received little data that was helpful. Although one commentator submitted data regarding payments made by some oil companies for tuition, rent, and living expenses for the students and relatives of officials in Equatorial Guinea, those payments are not within the list of payments types specified by Section 13(q). *See* letter from Sen. Levin 2. Another commentator noted that, based on Sierra Leone's 2007 EITI Reconciliation Report (published in 2010), a $1 million threshold would result in non-disclosure of over 40% of payments made by mining companies and all payments made by half of EITI reporting companies in that country. *See* letter from ERI 3. Although the letter provides information about payments made to Sierra Leone, it appears that the companies for which data is provided would not be subject to the reporting requirements under Section 13(q) and the related rules.

[258] *See* ONE Petition.

[259] *See* letters designated Type B and letter from Le Billon.

[260] *See* letters from CalSTRS, ERI 3, HII, RWI 1, Sen. Levin 1, SIF, and WACAM.

[261] *See* letters from CRS and PWYP 1.

[262] *See* letters from AngloGold and Talisman; *see also* letter from Barrick Gold.

[263] We also note that the AIM requirement differs from the disclosure required by Section 13(q) and the final rules in that the AIM only requires disclosure of payments by extractive issuers as an initial listing requirement and does not impose an ongoing reporting requirement related to those payments.

[264] *See* letters from AngloGold, Barrick Gold, and Talisman.

[265] *See* letter from Talisman.

[266] *See, e.g.,* the 2009 EITI Report for Ghana (regarding payment of royalties, corporate taxes, and dividends); the 2006–2008 EITI Report for Nigeria (regarding payment of petroleum taxes, royalties and signature bonuses); the 2004–2007 EITI Report for Peru (regarding payment of corporate income taxes and royalties); and the 2009 EITI Report for Timor Leste (regarding payment of petroleum taxes).

[267] *See* letters from ERI 3 and Rep. Frank *et al.*

[268] *See, e.g.,* letters from CRS (supporting a ''not de minimis'' threshold that is significantly less than $100,000) and PWYP 1 (supporting a ''not de minimis'' threshold of $1,000 for individual payments and $15,000 for payments in the aggregate); *see also* letter from ERI 3.

[269] *See* notes 224, 241, and 242 and accompanying text.

[270] *See* note 247 and accompanying text.

[271] *See* note 233 and accompanying text.

[272] The legislative history does not provide an indication as to how we should define the term.

[273] *See* letters from Cleary and NMA 2.

[274] *See, e.g.,* letters from API 1, Calvert, Chevron, PWYP 1, RDS 1, and Sen. Levin 1.

result in disclosures that are not comparable from issuer to issuer.'' [275] Several commentators urged us to adopt a definition of project that would not impede the ability of companies to compete for extractive industry contracts, but did not provide a particular definition.[276] One of those commentators recommended broadly defining ''project'' so that issuers would not have to disclose disaggregated price and cost information that could have anti-competitive effects.[277] Another of those commentators stated that we must adopt a definition of ''project,'' among other definitions, that is ''narrowly tailored to prevent a competitive imbalance for those SEC-registered companies which make payments to governments for the privilege of extracting natural resources.'' [278]

Some commentators suggested that we permit a resource extraction issuer to treat all of its operations in a single country as a project.[279] Commentators asserted that doing so would be consistent with the EITI and would prevent issuers from incurring tens of millions of dollars in compliance costs.[280] One commentator stated that defining ''project'' to require country-level disclosure would be consistent with Item 1200 of Regulation S–K, which treats an individual country as the lowest geographic level at which comprehensive oil and gas disclosures must be provided.[281] Commentators that opposed defining ''project'' as a country stated that such a definition would be inconsistent with the statute and Congressional intent.[282]

Other commentators supported defining ''project'' consistent with the definition of ''reporting unit.'' [283] According to one of those commentators, using a definition consistent with reporting unit ''would allow issuers to collect information on a basis with which they already are familiar, and draw upon established internal controls over financial reporting (''ICFR''), instead of having to reallocate and assign payments arbitrarily at a lower or different level than which they manage their operations, and incurring cost and burden beyond their existing ICFR systems.'' [284]

Other commentators stated that there are relatively limited instances in which resource extraction issuers make payments to governments at the entity level (for example, the payment of corporate income taxes), and that fact should have no bearing on the definition of ''project.'' [285] Those commentators noted that issuers could be permitted to report at the entity level those payments that are levied at the entity level that are not associated with a specific project.

Several commentators suggested defining the term in relation to a particular geologic resource. For example, ''project'' could be defined to mean technical and commercial activities carried out within a particular geologic basin or province to explore for, develop, and produce oil, natural gas, or minerals.[286] Two commentators further suggested that the definition could specify the covered activities to include acreage acquisition, exploration studies, seismic data acquisition, exploration drilling, reservoir engineering studies, facilities engineering design studies, commercial evaluation studies, development drilling, facilities construction, production operations, and abandonment.[287] The definition could further state that a project may consist of multiple phases or stages.[288]

Other commentators, however, opposed a definition of ''project'' based on a particular geologic basin or province.[289] Those commentators maintained that, because multiple companies often conduct activities in a single geologic basin, and because a basin may span more than one country, such a definition would be counter to the ''company-by-company'' and ''country-by-country'' reporting requirements of Section 13(q) and would be of limited use to citizens and investors. Commentators further stated that a definition of ''project'' based on a particular geologic basin would have no relation to the level at which royalty rates, tax payments, and other rights and fiscal obligations are assigned.[290]

Some commentators supported defining ''project'' to mean a material project,[291] while others opposed such a definition.[292] The commentators that supported defining the term to be a material project asserted that doing so would enable issuers to rely on traditional principles of materiality when determining what constitutes a project.[293] One commentator stated that materiality ''should be determined with reference to the issuer's total worldwide government payments and other qualitative factors.'' [294] Commentators that opposed defining ''project'' as a material project stated that such a definition is not supported by the plain

[275] Letter from API 1.

[276] *See* letters from Chairman Bachus and Chairman Miller, Timothy J. Muris and Bilal Sayyed (March 2, 2011) (''Muris and Sayyed''), and Split Rock.

[277] *See* letter from Muris and Sayyed.

[278] Letter from Chairman Bachus and Chairman Miller.

[279] *See* letters from AXPC, AngloGold, Barrick Gold, bcIMC, BHP Billiton, BP 1, Hispanic Leadership Fund (February 27, 2012), Petrobras, PWC, RDS 1, Sen. Murkowski and Sen. Cornyn, and Statoil. *See also* letters from API 1 and ExxonMobil 1 (stating that under certain circumstances, an issuer should be permitted to treat operations in a country as a project, for example, when all of an issuer's operations in a country relate to a single geologic basin or province).

[280] *See* letters from API 1, ExxonMobil 1, Petrobras, and RDS 1.

[281] *See* letter from PWC.

[282] *See, e.g.,* letters from Calvert, Earthworks, Global Financial 2, Global Witness 1, HURFOM 2, ONE, Oxfam 1, PWYP 1, Rep. Frank *et al.,* and Sen. Cardin *et al* 1. *See also* letter from Gates Foundation and Le Billon.

[283] *See* letters from API 1, Chevron, ExxonMobil 1, NMA 2, Rio Tinto, and Talisman. Generally, the commentators did not specify what they meant by reporting unit, but we assume that they were referring to a reporting unit as used for financial reporting purposes. *See also* note 305.

[284] Letter from NMA 2. In this regard, we note that the European Commission proposed disclosure requirements that would require companies that are registered or listed in the European Union to report payments to governments on a country and project basis where those payments had been attributed to a specific project. The reporting on a project basis would be made on the basis of companies' current reporting structures. *See Proposal for Directive on transparency requirements for listed companies and proposals on country by country reporting—frequently asked questions,* COM (2011) MEMO/11/734 (October 25, 2011), *available at http://europa.eu/rapid/pressReleasesAction.do?reference=MEMO/11/734&format=HTML&aged=0.* As noted above, the proposals are currently pending.

[285] *See* letters from Global Witness 1 and PWYP 1 (stating that a limited disclosure accommodation could be given in the relatively few instances that payments are made at the entity level). *See also* letter from Calvert (define ''project'' at the lease or license level except where payments originate at the entity level).

[286] *See* letters from API 1, API 3, Chairman Bachus, BP 1, Chamber Energy Institute, Chevron, ExxonMobil 1, IAOGP, Sen. Murkowski and Sen. Cornyn, Statoil, and USCIB.

[287] *See* letters from API 1 and ExxonMobil 1.

[288] *See* letters from API 1 and ExxonMobil 1.

[289] *See, e.g.,* letters from ERI 3, Gates Foundation, Oxfam (February 6, 2012) (''Oxfam 2''), Petition from Angolan citizens and Angolan civil society organizations (March 13, 2012) (''Angolan citizens''), Rep. Frank *et al.,* and Soros 2.

[290] *See, e.g.,* letters from Gates Foundation, Oxfam 2, and Rep. Frank *et al.*

[291] *See* letters from API 1, API 2, API 3, Chamber Energy Institute, Chevron, Cravath *et al.* pre-proposal, ExxonMobil 1, IAOGP, PetroChina, RDS 1, Sen. Murkowski and Sen. Cornyn, and Statoil.

[292] *See* letters from Global Witness 1, Oxfam 1, PWYP 1, and ERI 2. Oxfam and PWYP stated that should the Commission define ''project'' as a material project, it should clarify that, when determining the materiality of a project, consideration should be given to the significance of a project to a country and its citizens in addition to its significance to an issuer. According to PWYP, ''[t]he disclosure of projects that are material to the country would allow comparability across projects and meet the intent of the statute to provide information of use to hold governments accountable.''

[293] *See* letters from API 1, Chamber Energy Institute, Chevron, ExxonMobil 1, IAOGP, PetroChina, RDS 1, and Statoil.

[294] Letter from API 1.

language of Section 13(q) and would result in inconsistent disclosures.[295]

Several commentators urged the Commission to adopt a definition of ''project'' in relation to each lease, license, or other concession-level arrangement entered into by a resource extraction issuer.[296] In particular, one commentator urged us to adopt a definition of ''project'' as ''any oil, natural gas or mineral exploration, development, production, transport, refining or marketing activity from which payments above the de minimis threshold originate at the lease or license level, except where these payments originate from the entity level.'' [297] The commentators supporting a definition of ''project'' in relation to a lease or license asserted that such an approach would be appropriate because they believed the intent of Section 13(q) was to go beyond the EITI standards, and it would enable investors and others to evaluate the risks faced by issuers operating in resource-rich countries.[298]

According to some commentators, concerns expressed about compliance costs associated with project-level reporting ''inflate their likely impact'' because most issuers already have internal systems in place for recording payments that would be required to be disclosed under Section 13(q) and many issuers already report payments at the project level or are moving towards project-level disclosure.[299] Another commentator stated that project-level disclosure ''would have an extremely beneficial impact on improving investment risk assessment and would provide further levels of corporate and sovereign accountability.'' [300] That commentator further suggested that consistently applying the rules to all resource extraction issuers would diminish anti-competitive concerns.[301]

c. Final Rules

After carefully considering the comments, we have determined, consistent with the proposal, to leave the term ''project'' undefined in the final rules. We continue to believe that not adopting a definition of ''project'' has the benefit of giving issuers flexibility in applying the term to different business contexts depending on factors such as the particular industry or business in which the issuer operates, or the issuer's size. As noted above, neither Section 13(q) nor our rules include a definition of ''project,'' and the EITI does not define the term. In view of concerns expressed by some commentators with regard to leaving the term undefined,[302] we are providing some guidance about the meaning of the term.

We understand that the term ''project'' is used within the extractive industry in a variety of contexts. While there does not appear to be a single agreed-upon application in the industry, we note that individual issuers routinely provide disclosure about their own projects in their Exchange Act reports and other public statements, and as such, we believe ''project'' is a commonly used term whose meaning is generally understood by resource extraction issuers and investors. In this regard, we note that resource extraction issuers routinely enter into contractual arrangements with governments for the purpose of commercial development of oil, natural gas, or minerals. The contract defines the relationship and payment flows between the resource extraction issuer and the government,[303] and therefore, we believe it generally provides a basis for determining the payments, and required payment disclosure, that would be associated with a particular ''project.''

We considered defining ''project'' by reference to a materiality standard as it is used under the federal securities laws, as suggested by some commentators.[304] We recognize that such an approach may reduce compliance burdens for issuers; however, we believe that approach would be inconsistent with Congress' intent to provide more detailed disclosure than would be provided using such a materiality standard and would not result in the transparency benefits that the statute seeks to achieve. In addition, based on Congress' use of the terms ''de minimis'' and ''material'' in other provisions of Section 13(q), we believe that if it intended to limit the disclosure requirement to ''material projects'' it would have drafted the statutory language accordingly.

While we considered defining the term as a reporting unit [305] as suggested by some commentators,[306] we have decided against that approach. We appreciate the potential benefits to issuers from defining the term consistent with reporting unit and thereby allowing issuers to collect information on a basis with which they already are familiar and according to established financial reporting systems.[307] We also appreciate the concerns some commentators expressed regarding the need to disaggregate and allocate payments in a potentially arbitrary manner, which could increase costs and not provide meaningful information to investors.[308] Nonetheless, for the same reasons we declined to provide a definition of ''project'' based on materiality, we do not believe that requiring disclosure at the reporting unit level would be consistent with the use of the term ''project'' in Section 13(q). We also do not believe that a plain reading of the statutory language and the common use of the term ''project'' would lead one to think that a reporting unit would be a project. Based on Congress' intention to promote international transparency efforts, we believe that Congress intended a greater level of transparency than would be achieved if we defined ''project'' as a reporting unit.

We also appreciate the concerns some commentators expressed regarding potential definitions of ''project'' and

[295] *See* letters from Global Witness 1, Oxfam 1, and PWYP 1.

[296] *See* letters from Angolan citizens, BTAP, California Public Employees Retirement System (February 28, 2011) (''CalPERS''), Calvert, Cambodians, Derecho, Earthworks, ERI 2, Gates Foundation, Global Financial 2, Global Witness 1, Global Witness 2, Global Witness 3, Greenpeace, Grupo Faro, Guatemalan Forest Communities, Libyan Transparency, Arlene McCarthy, Member of the European Parliament (March 13, 2012) (''McCarthy''), NUPENG, Office of Natural Resources Revenue, US Department of the Interior (August 4, 2011) (''ONRR''), ONE, ONE Petition, Oxfam 1, Oxfam 2, PENGASSAN, PWYP pre-proposal, PWYP 1, PWYP (December 20, 2011) (nine page letter plus appendix) (''PWYP 4''), PWYP (February 23, 2012) (''PWYP 5''), Rep. Frank *et al.*, RWI 1, Revenue Watch Institute (February 27, 2012) (''RWI 2''), Sen. Cardin *et al.* 1, Soros 2, Syena, TIAA, and WACAM. *See also* letters designated as Type B (stating that a project should be ''defined as our Interior Department does it''). *But see* the letter from King & Spalding LLP (September 8, 2011) (''King & Spalding'') (objecting to ONRR's request for lease by lease payment disclosure because such a disclosure requirement would conflict with ONRR's duty under the Outer Continental Shelf Lands Act to protect the confidentiality of lease-level oil and gas exploration and production information submitted to the agency by a company operating under a federal lease or permit).

[297] Letter from Calvert.

[298] *See, e.g.,* letters from CRS, Global Witness 1, Oxfam 1, PWYP 1, and RWI 1.

[299] Letter from RWI 1; *see also* letters from PWYP 1 and ERI 2.

[300] Letter from Syena.

[301] *See id.*

[302] *See* note 275 and accompanying text.

[303] *See* letter from TIAA (stating that ''disclosure requirements should shed light on the financial relationship between companies and host governments by linking the definition of ''project'' to the individual contracts between the issuer and host country'').

[304] *See* note 291 and accompanying text.

[305] Accounting Standards Code (''ASC'') 350–20–20 defines a reporting unit as an operating segment, or a segment that is one level below an operating segment.

[306] *See* note 283 and accompanying text.

[307] *See* note 284 and accompanying text.

[308] *See, e.g.,* letters from API 1 and NMA 2.

the need to disaggregate and allocate payments made at the entity level in a potentially arbitrary manner, which could increase costs and would not provide meaningful information to investors.[309] We do not believe that resource extraction issuers should be required to disaggregate and allocate payments to projects for payments that are made for obligations levied on the issuer at the entity level rather than the project level. Consistent with the suggestion of some commentators,[310] the final rules we are adopting will permit a resource extraction issuer to disclose payments at the entity level if the payment is made for obligations levied on the issuer at the entity level rather than the project level.[311] Thus, if an issuer has more than one project in a host country, and that country's government levies corporate income taxes on the issuer with respect to the issuer's income in the country as a whole, and not with respect to a particular project or operation within the country, the issuer would be permitted to disclose the resulting income tax payment or payments without specifying a particular project associated with the payment.[312]

We believe the term ''project'' requires more granular disclosure than country-level reporting. Section 13(q) clearly requires project-level reporting, and we believe the statutory requirement to provide interactive data tags identifying the government that received the payment and the country in which that government is located is further evidence that reference to ''project'' was intended to elicit disclosure at a more granular level than country-level reporting.[313]

4. Payments by ''a Subsidiary * * * or an Entity Under the Control of * * *''

a. Proposed Rules

Consistent with Section 13(q),[314] the proposed rules would have required a resource extraction issuer to disclose payments made by the issuer, a subsidiary, or an entity under the control of the resource extraction issuer, to a foreign government or the U.S. Federal Government for the purpose of commercial development of oil, natural gas, or minerals. Under the proposal, and consistent with Section 13(q), a resource extraction issuer would have been required to provide disclosure if control is present. Consistent with the definition of control under the federal securities laws,[315] a resource extraction issuer would have been required to make a factual determination as to whether it has control of an entity based on a consideration of all relevant facts and circumstances. At a minimum, a resource extraction issuer would have been required to disclose payments made by a subsidiary or entity under the issuer's control if the issuer must provide consolidated financial information for the subsidiary or other entity in the issuer's financial statements included in its Exchange Act reports.

b. Comments on the Proposed Rules

Several commentators stated that we should rely on the current definitions of ''control'' and ''subsidiary'' under Exchange Act Rule 12b–2,[316] or as those terms are used under U.S. GAAP or IFRS, and we need not adopt new definitions of those terms for purposes of this rulemaking because the current definitions are well-understood by both extractive issuers and investors.[317] When applying those definitions, however, commentators held a variety of views regarding the entities for which resource extraction issuers should be required to provide the required payment information.

Some commentators believed that whether an issuer has control over an entity is consistent with whether it must consolidate that entity for purposes of the issuer's financial reporting. Those commentators suggested the rules should only require an issuer to report payments for an entity that it must either fully or proportionately consolidate for U.S. financial reporting purposes and not require disclosure of payments of equity investees for which no consolidation is required.[318] Some commentators further stated that an issuer should not have to report payments corresponding to its proportional interest in a joint venture unless it makes such payments directly to the host government.[319] The commentators noted that, under such an approach, proportional payments made to the joint venture operator would not be reported.[320]

One commentator supported requiring an issuer to disclose payments only for entities that it must consolidate because that approach would provide a bright-line test that is easy to administer and because it would be consistent with the EITI.[321] The commentator further stated that an issuer should be required to disclose payments made on behalf of a joint venture, regardless of control, when the payments are disproportionate to the issuer's interest in the joint venture.[322]

Other commentators believed that, in addition to requiring disclosure of payments made by consolidated entities, the rules also should require disclosure of payments:

- Made by or on behalf of unconsolidated equity investees and joint venture partners on a proportionate share basis where a facts and circumstances test determines that the issuer possesses control;[323]
- Made by the issuer's non-reporting parent or other related entity on behalf or for the benefit of the issuer when the issuer is the alter ego or instrumentality of the parent or related entity[324] or when the issuer ''controls, is controlled by, or is under common control with'' the non-reporting parent or related entity, and the subsidiary would

[309] *See, e.g.,* letters from API 1, Muris and Sayyed, and NMA 2.

[310] *See* note 285 and accompanying text.

[311] *See* Instruction 2 to Item 2.01 of Form SD.

[312] One commentator provided, as an example, a situation where the payment of corporate income taxes is calculated on the basis of all projects in a given jurisdiction. *See* letter from Global Witness 1.

[313] *See* 15 U.S.C. 78m(q)(2)(D)(ii)(V).

[314] *See* 15 U.S.C. 78m(q)(2)(A).

[315] Under Exchange Act Rule 12b–2 [17 CFR 240.12b–2] and Rule 1.02 of Regulation S–X [17 CFR 210.1.02], ''control'' (including the terms ''controlling,'' ''controlled by'' and ''under common control with'') is defined to mean ''the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting shares, by contract, or otherwise.'' The rules also define ''subsidiary'' (''A 'subsidiary' of a specified person is an affiliate controlled by such person directly, or indirectly through one or more intermediaries. (*See also* 'majority-owned subsidiary,' 'significant subsidiary,' and 'totally-held subsidiary.')'').

[316] *See id.*

[317] *See* letters from API 1, AngloGold, BP 1, ERI 1, ExxonMobil 1, PWC, and RDS 1.

[318] *See* letters from API 1, BP 1, ExxonMobil 1, and RDS 1. Other commentators agreed that the final rules should define control to mean consolidated entities only but opposed using the definition of control under Exchange Act Rule 12b–2 on the grounds that the existing definition could include companies that are not consolidated and regarding which an issuer would lack access to the underlying accounting data for the controlled entities' payments. *See* letters from Barrick Gold, Cleary, GE, NMA 2, NYSBA Committee, Petrobras, Rio Tinto, and Statoil. One commentator further observed that restricting the definition of control to consolidated entities would avoid the possible overstating of resource extraction payments that might occur if payments by equity investees are required to be disclosed. *See* letter from Rio Tinto.

[319] *See* letters from API 1, ExxonMobil 1, and RDS 1.

[320] *See id.*

[321] *See* letter from AngloGold.

[322] *See* letter from AngloGold. This commentator provided an example in which an issuer that is a 50% partner in a joint venture would have to disclose payments made on behalf of that joint venture if the payments include the share attributable to the other joint venture partner in circumstances where the other partner is unwilling or unable to make its share of the payments.

[323] *See* letters from Earthworks and PWYP 1.

[324] *See* letter from Conflict Risk Network (February 28, 2011) (''Conflict Risk'').

otherwise be required to disclose those payments under Section 13(q); [325]

- Made by an entity that is contractually obligated to collect funds and make payments to various parties, including the host government, on behalf of an issuer; [326] and
- Made by one party to a joint venture that has guaranteed the debt of another joint venture party in an off-balance sheet transaction.[327]

Some commentators believed that a foreign government-owned or controlled entity should not have to report certain payments made to its parent government[328] or to a subsidiary or other entity controlled by it.[329] Another commentator stated that a wholly-owned subsidiary of an Exchange Act reporting parent should not have to disclose payments as long as the subsidiary's parent has included the subsidiary's payments in the parent's Exchange Act report.[330]

c. Final Rules

We are adopting this requirement as proposed, consistent with the statutory language of Section 13(q). The final rules require a resource extraction issuer to provide disclosure of payments made by the issuer, a subsidiary of the issuer, or an entity under the control of the issuer to a foreign government or the U.S. Federal Government for the purpose of the commercial development of oil, natural gas, or minerals.[331] ''Control'' and ''subsidiary'' are terms defined as in Exchange Act Rule 12b–2.[332] Therefore, a resource extraction issuer must disclose payments made by a subsidiary or entity under the control of the resource extraction issuer where the subsidiary or entity is consolidated in the resource extraction issuer's financial statements included in its Exchange Act reports,[333] as well as payments by other entities it controls as determined in accordance with Rule 12b–2. A resource extraction issuer may be required to provide the disclosure for entities in which it provides proportionately consolidated information.[334]

We understand that resource extraction issuers commonly engage in commercial development of oil, natural gas, or minerals through joint ventures, as an operator of a joint venture, or through an equity investment.[335] In these situations a resource extraction issuer will be required to determine whether it has control of an entity based on a consideration of all relevant facts and circumstances.[336] Following the definition of control under the federal securities laws, such as in Rule 12b–2, a resource extraction issuer will be required to determine whether it has control of an entity for purposes of Rule 13q–1 based on a consideration of all relevant facts and circumstances.[337] We continue to believe that a facts-and-circumstances determination of control consistent with the federal securities laws is preferable to a bright-line rule limiting disclosure to payments made only by consolidated entities because it is consistent with the statutory language. Limiting the scope of the requirement to situations in which an issuer provides consolidated financial information for an entity may limit the rules more narrowly than the intended scope of the statute because a resource extraction issuer may have control over an unconsolidated entity that makes payments that would be covered by Section 13(q) and the final rules. Thus, an issuer that engages in joint ventures or contractual arrangements will need to consider whether it has control to determine whether it must disclose payments.

We disagree with commentators who suggested that the definition of ''control'' not track Rule 12b–2 and instead be entirely consistent with the use of the term for purposes of financial reporting. While determinations made pursuant to the relevant accounting standards applicable for financial reporting may be indicative of whether control exists, we do not believe it is determinative in all cases. We note the suggestion by some commentators to adopt a definition of control that does not track Rule 12b–2 and specifically addresses unconsolidated equity investees.[338] We are not adopting such a definition because we believe it is appropriate and consistent with the statute to use the same definition of control used for other purposes under the Exchange Act, and because issuers should already be familiar with applying that definition. A resource extraction issuer is required to make a facts-and-circumstances determination as to whether the equity investee is an entity under the control of the resource extraction issuer under the final rules.

*E. Definition of ''Foreign Government''*

1. Proposed Rules

Consistent with Section 13(q), the proposed rules would have required a resource extraction issuer to disclose payments made to a foreign government or the Federal Government. Under Section 13(q), Congress defined ''foreign government'' to mean a foreign government, a department, agency, or instrumentality of a foreign government, or a company owned by a foreign government, while granting the Commission authority to determine the scope of the definition.[339] The proposed rules would have defined the term consistent with the statute. In addition, the proposed definition of ''foreign government'' explicitly included both a foreign national government as well as a foreign subnational government, such as the government of a state, province, county, district, municipality, or territory under a foreign national government. The proposed rules would have clarified that the term ''Federal Government'' means the United States Federal Government. The proposed rules would have further clarified that a company owned by a foreign government is a company that is at least

[325] *See* letters from HURFOM 1, PWYP 1, and WRI.

[326] *See* letters from ERI pre-proposal and Le Billon.

[327] *See id.*

[328] *See* letter from Cleary.

[329] *See* letter from Statoil.

[330] *See* letter from API 1.

[331] With respect to payments by an Exchange Act reporting company meeting the definition of resource extraction issuer that also is a wholly-owned subsidiary of an Exchange Act reporting parent that is a resource extraction issuer, consistent with some commentators' suggestions, the subsidiary will not be required to separately disclose payments to governments provided that the subsidiary's parent has included the subsidiary's payments in the parent's Form SD. The subsidiary must file its own Form SD indicating that the required disclosure was provided in the parent's Form SD. *See* Instruction 8 to Item 2.01 of Form SD.

[332] *See* note 315 above.

[333] This would be the case whether the resource extraction issuer provides consolidated financial information under U.S. Generally Accepted Accounting Principles (''GAAP''), International Financial Reporting Standards as issued by the International Accounting Standards Board (''IFRS''), or another comprehensive basis of accounting other than U.S. GAAP or IFRS.

[334] Proportionate consolidation may be used in a variety of circumstances in which an issuer may or may not have control, and therefore resource extraction issuers will need to make a facts-and-circumstances determination, as discussed below.

[335] *See, e.g.,* letters from API 1, ERI pre-proposal, NMA 2, and PWYP 1. *See also* Ernst & Young, *Navigating Joint Ventures in the Oil and Gas Industry* (2011), *available at http://www.ey.com/Publication/vwLUAssets/Navigating_joint_ventures_in_oil_and_gas_industry/$FILE/Navigating_joint_ventures_in_oil_and_gas_industry.pdf.*

[336] As we noted in the Proposing Release, if a resource extraction issuer makes a payment to a third party to be paid to the government on its behalf, the rules will require disclosure of that payment. Similarly, where an entity makes payments (that are otherwise covered by the definition of payment) to a foreign government as a paying agent for a resource extraction issuer, pursuant to a contractual obligation with the resource extraction issuer, the final rules require the resource extraction issuer to disclose these payments.

[337] We expect that a determination in accordance with consolidation guidance generally would be the same as under Rule 12b–2.

[338] *See* letters from Earthworks and PWYP 1.

[339] *See* 15 U.S.C. 78m(q)(1)(B).

majority-owned by a foreign government.

2. Comments on the Proposed Rules

Commentators generally supported the proposed definition of foreign government.[340] Some of those commentators noted that inclusion of foreign subnational governments is appropriate because issuers frequently make payments to subnational governments and that including them would be consistent with the EITI.[341] Some commentators also supported the proposed clarification regarding the meaning of ''Federal Government'' [342] and agreed that the term did not include state governments.[343] Those commentators believed that extending the disclosure requirement to states and other subnational governments in the United States would go beyond the scope of the statute. A few commentators explicitly supported the proposed clarification regarding the meaning of ''a company owned by a foreign government.'' [344]

Some commentators, however, suggested alternative approaches to the definition of foreign government.[345] A few commentators supported adopting the statutory definition of ''foreign government'' and suggested limiting the rule to require resource extraction issuers to disclose only those payments made to foreign national governments. According to those commentators, it would be unfair to require disclosure of payments to foreign subnational governments because Section 13(q) does not require disclosure of payments to subnational governments in the United States. Thus, limiting the requirement to disclose payments only to foreign national governments would promote consistency and fairness.[346] One commentator stated that defining ''foreign government'' to mean only a foreign national government would be consistent with the plain meaning of Section 13(q). [347] According to that commentator, the fact that the statute requires an issuer to include electronic tags identifying both the recipient government for each payment and the country in which that government is located does not mean that Congress intended to include foreign subnational governments within the definition of foreign government. Rather, according to that commentator, because the statutory definition of foreign government includes departments, agencies and instrumentalities of a foreign government, Congress intended only that an issuer would use the recipient government tag to identify the specific department, agency or instrumentality receiving the payment. In addition, one commentator noted that it has a substantial number of provincial government leases and that it would be overburdened by reporting payments on a subnational level.[348] A few commentators supported adoption of the proposed definition of ''foreign government'' and also suggested requiring the disclosure of payments made to U.S. subnational governments because extractive companies may make substantial payments to U.S. subnational governments.[349]

Some commentators requested the Commission clarify that whether an issuer will be required to disclose payments made to a foreign government-owned company would depend on whether the foreign government controls that company.[350] One of those commentators suggested that whether control exists should be determined by a facts-and-circumstances analysis, which could result in the conclusion that a non-majority owned company is controlled by a foreign government.[351] The commentator believed the analysis should consider whether the government has provided working capital to the company, and whether the government has the ability to direct economic or policy decisions of the company, appoint or remove directors or management, restrict the composition of the board, or veto the decisions of the company.[352] The other commentator suggested we also ''[should] look at the extent to which the government has control over the company and also the extent of advances and payments by the company to the government.'' [353]

Other commentators suggested that the Commission clarify whether an issuer will be required to disclose payments made to a foreign government-owned company would depend on the capacity in which the company is acting.[354] According to the commentators, if the government-owned company is acting as the agent of the government, the issuer should have to disclose payments made to the government-owned company.[355] If the government-owned company is acting in the capacity of a commercial partner with the issuer, and the government-owned company is the operator of the joint venture, the issuer should not have to disclose payments ''for capital or operating cash calls'' made to the government-owned company.[356] Two commentators asserted that an issuer also should not have to disclose payments to a government-owned company acting in the capacity of a commercial vendor of goods and services.[357] Other commentators believed that Section 13(q) requires the disclosure of all payments to a government or government-owned company whether for ''rent, security, food and water, use of roads and airports'' or for capital contributions.[358]

3. Final Rules

After considering the comments, we are adopting the definition of ''foreign government'' consistent with the definition in Section 13(q), as proposed. A ''foreign government'' includes a foreign national government as well as a foreign subnational government, such as the government of a state, province, county, district, municipality, or territory under a foreign national government.[359] Although we acknowledge the concerns of commentators that sought to limit the definition of foreign government to foreign national governments,[360] we continue to believe that the definition also should include foreign subnational governments. The adopted definition is not only consistent with Section 13(q), which requires an issuer to identify, for each disclosed payment, the government that received the payment, and the country in which the government is located,[361] but it also is consistent with the EITI, which recognizes that payments to subnational governments may have to be included within the scope of an EITI program.[362] As noted in the proposal, if a resource

[340] *See* letters from API 1, AngloGold, Barrick Gold, BP 1, Calvert, CRS, Earthworks, EIWG, ExxonMobil 1, PWYP 1, RDS 1, and WRI.

[341] *See* letters from API 1, AngloGold, Barrick Gold, BP 1, Calvert, CRS, Earthworks, EIWG, ExxonMobil 1, PWYP 1, RDS 1, and WRI.

[342] *See* letters from API 1, BP 1, Calvert, ExxonMobil 1, NYSBA Committee, and RDS 1.

[343] *See* letters from API 1, BP 1, Calvert, ExxonMobil 1, NYSBA Committee, and RDS 1.

[344] *See* letters from API 1, ExxonMobil 1, and PetroChina.

[345] *See, e.g.,* letters from NMA 2, Statoil, and Talisman.

[346] *See* letters from NMA 2, Statoil, and Talisman.

[347] *See* letter from Statoil.

[348] *See* letter from Talisman.

[349] *See* letters from AngloGold, Barrick Gold, and Earthworks.

[350] *See* letters from PetroChina and PWYP 1.

[351] *See* letter from PWYP 1.

[352] *See* letter from PWYP 1.

[353] *See* letter from PetroChina.

[354] *See* letters from API 1, Cleary, ExxonMobil 1, and Vale.

[355] *See* letters from API 1 and ExxonMobil 1.

[356] *See* letters from API 1 and ExxonMobil 1.

[357] *See* letters from Cleary and Vale.

[358] *See* letters from PWYP 1 and Sen. Levin 1.

[359] *See* Item 2.01(c)(2) of Form SD.

[360] *See, e.g.,* letter from Statoil.

[361] *See* 15 U.S.C. 78m(q)(2)(D)(ii)(V).

[362] *See Implementing the EITI,* at 34.

extraction issuer makes a payment that meets the definition of payment to a third party to be paid to the government on its behalf, disclosure of that payment is covered under the rules.

In addition, as proposed, the final rules clarify that a company owned by a foreign government is a company that is at least majority-owned by a foreign government.[363] As noted above, some commentators requested that we clarify the circumstances in which an issuer will be required to disclose payments made to a foreign government-owned company. The final rules specify the types of payments that will be required to be disclosed, and resource extraction issuers will need to consider whether the payments being made to a foreign government-owned company fall within the categories of payments for which the final rules require disclosure.

As proposed, the final rules clarify that ''Federal Government'' means the United States Federal Government.[364] Although we acknowledge that there is a difference in the final rules between requiring disclosure of payments to foreign subnational governments and not requiring payments to state or local governments in the United States, we believe that Section 13(q) is clear in only requiring disclosure of payments made to the Federal Government in the United States and not to state and local governments. As we noted in the proposal, typically the term ''Federal Government'' refers only to the U.S. national government and not the states or other subnational governments in the United States.

### *F. Disclosure Required and Form of Disclosure*

#### 1. Annual Report Requirement

#### a. Proposed Rules

As noted in the proposal, Section 13(q) mandates that a resource extraction issuer provide the payment disclosure required by that section in an annual report, but otherwise does not specify the location of the disclosure, either in terms of a specific form or in terms of location within a specific form. The proposed rules would have required a resource extraction issuer to provide the payment disclosure in exhibits to its Exchange Act annual report filed on Form 10–K, Form 20–F, or Form 40–F. In addition, the proposed rules would have required a resource extraction issuer to include a brief statement in the body of the annual report directing investors to detailed information about payments provided in the exhibits.

#### b. Comments on Proposed Rules

Some commentators supported the proposed approach,[365] while other commentators opposed requiring the disclosure in Exchange Act annual reports on Form 10–K, Form 20–F, and Form 40–F and suggested alternative approaches.[366]

Commentators asserted that it would be difficult to provide the payment disclosure, which could be voluminous, within the same time period for Exchange Act annual reports. Those commentators maintained that additional time is necessary to provide the required information.[367] Otherwise, according to commentators, due to resource constraints, issuers may be unable to file their Exchange Act annual reports on a timely basis if they are required to provide the new payment disclosure at the same time that they must meet their existing obligations with respect to Exchange Act annual reports.[368] Commentators further maintained that the payment disclosures are largely cash-based, unaudited, of little relevance to most financial statement users, and should not be subject to certification requirements, whereas the financial statement information in an existing Exchange Act annual report is accrual-based, audited, of primary importance to most financial statement users, and subject to certification requirements.[369] Those commentators believed that keeping the payment disclosure separate from the financial statements and corresponding disclosure would avoid confusion.

Many commentators supported requiring a resource extraction issuer to make the payment disclosure in a new annual report form or under cover of a Form 8–K or Form 6–K, rather than in an existing Exchange Act annual report.[370] Some commentators supported using only Forms 8–K or 6–K,[371] while other commentators favored using only a new annual report.[372] One commentator opposed using Form 8–K for the Section 13(q) disclosure because Form 8–K is the ''venue for time-sensitive disclosures of unique changes to a company'' whereas, according to that commentator, the Section 13(q) disclosure consists of ''standard, material financial disclosures that should be included in the primary documents filed in the Exchange Act annual report.'' -[373]

Some commentators supporting a new annual report form believed the potential benefits of providing the disclosure on a new form rather than in an Exchange Act annual report outweighed the potential costs associated with the new form.[374] Commentators suggested that the required disclosure could be due 150 or 180 days or some other lengthy period following the end of the issuer's fiscal year.[375] Two commentators believed that the reporting period for the resource extraction issuer disclosure should be the calendar year as opposed to the fiscal year as is the case for existing Exchange Act annual reports because the calendar year approach would facilitate review and compilation by the Commission and analysis by users.[376] Other commentators, however, suggested that disclosure should be required for the issuer's fiscal year.[377]

Several commentators that supported a deadline for the disclosure separate from the due date for the Exchange Act annual report opposed allowing the disclosure to be provided in an amendment to the Form 10–K, Form 20–F, and Form 40–F.[378] According to those commentators, such an amendment could be misconstrued as a correction of an error or omission or as a restatement.[379] Other commentators stated that if the Commission decides to require inclusion of the disclosure in an Exchange Act annual report, it would be reasonable to permit an issuer to

[363] *See* Instruction 4 to Item 2.01 of Form SD.

[364] *See* Item 2.01(a) of Form SD.

[365] *See* letters from Calvert, Earthworks, HURFOM 1, ONE, PGGM, PWYP 1, RWI 1, and Soros 1.

[366] *See, e.g.,* letters from API 1, AngloGold, Barrick Gold, BP 1, Chevron, Cleary, ExxonMobil 1, NMA 2, NYSBA Committee, Nexen, PetroChina, Petrobras, RDS 1, and Statoil.

[367] *See* letters from API 1, AngloGold, Barrick Gold, BP 1, Cleary, ExxonMobil 1, NMA 2, NYSBA Committee, Nexen, Petrobras, and RDS 1.

[368] *See* letter from Cleary; *see also* letters from Barrick Gold and Petrobras.

[369] *See* letters from API 1, AngloGold, Barrick Gold, Cleary, ExxonMobil 1, NMA 2, and NYSBA Committee.

[370] *See* letters from API 1, Barrick Gold, Chevron, Cleary, ExxonMobil 1, NYSBA Committee, and RDS 1.

[371] *See* letters from AngloGold, Nexen, PetroChina, and Petrobras.

[372] *See* letters from NMA 2 and Statoil.

[373] Letter from Calvert.

[374] *See* letters from API 1 and Cleary.

[375] *See* letters from API 1, AngloGold, Barrick Gold, BP 1, Chevron, Cleary, ExxonMobil 1, NMA 2, NYSBA Committee, Nexen (supporting 180 days), PetroChina, Petrobras, RDS 1 (supporting 150 days), and Statoil.

[376] *See* letters from API 1 and ExxonMobil 1.

[377] *See* letters from AngloGold and RDS 1.

[378] *See* letters from API 1, AngloGold, ExxonMobil 1, NMA 2, and RDS 1.

[379] *See id.*

disclose the information in an amendment to the annual report.[380]

Some commentators suggested permitting issuers to submit the payment disclosure on a confidential basis.[381] These commentators stated that the Commission could then use the confidentially submitted information to prepare a public compilation, which would consist of information only at the country or other highly aggregated level. The commentators asserted that Section 13(q)(3), which is entitled ''Public Availability of Information,'' requires the Commission to make public a compilation of the information required to be submitted under Section 13(q)(2). According to the commentators, the statute does not require the submitted information itself to be publicly available.[382] Commentators argued that the payment information should be submitted confidentially at a disaggregated level and that the public compilation by the Commission could be presented on ''an aggregated, per-country or similarly high-level basis.'' [383] According to those commentators, this approach would satisfy the specific text of the statute and fulfill the underlying goal of promoting the international transparency regime of the EITI.[384]

In contrast, other commentators strongly disagreed with the interpretation that Section 13(q) should be read as to not require the public disclosure of the payment information submitted in annual reports and that the Commission may choose to make public only a compilation of the information.[385] One commentator stated that the ''compilation would be in addition to the public availability of the original company data and in no way is expected to replace the availability of that data.'' [386] Two commentators supporting the proposed approach requested that the Commission clarify that the statutorily-required compilation would function both as an online database and summary report, which would allow users to download data in bulk, in addition to allowing users to search by country and company, as well as by year or multiple years of reporting.[387]

Two commentators stated that, to the extent the new rules require the payment disclosure to be in an existing Exchange Act annual report, the rules should provide that the officer certifications required by Exchange Act Rules 13a–14(a) and (b) and 15d–14(a) and (b) do not extend to exhibits or disclosures required pursuant to Section 13(q).[388]

c. Final Rules

After considering the comments, we have determined that resource extraction issuers should provide the required disclosure about payments in a new annual report, separate from the issuer's existing Exchange Act annual report. We are requiring the disclosure on new Form SD.[389] As noted above, Section 13(q) does not specify a location for the disclosure. We believe requiring resource extraction issuers to provide the payment disclosure in new Form SD will facilitate interested parties' ability to locate the disclosure and address issuers' concerns about providing the disclosure in their Exchange Act annual reports on Forms 10–K, 20–F, or 40–F.[390] Similar to the proposal, Form SD requires issuers to include a brief statement in the body of the form in an item entitled, ''Disclosure of Payments By Resource Extraction Issuers,'' directing investors to the detailed payment information provided in the exhibits to the form.

We considered commentators' suggestions about requiring the disclosure in a Form 8–K or Form 6–K,[391] and we determined not to require the disclosure in those forms because we continue to believe, and agree with commentators that noted, the resource extraction payment disclosure differs from the disclosure required by those forms.[392] In this regard, we note that Section 13(q) requires us to issue final rules requiring the disclosure in an annual report rather than requiring the disclosure to be provided on a more rapid basis, such as disclosure of material corporate events that are required to be filed on a current basis on Form 8–K.[393] In addition, we are persuaded by the comments asserting that it would be preferable to use a different form rather than to extend the deadline for the disclosure to be filed and require an amendment to Form 10–K, Form 20–F, or Form 40–F, which might suggest a change or correction had been made to a previous filing,[394] and therefore we are not adopting that approach. We also believe that requiring the disclosure in a new form, rather than in issuers' Exchange Act annual reports, should alleviate some commentators' concerns about the disclosure being subject to the officer certifications required by Rules 13a–14 and 15d–14 under the Exchange Act [395] and will allow us to adjust the timing of the submission.

While Section 13(q) mandates that a resource extraction issuer include the payment disclosure required by that section in an annual report, it does not specifically mandate the time period in which a resource extraction issuer must provide the disclosure. Although two commentators believed that the reporting period for the resource extraction disclosure should be the calendar year, other commentators suggested that the fiscal year should be the reporting period for Form SD.[396] We believe that the fiscal year is the more appropriate reporting period for the payment disclosure because, to the extent that resource extraction issuers are able to use part of the tracking and reporting systems that issuers already have established for their public reports

[380] *See* letters from Cleary, NMA 2, and NYSBA Committee. Cleary and NYSBA Committee supported this approach if the Commission decided not to require the disclosure in a new annual report form or under cover of Form 8–K or 6–K.

[381] *See* letters from API 1, Chevron, ExxonMobil 1, Nexen, and RDS 1.

[382] *See* letters from API 1, Chevron, ExxonMobil 1, Nexen, and RDS 1.

[383] *See* letters from API 1 and ExxonMobil 1. *See also* letters from Chevron, Nexen, and RDS 1.

[384] *See* letters from API 1 and ExxonMobil 1. *See also* letters from Chevron and RDS 1.

[385] *See* letters from Calvert, PWYP 1, RWI 1, Sen. Cardin *et al.* 1, Sen. Cardin *et al.* 2, and Sen. Levin 1.

[386] Letter from Sen. Cardin *et al.* 1.

[387] *See* letters from PWYP 1 and USW.

[388] *See* letters from Cleary and NYSBA Committee.

[389] Form SD is a new disclosure form to be used for specialized disclosure not included within an issuer's periodic or current reports. In addition to resource extraction issuer payment disclosure, Form SD also will be used to provide the disclosure required by the rules implementing Section 1502 of the Dodd-Frank Act. The Commission adopted Form SD at the same time as the final rules implementing that provision. *See* Conflict Minerals Adopting Release.

[390] *See* notes 366–370 and accompanying text. As noted, under the proposed rules, a resource extraction issuer would have been required to furnish the payment information in its annual report on Form 10–K, Form 20–F, or Form 40–F. As such, investment companies that are registered under the Investment Company Act of 1940 (''registered investment companies'') would not have been subject to the disclosure requirement because those companies are not required to file Form 10–K, Form 20–F, or Form 40–F. Our decision to require this disclosure in a new form is not intended to change the scope of companies subject to the disclosure requirement. Therefore, consistent with the proposal, registered investment companies that are required to file reports on Form N–CSR or Form N–SAR pursuant to Rule 30d–1 under the Investment Company Act (17 CFR 270.30d–1) will not be subject to the final rules.

[391] *See* note 371 and accompanying text.

[392] *See, e.g.,* letter from Calvert.

[393] A Form 8–K report is required to be filed or furnished within four business days after the occurrence of one or more of the events required to be disclosed on the Form, unless the Form specifies a different deadline, *e.g.,* for disclosures submitted to satisfy obligations under Regulation FD (17 CFR 243.100 *et seq. See* General Instruction B.1 of Form 8–K (17 CFR 249.308).

[394] *See* note 379 and accompanying text.

[395] *See* note 369.

[396] *Compare* note 376 with note 377.

to track and report payments under Section 13(q), their compliance costs should be reduced.

After considering the comments expressing concern about the difficulty of providing the payment disclosure within the current annual reporting cycle,[397] we believe it is reasonable to provide a filing deadline for Form SD that is later than the deadline for an issuer's Exchange Act annual report. Therefore, consistent with some commentators' suggestions regarding timing,[398] the final rules require resource extraction issuers to file Form SD on EDGAR no later than 150 days after the end of the issuer's most recent fiscal year.

We are not persuaded by commentators that the statute allows resource extraction issuers to submit, or that it mandates resource extraction issuers submit, the payment information confidentially to us and have the Commission make public only a compilation of the information.[399] We believe that Section 13(q) contemplates that resource extraction issuers will provide the disclosure publicly. Section 13(q) refers to ''disclosure'' and specifies that the final rules require an issuer to include the information ''in an annual report.'' Our existing disclosure requirements under the Exchange Act require companies to publicly file annual, quarterly, and current reports; the requirements generally do not provide for non-public reports.[400] We do not believe that Congress intended for a different approach with respect to the information required under Section 13(q). In this regard, we note that the disclosure required under Section 13(q)(2) must be submitted in an interactive data format, which suggests that Congress intended for the information to be available for public analysis. Requiring resource extraction issuers to provide the payment information in interactive data format will enable users of the information to extract the information that is of the most interest to them and to compile and compare it in any manner they find useful. We also note that the provision regarding the public compilation does not require the Commission to publish a compilation; rather, it states that the Commission shall make a public compilation of the information available online ''to the extent practicable.''[401] Further, Section 13(q)(3)(B) states that ''[n]othing in [Section 13(q)(3)] shall require the Commission to make available online information other than the information required to be submitted [under the provision requiring the Commission to issue rules to require resource extraction issuers to provide payment disclosure].'' We believe these provisions, when read together and with the statute's transparency goal, mean that the statutory intent is for the disclosure made by resource extraction issuers to be publicly available, and under the final rules, the disclosure will be available on Form SD on EDGAR. We note that, in this regard, the EITI approach is fundamentally different from Section 13(q). Under the EITI, companies and the host country's government generally each submit payment information confidentially to an independent administrator selected by the country's multi-stakeholder group, frequently an independent auditor, who reconciles the information provided by the companies and the government, and then the administrator produces a report.[402] In addition, it is not clear that having the information submitted confidentially to the Commission would necessarily address commentators' concerns about confidentiality because the information may well be subject to disclosure under the Freedom of Information Act.[403]

2. Exhibits and Interactive Data Format Requirements

a. Proposed Rules

The proposed rules would have required a resource extraction issuer to submit the payment disclosure on an unaudited, cash basis. The disclosure would have been required to be presented in two exhibits to a Form 10–K, Form 20–F, or Form 40–F, as appropriate. One exhibit would be in HTML or ASCII format, which would have enabled investors to easily read the disclosure about payments without additional computer programs or software. The other exhibit would be in XBRL format, which would have satisfied the requirement in Section 13(q) that the payment information be submitted in an interactive data format. Consistent with the statute, the proposed rules would have required an issuer to submit the payment information using electronic tags that identify, for any payments made by a resource extraction issuer to a foreign government or the U.S. Federal Government:

- The total amounts of the payments, by category;
- The currency used to make the payments;
- The financial period in which the payments were made;
- The business segment of the resource extraction issuer that made the payments;
- The government that received the payments, and the country in which the government is located; and
- The project of the resource extraction issuer to which the payments relate.

In addition, a resource extraction issuer would have been required to provide the type and total amount of payments made for each project and the type and total amount of payments made to each government in the XBRL format.

As noted above, Section 13(q) requires the Commission, to the extent practicable, to make available online, to the public, a compilation of the information required under paragraph (2)(A) of that section.[404] The statute does not specify the content, form or frequency of the compilation. We solicited comment on the compilation without proposing any specific requirements for it.

b. Comments on the Proposed Rules

Numerous commentators supported the proposed submission of the payment information on an unaudited, cash

[397] *See* note 367 and accompanying text.

[398] *See* notes 375–377 and accompanying text.

[399] *See* note 381 and accompanying text.

[400] We note that in certain limited instances, an issuer may request confidential treatment regarding information that otherwise would be required to be disclosed, such as commercial information obtained from a person and that is privileged or confidential. *See, e.g.,* Exchange Act Rule 24b–2 (17 CFR 240.24b–2). For example, an issuer may be permitted to omit certain information from an exhibit filed with an Exchange Act report if that information is commercial and disclosure would likely result in substantial competitive harm. The Commission's staff is of the view that issuers generally are not permitted to omit information that is required by an applicable disclosure requirement. *See* Division of Corporation Finance Staff Legal Bulletins Nos. 1 (February 28, 1997) and 1A (July 11, 2001, as amended), *available at http://www.sec.gov/interps/legal/slbcf1r.htm.*

[401] Specifically, Section 13(q)(3)(A) provides that ''[t]o the extent practicable, the Commission shall make available online, to the public, a compilation of the information required to be submitted under the rules issued under paragraph (2)(A).''

[402] *See EITI Source Book,* at 23 (''It will be necessary to appoint an administrator to collect and evaluate the revenue data provided by companies and government. It is essential that there is stakeholder trust in the administrator's impartiality and competency. The administrator may be a private audit firm, an individual or an existing or specially created official body that is universally regarded as independent of, and immune to influence by, the government.'')

[403] 5 U.S.C. 552.

[404] *See* Section 13(q)(3)(A). The information required under Section 13(q)(2)(A) includes the type and total amount of payments made by resource extraction issuers to foreign governments or the U.S. Federal Government for the purpose of the commercial development of oil, natural gas, or minerals on a per project and per government basis.

basis.[405] After noting that Section 13(q) neither requires the payment information to be audited nor provided on an accrual basis, those commentators stated that such a requirement would significantly increase issuers' implementation and ongoing reporting costs without providing a benefit to investors. One commentator further noted that ''auditors would have to develop specific additional procedures to be able to provide assurance regarding the completeness and accuracy of the information provided.'' [406]

Other commentators, however, suggested requiring the payment information to be audited, presented on both a cash and accrual basis, and filed as part of the issuer's audited financial statements.[407] One of the commentators stated that an audit requirement would enhance investor protection and be consistent with the EITI because one of the basic criteria of EITI implementation is that the reported payment data be audited.[408] Another commentator similarly believed that requiring the payment information to be audited and submitted on a cash basis would improve comparability with EITI-related data, which it noted is subject to audit and reported on a cash basis. That commentator further suggested that the payment information also be reported on an accrual basis to accommodate the needs of all potential users of the data.[409]

Several commentators supported the proposed requirement to use XBRL to tag the payment disclosure because XBRL is currently used by many registrants when filing their financial statements in their Exchange Act annual reports.[410] Some commentators further supported a requirement to prepare the payment disclosure in either ASCII or HTML in addition to XBRL.[411] Those commentators noted that the requirement would provide the Commission with the ability to extract, analyze, and accumulate XBRL information while also providing investors and others the ability to view directly the information. Several commentators requested that the Commission delay implementation of the tagging requirement until an appropriate XBRL taxonomy for the payment information is available.[412]

Other commentators suggested permitting an issuer to choose between XBRL, XML, or some other format that would enable the electronic tagging of all of the information specified in Section 13(q).[413] According to those commentators, such a flexible approach would recognize that some issuers may prefer to use XBRL because that standard is already being implemented, while others may prefer to use XML or some other format because it is less expensive than XBRL and more consistent with a cash-based report.[414] One of the commentators noted that ''XBRL conversion of data can be time consuming and result in delay'' and requested that the rules permit an issuer to ''use any format that would allow users to click through the information in a standard file type to reach data sorted by each of the electronic tags specified in the Act.'' [415] One commentator opposed a requirement to provide the payment information in XBRL format.[416] The commentator stated that the Commission has limited the implementation of XBRL to only financial statements and stated there was not ''any justifiable reason for a departure from this stated scope.'' [417]

Some commentators expressed views about specific electronic tags. For example, commentators suggested various approaches regarding the requirement to electronically tag information about the currency used to make the payments. Some commentators opposed having to present payment information in dual currencies—in the local currency in which the payments were made and, if different, in the issuer's reporting currency—and further opposed having to electronically tag the dual currency presentations.[418] Those commentators stated that an issuer should only have to present and electronically tag payment information in its reporting currency, which is typically the U.S. dollar.[419] Other commentators opposed a requirement to reconcile payments made in the host country's currency to an issuer's reporting currency or U.S. dollars.[420] Those commentators either supported a requirement to present payments in the currency in which they were made [421] or to permit issuers to choose between presenting payments in either the local currency or its reporting currency as long as the issuer discloses the methodology for translation and exchange rates used.[422] Commentators noted that the EITI does not require currency conversion and urged the Commission to maintain flexibility in the final rules so that issuers can produce the required information in as efficient a manner as possible, in light of their reporting systems and any local requirements.[423] One commentator asserted that requiring disclosure of the host country currency and the reporting currency could unduly complicate the disclosure.[424]

Commentators also provided views on the proposed requirement to identify the business segment that made the payments. Some commentators suggested defining ''business segment'':

• According to how an issuer operates its business; [425]

• In a manner that is consistent with the definition used for financial reporting purposes; [426] or

• As a subsidiary if the parent company is making payments on behalf of the subsidiary.[427]

Some commentators opposed requiring an issuer to electronically tag the information to identify the business segment that made the payments on a basis other than as defined under GAAP. According to those commentators, a ''definition that differs from GAAP would require companies to gather information in a manner that is not consistent with how the business is structured or how its accounting systems are designed.'' [428] One commentator stated that the business segment disclosure should be consistent with the Commission's reserve disclosures, which are associated with upstream operations.[429]

Several commentators opposed requiring an issuer to electronically tag

[405] *See* letters from API 1, Anadarko Petroleum Corporation (March 2, 2011) (''Anadarko''), AngloGold, BP 1, Chevron, Ernst & Young (January 31, 2011) (''E&Y''), ExxonMobil 1, NMA 2, NYSBA Committee, Petrobras, PWC, and RDS 1.

[406] Letter from E&Y.

[407] *See* letters from PWYP 1 and RWI 1. Another commentator supported a requirement to submit the payment information solely on an accrual basis because that would be consistent with financial reporting requirements. *See* letter from Talisman.

[408] *See* letter from RWI 1.

[409] *See* letter from PWYP 1.

[410] *See* letters from API 1, Anadarko, AngloGold, BP 1, CalPERS, ExxonMobil 1, PWYP 1, and RDS 1.

[411] *See* letters from API 1, ExxonMobil 1, and PWYP 1.

[412] *See* letters from API 1, AngloGold, and ExxonMobil 1.

[413] *See* letters from Barrick Gold and NMA 2.

[414] *See* letters from Barrick Gold and NMA 2.

[415] Letter from Barrick Gold.

[416] *See* letter from PetroChina.

[417] Letter from PetroChina.

[418] *See* letters from API 1, BP 1, ExxonMobil 1, and RDS 1.

[419] *See* letters from API 1, BP 1, ExxonMobil 1, and RDS 1. One commentator supported requiring only the use of U.S. dollars, regardless of the issuer's reporting currency. *See* letter from RDS 1.

[420] *See* letters from Cleary, NMA 2, and Rio Tinto; *see also* letter from PWYP 1.

[421] *See, e.g.,* letters from NMA 2 and PWYP 1.

[422] *See* letter from Rio Tinto.

[423] *See* letters from Cleary and NMA 2.

[424] *See* letter from NMA 2.

[425] *See* letter from NMA 2.

[426] *See* letters from Cleary and NYSBA Committee.

[427] *See* letter from PWYP 1.

[428] Letters from API 1 and ExxonMobil 1.

[429] *See* letter from RDS 1.

each payment according to the project in which it relates because there are some types of payments that are made at the entity level or relate to numerous projects.[430] Those commentators urged us to permit an issuer to identify the government receiving the payments rather than requiring allocation of payments to a particular project in a potentially arbitrary manner.[431] Another commentator stated that an issuer should be allowed to omit the project tag for payments, such as taxes and dividends, which are levied at the entity level, as long as it provides all other required tags.[432]

As noted in Section II.F.1 above, some commentators were of the view that Section 13(q) only requires a compilation of resource extraction issuers' payment information, and not the annual reports containing the issuers' payment disclosures, to be made public, and suggested the compilation could present the payment disclosure only on an aggregated per country or similarly high-level basis.[433] Other commentators, however, strongly disagreed with that view and stated that the plain language of Section 13(q) clearly reveals Congress' intent to require the disclosure to investors of disaggregated payment information through the inclusion of that information in an issuer's annual report.[434] Towards that end, one commentator recommended that the compilation take the form of an online database and that a summary report be provided annually.[435]

c. Final Rules

We are adopting the requirement regarding the presentation of the mandated payment information substantially as proposed, except that a resource extraction issuer will be required to present the mandated payment information in only one exhibit to new Form SD instead of two exhibits, as proposed. Under the rule as proposed, an issuer would have been required to file one exhibit in HTML or ASCII and another exhibit in the XBRL interactive data format. In proposing the requirement, we noted our belief that requiring two exhibits would provide the information in an easily-readable format in addition to the electronically tagged data that would be readable through a viewer. After further consideration, we have decided to require only one exhibit formatted in XBRL because we believe that we can achieve the goal of the dual presentation with only one exhibit. Issuers will submit the information on EDGAR in XBRL format, thus enabling users of the information to extract the XBRL data, and at the same time the information will be presented in an easily-readable format by rendering the information received by the issuers.[436] We believe that requiring the information to be provided in this way may reduce the compliance burden for issuers.

Similar to the proposal, a resource extraction issuer also must include a brief statement in Item 2.01 of Form SD directing investors to the detailed information about payments provided in the exhibit. By requiring resource extraction issuers to provide the payment information in an exhibit, rather than in the form itself, anyone accessing EDGAR will be able to determine quickly whether an issuer filed a Form SD to satisfy the requirements of Section 13(q) and the related rules.

As noted above, Section 13(q) requires the submission of certain information in interactive data format.[437] Under the final rules, consistent with the proposal and tracking the statutory language, a resource extraction issuer must submit the payment information in XBRL using electronic tags that identify, for any payment required to be disclosed:

- The total amounts of the payments, by category;
- The currency used to make the payments;
- The financial period in which the payments were made;
- The business segment of the resource extraction issuer that made the payments;
- The government that received the payments, and the country in which the government is located; and
- The project of the resource extraction issuer to which the payments relate.[438]

In addition, a resource extraction issuer must provide the type and total amount of payments made for each project and the type and total amount of payments made to each government in interactive data format. In determining to require the use of XBRL as the interactive data format, we note that a majority of the commentators that addressed the issue supported the use of XBRL.[439] While some commentators suggested allowing a flexible approach to use an interactive data format of their preference,[440] we believe doing so may reduce the comparability of the information and may make it more difficult for interested parties to track payments made to a particular government or project; thus, we are not adopting such an approach.

As mentioned above, several commentators requested that we delay implementation of the tagging requirement until an appropriate XBRL taxonomy for the payment information is available.[441] We note that the staff is currently working to develop the taxonomy for the payment information, and we anticipate that the taxonomy will soon be published for comment. As such, and in light of the implementation period for the payment disclosure,[442] we do not believe it is necessary to provide a delay for the interactive data tagging requirement.

Consistent with the statute, the final rules require a resource extraction issuer to include an electronic tag that identifies the currency used to make the payments. As previously noted, the statute requires a resource extraction issuer to present the type and total amount of payments made for each project and to each government, without specifying how the issuer should report the total amounts. Although some commentators suggested requiring the reporting of payments only in the currency in which they were made,[443] we believe that the statutory requirements to provide a tag identifying the currency used to make the payment and the requirement to provide the total amount of payments by payment type for each project and to each government constrain us to require that issuers perform some currency conversion to the extent necessary.

As noted in an instruction to Form SD, issuers will be required to report the amount of payments made for each payment type, and the total amount of payments made for each project and to each government in either U.S. dollars or the issuer's reporting currency.[444]

[430] *See* letters from API 1, AngloGold, ExxonMobil 1, NMA 2, and RDS 1.

[431] *See* letters from API 1, AngloGold, ExxonMobil 1, NMA 2, and RDS 1.

[432] *See* letter from PWYP 1.

[433] *See* letters from API 1, Anadarko, Chamber Energy Institute, Chevron, ExxonMobil 1, Nexen, and RDS 1.

[434] *See* letters from Calvert, PWYP 1, RWI 1, and Sen. Cardin *et al.* 1.

[435] *See* letter from PWYP 1.

[436] Users of this information should be able to render the information by using software available free of charge on our Web site.

[437] 15 U.S.C. 78m(q)(2)(C) and 15 U.S.C. 78m(q)(2)(D)(ii).

[438] *See* Item 2.01(a) of Form SD.

[439] *See* note 410 and accompanying text.

[440] *See* note 413 and accompanying text.

[441] *See* letters from API 1, AngloGold, and ExxonMobil 1.

[442] *See* Section II.G.3. below.

[443] *See* note 421 and accompanying text.

[444] *See* Instruction 3 to Item 2.01 of Form SD. Currently, foreign private issuers may present their financial statements in a currency other than U.S. dollars for purposes of Securities Act registration

Continued

Thus, in order to provide total amounts, issuers that make payments in other currencies will have to convert those payments into either U.S. dollars or the issuer's reporting currency. We understand issuers' concerns regarding the compliance costs relating to making payments in multiple currencies and being required to report the information in another currency.[445] To address these concerns, the final rules permit an issuer to choose between disclosing payments in either U.S. dollars or its reporting currency. In addition, an issuer may choose to calculate the currency conversion between the currency in which the payment was made and U.S. dollars or the issuer's reporting currency, as applicable, in one of three ways: (1) By translating the expenses at the exchange rate existing at the time the payment is made; (2) using a weighted average of the exchange rates during the period; or (3) based on the exchange rate as of the issuer's fiscal year end.[446] A resource extraction issuer must disclose the method used to calculate the currency conversion.[447]

Consistent with Section 13(q) and the proposal, the final rules do not require the resource extraction payment information to be audited or provided on an accrual basis. We note that, in this regard, the EITI approach is fundamentally different from Section 13(q). Under the EITI, companies and the host country's government generally each submit payment information confidentially to an independent administrator selected by the country's multi-stakeholder group, frequently an independent auditor, who reconciles the information provided by the companies and the government, and then the administrator produces a report.[448] In contrast, Section 13(q) requires us to issue final rules for disclosure of payments by resource extraction issuers; it does not contemplate that an administrator will audit and reconcile the information, or produce a report as a result of the audit and reconciliation. In addition, we recognize the concerns raised by some commentators that an auditing requirement for the payment information would significantly increase implementation and ongoing reporting costs. We believe that not requiring the payment information to be audited or provided on an accrual basis is consistent with Section 13(q) because the statute refers to ''payments'' and does not require the information to be included in the financial statements.[449] In addition, not requiring the information to be audited or provided on an accrual basis may result in lower compliance costs than otherwise would be the case if resource extraction issuers were required to provide audited information.

Consistent with the statute, the final rules require a resource extraction issuer to include an electronic tag that identifies the business segment of the resource extraction issuer that made the payments. As suggested by commentators,[450] we are defining ''business segment'' to mean a business segment consistent with the reportable segments used by the resource extraction issuer for purposes of financial reporting.[451] We believe that defining ''business segment'' in this way will enable issuers to report the information according to how they currently report their business operations, which should help to reduce compliance costs.

We note that some of the electronic tags, such as those pertaining to category, currency, country, and financial period will have fixed definitions and will enable interested persons to evaluate and compare the payment information across companies and governments. Other tags, such as those pertaining to business segment, government, and project, will be customizable to allow issuers to enter information specific to their business. To the extent that payments, such as corporate income taxes and dividends, are made for obligations levied at the entity level, issuers may omit certain tags that may be inapplicable (*e.g.,* project tag, business segment tag) for those payment types as long as they provide all other electronic tags, including the tag identifying the recipient government.[452]

As discussed in greater detail above, we agree with those commentators who stated that the public compilation was not intended to be a substitute for the payment disclosure required of resource extraction issuers under Section 13(q),[453] and we have not yet determined the content, form, or frequency of any such compilation.[454] We note that users of the information will be able to compile the information in a manner that is most useful to them by using the electronically-tagged data filed by resource extraction issuers.

3. Treatment for Purposes of Securities Act and Exchange Act

a. Proposed Rules

As noted in the proposal, the statutory language of Section 13(q) does not specify that the information about resource extraction payments must be ''filed,'' rather, it states that the information should be ''include[d] in an annual report[.]'' [455] As proposed, the rules would have required the disclosure of payment information to be ''furnished'' rather than ''filed'' and not subject to liability under Section 18 of the Exchange Act, unless the issuer explicitly states that the resource extraction disclosure is filed under the Exchange Act.

b. Comments on the Proposed Rules

Numerous commentators stated their belief that the payment disclosure should be furnished rather than filed and, therefore, not subject to Exchange Act Section 18 liability.[456] Such commentators expressed the view that the nature and purpose of the Section 13(q) disclosure requirements is not primarily for the protection of investors but, rather, to increase the accountability of governments for the proceeds they receive from their natural resources and, thus, to support the commitment of the Federal Government

and Exchange Act registration and reporting. *See* Rule 3–20 of Regulation S–X (17 CFR 210.3–20).

[445] *See, e.g.,* letters from API 1, BP 1, ExxonMobil 1, NMA 2, and RDS 1. We note that the EITI recommends that oil and natural gas participants report in U.S. dollars, as the quoted market price is in U.S. dollars. It also recommends that mining companies be permitted to use the local currency because most benefit streams for those companies are paid in the local currency. The EITI also suggests that companies may decide to report in both U.S. dollars and the local currency. *See* the *EITI Source Book,* at 30.

[446] *See* Instruction 3 to Item 2.01 of Form SD.

[447] *See id.*

[448] *See EITI Source Book,* at 23 (''It will be necessary to appoint an administrator to collect and evaluate the revenue data provided by companies and government. It is essential that there is stakeholder trust in the administrator's impartiality and competency. The administrator may be a private audit firm, an individual or an existing or specially created official body that is universally regarded as independent of, and immune to influence by, the government.'').

[449] *See* note 405 and accompanying text.

[450] *See* note 426 and accompanying text.

[451] *See* Item 2.01(c)(4) of Form SD. The term ''reportable segment'' is defined in FASB ASC Topic 280, *Segment Reporting,* and IFRS 8, *Operating Segments.*

[452] *See* note 432 and accompanying text.

[453] *See* note 434 and accompanying text.

[454] In this regard, we note that members of Congress, including one of the sponsors of the provision, submitted a comment letter stating ''Section 1504 requires companies to report the information in an interactive format so that the information is readily usable by investors and the public—the basic intent of the section. Section 1504 also suggests that if practicable, the SEC can make a compilation of all the data available to investors and the public for ease of use. This compilation would be in addition to the public availability of the original company data and in no way is expected to replace the public availability of that data.'' *See* letter from Sen. Cardin *et al.* 1.

[455] 15 U.S.C. 78m(q)(2)(A).

[456] *See* letters from API 1, AngloGold, Barrick Gold, BP 1, Cleary, ExxonMobil 1, NMA 2, NYSBA Committee, PetroChina, PWC, and RDS 1.

to international transparency promotion efforts relating to the commercial development of oil, natural gas, or minerals.[457] One commentator stated that ''requiring [the disclosure to be filed] could indirectly increase the costs of Securities Act disclosures that incorporate the filing by reference (raising underwriting, auditing, and perhaps even credit rating costs).'' [458] Two commentators requested that if the final rules require an issuer to include the disclosure in an existing Exchange Act annual report, the rules should not extend the officer certifications required by Exchange Act Rules 13a–14, 13a–15, 15d–14, and 15d–15 to that disclosure.[459]

Numerous other commentators disagreed with the proposal and urged the Commission to require the payment disclosures to be filed rather than furnished and subject to Section 18 liability.[460] Several commentators believed that the plain language of the statute requires filing of the disclosure.[461] Commentators also asserted that one of the goals of Section 13(q) is to enhance investor protection from risks inherent in the extractive industries, and therefore the nature and purpose of Section 13(q) is not qualitatively different than other disclosure that has historically been required under Section 13.[462] According to those commentators, the best way to enhance investor protection would be to require that resource extraction payment disclosures be filed rather than furnished; otherwise, investor confidence in the accuracy of the disclosures would be undermined.[463] Some commentators stated that requiring the disclosure to be furnished rather than filed would deprive investors of causes of action in the event that the disclosure is false or misleading.[464]

In addition, several commentators opposed extending the disclosure requirements to registration statements under the Securities Act.[465] In opposing such an extension of the requirements, one commentator stated that ''the purpose of these disclosures is not to inform investors * * * so there is no logical reason for such inclusion. Also, inclusion would raise nettlesome concerns relating to liability, and directors' and underwriters' due diligence obligations, for no good reason.'' [466] Other commentators, however, believed that the Commission should require the inclusion of the payment information in Securities Act registration statements.[467]

c. Final Rules

Although the proposed rules would have required the payment information to be furnished, after considering the comments, the final rules we are adopting require resource extraction issuers to file the payment information on new Form SD. As discussed above, commentators disagreed as to whether the required information should be furnished or filed,[468] and Section 13(q) does not state how the information should be submitted. In reaching our conclusion that the information should be ''filed'' instead of ''furnished'' we note that the statute defines ''resource extraction issuer'' in part to mean an issuer that is required to file an annual report with the Commission,[469] which, as commentators have noted, suggests that the annual report that includes the required payment information should be filed.[470] Additionally, many commentators believed that investors would benefit from the payment information being ''filed'' and subject to Exchange Act Section 18 liability.[471] Some commentators asserted that allowing the information to be furnished would diminish the importance of the information.[472] Some commentators believed that requiring the information to be filed would enhance the quality of the disclosure.[473] In addition, some commentators argued that the information required by Section 13(q) differs from the information that the Commission permits issuers to furnish and that the information is qualitatively similar to disclosures that are required to be filed under Exchange Act Section 13.[474]

Other commentators supporting the proposal that the disclosure be furnished argued that the information is not material to investors.[475] We note, however, other commentators, including investors, argued that the information is material.[476] Given the disagreement, and that materiality is a fact specific inquiry, we are not persuaded that this is a reason to provide that the information should be furnished. Additionally, while we appreciate the comments that the payment information should be furnished and not subject to Section 18 liability, we note that Section 18 does not create strict liability for filed information. Rather, it states that a person shall not be liable for misleading statements in a filed document if it can establish that it acted in good faith and had no knowledge that the statement was false or misleading.[477] As noted

[457] *See, e.g.,* letters from API 1 and AngloGold.

[458] *See* letter from NMA 2.

[459] *See* letters from Cleary and NYSBA Committee.

[460] *See* letters from Bon Secours, Calvert, CRS, Earthworks, EIWG, ERI, ERI 2, Global Financial 2, Global Witness 1, Greenpeace, HII, HURFOM 1, HURFOM 2, Newground, ONE, Oxfam 1, PGGM, PWYP 1, RWI 1, Sanborn, Sen. Cardin *et al.* 1, Sen. Cardin *et al.* 2, Sen. Levin 1, Soros 1, TIAA, USAID, USW, and WRI.

[461] *See* letters from Calvert, Global Witness 1, PWYP 1, and Sen. Cardin *et al.* 1.

[462] *See, e.g.,* letters from Global Witness 1, PWYP 1, Sen. Cardin *et al.* 1, and Sen. Levin 1; *see also* letter from Sen. Cardin *et al.* 2.

[463] *See, e.g.,* letters from Global Witness 1, PWYP 1, and Sen. Levin 1.

[464] *See* letters from Global Witness 1, Oxfam 1, PWYP 1, Sen. Cardin *et al.* 1, and Sen. Levin 1; *see also* letter from Sen. Cardin *et al.* 2.

[465] *See* letters from API 1, AngloGold, Cleary, ExxonMobil 1, NMA 2, NYBSA Committee, RDS 1 and Statoil.

[466] Letter from NYSBA Committee.

[467] *See* letters from Calvert, Earthworks, and PWYP 1.

[468] *Compare* letters from API 1, AngloGold, Barrick Gold, BP 1, Cleary, ExxonMobil 1, NMA 2, NYSBA Committee, PetroChina, PWC, and RDS 1 (supporting a requirement to furnish the disclosure) with letters from Bon Secours, Calvert, Earthworks, EIWG, ERI, ERI 2, Global Financial 2, Global Witness 1, HII, HURFOM 1, HURFOM 2, Newground, ONE, Oxfam 1, PGGM, PWYP 1, RWI 1, Sanborn, Sen. Cardin *et al.* 1, Sen. Cardin *et al.* 2, Sen. Levin 1, Soros 1, TIAA, USAID, USW, and WRI (supporting a requirement to file the disclosure).

[469] 15 U.S.C. 78m(q)(1)(D)(i).

[470] *See* letters from Global Witness 1, PWYP 1, and Sen. Cardin *et al.*

[472] *See* letters from Calvert and Global Witness 1.

[473] *See* letters from HURFOM, Global Witness 1, and PWYP 1.

[474] *See* letters from ERI 1, HII, Oxfam 1, PGGM, PWYP 1, Sen. Cardin *et al.* 1, and Soros 1.

[475] *See* letters from API 1, ExxonMobil 1, and RDS 1; *see also* letter from AngloGold.

[476] *See* letters from Calvert, ERI 1, Soros 1, Global Financial Integrity (January 28, 2011) (''Global Financial Integrity 1''), Global Witness 1, HII, Oxfam, Sanborn, PGGM, PWYP 1, Sen. Cardin *et al.* 1, and TIAA.

[477] Exchange Act Section 18(a) provides: ''Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this title or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 15 of this title, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading. A person seeking to enforce such liability may sue at law or in equity in any court of competent jurisdiction. In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such suit, and assess reasonable costs, including reasonable attorneys' fees, against either party litigant.'' A plaintiff asserting a claim under Section 18 would need to meet the elements of the statute to establish a claim, including reliance and damages. In addition, we note that issuers that fail to comply with the final rules could also be violating Exchange Act Sections 13(a) and (q) and 15(d), as applicable. Issuers also would be subject to potential liability under Exchange Act Section 10(b) [15 U.S.C. 78j] and Rule

Continued

above, because the disclosure is in a new form, rather than in issuers' Exchange Act annual reports, the filed disclosure is not subject to the officer certifications required by Rules 13a–14 and 15d–14 under the Exchange Act.

We also note a commentator stated that filing the disclosure would require auditors to consider whether the resource extraction payment disclosures are materially inconsistent with the financial statements thereby increasing the cost.[478] We note however, that unlike the proposal, the disclosure will not be required in the Form 10–K but instead will be required in new Form SD, which does not include audited financial statements, and therefore will not be subject to this potential increased cost.

*G. Effective Date*

1. Proposed Rules

In the Proposing Release, we requested comment on whether we should provide a delayed effective date for the final rules and whether doing so would be consistent with the statute.

2. Comments on the Proposed Rules

Some commentators believed that the final rules should be effective for fiscal years ending on or after April 15, 2012, without exception.[479] One of those commentators believed that providing exceptions would go against the principle of equal treatment of issuers.[480] Another commentator stated that implementation of the final rules should not be delayed because ''companies have known of the possibility of disclosure regulations for many years.'' [481]

Other commentators suggested delaying the effective date of the final rules because compliance with the final rules would necessitate significant changes to resource planning systems.[482] Commentators maintained that we have the flexibility to delay the effective date because Section 13(q) states that the disclosure must be provided not earlier than for the fiscal year ending one year after issuance of the final rules.[483] Some commentators stated that an effective date for 2012 is feasible only if the scope of the required disclosure is limited.[484] These commentators suggested further delaying the effective date if the final rules include, among other things, an audit requirement, downstream activities, a granular definition of project (*e.g.,* a definition that precludes disclosure at the country or entity level), preparation of disclosures on a cash basis, or required reporting in multiple currencies.[485] Some commentators urged the delay of the effective date due to the need to implement new accounting standards.[486] Commentators suggested that we require compliance with the rule for 2013, 2014, or 2015.[487]

Some commentators believed that all resource extraction issuers should be subject to the same effective date.[488] One commentator suggested a phase-in approach requiring large accelerated filers to provide the disclosure for fiscal years ending on or after July 1, 2012 and for all others to provide the disclosure for fiscal years ending on or after July 1, 2013.[489] The commentator believed that a phase-in approach would reduce costs for smaller issuers because it would enable those issuers to observe how larger issuers comply with the new rules.[490] Another commentator stated that a phase-in would be appropriate for smaller reporting companies.[491]

3. Final Rules

Under the final rules, a resource extraction issuer will be required to comply with new Rule 13q–1 and Form SD for fiscal years ending after September 30, 2013. The final rules will require a resource extraction issuer to file with the Commission for the first time an annual report that discloses the payments it made to governments for the purpose of the commercial development of oil, natural gas, or minerals. Based on the comments we received, we understand that resource extraction issuers will need time to undertake significant changes to their reporting systems and processes to gather and report the payment information. Even for those issuers that provide some payment disclosure voluntarily or as part of an EITI program, compliance with the final rules will likely require changes in their reporting systems.[492] In light of this, we believe it is appropriate to provide all issuers with a reasonable amount of time to make such changes and to allow a transition period for reporting. Therefore, the final rules provide that for the first report filed for fiscal years ending after September 30, 2013, a resource extraction issuer may provide a partial year report if the issuer's fiscal year began before September 30, 2013. The issuer will be required to provide a report for the period beginning October 1, 2013 through the end of its fiscal year. For example, a resource extraction issuer with a December 31, 2013 fiscal year end will be required to file a report disclosing payments made from October 1, 2013–December 31, 2013. For any fiscal year beginning on or after September 30, 2013, a resource extraction issuer will be required to file a report disclosing payments for the full fiscal year.

We believe that requiring compliance with the final rules for fiscal years ending after September 30, 2013 and providing a transition period in which partial year reports are permitted will provide time for issuers to effect the changes in their reporting systems necessary to gather and report the payment information required by the final rules.[493] We recognize that adoption of this compliance date and transition period means that most companies will provide partial year reports for the first report required under the rules. We believe this result is required, however, to enable issuers to make the changes to their reporting systems necessary to achieve full compliance with the final rules.

If any provision of these rules, or the application thereof to any person or circumstance, is held to be invalid, such invalidity shall not affect other provisions or application of such provisions to other persons or circumstances that can be given effect without the invalid provision or

10b–5 [17 CFR 240.10b–5], promulgated thereunder, for any false or misleading material statements in the information disclosed pursuant to the rule.

[478] *See* letter from PWC.

[479] *See* letters from Earthworks and PWYP 1. A third commentator urged the Commission to follow the statutory effective date because of the current consideration by the EC of extractive industry disclosure rules in the EU, which could follow the U.S. standard. *See* letter from PWYP U.K.

[480] *See* letter from PWYP 1.

[481] *See* letter from Earthworks.

[482] *See* letters from API 1, ExxonMobil 1, Chevron, and RDS 1.

[483] *See* letters from Cleary and NMA 2.

[484] *See* letters from API 1, Chevron, ExxonMobil 1, and NMA 2.

[485] *See* letters from API 1, Chevron, ExxonMobil 1, and NMA 2.

[486] *See* letters from Nexen, PetroChina, PWC, and RDS 1.

[487] *See* letters from Barrick Gold (fiscal year 2013), PetroChina (fiscal years ending on or after December 31, 2015); PwC (annual periods beginning after December 31, 2012).

[488] *See* letters from API 1, Chevron, ExxonMobil 1, and RDS 1.

[489] *See* letter from AngloGold.

[490] *See id.*

[491] *See* letter from Cleary.

[492] For example, issuers reporting under EITI programs that require material information to be reported at the country level will likely need to further develop their systems to gather and report information at the project level and meeting the ''not de minimis'' threshold.

[493] In this regard, we note changes required to internal tracking and reporting systems will likely be specific to the particular company and therefore we believe it is unlikely that smaller issuers would benefit from a phase-in that would allow them to observe how larger issuers comply with the new rules.

application. Moreover, if any portion of Form SD not related to resource extraction disclosure is held invalid, such invalidity shall not affect the use of the form for purposes of disclosure pursuant to Section 13(q).

## III. Economic Analysis

### *A. Introduction*

As discussed in detail above, we are adopting the new rules and amendment to Form SD discussed in this release to implement Section 13(q), which was added to the Exchange Act by Section 1504 of the Act. The new rules and revised form will require a resource extraction issuer to disclose in an annual report filed with the Commission on Form SD certain information relating to payments made by the issuer, a subsidiary of the issuer, or an entity under the control of the issuer to a foreign government or the U.S. Federal Government for the purpose of the commercial development of oil, natural gas, or minerals. The information will include the type and total amount of payments made for each project of the issuer relating to the commercial development of oil, natural gas, or minerals as well as the type and total amount of payments made to each government. We expect that the final rules will affect in substantially the same way both U.S. companies and foreign companies that meet the definition of ''resource extraction issuer,'' which is an issuer that is required to file an annual report with the Commission and engages in the commercial development of oil, natural gas, or minerals.

Since Congress adopted Section 13(q) in July 2010, we have sought comment on our implementation of the provision and provided opportunities for commentators to provide input. Members of the public interested in making their views known were invited to submit comment letters in advance of when the official comment period for the proposed rules opened, and the public had the opportunity to submit comment on the proposal during the comment period. In addition, in response to the suggestion by some commentators that we extend the comment period to allow the public additional time to thoroughly consider the matters addressed in the Proposing Release and to submit comprehensive responses, we extended the comment period for an additional 30 days[494] and have continued to receive comment letters after the extended deadline, all of which we have considered. We believe interested parties have had ample opportunity to review the proposed rules, as well as the comment letters, and to provide views on the proposal, other comment letters, and data to inform our consideration of the final rules. Accordingly, we do not believe that a re-proposal is necessary.

The Proposing Release cited some pre-proposal letters we received from commentators indicating the potential impact of the proposed rules on competition and capital formation. In addition to requesting comment throughout the Proposing Release on the proposals and on potential alternatives to the proposals, the Commission also solicited comment in the Proposing Release on whether the proposals, if adopted, would promote efficiency, competition, or capital formation, or have an impact or burden on competition. We also requested comment on the potential effect on efficiency, competition, or capital formation should the Commission not adopt certain exceptions or accommodations. As discussed throughout this release, we received many comments addressing the potential economic and competitive impact of the proposed rules. Indeed, many commentators provided multiple comment letters to support, expand upon, or contest views expressed by other commentators.[495]

Section 13(q) of the Exchange Act requires us to issue rules to implement the disclosure requirement for certain payments made by resource extraction issuers to the Federal Government and foreign governments. Congress intended that the rules issued pursuant to Section 13(q) would increase the accountability of governments to their citizens in resource-rich countries for the wealth generated by those resources.[496] This type of social benefit differs from the investor protection benefits that our rules typically strive to achieve. We understand that the statute is seeking to achieve this benefit by mandating a new disclosure requirement under the Exchange Act that requires resource extraction issuers to identify and report payments they make to governments and that supports international transparency promotion efforts relating to the commercial development of oil, natural gas, or minerals.[497] In addition, some commentators stated that the information disclosed pursuant to Section 13(q) would benefit investors, by among other things, helping investors model project cash flows and assess political risk, acquisition costs, and management effectiveness.[498] Moreover, investors and other market participants, as well as civil society in countries that are resource-rich, may benefit from any increased economic and political stability and improved investment climate that transparency promotes. Commentators and the sponsors of Section 13(q) also have noted that the United States has an interest in promoting accountability, stability, and good governance.[499]

We are sensitive to the costs and benefits of the final rules, and Exchange Act Section 23(a)(2) requires us, when adopting rules, to consider the impact that any new rule would have on competition. In addition, Section 3(f) of the Exchange Act requires us, when engaging in rulemaking that requires us to consider or determine whether an action is necessary or appropriate in the public interest, to consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation. We have considered the costs and benefits

[494] *See* Exchange Act Release No. 34–67395 (January 28, 2011), 76 FR 6111 (February 3, 2011), *available at http://www.sec.gov/rules/proposed/2011/34-63795.pdf.* This robust, public input has allowed us to more fully consider how to develop the final rules.

[495] *See, e.g.,* letters from API 1, API 2, API 3, American Petroleum Institute (February 13, 2012), ExxonMobil 1, ExxonMobil 2, ExxonMobil 3, Global Witness 1, Global Witness 2, Global Witness 3, PWYP 1, PWYP 2, PWYP 3, PWYP 4, PWYP 5, ERI 1, ERI 2, ERI 3, ERI 4, Oxfam 1, Oxfam 2, RELUFA 1, RELUFA 2, RELUFA 3, RWI 1, RWI 2, RDS 1, RDS 2, RDS 3, RDS 4, Sen. Cardin *et al.* 1, Sen. Cardin *et al.* 2, Sen. Levin 1, Sen. Levin 2, Soros 1, and Soros 2. One commentator urged us to re-propose the rules in order to give the public an additional opportunity to comment on and inform the Commission's assessment of the economic impact of the proposed rules. *See* letter from API 3. As described above, we believe interested parties have had ample opportunity to review the proposed rules, as well as the comment letters, and to provide views and data to inform our consideration of the economic effects of the final rules.

[496] *See* note 7 and accompanying text.

[497] *See* note 8 and accompanying text.

[498] *See, e.g.,* letters from Calvert, CALPERS, and Soros 1.

[499] *See, e.g.,* letter from Sen. Cardin (February 28, 2012) (includes a transcript of testimony from Secretary of State Hilary Rodham Clinton before the Senate Foreign Relations Committee). *See also* statement from Senator Cardin regarding the provision (''* * * Transparency helps create more stable governments, which in turn allows U.S. companies to operate more freely—and on a level playing field—in markets that are otherwise too risky or unstable.''), 156 Cong. Rec. S5870 (daily ed. Jul. 15, 2010) (statement of Sen. Cardin); and Senator Lugar regarding the provision (''* * * Transparency empowers citizens, investors, regulators, and other watchdogs and is a necessary ingredient of good governance for countries and companies alike * * *. Transparency also will benefit Americans at home. Improved governance of extractive industries will improve investment climates for our companies abroad, it will increase the reliability of commodity supplies upon which businesses and people in the United States rely, and it will promote greater energy security.'' 156 Cong. Rec. S3816 (daily ed. May 17, 2010) (statement of Sen. Lugar)).

imposed by the rule and form amendments we are adopting, as well as their effects on efficiency, competition, and capital formation. Many of the economic effects of the rules stem from the statutory mandate, while others are affected by the discretion we exercise in implementing the Congressional mandates. The discussion below addresses the costs and benefits resulting from both the statute and our exercise of discretion, and the comments we received about these matters. In addition, as discussed elsewhere in this release, we recognize that the rules will impose a burden on competition, but we believe that any such burden that may result is necessary in furtherance of the purposes of Exchange Act Section 13(q).

After analyzing the comments and taking into account additional data and information, we believe it is likely that the total initial cost of compliance for all issuers is approximately $1 billion and the ongoing cost of compliance is between $200 million and $400 million. We reach these estimates by considering carefully all comments we received on potential costs. We relied particularly on those comment letters that provided quantification and were transparent about their methodologies. As discussed in more detail below, after thoroughly considering each comment letter, we determined that it was appropriate to modify and/or expand upon some of the submitted estimates and methodologies to reflect data and information submitted by other commentators, as well as our own judgment, experience, and expertise. Our considered estimate of the total costs thus reflects these synthesized data and analyses. We consider the full range of these costs in the following sections, although where it is possible to discuss separately the costs and benefits related to our discretionary choices in the rules, we attempt to do so.[500]

Given the specific language of the statute and our understanding of Congress' objectives, we believe it is appropriate for the final rules generally to track the statutory provision. Our discretionary authority to implement Section 13(q) is limited, and we are committed to executing the Congressional mandate. Throughout this release, and in the following economic analysis, we discuss the benefits and costs arising from both the new reporting requirement mandated by Congress and from those choices in which we have exercised our discretion. Sections III.B. and III.C. below provide a narrative discussion of the costs and benefits of resulting from the mandatory reporting requirement and our exercise of discretion, respectively. In Section III.D. below, based on commentators' estimates and our estimates, we provide a quantitative discussion of the costs associated with the final rules as adopted.[501]

*B. Benefits and Costs Resulting From the Mandatory Reporting Requirement*

1. Benefits

As noted above, Congress intended that the rules issued pursuant to Section 13(q) would increase the accountability of governments to their citizens in resource-rich countries for the wealth generated by those resources.[502] In addition, commentators and the sponsors of Section 13(q) also have noted that the United States has an interest in promoting accountability, stability, and good governance.[503] Congress' goal of enhanced government accountability through Section 13(q) may result in social benefits that cannot be readily quantified with any precision.[504] We also note that while the objectives of Section 13(q) do not appear to be ones that will necessarily generate measurable, direct economic benefits to investors or issuers, investors have stated that the disclosures required by Section 13(q) have value to investors and can ''materially and substantially improve investment decision making.'' [505]

Many commentators stated that they support the concept of increasing transparency of resource extraction payments.[506] While commentators stated that a benefit of increasing transparency is increased government accountability, some commentators also noted that the new disclosure requirements would help investors assess the risks faced by resource extraction issuers operating in resource-rich countries.[507] To the extent that investors want information about payments to assess these risks, the rules may result in increased investment by those investors and thus may increase capital formation.

Several commentators noted that the statutory requirement to provide project-level disclosure significantly enhances the benefits of the mandatory reporting required under Section 13(q).[508] One commentator stated that the benefits to civil society of project-level reporting are significantly greater than those of country-level reporting.[509] This commentator stated that project-level data will enable civil society groups, representing local communities, to know how much their governments earn from the resources that are removed from their respective territories and empower them to advocate for a fairer share of revenues, double-check government-published budget data, and better calibrate their expectations from the extractive companies.[510] This commentator further stated that project-level reporting will enable both local government officials and civil society groups to monitor the revenue that flows back to the regions from the central government and ensure that they receive what is promised—a benefit that would be unavailable if revenue streams were not differentiated below the country level.[511] Another commentator noted that project-level reporting would shine greater light on dealings between resource extraction issuers and governments, thereby providing companies with ''political cover to sidestep government requests to engage in potentially unethical activities.'' [512]

One commentator noted the benefits to investors of project-level reporting.[513] One benefit cited by this commentator is that project-level reporting will enable investors to better understand the risk profiles of individual projects within a given country, which may vary greatly depending on a number of factors such as regional unrest, personal interest by powerful government figures, degree of community oppression, and environmental sensitivity.[514] This commentator indicated that project-level disclosures will enable investors to

[500] As discussed above, our discretionary choices are informed by the statutory mandate and thus, discussion of the benefits and costs of those choices will necessarily involve the benefits and costs of the underlying statute.

[501] As noted below, Congress' goal of enhanced accountability through Section 13(q) is an intended social benefit that cannot be readily quantified with any precision, and therefore, our quantitative analysis focuses on the costs.

[502] *See* note 7 and accompanying text.

[503] *See* note 499 and accompanying text.

[504] These benefits could ultimately be quite significant given the per capita income of the potentially affected countries.

[505] Calvert (March 1, 2011). *See* note 498 and accompanying text.

[506] *See, e.g.,* letters from API 1, Calvert, Chamber Energy Institute, ExxonMobil 1, Global Witness 1, Oxfam 1, Petrobras, PWYP 1, RDS 1, and Statoil.

[507] *See, e.g.,* letters from Calvert, ERI 2, Global Witness 1, and Oxfam 1.

[508] *See, e.g.,* letters from Global Witness 1, Oxfam 1, PWYP 1, RWI 1, and Syena.

[509] *See* letter from ERI 1; *see also* letter from Gates Foundation.

[510] *See* letter from ERI 1; *see also* letter from Gates Foundation (stating that it is important to seek disclosure below the country level, that project-level disclosure will give both citizens and investors valuable information, and that defining ''project'' as a geologic basin or province would be of limited use to both citizens and investors).

[511] *See* letter from ERI 1.

[512] *See* letter from EG Justice.

[513] *See* letter from ERI 2.

[514] *See id.*

better understand these risks, whereas country-level reporting would allow companies to mask particularly salient projects by aggregating payments with those from less risky projects.[515] The commentator noted that unusually high signing bonus payments for a particular project may be a proxy for political influence, whereas unusually low tax or royalty payments may signal that a project is located in a zone vulnerable to attacks or community unrest.[516] A further benefit of project-level disclosures is that it would assist investors in calculations of cost curves that determine whether and for how long a project may remain economical, using a model that takes into account political, social, and regulatory risks.[517]

There also may be a benefit to investors given the view expressed by some commentators that new disclosure requirements would help investors assess the risks faced by resource extraction issuers operating in resource-rich countries. To the extent that the required disclosure will help investors in pricing the securities of the issuers subject to the requirement mandated by Section 13(q), the rules could improve informational efficiency. One commentator indicated that project-level disclosures will promote capital formation by reducing information asymmetry and providing more security and certainty to investors as to extractive companies' levels of risk exposure.[518] One commentator was of the view that improved transparency regarding company payments of royalties, taxes, and production entitlements on a country level would provide institutional investors, such as the commentator, with the necessary information to assess a company's relative exposure to country-specific risks including political and regulatory risks, and would contribute to good governance by host governments.[519] Similarly, another commentator was of the view that in countries where governance is weak, the resulting corruption, bribery, and conflict could negatively affect the sustainability of a company's operations, so Section 13(q) would benefit companies' operations and investors' ability to more effectively make investment decisions.[520] One commentator anticipated benefits of lower capital costs and risk premiums as a result of improved stability stemming from the statutory requirements and lessened degree of uncertainty promoted by greater transparency.[521] This same commentator believed that the disclosure standardization imposed through Section 13(q) would be of particular benefit to long-term investors by providing a model for data disclosure as well as help to address some of the key challenges faced by EITI implementation.[522] Another commentator maintained that transparency of payments is a better indicator of risk for extractive companies than the bond markets and is also a better indicator of financial performance.[523]

2. Costs

Many commentators stated that the reporting regime mandated by Section 13(q) would impose significant compliance costs on issuers. Several commentators addressed Paperwork Reduction Act (''PRA'')-related costs specifically,[524] while others discussed the costs and burdens to issuers generally as well as costs that could have an effect on the PRA analysis.[525] As discussed further in Section III.D. below, in response to comments we received, we have provided our estimate of both initial and ongoing compliance costs. In addition, also in response to comments, we have made several changes to our PRA estimates that are designed to better reflect the burdens associated with the new collections of information.

Some commentators disagreed with our industry-wide estimate of the total annual increase in the collection of information burden and argued that it underestimated the actual costs that would be associated with the rules.[526] Some commentators stated that, depending upon the final rules adopted, the compliance burdens and costs caused by implementation and ongoing compliance with the rules would be significantly greater than those estimated by the Commission.[527] Significantly, however, in general these commentators did not provide any quantitative analysis to support their estimates.[528]

Some commentators noted that modifications to issuers' core enterprise resource planning systems and financial reporting systems will be necessary to capture and report payment data at the project level, for each type of payment, government payee, and currency of payment.[529] Commentators provided examples of such modifications including establishing additional granularity to existing coding structures (*e.g.,* splitting accounts that contain both government and non-government payment amounts), developing a mechanism to appropriately capture data by ''project,'' building new collection tools within financial reporting systems, establishing a trading partner structure to identify and provide granularity around government entities, establishing transaction types to accommodate types of payment (*e.g.,* royalties, taxes, bonuses, etc.), and developing a systematic approach to handle ''in-kind'' payments.[530] These commentators estimated that the resulting initial implementation costs would be in the tens of millions of dollars for large issuers and millions of dollars for many small issuers.[531] Two commentators also estimated that total industry costs for initial implementation of the final rules could amount to hundreds of millions of dollars.[532]

These commentators also noted, however, that these costs could be increased significantly depending on the scope of the final rules.[533] For example, commentators suggested that these cost estimates could be greater depending on the how the final rules define ''project,'' and whether the final rules require reporting of non-consolidated entities, require ''net'' and accrual reporting, or include an audit requirement.[534] Another commentator

[515] *See id.*

[516] *See id.*

[517] *See* letter from Calvert Asset Management Company and SIF (November 15, 2010) (pre-proposal letter).

[518] *See* letter from ERI 2.

[519] *See* letter from PGGM. This commentator also noted that the disclosure required by Section 13(q) would provide in-country activists with information to hold their governments accountable.

[520] *See* letter from CalPERS.

[521] *See* letter from Hermes.

[522] *See* letter from Hermes.

[523] *See* letter from Vale Columbia Center (December 16, 2011).

[524] *See* letters from API 1, API 2, Barrick Gold, ERI 2, ExxonMobil 1, ExxonMobil (October 25, 2011) (''ExxonMobil 3''), NMA 2, Rio Tinto, RDS 1, and RDS 4.

[525] *See, e.g.,* letters from BP 1, Chamber Energy Institute, Chevron, Cleary, Hermes, and PWYP 1.

[526] *See* letters from API 1 and ExxonMobil 1.

[527] *See* letters from API 1, API 2, API 3, Barrick Gold, ExxonMobil 1, NMA 2, Rio Tinto, and RDS 1.

[528] *See* letters from API 1 and ExxonMobil 1. ExxonMobil 1 does provide estimated implementation costs of $50 million if the definition of ''project'' is narrow and the level of disaggregation is high across other reporting parameters. This estimate is used in our analysis of the expected implementation costs.

[529] *See* letters from API 1 and ExxonMobil 1. *See also* letter from RDS 1.

[530] *See* letters from API 1 and ExxonMobil 1.

[531] *See* letters from API 1, ExxonMobil 1, and RDS 1. These commentators did not describe how they defined small and large issuers.

[532] *See* letters from API 1 and ExxonMobil 1.

[533] *See* letters from API 1, ExxonMobil 1, and RDS 1.

[534] *See* letters from API 1, ExxonMobil 1, and RDS 1. As previously discussed, the final rules do not require the payment information to be audited or reported on an accrual basis, so commentators'

Continued

estimated that the initial set up time and costs associated with the rules implementing Section 13(q) would require 500 hours to effect changes to its internal books and records, and $100,000 in IT consulting, training, and travel costs.[535] One commentator representing the mining industry estimated that start-up costs, including the burden of establishing new reporting and accounting systems, training local personnel on tracking and reporting, and developing guidance to ensure consistency across reporting units, would be at least 500 hours for a mid-to-large sized multinational company.[536]

Two commentators stated that arriving at a reliable estimate for the ongoing annual costs of complying with the rules would be difficult because the rules were not yet fully defined, but suggested that a ''more realistic'' estimate than the estimate included in the Proposing Release is hundreds of hours per year for each large issuer with many foreign locations.[537] Commentators also indicated that costs related to external professional services would be significantly higher than the Commission's estimate, resulting primarily from XBRL tagging and higher printing costs, although these commentators noted that it is not possible to estimate these costs until the final rules are fully defined.[538]

One commentator estimated that ongoing compliance with the rules implementing Section 13(q) would require 100–200 hours of work at the head office, an additional 100–200 hours of work providing support to its business units, and 40–80 hours of work each year by each of its 120 business units, resulting in a total of approximately 4,800–9,600 hours and costs approximating between $2,000,000 to $4,000,000.[539] One commentator, a large multinational issuer, estimated an additional 500 hours each year, including time spent to review each payment to determine if it is covered by the reporting requirements and ensure it is coded to the appropriate ledger accounts.[540] Another commentator representing the mining industry estimated that the annual burden for a company with a hundred projects or reporting units, the burden could ''easily reach nearly'' 10 times the estimate set out in the Proposing Release.[541] This commentator noted that its estimate takes into account the task of collecting, cross-checking, and analyzing extensive and detailed data from multiple jurisdictions around the world, as well as the potential for protracted time investments (a) seeking information from certain non-consolidated entities that would be considered ''controlled'' by the issuer, (b) attempting to secure exceptions from foreign confidentiality restrictions, (c) obtaining compliance advice on the application of undefined terms such as ''not de minimis'' and ''project'' and implementing new systems based upon those definitions, (d) responding to auditor comments or queries concerning the disclosure, which, although not in the financial statements would, under the proposed rules, be a furnished exhibit to Form 10–K or equivalent report for foreign issuers, and (e) any necessary review of Section 13(q) disclosures in connection with periodic certifications under the Sarbanes-Oxley Act.[542] This commentator also noted that the estimate in the Proposing Release did not adequately capture the burden to an international company with multiple operations where a wide range of personnel will need to be involved in capturing and reviewing the data for the required disclosures as well as for electronically tagging the information in XBRL format.[543] A number of commentators submitted subsequent letters reiterating and emphasizing the potential of the proposed rules to impose substantial costs.[544]

Other commentators believed that concerns over compliance costs have been overstated.[545] One commentator stated that most issuers already have internal systems in place for recording payments that would be required to be disclosed under Section 13(q) and that many issuers currently are subject to reporting requirements at a project level.[546] Another commentator anticipated that while the rules will likely result in additional costs to resource extraction issuers, such costs would be marginal in scale because in the commentator's experience many issuers already have extensive systems in place to handle their current reporting requirements, and any adjustments needed as a result of Section 13(q) could be done in a timely and cost-effective manner.[547] Another commentator believed that issuers could adapt their current systems in a cost-effective manner because issuers should be able to adapt a practice undertaken in one operating environment to those in other countries without substantial changes to the existing systems and processes of an efficiently-run enterprise.[548]

Another commentator stated that, in addition to issuers already collecting the majority of information required to be made public under Section 13(q) for internal record-keeping and audits, U.S. issuers already report such information to tax authorities at the lease and license level.[549] This commentator added that efficiently-run companies should not have to make extensive changes to their existing systems and processes to export practices undertaken in one operating environment to another.[550]

One commentator, while not providing competing estimates, questioned the accuracy of the assertions relating to costs from industry participants.[551] This commentator cited the following factors which led it to question the cost assertions from industry participants: (i) Some issuers already report project-level payments in certain countries in one form or another and under a variety of regimes; (ii) some EITI countries are already moving toward project-level disclosure; and (iii) it is unclear whether issuers can save much time or money by reporting government payments at the material project or country level.[552] This commentator also explained that issuers must keep records of their subsidiaries' payments to governments as part of the books and records provisions of the

concerns about possible costs associated with these items should be alleviated. *See* Section II.F.2.c. above.

[535] *See* letter from Barrick Gold.

[536] *See* letter from NMA 2.

[537] *See* letters from API 1 and ExxonMobil 1 (each noting that estimates would increase if the final rules contain an audit requirement, or if the final rules are such that issuers are not able to automate material parts of the collection and reporting process).

[538] *See* letters from API 1 and ExxonMobil 1.

[539] *See* letter from Rio Tinto. These estimates exclude initial set-up time required to design and implement the reporting process and develop policies to ensure consistency among business units. They also assume that an audit is not required.

[540] *See* letter from Barrick Gold.

[541] *See* letter from NMA 2. The estimate provided in the Proposing Release was for the PRA analysis.

[542] *See* letter from NMA 2.

[543] *See* letter from NMA 2.

[544] *See* letters from API 2, ExxonMobil 3, and RDS 4.

[545] *See* letters from ERI 2, Oxfam 1, PWYP 1, and RWI 1.

[546] *See* letter from RWI 1. This commentator stated that issuers already have internal systems in place for reporting requirements at the project level ''as [RWI] believe[s] that term should be defined'' and provides examples (*e.g.,* Indonesia requires reporting at the production sharing agreement level; companies in the U.S. report royalties by lease).

[547] *See* letter from Hermes.

[548] *See* letter from RWI 1.

[549] *See* letter from PWYP 1.

[550] *See* letter from PWYP 1 (citing statement made by Calvert Investments at a June 2010 IASB-sponsored roundtable).

[551] *See* letter from ERI 2.

[552] *See id.*

Foreign Corrupt Practices Act, so the primary costs of reporting these payments will be in the presentation of the data rather than any need to institute new tracking systems.[553] This commentator indicated that to the extent that issuers may need to implement new accounting and reporting systems to keep track of government payments, then issuers presumably will need to develop mechanisms for receiving and attributing information on individual payments regardless of the form the final rules take.[554] The commentator also observed that the proposed rules simply would require companies to provide the payment information in its raw form, rather than requiring them to process it and disclose only those payments from projects they deem to be ''material,'' which could result in savings to issuers of time and money by allowing them to submit data without having to go through a sifting process.[555] This commentator observed that none of the commentators who submitted cost estimates attempted to quantify the savings that would ''supposedly accrue'' if disclosure were limited to ''material'' projects, as compared to disclosure of all projects, and noted that the Commission was not required to accept commentators' bare assertions that their ''marginal costs would be reduced very significantly.''[556]

One commentator disagreed that issuers already report the payment information required by Section 13(q) for tax purposes.[557] According to that commentator, ''[t]his is a simplistic view, and the problem is that tax payments for a specific year are not necessarily based on the actual accounting results for that year.''[558] This commentator also noted that tax reporting and payment periods may differ.[559]

Some commentators suggested that the statutory language of Section 13(q) gives the Commission discretion to hold individual company data in confidence and to use that data to prepare a public report consisting of aggregated payment information by country.[560] Other commentators strongly disagreed with the interpretation that Section 13(q) could be read not to require the public disclosure of the payment information submitted in annual reports and that the Commission may choose to make public only a compilation of the information.[561] The commentators suggesting the Commission make public only a compilation of information submitted confidentially by resource extraction issuers argued such an approach would address many of their concerns regarding disclosure of commercially sensitive or legally prohibited information and would significantly mitigate the costs of the mandatory disclosure under Section 13(q). As noted above, we have not taken this approach in the final rules because we believe Section 13(q) requires resource extraction issuers to provide the payment disclosure publicly and does not contemplate confidential submissions of the required information. As a result, the final rules require public disclosure of the information. We note that in situations involving more than one payment, the information will be aggregated by payment type, government, and/or project, and therefore may limit the ability of competitors to use the information to their advantage.

To the extent public disclosure of this information could result in costs related to competitive concerns, we note that even if we permitted issuers to provide the information confidentially to us and we were to publish a compilation of the information, interested parties might still be able to obtain the information pursuant to the Freedom of Information Act (FOIA).[562] Section 13(q) does not state that it provides any special protection from FOIA disclosure for information required to be submitted. Thus, the same competitive concerns could still exist.

One commentator expressed concerns with the proposed requirement to prepare the payment disclosures on the cash-basis of accounting, and noted that because registrants' existing reporting processes and accounting systems are based on the accrual method of accounting (and require certain payments to be capitalized), the proposal would impose a burden on resource extraction issuers' accounting groups to develop new information system, processes, and controls.[563]

Several commentators stated that the Commission should define ''not de minimis'' to mean material.[564] According to those commentators, a definition based on materiality would be consistent with the EITI and the Commission's longstanding disclosure regime, and would encourage consistency of disclosure across issuers.[565] Although a materiality-based definition might result in reduced compliance costs for issuers, we continue to believe that given the use of the phrase ''not de minimis'' in Section 13(q) rather than use of a materiality standard, which is used elsewhere in the federal securities laws and in the EITI,[566] ''not de minimis'' does not equate to a materiality standard.

Consistent with Section 13(q), the final rules require resource extraction issuers to disclose payments made by a subsidiary or entity under the control of the issuer. Some commentators suggested that we limit the requirement to disclose only those payments made by an issuer and its subsidiaries for which consolidated financial information is provided. Although limiting the requirement might result in reduced compliance costs for issuers, we do not believe it would be appropriate to do so because the statute specifically states that resource extraction issuers must disclose payments made by subsidiaries and entities under the control of the issuer.

The final rules clarify that the term ''foreign government'' includes foreign subnational governments and define the term to explicitly include both a foreign national government as well as a foreign subnational government, such as the government of a state, province, county, district, municipality, or territory under a foreign national government. Thus, resource extraction issuers will be required to provide information about payments made to foreign subnational governments. This broad definition may increase disclosure costs compared to a less detailed definition, but we believe Section 13(q) requires this broader definition, because Section 13(q) defines the term ''foreign government'' and requires issuers to include an electronic tag identifying the government that received the payments, and the country in which the government is located. The statutory requirement to provide electronic tags for both the government that received the payments and the

[553] *See id.*

[554] *See id.*

[555] *See id.*

[556] *See id.*

[557] *See* letter from Rio Tinto.

[558] *See id.*

[559] *See id.*

[560] *See* note 381 and accompanying text.

[561] *See* letters from Calvert, PWYP 1, RWI 1, Sen. Cardin *et al.* 1, Sen. Cardin *et al.* 2, and Sen. Levin 1.

[562] FOIA requires all federal agencies to make specified information available to the public, including the information required to be filed publicly under our rules. To the extent that the information required to be filed does not fall within one of the exemptions in FOIA (*e.g.,* FOIA provides an exemption for ''trade secrets and commercial or financial information obtained from a person and privileged or confidential''; 5 U.S.C. 552(b)(4)) the information required to be filed would not be protected from FOIA disclosure.

[563] *See* letter from PWC.

[564] *See* note 224 and accompanying text.

[565] *See* notes 225 and 226 and accompanying text.

[566] *See* note 251 and accompanying text.

country in which the government is located indicates that the intent of the statute is to include foreign subnational governments in the definition of ''foreign governments.'' This clarification should further the statutory goal of increasing transparency with regard to the payments made to foreign governments.

In addition to direct compliance costs, we expect that the statute could result in significant economic effects. Issuers that have a reporting obligation under Section 13(q) could be put at a competitive disadvantage with respect to private companies and foreign companies that are not subject to the reporting requirements of the United States federal securities laws and therefore do not have such an obligation. For example, such competitive disadvantage could result from, among other things, any preference by the government of the host country to avoid disclosure of covered payment information, or any ability of market participants to use the information disclosed by reporting issuers to derive contract terms, reserve data, or other confidential information. With respect to the latter concern, the potential anti-competitive effect of the required disclosures may be tempered because, under the statute, only the amount of covered payments needs to be disclosed, not the manner in which such payments are determined or other contract terms. Some commentators have stated that confidential production and reserve data can be derived by competitors or other interested persons with industry knowledge by extrapolating from the payment information required to be disclosed.[567] Other commentators have argued, however, that such extrapolation is not possible, and that information of the type required to be disclosed by Section 13(q) would not confer a competitive advantage on industry participants not subject to such disclosure requirements.[568] Any competitive impact of Section 13(q) should be minimal in those jurisdictions in which payment information of the types covered by Section 13(q) is already publicly available.[569] In addition, the competitive impact may be reduced to the extent that other jurisdictions, such as the EU, adopt laws to require disclosure similar to the disclosure required by Section 13(q) and the related rules.[570] If the requirement to disclose payment information does impose a competitive disadvantage on an issuer, such issuer possibly may be incented to sell assets affected by such competitive disadvantage at a price that does not fully reflect the value of such assets, absent such competitive impact.[571] Additionally, resource extraction issuers operating in countries which prohibit, or may in the future prohibit, the disclosure required under the final rules could bear substantial costs.[572] Such costs could arise because issuers may have to choose between ceasing operations in certain countries or breaching local law, or the country's laws may have the effect of preventing them from participating in future projects. Some commentators asserted that four countries currently have such laws,[573] although other commentators disputed the assertion that there are foreign laws that specifically prohibit disclosure of payment information.[574] A foreign private issuer with operations in a country that prohibits disclosure of covered payments, or foreign issuer that is domiciled in such country, might face different types of costs—it might decide it is necessary to delist from an exchange in the United States, deregister, and cease reporting with the Commission,[575] thus incurring a higher cost of capital and potentially limited access to capital in the future. In addition, it is possible that more countries will adopt laws prohibiting the disclosure required by the final rules. Shareholders, including U.S. shareholders, might suffer an economic and informational loss if an issuer decides it is necessary to deregister and cease reporting under the Exchange Act in the United States.

Addressing other potential costs, one commentator referred to a potential economic loss borne by shareholders, without quantifying such loss, which the commentator believed could result from highly disaggregated disclosures of competitively sensitive information causing competitive harm.[576] The commentator also noted resource extraction issuers could suffer competitive harm because they could be excluded from many future projects altogether.[577] Another commentator noted that tens of billions of dollars of capital investments would potentially be put at risk if issuers were required to disclose, pursuant to our rules, information prohibited by the host country's laws or regulations.[578] One commentator also noted that because energy underlies every aspect of the economy, these negative impacts have repercussions well beyond resource extraction issuers.[579]

As discussed above, several commentators suggested that we adopt exemptions or modify the disclosure requirements to mitigate the adverse impact of the Section 13(q) reporting requirement.[580] One commentator indicated that the final rules should be ''aligned and coordinated'' with the process being developed by the DOI to fulfill the United States' commitment to implementing the EITI.[581] We considered alternatives to the approach we are adopting in the final rules, including providing certain exemptions from the disclosure requirements mandated by Section 13(q), but we believe that adopting any of the alternatives would be inconsistent with Section 13(q) and would undermine Congress' intent to promote international transparency efforts. In

[567] *See* letters from API 1, ExxonMobil 1, and RDS 1.

[568] *See* letters from PWYP 1 and Oxfam 1.

[569] PWYP provides examples of countries in which payments are publicly disclosed on a lease or concession level. *See* letter from PYWP 3.

[570] One commentator suggested that if both the US and EU implement disclosure requirements regarding payments to governments ''around 90% of the world's extractive companies will be covered by the rules.'' *See* letter from Arlene McCarthy (August 10, 2012) (Arlene McCarthy is a member of the European Parliament and the parliamentary draftsperson on the EU transparency rules for the extractive sector).

[571] For example, a study on divestitures of assets finds that companies that undertake voluntary divestitures have positive stock price reactions but finds that companies forced to divest assets due to action undertaken by the antitrust authorities suffer a decrease in shareholder value. *See* Kenneth J. Boudreaux, ''Divestiture and Share Price.'' Journal of Financial and Quantitative Analysis 10 (September 1975), 619–26. G. Hite and J. Owers. ''Security Price Reactions around Corporate Spin-Off Announcements.'' Journal of Financial Economics 12 (December 1983), 409–36 (finding that firms spinning off assets because of legal/regulatory difficulties experience negative stock returns).

[572] *See* notes 52 and 53 and accompanying text.

[573] *See* letters from API 1 and ExxonMobil 1. *See also* letter from RDS 1 (mentioning China, Cameroon, and Qatar).

[574] *See, e.g.,* letters from ERI 3, Global Witness 1, PWYP 1, PWYP 3, and Rep. Frank *et al.*

[575] *See* letter from Berns.

[576] *See* letter from API 1.

[577] *See id.*

[578] *See* letter from RDS 4.

[579] *See* letter from API 1.

[580] *See, e.g.,* notes 50, 60, and 66 and accompanying text.

[581] *See* letter from NMA 3. *See also* note 14. Referring to Executive Orders 13563 and 13610, the commentator suggested that we align the final rules with the process being developed by DOI so that ''extractive industries are not subject to contradictory or overlapping reporting processes.'' As we have described above, the final rules are generally consistent with the EITI, except where the language of Section 13(q) clearly deviates from the EITI. In these instances, the final rules generally track the statute because, on these specific points, we believe the statutory language demonstrates that Congress intended the final rules to go beyond what is required by the EITI. In this regard, we view the reporting regime mandated by Section 13(q) as being complementary to, rather than duplicative of, host country transparency initiatives implemented under the EITI.

Section 13(q) Congress mandated that we adopt rules with a specific scope and features (*e.g.,* ''not de minimis'' threshold, project level reporting, and electronic tagging). To faithfully effectuate Congressional intent, we do not believe it would be appropriate to adopt provisions that would frustrate, or otherwise be inconsistent with, such intent. Consequently, we believe the competitive burdens arising from the need to make the required disclosures under the final rules are necessary by the terms of, and in furtherance of the purposes of, Section 13(q).

A number of factors may serve to mitigate the competitive burdens arising from the required disclosure. We note there were differences in opinion among commentators as to the applicability of host country laws.[582] Moreover, the widening global influence of the EITI and the recent trend of other jurisdictions to promote transparency, including listing requirements adopted by the Hong Kong Stock Exchange and proposed directive of the European Commission, may discourage governments in resource-rich countries from adopting new prohibitions on payment disclosure.[583] Reporting companies concerned that disclosure required by Section 13(q) may be prohibited in a given host country may also be able to seek authorization from the host country in order to disclose such information, reducing the cost to such reporting companies resulting from the failure of Section 13(q) to include an exemption for conflicts with host country laws.[584] Commentators did not provide estimates of the cost that might be incurred to seek such an authorization.

Not providing any exemptions should improve the transparency of the payment information because users of the Section 13(q) disclosure can obtain more information about payments than would otherwise be the case if the final rules provided an exemption. To the extent that other jurisdictions are developing and planning to adopt similar initiatives (*e.g.,* EU), the advantage to foreign companies not listed in the U.S. might diminish over time. Further, not providing any exemptions also improves the comparability of payment information among resource extraction issuers and across countries. As such, it may increase the benefit to users of the Section 13(q) disclosure. In addition, in light of the absence of an exemption from the disclosure requirement for foreign laws that prohibit the payment disclosure, countries may be less incentivized to enact laws prohibiting the disclosure.

Unlike many of the Commission's rulemakings, the compliance costs imposed by disclosure requirement mandated by Section 13(q) are intended to achieve social benefits. As noted above, the cost of compliance for this provision will be borne by the shareholders of the company thus potentially diverting capital away from other productive opportunities which may result in a loss of allocative efficiency.[585] Such effects may be partially offset if increased transparency of resource extraction payments reduces rent-seeking behavior by governments of resource-rich countries and leads to improved economic development and higher economic growth. A number of economic studies have shown that reducing corruption results in higher economic growth through more private investments, better deployment of human capital, and political stability.[586]

### *C. Benefits and Costs Resulting From Commission's Exercise of Discretion*

As discussed in detail in Section II, we have revised the rules from the Proposing Release to address comments we received while remaining faithful to the language and intent of the statute as adopted by Congress. In addition to the statutory benefits and costs noted above, we believe that the use of our discretion in implementing the statutory requirements will result in a number of benefits and costs to issuers and users of the payment information. We discuss below the choices we made in implementing the statute and the associated benefits and costs. We are unable to quantify the impact of each of the decisions we discuss below with any precision because reliable, empirical evidence regarding the effects is not readily available to the Commission. Thus, in this section, our discussion on the costs and benefits of our individual discretionary choices is qualitative. In Section III.D. below, we present a quantified analysis on the overall costs of the final rules that include all aspects of the implementation of the statute.

#### 1. Definition of ''Commercial Development of Oil, Natural Gas, or Minerals''

Consistent with the proposal, the final rules define ''commercial development of oil, natural gas, or minerals'' to include exploration, extraction, processing, and export, or the acquisition of license for any such activity. As described above, the final rules we are adopting generally track the language in the statute, and except for where the language or approach of Section 13(q) clearly deviates from the EITI, the final rules are consistent with the EITI. In instances where the language or approach of Section 13(q) clearly deviates from the EITI, the final rules track the statute rather than the EITI. The definition of ''commercial development'' in Section 13(q) sets forth a clear list of activities that appears to include activities beyond what is currently contemplated by the EITI, and thus, clearly deviates from the EITI. Therefore, we believe the definition of the term in the final rules should be consistent with Section 13(q). The final rules we are adopting do not include additional activities, such as transportation or marketing, because those activities are not included in Section 13(q) and because the EITI does not explicitly include those activities. We believe defining the term in this way is consistent with Congress' goal of promoting international transparency efforts. To the extent that the definition of ''commercial development'' is consistent with the activities typically included in EITI programs, the final rules may promote consistency and comparability of disclosure made pursuant to Section 13(q) and the related rules and EITI programs, which may further Congress' goal of supporting international transparency promotion efforts. We recognize that limiting the definition to this list of specified activities could result in costs to users of the payment information to the extent that disclosure about additional activities, such as refining, smelting, marketing, or stand-alone transportation

[582] *See* note 84.

[583] *See* notes 15 and 48.

[584] The Angola Order indicates that the Minister of Petroleum may provide formal authorization for the disclosure of information regarding a reporting company's activities in Angola. *See* letter from ExxonMobil 2. *See also* letter from PWYP 2 (''Current corporate practice suggests that the Angolan government regularly provides this authorization. For instance, Statoil regularly reports payments made to the Angolan government.'' (internal citations omitted)). The legal opinions submitted by Royal Dutch Shell with its comment letter also indicate that disclosure of otherwise restricted information may be authorized by government authorities in Cameroon and China, respectively. *See* letter from RDS 2.

[585] *See* letter from Chevron; *see also* letter from Chairman Bachus and Chairman Miller.

[586] *See* Paolo Mauro, ''Corruption and Growth.'' *Quarterly Journal of Economics.* 110, 681–712 (1995); Pak Hung Mo, ''Corruption and Economic Growth.'' *Journal of Comparative Economics* 29, 66–79 (2001); K. Gyimah-Brempong, ''Corruption, economic growth, and income inequality in Africa'', Economics of Governance 3, 183–209 (2002); K. Blackburn, N. Bose, and E.M. Haque, ''The Incidence and Persistence of Corruption in Economic Development'', Journal of Economic Dynamics and Control 30, 2447–2467 (2006); Pierre-Guillaume Méon and Khalid Sekkat, ''Does corruption grease or sand the wheels of growth?'', Public Choice 122, 69–97 (2005).

services (that is, transportation that is not otherwise related to export), would be useful to users of the information.

As noted above, to promote the goals of the provision, the final rules include an anti-evasion provision that requires disclosure with respect to an activity or payment that, although not in form or characterization one of the categories specified under the final rules, is part of a plan or scheme to evade the disclosure required under Section 13(q).[587] Under this provision, a resource extraction issuer could not avoid disclosure, for example, by re-characterizing an activity that would otherwise be covered under the final rules as transportation. We recognize that adding this requirement may increase the compliance costs for some issuers; however, we believe this provision is appropriate in order to minimize evasion and improve the effectiveness of the disclosure, thereby furthering Congress' goal.

We considered requiring disclosure about additional activities such as refining, smelting, marketing, or stand-alone transportation services, but determined not to include those activities in the definition of ''commercial development'' for the reasons described above and because it would unnecessarily increase compliance costs for issuers. We also considered adopting a definition of ''commercial development'' that omitted one or more of the statutorily-listed activities, such as ''export,'' as some commentators had suggested.[588] We decided against that alternative because, although it might result in less costs for issuers, the plain language of Section 13(q) does not support that approach.

In response to commentators' request for clarification of the activities covered by the final rules, we also are providing guidance about the activities covered by the terms ''extraction,'' ''processing,'' and ''export.'' The guidance should reduce uncertainty about the scope of the activities that give rise to disclosure obligations under Section 13(q) and the related rules, and therefore should facilitate compliance and help to lessen the costs associated with the disclosure requirements.

2. Types of Payments

In the final rules we added two additional categories of payments to the list of payment types that must be disclosed—dividends and payments for infrastructure improvements. We included these payment types in the final rules because, based on the EITI and the comments we received on the proposal, we believe they are part of the commonly recognized revenue stream.[589] Defining the term ''payment'' to include dividends [590] and payments for infrastructure improvements (*e.g.,* building a road) in the list of payment types required to be disclosed under the final rules should promote consistency with EITI reporting and improve the effectiveness of the disclosure, thereby furthering Congress' goal of supporting international transparency promotion efforts. Defining ''payment'' to include dividends and payments for infrastructure improvements also could help alleviate competitiveness concerns by imposing similar disclosure requirements on issuers that make such payments and issuers that make other types of payments, such as royalties, production entitlements, or fees, required to be disclosed under the final rules.

As discussed earlier, resource extraction issuers will incur costs to provide the payment disclosure for the payment types identified in the statute, such as the costs associated with modifications to the issuers' core enterprise resource planning systems and financial reporting systems to capture and report the payment data at the project level, for each type of payment, government payee, and currency of payment.[591] The addition of dividends and payments for infrastructure improvements to the list of payment types for which disclosure is required may increase some issuers' costs of complying with the final rules. For example, issuers may need to add these types of payments to their tracking and reporting systems. We understand that these types of payments are more typical for mineral extraction issuers than for oil firms,[592] and therefore only a subset of the issuers subject to the final rules might be affected.

The final rules do not require disclosure of certain other types of payments, such as social or community payments. We recognize that excluding those payments reduces the overall level of disclosure; however, we have not included those payments as required payment types under the final rules because commentators disagreed as to whether they are part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals and the EITI does not require the disclosure of social or community payments.[593] In addition, by not including these types of payments, the final rules should benefit issuers by avoiding additional compliance costs for disclosure that does not clearly enhance the effectiveness of the disclosure required under Section 13(q).

Resource extraction issuers that predominantly make payments that must be disclosed pursuant to the final rules may be at a competitive disadvantage as compared to resource extraction issuers that predominately make payments that are not identified in the final rules. To the extent that other types of payments could be used to substitute for explicitly defined payments, resource extraction issuers may try to circumvent the required disclosures by shifting to other, not explicitly defined payments, and away from the types of payments listed in the final rules. This could have the effect of reducing the transparency contemplated by the statute. For example, the exclusion of social or community payments might encourage issuers to mask other payments, such as infrastructure improvement payments, as social or community payments to avoid reporting under the rules, limiting the effectiveness of the disclosure. As noted above, to promote the goals of Section 13(q), the final rules include an anti-evasion provision that requires disclosure with respect to an activity or payment that, although not in form or characterization of one of the categories specified under the final rules, is part of a plan or scheme to evade the disclosure required under Section 13(q).[594] Under this provision, a resource extraction issuer could not avoid disclosure, for example, by re-characterizing or re-configuring a payment as one that is not required to be disclosed. We considered, as an alternative to an anti-evasion provision, defining terms broadly to cover a wider range of activities, but

[587] *See* Instruction 9 to Item 2.01 of Form SD.

[588] *See, e.g.,* letters from API 1 and ExxonMobil 1.

[589] *See* notes 164, 176, and 177 and accompanying text.

[590] The final rules generally do not require the disclosure of dividends paid to a government as a common or ordinary shareholder of the issuer as long as the dividend is paid to the government under the same terms as other shareholders. The issuer will be required to disclose dividends paid to a government in lieu of production entitlements or royalties. *See* Instruction 7 to Item 2.01 of Form SD.

[591] *See* note 529 and accompanying text.

[592] *See, e.g.,* letters from PWYP 1 and Global Witness 1; *see also* Chapter 19 ''Advancing the EITI in the Mining Sector: Implementation Issues'' by Sefton Darby and Kristian Lempa, in *Advancing the EITI in the Mining Sector: A Consultation with Stakeholders* (EITI 2009).

[593] *See* note 185 and accompanying discussion, above (citing commentators suggesting that social or community payments constitute part of the commonly recognized revenue stream of resource extraction) and note 188 and accompanying discussion, above (citing commentators maintaining that social or community payments are not part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals).

[594] *See* Instruction 9 to Item 2.01 of Form SD.

determined that more expansive definitions could increase compliance costs for resource extraction issuers and that an anti-evasion provision should result in lower compliance costs and would accomplish the statute's transparency goals.

As discussed above, the final rules clarify that the term ''fees'' includes license fees, rental fees, entry fees, and other considerations for licenses or concessions, and the term ''bonuses'' includes signature, discovery, and production bonuses. In addition, the final rules clarify that a resource extraction issuer will be required to disclose payments for taxes levied on corporate profits, corporate income, and production, but will not be required to disclose payments for taxes levied on consumption, such as value added taxes, personal income taxes, or sales taxes. These clarifications are consistent with the EITI and, therefore, should help promote comparability and support international transparency promotion efforts. Moreover, these clarifications should benefit issuers by reducing uncertainty about the types of payments required to be disclosed under Section 13(q) and the related rules, and therefore should facilitate compliance and help mitigate costs. On the other hand, inclusion of these specific types of fees, taxes, and bonuses could increase compliance costs for issuers, particularly for issuers that have not participated in an EITI program and would not track or report these items except for our clarification.

Under the final rules, issuers may disclose payments that are made for obligations levied at the entity level, such as corporate income taxes, at that level rather than the project level. This accommodation should help reduce compliance costs for issuers without interfering with the goal of achieving increased payment transparency.

Under the final rules, issuers must disclose payments made in-kind. This requirement is consistent with the EITI and should help further the goal of supporting international transparency promotion efforts and enhance the effectiveness of the disclosure. We have provided issuers with some flexibility in reporting in-kind payments. Resource extraction issuers may report in-kind payments at cost, or if cost is not determinable, at fair market value, which we believe should facilitate compliance with Section 13(q) and potentially lower compliance costs. This requirement could impose costs to the extent that issuers have not previously had to value their in-kind payments, or they use a different method to value those payments.

3. Definition of ''Not De Minimis''

Section 13(q) requires the disclosure of payments that are ''not de minimis,'' but leaves the term ''not de minimis'' undefined. In the final rules we define ''not de minimis'' to mean any payment, whether made as a single payment or a series of related payments, that equals or exceeds $100,000. Although we considered leaving ''not de minimis'' undefined, as we had proposed, we were convinced by commentators that defining this term should help to promote consistency in payment disclosures and reduce uncertainty about what payments must be disclosed under Section 13(q) and the related rules, and therefore should facilitate compliance.[595] As noted above, because the primary purpose of Section 13(q) is to further international transparency efforts regarding payments to governments for the commercial development of oil, natural gas, or minerals, we believe that whether a payment is ''not de minimis'' should be considered in relation to a host country. We recognize that issuers may have difficulty assessing the significance of particular payments for particular countries or recipient governments; therefore, we are adopting a $100,000 threshold that we believe will provide clear guidance about payments that are ''not de minimis'' and promote the transparency goals of the statute.

We considered adopting a definition of ''not de minimis'' that was based on a qualitative principle or a relative quantitative measure rather than an absolute quantitative standard.[596] We chose the absolute quantitative approach for several reasons. An absolute quantitative approach will promote consistency of disclosure and, in addition, will be easier for issuers to apply than a definition based on either a qualitative principle or relative quantitative measure.[597] Moreover, using an absolute dollar amount threshold for disclosure purposes should also reduce compliance costs by reducing the work necessary to determine what payments must be disclosed.

Therefore, in choosing the ''de minimis'' amount, we selected an amount that we believe strikes an appropriate balance in light of varied commentators' concerns and the purpose of the statute. Although some commentators suggested various thresholds,[598] no commentator provided data to assist us in determining an appropriate threshold amount.

We considered other absolute amounts but chose $100,000 as the quantitative threshold in the definition of ''not de minimis.'' We decided not to adopt a lower threshold because we are concerned that such an amount could result in undue compliance burdens and raise competitive concerns for many issuers. As previously noted, we believe a $100,000 threshold is more appropriate than, and an acceptable compromise to, the amounts suggested by commentators because it furthers the purpose of Section 13(q) and may result in a lesser compliance burden than otherwise would be the case if a lower threshold was used.[599] In addition, to prevent issuers from breaking down their payments into amounts smaller than $100,000 and thus avoiding disclosure, we provide an instruction in the final rules noting that in the case of any arrangement providing for periodic payments or installments of the same type, a resource extraction issuer must consider the aggregate amount of the related periodic payments or installments of the related payments in determining whether the payment threshold has been met for that series of payments, and accordingly, whether disclosure is required.

We also considered defining ''not de minimis'' in terms of a materiality standard, which would generally suggest, consistent with commentators views, a threshold larger than $100,000. Such an alternative would likely have resulted in lower compliance costs for issuers. We also could have chosen to use a larger number, such as $1,000,000, to define ''not de minimis,'' which again would have resulted in lower compliance costs. Although a ''not de minimis'' definition based on a materiality standard, or a much higher amount, such as $1,000,000, could lessen competitive concerns, setting the threshold too high could leave important payment streams undisclosed, reducing the potential benefits to be derived from Section 13(q). In addition, we believe that use of the term ''not de minimis'' in Section 13(q) indicates that a threshold quite different from a materiality standard and significantly less than $1,000,000 is necessary to further the transparency goals of the statute. While the $100,000 threshold may result in some smaller payments not being reported, we believe this threshold strikes an appropriate

[595] *See* notes 223 and 231–233 and accompanying text.

[596] As previously noted, we declined to adopt a ''not de minimis'' definition based on a materiality principle because that alternative is not supported by the language of Section 13(q). *See* note 566 and accompanying text.

[597] *See* note 252 and accompanying text.

[598] *See* notes 235–243 and accompanying text.

[599] *See* notes 257–267 and accompanying text.

balance between concerns about the potential compliance burdens of a lower threshold and the need to fulfill the statutory directive for resource extraction issuers to disclose payments that are ''not de minimis.''

4. Definition of ''Project''

Section 13(q) requires a resource extraction issuer to disclose information regarding the type and total amount of payments made to a foreign government or the Federal Government for each project relating to the commercial development of oil, natural gas, or minerals, but it does not define the term ''project.'' As noted above, the final rules leave the term undefined, but we have provided some guidance about the term. Leaving the term ''project'' undefined should provide issuers some flexibility in applying the term to different business contexts depending on factors such as the particular industry or business in which the issuer operates, or the issuer's size.

As noted above, resource extraction issuers routinely enter into contractual arrangements with governments for the purpose of commercial development of oil, natural gas, or minerals. The contract defines the relationship and payment flows between the resource extraction issuer and the government, and therefore, it would serve as the basis for determining a ''project.'' We understand that the term ''project'' is used within the extractive industry in a variety of contexts, and that individual issuers routinely provide disclosure about their own projects in their Exchange Act reports and other public statements. To the extent that the meaning of ''project'' is generally understood by resource extraction issuers and investors, leaving the term undefined should not impose undue costs.

Resource extraction issuers may incur costs in determining their ''projects.'' Leaving the term undefined in the final rules may result in higher costs for some resource extraction issuers than others if an issuer's determination of what constitutes a ''project'' would result in more granular information being disclosed than another issuer's determination of what constitutes a ''project.'' We anticipate that these costs may diminish over time as resource extraction issuers become familiar with how other resource extraction issuers determine their ''projects.'' In addition, we recognize that leaving the term ''project'' undefined may not result in the transparency benefits that the statute seeks to achieve as effectively as would be the case if we adopted a definition because resource extraction issuers' determination of what constitutes a ''project'' may differ, which could reduce the comparability of disclosure across issuers. Inconsistent disclosure may be mitigated to some extent by the guidance we are providing about the term.

We considered defining ''project'' at the country level. A number of commentators asserted that this approach would further lower their compliance burdens.[600] While we recognize that approach would reduce compliance burdens for issuers, we did not adopt it because we believe it would be inconsistent with Congress' intent to provide more detailed disclosure than at the country level and would not effectively result in the transparency benefits that the statute seeks to achieve.[601] We believe the statutory requirement to provide interactive data tags identifying the government that received the payment and the country in which that government is located is further evidence that statutory reference to ''project'' was intended to elicit disclosure at a more granular level than country-level reporting.

We also considered defining ''project'' as a reporting unit, as suggested by some commentators.[602] We decided against that approach because we believe that requiring disclosure at the reporting unit level would be inconsistent with the use of the term ''project'' in Section 13(q). In this regard we note that it is not uncommon for an issuer to define a reporting unit as a geographic region (for example, as a country or continent), which would result in aggregated payment disclosure that is inconsistent with the transparency goal of the statute.

As suggested by some commentators, we considered defining ''project'' in relation to a particular geologic resource, such as a ''geologic basin'' or ''mineral district.''[603] We decided not to adopt this approach because, as noted by some commentators,[604] a geologic basin or mineral district may span more than one country, which would be counter to the country-by-country reporting required by Section 13(q). In addition, we understand that defining the term in this manner may not reflect how resource extraction issuers enter into contractual arrangements for the extraction of resources, which define the relationship and payment flows between the resource extraction issuer and the government. For these reasons, we believe that defining ''project'' as a ''geologic basin'' may be inconsistent with the use of the term ''project'' in Section 13(q) and may not result in the transparency benefits that the statute seeks to achieve.

In addition, we considered defining ''project'' by reference to a materiality standard as it is used under the federal securities laws, as suggested by some commentators.[605] While such an approach could reduce compliance burdens for issuers, we did not adopt it because we believe it would be inconsistent with Congress' intent to provide more detailed disclosure than would be provided using such a materiality standard and would not result in the transparency benefits that the statute seeks to achieve.

To comply with the final rules, a resource extraction issuer could be required to implement systems to track payments at a different level of granularity than what it currently tracks, which could result in added compliance and implementation costs. We expect, however, that to the extent resource extraction issuers' systems currently track ''projects'' or information by reference to its contractual arrangements, such costs should be reduced. Not defining the term ''project'' under the final rules could result in added compliance costs when compared to the alternative of adopting a definition suggested by some commentators. By not defining ''project'' as ''country,'' ''reporting unit,'' ''geologic basin,'' or ''material project,'' as some commentators suggested,[606] issuers could incur costs relating to implementation of systems to track payment information at a more granular level than what their current systems track. In addition, by leaving the term undefined rather than adopting one of the definitions suggested by commentators, the final rules may effectively require disclosure that may result in voluminous information and increase the costs to issuers to track and report.

5. Annual Report Requirement

Section 13(q) provides that the resource extraction payment disclosure must be ''include[d] in an annual report.'' The final rules require an issuer to file the payment disclosure in an annual report on new Form SD, rather than furnish it in one of the existing Exchange Act annual report forms as proposed. Form SD will be due no later

[600] *See* letters from API 1, ExxonMobil 1, Petrobras, and RDS 1.

[601] *See* note 313 and accompanying text.

[602] *See* note 283 and accompanying text.

[603] *See* note 286 and accompanying text.

[604] *See* note 290 and accompanying text.

[605] *See* note 291 and accompanying text.

[606] *See* notes 279, 283, 286, and 291 and accompanying text.

than 150 days after the end of the issuer's most recent fiscal year. This should lessen the burden of compliance with Section 13(q) and the related rules because issuers generally will not have to incur the burden and cost of providing the payment disclosure at the same time that it must fulfill its disclosure obligations with respect to an Exchange Act annual report.[607] An additional benefit is that this requirement also would provide information to users in a standardized manner for all issuers rather than in different annual report forms depending on whether a resource extraction issuer is a domestic or foreign filer. In addition, requiring the disclosure in new Form SD, rather than in issuers' Exchange Act annual reports, should alleviate concerns about the disclosure being subject to the officer certifications required by Exchange Act Rules 13a–14 and 15d–14, thus potentially lowering compliance costs.

Resource extraction issuers will incur costs associated with preparing and filing new Form SD; however, we do not believe the costs associated with filing a new form to provide the disclosure instead of furnishing the disclosure in an existing form will be significant.

Requiring covered issuers to file, instead of furnish, the payment information in Form SD may increase the ability of investors to bring suit, for instance under Section 18 of the Exchange Act. This may improve the avenues of redress available to investors if issuers fail to comply with the new disclosure requirements. Because this could improve investors' ability to seek redress, it is possible that resource extraction issuers may be more accountable for and more likely to make the required disclosure. This, in turn, may provide benefits to investors to the extent they use the information to make investment decisions. On the other hand, our decision to require issuers to file, rather than furnish, the payment information will potentially subject issuers to litigation under Section 18 and may cause issuers to take greater care in preparing the disclosures, thereby increasing issuers' costs of complying with the rules.[608]

Finally, some commentators noted the potential for their cost estimates to increase if the final rules required the payment information to be audited. Consistent with Section 13(q) and the proposal, the final rules do not require the resource extraction payment information to be audited or provided on an accrual basis. Not requiring the payment information to be audited or provided on an accrual basis is consistent with Section 13(q) because the statute requires the Commission to issue final rules for disclosure of payments by resource extraction issuers and, unlike the EITI, does not contemplate that an administrator will audit and reconcile the information, or produce a report as a result of the audit and reconciliation. In addition, not requiring the payment information to be audited or provided on an accrual basis may result in lower compliance costs than otherwise would be the case if resource extraction issuers were required to provide the information on an accrual basis or audited information.[609] A potential cost associated with not requiring an audit is that users of the information may perceive non-audited information as less reliable than audited information.

6. Exhibit and Interactive Data Requirement

Section 13(q) requires the payment disclosure to be electronically formatted using an interactive data standard. Under the proposed rules, a resource extraction issuer would have been required to provide the disclosure in two exhibits—one in HTML and one in XBRL. The final rules require a resource extraction issuer to provide the required payment disclosure in one exhibit to Form SD. The exhibit must be formatted in XBRL and provide all of the electronic tags required by Section 13(q) and the final rules. We have decided to require only one exhibit formatted in XBRL because we believe that we can achieve the goal of the dual presentation with only one exhibit. Issuers will submit the information on EDGAR in XBRL format, thus enabling users of the information to extract the XBRL data, and at the same time the information will be presented in an easily-readable format by rendering the information received by the issuers.[610] We believe that requiring the information to be provided in this way may reduce the compliance burden for issuers as compared to requiring a second exhibit formatted in HTML. In addition, we believe that, to the extent requiring the specified information to be presented in XBRL format promotes consistency and standardization of the information, increases the usability of the payment disclosure, and reduces compliance costs, a benefit results to both issuers and users of the information.

Our choice of XBRL as the required interactive data standard may increase compliance costs for some issuers; however, Congress expressly required interactive data tagging. The electronic formatting costs will vary depending upon a variety of factors, including the amount of payment data disclosed and an issuer's prior experience with XBRL. While most issuers are already familiar with XBRL because they currently use XBRL for their annual and quarterly reports filed with the Commission, issuers not already filing reports using XBRL (*i.e.* foreign private issuers that report pursuant to International Financial Reporting Standards (IFRS)) will incur some start-up costs associated with XBRL. We do not believe that the ongoing costs associated with this data tagging would be greater than filing the data in XML.

Consistent with the statute, the final rules require a resource extraction issuer to include an electronic tag that identifies the currency used to make the payments. The statute does not otherwise specify how the resource extraction issuer should present the type and total amount of payments for each project or to each government. We understand that resource extraction issuers may make payments in any number of currencies, and as a result, providing total amounts may be difficult. If multiple currencies are used to make payments for a specific project or to a government, a resource extraction issuer may choose to provide the total amount per project or per government in U.S. dollars or the issuer's reporting currency. A resource extraction issuer could incur costs associated with converting payments made in multiple currencies to U.S. dollars or its reporting currency. Given the statute's tagging requirements and requirements for disclosure of total amounts, we believe reporting in one currency is required. The final rules provide flexibility to issuers in how to perform the currency conversion, which may result in lower compliance costs because it enables issuers to choose the option that works best for them. To the extent issuers choose different options to perform the conversion, it may result in less comparability of the payment

[607] For example, a resource extraction issuer may potentially be able to save resources to the extent that the timing of its obligations with respect to its Exchange Act annual report and its obligations to provide payment disclosure allow for it to allocate its resources, in particular personnel, more efficiently.

[608] While the potential for litigation may increase costs, we note that Section 18 claims have not been prevalent in recent years and a plaintiff asserting a claim under Section 18 would need to meet the elements of the statute, including materiality, reliance, and damages. *See* Louis Loss and Joel Seligman, Ch. 11 ''Civil Liability,'' Subsect. c ''False Filings [§ 18],'' *Fundamentals of Securities Regulation* (3rd Ed. 2005).

[609] *See* note 405 and accompanying text.

[610] Users of this information should be able to render the information by using software available on our Web site at no cost.

information and, in turn, could result in costs to users of the information.

*D. Quantified Assessment of Overall Economic Effects*

As noted above, Congress intended that the rules issued pursuant to Section 13(q) would increase the accountability of governments to their citizens in resource-rich countries for the wealth generated by those resources.[611] In addition, commentators and the sponsors of Section 13(q) also have noted that the United States has an interest in promoting accountability, stability, and good governance.[612] Congress' goal of enhanced government accountability through Section 13(q) is intended to result in social benefits that cannot be readily quantified with any precision. We also note that while the objectives of Section 13(q) do not appear to be ones that will necessarily generate measurable, direct economic benefits to investors or issuers, investors have stated that the disclosures required by Section 13(q) have value to investors and can ''materially and substantially improve investment decision making.'' [613] As noted previously, the benefits are inherently difficult to quantify and thus our quantitative assessment of the overall economic effects focuses on the costs of complying with the rules.

To assess the economic impact of the final rules, we estimated the initial and ongoing costs of compliance using the quantitative information supplied by commentators using two different methods. In the first method, we estimate the cost of compliance for the average company and then multiply this number by the total number of affected issuers (1,101). In the second method, we separately estimate the costs of compliance for small issuers (issuers with less than $75 million in market capitalization) and for large issuers (issuers with $75 million or more in market capitalization). For initial compliance costs, we received estimates from Barrick Gold and ExxonMobil.[614] We use these numbers to estimate a lower and an upper bound, respectively, on initial compliance costs.

Our methodology to estimate both initial and ongoing compliance costs takes the specific company estimates from Barrick Gold and ExxonMobil and applies these costs, as a percentage of total assets, to the average issuer and small and large issuers. Both Barrick Gold and ExxonMobil are very large issuers and their compliance costs may not be representative of other types of issuers. Thus, we believe it is appropriate to scale these costs to the size of the issuer. While a portion of the compliance costs will most likely be fixed (*i.e.,* they will not vary with the size of the issuer), we expect that a portion of those costs will be variable. For example, we expect larger, multinational issuers to have more complex payment tracking systems compared to smaller, single country based issuers. Thus, in our analysis we assume that compliance costs will tend to increase with firm size. Commentators did not provide any information regarding what fraction of compliance costs would be fixed versus variable.

Barrick Gold estimated that it would require 500 hours for initial changes to internal books and records and processes, and 500 hours for ongoing compliance costs. At an hourly rate of $400,[615] this amounts to $400,000 (1,000 hours × $400) for hourly compliance costs. Barrick Gold also estimated that it would cost $100,000 for initial IT/consulting and travel costs for a total initial compliance cost of $500,000. As a measure of size, Barrick Gold's total assets as of the end of fiscal year 2009 were approximately $25 billion.[616] As a percentage of Barrick Gold's total assets, initial compliance costs are estimated to be 0.002% ($500,000/$25,075,000,000).

A similar analysis for ExxonMobil estimated initial compliance costs using its estimate of $50 million. ExxonMobil's total assets as of the end of 2009 were approximately $233 billion and the percentage of initial compliance costs to total assets is 0.021% ($50,000,000/$233,323,000,000). Therefore, the lower bound of initial compliance costs to total assets is 0.002% based upon estimates from Barrick Gold and the upper bound is 0.021% based upon estimates from ExxonMobil.

Below is a summary of how we calculated the initial compliance costs as a percentage of total assets:

| Initial compliance cost estimates | | Calculation |
|---|---|---|
| Total number of affected issuers | 1,101 | |
| *Barrick Gold compliance costs (lower bound)*: | | |
| Number of hours for initial changes to internal books and records and processes | 500 | |
| Number of hours for annual compliance costs | 500 | |
| Initial number of compliance hours | 1,000 | 500 + 500 |
| Hourly cost | $400 | |
| Initial hourly compliance costs | $400,000 | 1,000 * $400 |
| Initial IT/consulting/travel costs | $100,000 | |
| *Total initial total compliance costs* | $500,000 | $400,000 + $100,000 |
| Barrack Gold's 2009 total assets (Compustat) | $25,075,000,000 | |
| Initial compliance costs as a percentage of total assets using Barrick Gold (lower bound) | 0.002% | $500,000/$25,075,000,000 |
| *ExxonMobil compliance costs (upper bound):* | | |
| Initial compliance costs | $50,000,000 | |
| ExxonMobil's 2009 total assets (Compustat) | $233,323,000,000 | |
| Initial compliance costs as a percentage of total assets using ExxonMobil (upper bound) | 0.021% | $50,000,000/$233,323,000,000 |

[611] *See* note 7 and accompanying text.

[612] *See* note 499 and accompanying text.

[613] *See* letter from Calvert. *See* note 498 and accompanying text.

[614] *See* letter from Barrick Gold and ExxonMobil 1. NMA also provided initial compliance hours that are similar to Barrick Gold. *See* letter from NMA 2.

[615] This is the rate we use to estimate outside professional costs for purposes of the PRA. Although we believe actual internal costs may be less in many instances, we are using this rate to arrive at a conservative estimate of hourly compliance costs.

[616] All data on total assets is obtained from Compustat, which is a product of Standard and Poor's. In addition to considering total assets as a measure of firm size, we also considered using market capitalization. Although both measures will fluctuate, we believe that market capitalization will fluctuate more and the resulting percentage would then be sensitive to the measurement date chosen. As a result, we believe that using total assets as a measure of size is more appropriate.

We apply these two ratios to the average issuer (Method 1) and to small and large issuers (Method 2). In Method 1, we calculate the average total assets of all affected issuers to be approximately $4.4 billion.[617] Applying the ratio of initial compliance costs to total assets (0.002%) from Barrick Gold, we estimate the lower bound of total initial compliance costs for all issuers to be $97 million (0.002% × $4,422,000,000 × 1,101). Applying the ratio of initial compliance costs to total assets (0.021%) from ExxonMobil, we estimate the upper bound of total initial compliance costs for all issuers to be $1 billion (0.021% × $4,422,000,000 × 1,101). The table below summarizes the upper and lower bound of total initial compliance costs using Method 1:

| Method 1: Average company compliance costs | | Calculation |
|---|---|---|
| Average total assets of all affected issuers (Compustat) | $4,422,000,000 | |
| Average initial compliance costs per issuer using Barrick Gold percentage of total assets (lower bound) | 88,440 | $4,422,000,000*0.002% |
| Total initial compliance costs using Barrick Gold (lower bound) | 97,372,440 | $88,440*1,101 |
| Average initial compliance costs per issuer using Exxon Mobil's percentage of total assets (upper bound) | 928,620 | 4,422,000,000*0.021% |
| Total initial compliance costs using ExxonMobil (upper bound) | 1,022,410,620 | 928,620 * 1,101 |

In Method 2, we conduct a similar analysis for small and large issuers. We estimate the proportion of issuers that are small issuers (63%) and the proportion of issuers that are large issuers (37%).[618] Next, we calculate the average total assets of small issuers in 2009 ($509 million) and large issuers ($4.5 billion) and apply the ratios of initial compliance costs to total assets estimated using the estimates from Barrick Gold (lower bound) and ExxonMobil (upper bound) for each type of issuer. In this analysis, we assume that the ratio of initial compliance costs to total assets does not vary by size. Therefore, small issuers have a lower bound estimate of initial compliance costs of $7 million (0.002% × $509,000,000 × 63% × 1,101) and an upper bound of $74 million (0.021% × $509,000,000 × 63% × 1,101). Large issuers have a lower bound estimate of initial compliance costs of $37 million (0.002% × $4,504,000,000 × 37% × 1,101) and an upper bound of $385 million (0.021% × $4,504,000,000 × 37% × 1,101). The sum of these two numbers provides an estimate of $44 million ($7,061,153 + $36,704,037) for the lower bound and $460 million ($74,142,111 + $385,306,841) for the upper bound of initial compliance costs.

| Method 2: By small and large issuers | | |
|---|---|---|
| Percentage of small issuers (market capitalization <$75m) | 63% | |
| Percentage of large issuers (market capitalization = >$75m) | 37% | |
| Average total assets of small issuers in 2009 (Compustat) | $509,000,000 | |
| Average total assets of large issuers in 2009 (Compustat) | $4,504,000,000 | |
| *Initial compliance costs for average small issuer*: | | |
| Initial compliance costs for a small issuer using Barrick Gold (lower bound) | $10,180 | 0.002%*$509,000,000 |
| Total initial compliance costs for small issuers using Barrick Gold (lower bound) | $7,061,153 | $10,180*1,101*63% |
| Initial compliance costs for a small issuer using ExxonMobil (upper bound) | $106,890 | 0.021%*$509,000,000 |
| Total initial compliance costs for small issuers using ExxonMobil (upper bound) | $74,142,111 | $106,890*1,101*63% |
| *Initial compliance costs for average large issuer*: | | |
| Initial compliance costs for a large issuer using Barrick Gold (lower bound) | $90,080 | 0.0020%*4,504,000,000 |
| Total initial compliance costs for large issuers using Barrick Gold (lower bound) | $36,695,890 | $90,080*1,101*37% |
| Initial compliance costs for a large issuer using ExxonMobil (upper bound) | $945,840 | 0.021%*4,504,000,000 |
| Total initial compliance costs for large issuers using ExxonMobil (upper bound) | $385,306,841 | $945,840*1,101*37% |
| Total initial compliance costs for small and large issuers using Barrick Gold (lower bound) | $43,757,043 | $7,061,153 + $36,695,890 |
| Total initial compliance costs for small and large issuers using ExxonMobil (upper bound) | $459,448,952 | $74,142,111 + $385,306,841 |

In summary, using the two methods, the range of initial compliance costs is as follows:[619]

[617] We determined this average by identifying the SIC codes that will be affected by the rulemaking and then obtaining from Compustat the total assets for fiscal year 2009 of all affected issuers. We then calculated the average of those total assets.

[618] For purposes of this analysis, we classify as small issuers those whose market capitalization is less than $75 million and we classify the rest of the affected issuers as large issuers.

[619] The total estimated compliance cost for PRA purposes is $234,829,000 ([332,164 hrs * $400/hr] + $101,963,400). The compliance costs for PRA purposes would be encompassed in the total estimated compliance costs for issuers. As discussed in detail below, our PRA estimate includes costs related to tracking and collecting information about different types of payments across projects, governments, countries, subsidiaries, and other controlled entities. The estimated costs for PRA purposes are calculated by treating compliance costs as fixed costs, so despite using similar inputs for calculating compliance costs under Methods 1 and 2 above, the PRA estimate differs from the lower and upper bounds calculated above. The PRA estimate is, however, within the range of total compliance costs estimated using commentators' data.

| Initial compliance costs | Method 1: Average issuer analysis | Method 2: Small and large issuer analysis |
|---|---|---|
| Using Barrick Gold (lower bound) | $97,372,440 | $43,757,043 |
| Using ExxonMobil (upper bound) | 1,022,410,620 | 459,448,952 |

We acknowledge limitations on our analysis. First, the analysis is limited to two large issuers' estimates from two different industries, mining and oil and gas, and the estimates may not accurately reflect the initial compliance costs of all affected issuers. Second, we assume that compliance costs are a constant fraction of total assets, but there may be substantial fixed costs to compliance that are underestimated by using a variable cost analysis. Third, commentators mentioned other potential compliance costs not necessarily captured in this discussion of compliance costs.[620] Because of these limitations, we believe that total initial compliance costs for all issuers are likely to be near the upper bound of approximately $1 billion. This estimate is consistent with two commentators' qualitative estimates of initial implementation costs.[621]

We also estimated ongoing compliance costs using the same two methods. We received quantitative information from three commentators, Rio Tinto, National Mining Association, and Barrick Gold, that we used in the analysis. Rio Tinto estimated that it would take between 5,000 and 10,000 hours per year to comply with the requirements, for a total ongoing compliance cost of between $2 million (5,000*$400) and $4 million (10,000*$400). We use the midpoint of their estimate, $3 million, as their expected ongoing compliance cost. The National Mining Association (NMA), which represents the mining industry, estimated that ongoing compliance costs would be 10 times our initial estimate, although it did not state specifically the number to which it referred. We believe NMA was referring to our proposed estimate of $30,000.[622] Although this is the dollar figure for total costs, NMA referred to it when providing an estimate of ongoing costs, so we do the same here, which would result in $300,000 (10*$30,000). Finally, Barrick Gold estimated that it would take 500 hours per year to comply with the requirements, or $200,000 (500*$400) per year. As with the initial compliance costs, we calculate the ongoing compliance cost as a percentage of total assets. Rio Tinto's total assets as of the end of fiscal year 2009 were approximately $97 billion and their estimated ongoing compliance costs as a percentage of assets is 0.003% ($3,000,000/$97,236,000,000). We calculated the average total assets of the mining industry to be $1.5 billion,[623] and using NMA's estimated ongoing compliance costs, we estimate ongoing compliance costs as a percentage of assets of 0.02% ($300,000/$1,515,000,000). Barrick Gold's total assets as of the end of fiscal year 2009 were approximately $25 billion and their estimated ongoing compliance costs as a percentage of assets is 0.0008% ($200,000/$25,075,000,000). We then average the percentage of ongoing compliance costs to get an estimate of 0.0079% of total assets.

| Ongoing compliance costs | | Calculation |
|---|---|---|
| Rio Tinto estimate of yearly compliance costs | $2,000,000–$4,000,000 | (5,000–10,000)*$400 |
| Average Rio Tinto estimate | $3,000,000 | |
| Rio Tinto's 2009 total assets (Compustat) | $97,236,000,000 | |
| *Ongoing compliance costs as a percentage of Rio Tinto's total assets* | 0.003% | $3,000,000/$97,236,000,000 |
| NMA estimate of 10 times SEC estimate in proposing release | $300,000 | 10*$30,000 |
| Average total assets for all mining issuers (Compustat) | $1,515,000,000 | |
| *Ongoing compliance costs as a percentage of all mining issuers total assets (NMA)* | 0.02% | $300,000/$1,515,000,000 |
| Barrick Gold estimate of 500 hours per year | $200,000 | 500*$400 |
| Barrick Gold's 2009 total assets (Compustat) | $25,075,000,000 | |
| *Ongoing compliance costs as a percentage of Barrick Gold's total assets* | 0.0008% | $200,000/$25,075,000,000 |
| Average ongoing compliance costs as a percentage of total assets for all three estimates: Rio Tinto, NMA and Barrick Gold | 0.0079% | |

We use the same two methods used to estimate initial compliance costs to estimate ongoing compliance costs: Method 1 for the average affected issuer and Method 2 for small and large issuers separately. In Method 1, we take the average total assets for all affected issuers, $4,422,000,000, and multiply it by the average ongoing compliance costs as a percentage of total assets (0.0079%) to get total ongoing compliance costs of approximately $385 million.

| Method 1: Average company ongoing compliance costs | | Calculation |
|---|---|---|
| Average 2009 total assets of all affected issuers (Compustat) | $4,422,000,000 | |
| Average ongoing compliance costs per issuer using average percentage of total assets (lower bound) | $349,338 | 0.0079%*$4,422,000,000 |
| Total ongoing compliance costs | $384,621,138 | $349,338*1,101 |

[620] Those could include, for example, costs associated with the termination of existing agreements in countries with laws that prohibit the type of disclosure mandated by the rules, or costs of decreased ability to bid for projects in such countries in the future, or costs of decreased competitiveness with respect to non-reporting entities. Commentators generally did not provide estimates of such costs. As discussed further below, we have attempted to estimate the costs associated with potential foreign law prohibitions on providing the required disclosure. *See* Section III.D.

[621] *See* letters from API 1 and ExxonMobil 1. ''Total industry costs just for the initial implementation could amount to hundreds of millions of dollars even assuming a favorable final decision on audit requirements and reasonable application of accepted materiality concepts.''

[622] The $30,000 estimate was calculated as follows: [(52,931*$400) + $11,857,600]/1,101 = $30,000.

[623] We estimated this number by selecting only mining issuers, based on their SIC codes, obtaining their total assets as of the end of fiscal year 2009 from Compustat, and averaging the total assets of those issuers.

In Method 2, we estimate ongoing compliance costs separately for small and large issuers using the same proportion of issuers as in the analysis on initial compliance costs: small issuers (63%) and large issuers (37%). For small issuers, we take the average total assets in 2009 ($509,000,000)[624] and multiply it by the average ongoing compliance costs as a percentage of total assets (0.0079%) to get total ongoing compliance costs of approximately $28 million. For large issuers, we take the average total assets in 2009 ($4,504,000,000)[625] and multiply it by the average ongoing compliance costs as a percentage of total assets (0.0079%) to get total ongoing compliance costs of approximately $145 million. The sum of these two numbers provides an estimate of $173 million ($27,891,556 + $144,948,764) for total ongoing compliance costs for affected issuers. Comparing these two methods suggests that the ongoing compliance costs are likely to be between $200 million and $400 million.

| Method 2: By small and large issuers | | |
|---|---|---|
| Percentage of small issuers (market capitalization < $75m) | 63% | |
| Percentage of large issuers (market capitalization = > $75m) | 37% | |
| Average total assets of small issuers in 2009 (Compustat) | $509,000,000 | |
| Average total assets of large issuers in 2009 (Compustat) | $4,504,000,000 | |
| Yearly ongoing compliance costs for a small issuer | $40,211 | 0.0079%*$509,000,000 |
| Total yearly ongoing compliance costs for small issuer | $27,891,556 | $40,211*1,101*63% |
| Yearly ongoing compliance costs for a large issuer | $355,816 | 0.0079%*$4,504,000,000 |
| Total yearly ongoing compliance costs for large companies | $144,948,764 | $355,816*1,101*37% |
| Total yearly ongoing compliance costs for small and large issuers | $172,840,320 | $27,891,556+$144,948,764 |

As discussed above in Section III.B., host country laws that prohibit the type of disclosure required under the final rules could lead to significant additional economic costs that are not captured by the compliance cost estimates above. We have attempted to assess the magnitude of these costs to the extent possible. We base our analysis on the four countries that, according to commentators, currently have some versions of such laws (although we do not know if such countries would, in fact, prohibit the required disclosure or whether there might be other countries).[626] We searched (through a text search in the EDGAR system) the Forms 10–K and 20–F of affected issuers for years 2009 and 2010 for any mention of Angola, Cameroon, China, or Qatar. An examination of many of the filings that mentioned one or more of these countries indicate that most filings did not provide detailed information on the extent of their operations in these countries.[627] Thus, we are unable to determine the total amount of capital that may be lost in these countries if the information required to be disclosed under the final rules is, in fact, prohibited by laws or regulations.

We can, however, assess if the costs of withdrawing from these four countries are in line with one commentator's estimate of tens of billions of dollars. We estimate the potential loss from terminating activities in a country with such laws by the present value of the cash flows that a firm would forgo. We assume that a firm would not suffer any substantial losses when redeploying or disposing of its assets in the host country under consideration. We then discuss how the presence of various opportunities for the use of those assets by the firm itself or another firm would affect the size of the firm's potential losses. We also discuss how these losses would be affected if a firm cannot redeploy the assets in question easily, or it has to sell them with a steep discount (a fire sale). In order to estimate the lost cash flows, we assume that the cash flows from the projects in one of these countries are a fraction of the firm's total cash flows, and this fraction is equal to the ratio of total project assets in the given country to the firm's total assets. Also, we assume that the estimated cash flows grow annually at the rate of inflation over the life of the project.

We were able to identify a total of 51 issuers that mentioned that they have operations in these countries (some operate in more than one country). The table below provides information from 19 of the 51 issuers with regard to projects disclosed in their Forms 10–K and 20–F.[628]

| Issuer | Project assets ($ mil) | Project term (yrs) | Investments ($ mil) | Revenues ($ mil) | Expenses ($ mil) | Country |
|---|---|---|---|---|---|---|
| Issuer 1 | 7,320 | 25 | | | | Angola. |
| Issuer 2 | | 20 | 18.8 | | | Angola. |
| Issuer 3 | | 21 | 1853 | | | Angola. |
| Issuer 4 | 724 | 4 | | 322.3 | | Angola. |
| Issuer 5 | 51.1 | | | 22 | | Cameroon. |
| Issuer 6 | | 16 | | | | Cameroon. |
| Issuer 7 | | | 11.4 | | | Angola. |
| Issuer 8 | | | | 66.2 | 14 | Angola. |
| Issuer 9 | 91.7 | | | 78.8 | | Qatar. |

[624] We calculate this number by selecting all small issuers according to our classification scheme (market capitalization less than or equal to $75 million) and then averaging their total assets as of the end of fiscal year 2009.

[625] We calculate this number by selecting all large issuers according to our classification scheme (market capitalization $75 million or more) and then averaging their total assets as of the end of fiscal year 2009.

[626] *See* letters from API 1 and ExxonMobil 1 (mentioning Angola, Cameroon, China, and Qatar); *see also* letter from RDS 1 (mentioning Cameroon, China, and Qatar). Other commentators disputed the assertion that there are foreign laws that specifically prohibit disclosure of payment information. *See, e.g.,* letters from ERI 3, Global Witness 1, PWYP 1, Publish What You Pay (December 20, 2011) (''PWYP 3''), and Rep. Frank et al.

[627] We note that some issuers do not operate in those four countries, and thus, would not have any such information to disclose. Other issuers may have determined that they were not required to provide detailed information in their filings regarding their operations in those countries.

[628] As we noted, we identified 51 issuers that disclosed operations in at least one of the four countries, but only 19 of the issuers provided information with regard to projects in those countries that was specific enough to use in our analysis.

| Issuer | Project assets ($ mil) | Project term (yrs) | Investments ($ mil) | Revenues ($ mil) | Expenses ($ mil) | Country |
|---|---|---|---|---|---|---|
| Issuer 10 | 364.7 | | | 158.1 | | Qatar. |
| Issuer 11 | 2.8 | | | 2.7 | | Qatar. |
| Issuer 12 | 86.1 | | | 27.1 | | Angola. |
| Issuer 13 | 722 | 25 | | | | Qatar. |
| Issuer 14 | | | 0.33 | | | China. |
| Issuer 15 | | 23 | | | | China. |
| Issuer 16 | 155 | | 59 | 45 | | China. |
| Issuer 17 | 261.5 | | | | | China. |
| Issuer 18 | | | | 2.1 | 11.7 | China. |
| Issuer 19 | 605.2 | | | 177.6 | | China. |

From the issuers with information on projects in Angola, Cameroon, China, or Qatar, we select Issuer 1's and Issuer 4's Angola projects and Issuer 13's Qatar project because they reported data on both the firm assets involved in the projects in these countries and the terms of these projects. Other issuers reported some relevant information, but not enough, in our opinion, to meaningfully evaluate the cash flows of their projects. We supplemented the Angola data for the two issuers with firm financial information for the 2008 and 2009 fiscal years from Compustat. In addition, we obtained Issuer 1's and Issuer 13's weighted-average cost of capital (WACC) from Bloomberg, although data was not available on Issuer 4's WACC.[629] Instead, we assumed for these purposes it has a similar WACC as another issuer of a similar size for which WACC was available from Bloomberg. We assume that the purchasing power parity holds and thus use the U.S. inflation rate for 2009 as a constant growth rate for the projects' cash flows.[630]

In the table below we estimate the cash flows of Issuer 1's and Issuer 4's Angola projects and Issuer 13's Qatar project using a standard valuation methodology—the present value of discounted cash flows—and assuming a corporate tax rate of 30% for all three issuers. For Issuer 1, we estimate that a termination of its projects in Angola would result in lost cash flows of approximately $12 billion. For Issuer 4, the loss would be approximately $119 million. For Issuer 13, the loss would be approximately $392 million.

| Financial information FY2009 ($ mil) | Issuer 1 | Issuer 4 | Issuer 13 | Calculation |
|---|---|---|---|---|
| Earnings before interest and taxes (EBIT). | 26,239 | 469 | 3,689 | |
| Depreciation/Amortization | 11,917 | 159 | 830 | |
| Change in deferred taxes | −1,472 | −59 | 0 | |
| Capital expenditures | 17,770 | 301 | 1,914 | NetPP&E2009 − Net PP&E2008 |
| Change in working capital | −19,992 | −188 | 277 | Working capital = Current assets − Current liabilities. |
| Tax rate (%) | 30% | 30% | 30% | |
| Company free cash flow (FCF). | 31,034 | 314 | 1,221 | EBIT*(1 − tax rate) + Depreciation/Amortization + Change in Deferred taxes − Capital Expenditures − Change in Working Capital. |
| Firm total assets | 233,323 | 6,143 | 19,393 | |
| Angola/Qatar total assets | 7,320 | 724 | 722 | |
| Angola/Qatar FCF | 974 | 37 | 45 | Company FCF*(Angola or Qatar TA/Firm TA). |
| Term of Angola/Qatar project (years). | 25 | 4 | 25 | |
| Company cost of capital (WACC). | 0.09 | 0.1098 | 0.1329 | |
| U.S. 2009 inflation rate (i) | 0.027 | 0.027 | 0.027 | |
| Present value of Angola/Qatar FCFs. | 11,966 | 119 | 392 | Angola or Qatar FCF * [1/(WACC - i) − (1+ i) ^term of project/(WACC − i)*(WACC + 1) ^term of project]. |

Even though our analysis was limited to just three issuers, these estimates suggest commentators' concerns that the impact of such host country laws could add billions of dollars of costs to affected issuers, and hence have a significant impact on their profitability and competitive position, appear warranted. The assumption underlying these estimates is that each firm either sells its assets in that particular country at their accounting value or holds on to them but does not use them in other projects. The losses could be larger than the estimates in the table above if these firms are forced to sell their assets in the above-mentioned host countries at fire sale prices. In that case, the price discount will add to the loss of cash flows. While we do not have data on fire sale prices for the industries of the affected issuers, financial studies on other industries could provide some estimates. For example, a study on the airline industry[631] finds that planes sold by financially distressed airlines bring 10 to 20 percent lower prices than those sold by undistressed airlines. If we apply those percentages to the accounting value of the three issuers' assets in these host countries, this would add hundreds of millions of dollars to their potential losses. These costs also could be significantly higher than our estimates if we allow the cash

[629] In 2011, Issuer 4 was acquired by another issuer.

[630] Data on the U.S. inflation rate is obtained from the Bureau of Labor Statistics.

[631] *See* Todd Pulvino 1998. ''Do Fire-Sales Exist? An Empirical Study of Commercial Aircraft Transactions.'' *Journal of Finance,* 53(3): 939–78.

flows of the project to grow annually at a rate higher than the rate of inflation.

Alternatively, a firm could redeploy these assets to other projects that would generate cash flows. If a firm could redeploy these assets relatively quickly and without a significant cost to projects that generate similar rates of returns as those in the above-mentioned countries, then the firm's loss from the presence of such host country laws would be minimal. The more difficult and costly it is for a firm to do so, and the more difficult it is to find other projects with similar rates of return, the larger the losses of the firm would be. Unfortunately, we do not have enough data to quantify more precisely the potential losses of firms under those various circumstances. Likewise, if the firm could sell those assets to a buyer (*e.g.,* a non-reporting issuer) that would use them for similar projects in the host country or elsewhere, then the buyer would likely pay the fair market value for those assets, resulting in minimal to no loss for the firm.

Overall, the results of our analysis concur with commentators that the presence of host country laws that prohibit the type of disclosure required under the final rules could be very costly. The size of the potential loss to issuers will depend on the presence of other similar opportunities, third parties willing to buy the assets at fair-market values in the above-mentioned host countries, and the ability of issuers to avoid fire sale of these assets.

As noted above, we considered alternatives to the approach we are adopting in the final rules, including providing certain exemptions from the disclosure requirements mandated by Section 13(q), but we believe that adopting any of the alternatives would be inconsistent with Section 13(q) and would undermine Congress' intent to promote international transparency efforts. To faithfully effectuate Congressional intent, we do not believe it would be appropriate to adopt provisions that would frustrate, or otherwise be inconsistent with, such intent. Consequently, we believe the competitive burdens arising from the need to make the required disclosures under the final rules are necessary by the terms of, and in furtherance of the purposes of, Section 13(q).

A number of factors may serve to mitigate the competitive burdens arising from the required disclosure. We note there were differences in opinion among commentators as to the applicability of host country laws.[632] Moreover, the widening global influence of the EITI and the recent trend of other jurisdictions to promote transparency, including listing requirements adopted by the Hong Kong Stock Exchange and proposed directives of the European Commission, may discourage governments in resource-rich countries from adopting new prohibitions on payment disclosure.[633] Reporting companies concerned that disclosure required by Section 13(q) may be prohibited in a given host country may also be able to seek authorization from the host country in order to disclose such information, reducing the cost to such reporting companies resulting from the failure of Section 13(q) to include an exemption for conflicts with host country laws.[634]

[632] *See* note 84 and accompanying text.

## IV. Paperwork Reduction Act

### *A. Background*

Certain provisions of the final rules contain ''collection of information'' requirements within the meaning of the Paperwork Reduction Act of 1995 (''PRA'').[635] We published a notice requesting comment on the collection of information requirements in the Proposing Release for the rule amendments. An agency may not conduct or sponsor, and a person is not required to comply with, a collection of information unless it displays a currently valid control number. The title for the collection of information is:

- ''Form SD'' (a new collection of information).[636]

We are amending Form SD to contain disclosures required by Rule 13q-1, which will require resource extraction issuers to disclose information about payments made by the issuer, a subsidiary of the issuer, or an entity under the control of the issuer to foreign governments or the U.S. Federal Government for the purpose of the commercial development of oil, natural gas, or minerals. Form SD will be filed on EDGAR with the Commission.[637]

The new rules and amendment to the form implement Section 13(q) of the Exchange Act, which was added by Section 1504 of the Act. Section 13(q) requires the Commission to ''issue final rules that require each resource extraction issuer to include in an annual report of the resource extraction issuer information relating to any payment made by the resource extraction issuer, a subsidiary of the resource extraction issuer, or an entity under the control of the resource extraction issuer to a foreign government or the Federal Government for the purpose of the commercial development of oil, natural gas, or minerals, including—(i) the type and total amount of such payments made for each project of the resource extraction issuer relating to the commercial development of oil, natural gas, or minerals, and (ii) the type and total amount of such payments made to each government.'' [638] Section 13(q) also mandates the submission of the payment information in an interactive data format, and provides the Commission with the discretion to determine the applicable interactive data standard.[639] We are adopting the requirement regarding the presentation of the mandated payment information substantially as proposed, except that a resource extraction issuer will be required to present the mandated payment information in only one exhibit to new Form SD instead of two exhibits, as proposed. We have decided to require only one exhibit formatted in XBRL because we believe that we can achieve the goal of the dual presentation with only one exhibit. The disclosure requirements apply equally to U.S. issuers and foreign issuers meeting the definition of a resource extraction issuer. As discussed in detail above, in adopting the final rules, we have made significant changes to the rules that were proposed.

Compliance with the rules by affected issuers is mandatory. Responses to the information collections will not be kept confidential and there is no mandatory retention period for the collection of information.

### *B. Summary of the Comment Letters*

As proposed, the required disclosure would have been included in a resource extraction issuer's Form 10–K, Form 20–F, or Form 40–F, as appropriate. We estimated in the Proposing Release the number of issuers filing each of the forms that would likely be resource extraction issuers totaled 1,101

[633] *See* notes 15 and 48 and accompanying text.

[634] *See* note 584.

[635] 44 U.S.C. 3501 *et seq.*

[636] As previously noted, in another release we are issuing today, we are adopting rules to implement the requirements of Section 1502 of the Dodd-Frank Act and requiring issuers subject to those requirements to file the disclosure on Form SD. *See* note 30 and accompanying text (referencing the Conflict Minerals Adopting Release, Release 34–67716 (August 22, 2012).

[637] The information required by Rule 13q-1 and Form SD is similar to the information that would have been required under the proposal in Forms 10–K, 20–F, or 40–F and Item 105 of Regulation S–K. We do not believe that requiring the information to be filed in a Form SD, rather than furnishing it in an issuer's Exchange Act annual reports, will affect the burden estimate.

[638] 15 U.S.C. 78m(q)(2)(A).

[639] 15 U.S.C. 78m(q)(2)(C) and (D).

issuers.[640] We estimated the total annual increase in the paperwork burden for all affected companies to comply with our proposed collection of information requirements to be approximately 52,932 hours of company personnel time and approximately $11,857,200 for the services of outside professionals. We also estimated in the Proposing Release that the annual incremental paperwork burden for each of Form 10–K, Form 20–F, and Form 40–F would be 75 burden hours per affected form.[641]

In the Proposing Release we requested comment on the PRA analysis. We received ten comment letters that addressed PRA-related costs specifically;[642] we also received a number of comment letters that discussed the costs and burdens to issuers generally that we considered in connection with our PRA analysis.[643] Section III.B.2 contains a detailed summary of these comments. As described above, some commentators disagreed with our industry-wide estimate of the total annual increase in the paperwork burden and argued that it underestimated the actual costs that would be associated with the rules.[644] Some commentators also stated that, depending upon the final rules adopted, the compliance burdens and costs caused by implementation and ongoing compliance with the rules would be significantly greater than those estimated by the Commission.[645]

We note that commentators did not object, or suggest alternatives, to our estimate of the number of issuers who would be subject to the proposed rules. As discussed below, we have made several changes to our estimates in response to comments on the estimates contained in the Proposing Release that are designed to better reflect the burdens associated with the new collection of information.

*C. Revisions to PRA Reporting and Cost Burden Estimates*

After considering the comments, and the changes we are making from the proposal, we have revised our PRA estimates for the final rules. As discussed above, we are adopting new Rule 13q–1 and an amendment to new Form SD to require resource extraction issuers to disclose the required payment information in a new form rather than including the disclosure requirements in existing Exchange Act annual reports. As described above, Rule 13q–1 requires resource extraction issuers to file the payment information required in Form SD. The collection of information requirements are reflected in the burden hours estimated for Form SD. Therefore, Rule 13q–1 does not impose any separate burden.

For purposes of the PRA, we continue to estimate that 1,101 issuers will be subject to Rule 13q–1. We have derived our burden estimates by estimating the average number of hours it would take an issuer to prepare and file the required disclosure. In deriving our estimates, we recognize that the burdens will likely vary among individual issuers based on a number of factors, including the size and complexity of their operations. We believe that some issuers will experience costs in excess of this average in the first year of compliance with the rules, and some issuers may experience less than these average costs. When determining these estimates, we have assumed that 75% of the burden of preparation is carried by the issuer internally and 25% of the burden of preparation is carried by outside professionals retained by the issuer at an average cost of $400 per hour.[646] The portion of the burden carried by outside professionals is reflected as a cost, while the portion of the burden carried by the issuer internally is reflected in hours. As discussed above, we received estimates from some commentators expressed in burden hours and estimates from other commentators expressed in dollar costs. For purposes of this analysis and consistent with our approach with respect to the estimates provided in burden hours, we assume 25% of the dollar costs provided by commentators relate to costs for outside professionals.[647] We expect that the rules' effect will be greatest during the first year of their effectiveness and diminish in subsequent years. To account for this expected diminishing burden, we believe a three-year average of the expected burden during the first year with the expected ongoing burden during the next two years is a reasonable estimate. After considering the comments we received, we are revising our estimate of the PRA compliance burden hours and costs associated with the disclosure requirements.[648]

In arriving at our initial estimate in the Proposing Release we looked to the burden hours associated with the disclosure required by the oil and gas rules adopted in 2008, and estimated that the burden would be less based on our belief that the disclosure required by the proposed rules was less extensive than the oil and gas rules adopted in 2008. As discussed above, some commentators believed that our initial estimates did not adequately reflect the actual burden associated with complying with the proposed disclosure requirements.[649] Based on the comments we received, we have increased our estimate of the total annual compliance burden for all affected issuers to comply with the collection of information in our final rules to be approximately 332,123 hours of company personnel time and approximately $144,967,250 for the services of outside professionals, as discussed in detail below.

Some commentators estimated implementation costs of tens of millions

[640] For purposes of the PRA, we estimated that the number of resource extraction issuers that would annually file Form 10–K would be approximately 861, the number of such issuers that would annually file Form 20–F would be approximately 166, and the number of such issuers that would annually file Form 40–F would be approximately 74. We derived these estimates by determining the number of issuers that fall under SIC codes that pertain to oil, natural gas, and mining companies and, thus, are most likely to be resource extraction issuers. The estimate for Form 10–K was derived by subtracting from the total number of resource extraction issuers the number of issuers that file annual reports on Form 20–F and Form 40–F.

[641] In estimating 75 burden hours, we looked to the burden hours associated with the disclosure required by the oil and gas rules adopted in 2008, which estimated an increase of 100 hours for domestic issuers and 150 hours for foreign private issuers.

[642] *See* letters from API 1, API 2, Barrick Gold, ERI 2, ExxonMobil 1, ExxonMobil 3, NMA 2, Rio Tinto, RDS 1, and RDS 4.

[643] *See* letters from BP 1, Chamber Energy Institute, Chevron, Cleary, Hermes, and PWYP 1.

[644] *See* letters from API 1 and ExxonMobil 1.

[645] *See* letters from API 1, Barrick Gold, ExxonMobil 1, NMA 2, Rio Tinto, and RDS 1.

[646] We recognize that the costs of retaining outside professionals may vary depending on the nature of the professional services, but for purposes of this PRA analysis we estimate that such costs would be an average of $400 per hour. This is the rate we typically estimate for outside legal services used in connection with public company reporting. We note that no commentators provided us with an alternative rate estimate for these purposes.

[647] The comment letters providing dollar estimates did not explain how they arrived at such estimates, or provide any calculations as to the cost per hour. As such, we have included 25% of the dollar cost estimate in our calculation of costs of outside professionals, but we were not provided with sufficient data to convert commentators' dollar cost estimates into burden hour estimates.

[648] Although the comments we received with respect to our PRA estimates related to the proposal to include the disclosure requirements in Forms 10–K, 20–F, and 40–F, we have considered these estimates in arriving at our estimate for Form SD because, although the disclosures will be provided pursuant to a new rule and in a new form, the disclosure requirements themselves are generally not impacted by moving the disclosure to a different form. In the Proposing Release we requested comment on whether the required disclosure should be provided in a new form. We believe that any additional burden created by the use of a new form, rather than existing annual reports, will be minimal. *See also* letters from API 1 and Cleary.

[649] *See* notes 526 and 527 and accompanying text.

of dollars for large filers, and millions of dollars for smaller filers.[650] These commentators did not describe how they defined ''small'' and ''large'' filers. One commentator provided an estimate of $50 million in implementation costs if the definition of ''project'' is narrow and the level of disaggregation is high across other reporting parameters, though it did not provide alternate estimates for different definitions of ''project,'' leaving project undefined, or different levels of disaggregation.[651] We note that the commentator that provided this estimate is among the largest 20 oil and gas companies in the world,[652] and we believe that the estimate it provided may be representative of the costs to companies of similar large size, though it is likely not a representative estimate of the burden for resource extraction issuers that are smaller than this commentator. While we received estimates for smaller filers and an estimate for one of the largest filers, we did not receive data on companies of varying sizes in between the two extremes.

Similar to our economic analysis above, to account for the range of issuers who will be subject to the final rules, for purposes of this analysis, we have used the cost estimates provided by these issuers to calculate different cost estimates for issuers of different sizes based on either assets or market capitalization. We have estimated costs for small issuers (issuers with less than $75 million in market capitalization) and larger issuers (issuers with $75 million or more in market capitalization). We believe that initial implementation costs will be lowest for the smallest issuers and incrementally greater for larger issuers. Based on a review of market capitalization data of Exchange Act registrants filing under certain Standard Industry Classification codes, we estimate that there are approximately 699 small issuers and 402 large issuers.

We use Method 2 from our Economic Analysis above[653] for our estimate of total compliance burden. Barrick Gold's estimate[654] of 1,000 hours for compliance (500 hours for initial changes to internal books and records and 500 hours for initial compliance) is the starting point of the analysis.[655] Barrick Gold is a large accelerated filer, so we use 1,000 hours as the burden estimate for large issuers. In order to determine the number of hours for a small issuer, we scale Barrick Gold's estimate of the number of hours by the relative size of a small issuer. In the Economic Analysis above, the ratio of all small issuer total assets, $353 billion ($509,000,000 × 63% × 1,101), to all large issuer total assets, $1,835 billion ($4,504,000,000 × 37% × 1,101), is 19%. In order to be conservative, rather than using 19%, we estimate that the number of burden hours for small issuers will be 25% of the burden hours of large issuers, resulting in 250 hours.

We received comments and estimates on the PRA analysis both in hours necessary to comply with the rules and dollar costs of compliance, as discussed above. In the Economic Analysis above, we assume that the commentators' estimates represent total implementation costs, including both internal costs and outside professional costs. For purposes of this PRA analysis, we assume, as we have throughout the analysis, that 25% of this burden of preparation represents the cost of outside professionals.

We believe that the burden associated with this collection of information will be greatest during the implementation period to account for initial set up costs, but that ongoing compliance costs will be less than during the initial implementation period once companies have made any necessary modifications to their systems to capture and report the information required by the rules. Two commentators provided estimates of ongoing compliance costs: Rio Tinto provided an estimate of 5,000–10,000 burden hours for ongoing compliance,[656] while Barrick Gold provided an estimate of 500 burden hours for ongoing compliance. Based on market capitalization data, Rio Tinto is among the top five percent of resource extraction issuers that are Exchange Act reporting companies. We believe that, because of the size of this commentator, the estimate it provided may be representative of the burden for resource extraction issuers of a similar size, but may not be a representative estimate for resource extraction issuers that are smaller than this commentator. We believe that Barrick Gold is more similar to the average large issuer than Rio Tinto, and as such, we believe that Barrick Gold's estimate is a conservative estimate of the ongoing compliance burden hours because a comparison of the average total assets of a large issuer to Barrick Gold's total assets is 18% ($4,504,000,000/$25,075,000,000).[657] As discussed above, commentators' estimates on the burdens associated with initial implementation and ongoing compliance varied widely, with commentators noting that the estimates varied based on the size of issuer.[658] We note that some estimates may reflect the burden to a particular commentator, and, as such, may not be a representative estimate of the burden for resource extraction issuers that are smaller or larger than the particular commentator.[659] Accordingly, we have revised our estimate using an average of the figures provided to produce a reasonable estimate of the potential burden associated with the rules, recognizing they would apply to resource extraction issuers of different sizes. We are using 500 burden hours (Barrick Gold's estimate) for our estimate of ongoing compliance costs for large issuers and 125 (25% × 500) for small issuers. Thus, we estimate that the incremental collection of information burden associated with the final rules and form amendment will be 667 burden hours per large respondent [(1,000 + 500 + 500)/3 years] and 250 per small respondent [(500 + 125 +125)/3 years]. We estimate the final rules and form amendment will result in an internal burden to small resource extraction issuers of 131,063 hours (699 forms × 250 hours/form × .75) and to large resource extraction issuers of

[650] *See* letters from API 1 and ExxonMobil 1.

[651] *See* letter from ExxonMobil 1. Although the rules we are adopting differ from the assumptions made by the commentator, we do not believe we have a basis for deriving a different estimate.

[652] *See* letter from API (October 12, 2010) (pre-proposal letter) (ranking the 75 largest oil and gas companies by reserves and production).

[653] Method 2 estimates compliance costs separately for small and large issuers. *See* Section III.D. above. Because 63% of the issuers estimated to be subject to the final rules are small issuers, we believe that, for PRA purposes, Method 2 provides for a more accurate assessment of Form SD's compliance costs than Method 1, which is based on deriving an average of costs.

[654] We use Barrick Gold's estimate because it is the only commentator that provided a number of hours and dollar value estimates for initial and ongoing compliance costs. Although in the Economic Analysis section we used ExxonMobil's dollar value estimate to calculate an upper bound of compliance costs, we are unable to calculate the number of burden hours for purposes of the PRA analysis using ExxonMobil's inputs.

[655] As noted above, the costs for PRA purposes are only a portion of the costs associated with complying with the final rules.

[656] *See* letter from Rio Tinto. This commentator estimated 100–200 hours of work at the head office, an additional 100–200 hours of work providing support to its business units, and a total of 4,800–9,600 hours by its business units. We arrived at the estimated range of 5,000–10,000 hours by adding the estimates provided by this commentator (100 + 100 + 4,800 = 5,000, and 200 + 200 + 9,600 = 10,000).

[657] The average large issuer's total assets compared to Rio Tinto's total assets ($97 billion) is 4.5%. *See* note 625 for an explanation of the average large issuer's total assets.

[658] *See* letter from API 1 (estimating implementation costs in the tens of millions of dollars for large filers and millions of dollars for many smaller filers). This commentator did not explain how it defined small and large filers.

[659] We note, for example, one commentator's letter indicating that it had approximately 120 operating entities. *See* letter from Rio Tinto.

201,101 hours (402 forms × 667 hours/form × .75) for a total incremental company burden of 332,164 hours. Outside professional costs will be $17,475,000 (699 forms × 250 hours/form × .25 × $400) for small resource extraction issuers and $26,813,400 (402 forms × 667 hours/form × .25 × $400). As discussed above, one commentator, Barrick Gold, indicated that its initial compliance costs also would include $100,000 for IT consulting, training, and travel costs. To account for these costs, we have used Barrick Gold's estimate and applied the same 25% factor to derive estimated IT costs of $100,000 for large issuers and $25,000 for small issuers. Thus, we estimate total IT compliance costs for small issuers to be $17,475,000 (699 issuers × $25,000) and for large issuers to be $40,200,000 (402 issuers × $100,000). We have added the estimated IT compliance costs to the cost estimates for other professional costs discussed above to derive total professional costs of $34,950,000 for small issuers and $67,013,400 for large issuers. The estimated overall professional cost for PRA purposes is $101,963,400.

*D. Revised PRA Estimate*

The table below illustrates the annual compliance burden of the Form SD collection of information.

| Issuer size | Annual responses (A) | Incremental burden hours/form (B) | Increase in burden hours (C) = (A*B)*0.75 | Increase in professional costs (D) | Increase in IT costs/issuer (E) | Total increase professional and IT costs (F) = (D) + (E) |
|---|---|---|---|---|---|---|
| Small | 699 | 250 | 131,063 | $17,475,000 | $17,475,000 | $34,950,000 |
| Large | 402 | 667 | 201,101 | 26,813,400 | 40,200,000 | 67,013,400 |
| Total | 1,101 | | 332,164 | | | 101,963,400 |

Our PRA estimate is within the range of our estimates in the Economic Analysis section above.[660]

**V. Final Regulatory Flexibility Act Analysis**

This Final Regulatory Flexibility Act Analysis (''FRFA'') has been prepared in accordance with the Regulatory Flexibility Act.[661] This FRFA relates to the final rules we are adopting to implement Section 13(q) of the Exchange Act, which concerns certain disclosure obligations of resource extraction issuers. As defined by Section 13(q), a resource extraction issuer is an issuer that is required to file an annual report with the Commission, and engages in the commercial development of oil, natural gas, or minerals.

*A. Reasons for, and Objectives of, the Final Rules*

The final rules are designed to implement the requirements of Section 13(q) of the Exchange Act, which was added by Section 1504 of the Dodd-Frank Act. Specifically, the new rule and form amendment will require a resource extraction issuer to disclose in an annual report certain information relating to payments made by the issuer, a subsidiary of the issuer, or an entity under the control of the issuer to a foreign government or the United States Federal Government for the purpose of the commercial development of oil, natural gas, or minerals. A resource extraction issuer will have to disclose the required payment information annually in new Form SD and include an exhibit with the required payment information formatted in XBRL.

*B. Significant Issues Raised by Public Comments*

In the Proposing Release, we requested comment on any aspect of the Initial Regulatory Flexibility Act Analysis (''IRFA''), including the number of small entities that would be affected by the proposed rules, the nature of the impact, how to quantify the number of small entities that would be affected, and how to quantify the impact of the proposed rules. We did not receive comments specifically addressing the IRFA; however, several commentators addressed aspects of the proposed rules that could potentially affect small entities. Some commentators supported an exemption for a ''small entity'' or ''small business'' having $5 million or less in assets on the last day of its most recently completed fiscal year.[662] Other commentators opposed an exemption for small entities and other smaller companies. Those commentators noted that, while smaller companies have more limited operations and projects, and therefore fewer payments to disclose as compared to larger companies, they generally take on greater risks due to the nature of their operations.[663]

*C. Small Entities Subject to the Final Rules*

The final rules will affect small entities that are required to file an annual report with the Commission under Section 13(a) or Section 15(d) of the Exchange Act, and are engaged in the commercial development of oil, natural gas, or minerals. Exchange Act Rule 0–10(a)[664] defines an issuer to be a ''small business'' or ''small organization'' for purposes of the Regulatory Flexibility Act if it had total assets of $5 million or less on the last day of its most recent fiscal year. We believe that the final rules will affect some small entities that meet the definition of resource extraction issuer under Section 13(q). Based on a review of total assets for Exchange Act registrants filing under certain Standard Industry Classification codes, we estimate that approximately 196 oil, natural gas, and mining companies are resource extraction issuers and that may be considered small entities.

*D. Reporting, Recordkeeping, and Other Compliance Requirements*

The final rules will add to the annual disclosure requirements of companies meeting the definition of resource extraction issuer, including small entities, by requiring them to file the payment disclosure mandated by Section 13(q) and the rules issued thereunder in new Form SD. The disclosure must include:

[660] Despite using Barrick Gold's estimate, our revised estimate of PRA professional costs of $101,963,400 is higher than the lower bound of compliance costs ($43,757,043) estimated under Method 2 in the Economic Analysis section, which is also based on Barrick Gold's estimate. This is mainly because we estimate the PRA costs as fixed costs for smaller and larger issuers, whereas in the Economic Analysis section, because of the nature of the data provided by commentators, we estimate the total compliance costs as variable costs.

[661] 5 U.S.C. 601.

[662] *See* letters from API 1, Chevron, ExxonMobil 1, and RDS 1.

[663] *See* letters from Calvert, Global Witness 1, Oxfam 1, PWYP 1, Sen. Cardin *et al.* 1, and Soros 1.

[664] 17 CFR 240.0–10(a).

- the type and total amount of payments made for each project of the issuer relating to the commercial development of oil, natural gas, or minerals; and
- The type and total amount of those payments made to each government.

A resource extraction issuer must provide the required disclosure in Form SD and in an exhibit formatted in XBRL. Consistent with the statute, the rules require an issuer to submit the payment information using electronic tags that identify, for any payments made by a resource extraction issuer to a foreign government or the U.S. Federal Government:

- The total amounts of the payments, by category;
- The currency used to make the payments;
- The financial period in which the payments were made;
- The business segment of the resource extraction issuer that made the payments;
- The government that received the payments, and the country in which the government is located; and
- The project of the resource extraction issuer to which the payments relate.

In addition, a resource extraction issuer will be required to provide the type and total amount of payments made for each project and the type and total amount of payments made to each government in XBRL format. The disclosure requirements will apply equally to U.S. and foreign resource extraction issuers.

*E. Agency Action To Minimize Effect on Small Entities*

The Regulatory Flexibility Act directs us to consider significant alternatives that would accomplish the stated objectives, while minimizing any significant adverse impact on small entities. In connection with adopting the final rules, we considered, as alternatives, establishing different compliance or reporting requirements that take into account the resources available to smaller entities, exempting smaller entities from coverage of the disclosure requirements, and clarifying, consolidating, or simplifying disclosure for small entities.

The final rules are designed to implement the payment disclosure requirements of Section 13(q), which applies to resource extraction issuers regardless of size. While a few commentators supported an exemption from the disclosure requirements for small entities,[665] numerous other commentators opposed exempting small entities because that would be inconsistent with the statute and would contravene Congress' intent of creating a level playing field for all affected issuers.[666] We do not believe that exempting resource extraction issuers that are small entities, many of which are mining companies engaged in exploration activities that require payments to governments,[667] or adopting different disclosure requirements or additional delayed compliance for small entities, would be consistent with the statutory purpose of Section 13(q). For example, we do not believe that adopting rules permitting small entities to disclose payments at the country level would be consistent with the statutory purpose of Section 13(q). The statute is designed to enhance the transparency of payments by resource extraction issuers to governments. Adoption of different disclosure requirements for small entities would impede the transparency and comparability of the disclosure mandated by Section 13(q). In addition, it is not clear that adopting different standards or a delayed compliance date would provide small entities with a significant benefit. For example, small entities may have a limited number of projects in a limited number of countries and in some cases small entities may have only one project in a country.

We also have considered the alternative of using performance standards rather than design standards. We generally have used design rather than performance standards in connection with the final rules because we believe the statutory language, which requires the electronic tagging of specific items, contemplates the adoption of specific disclosure requirements. We further believe the final rules will be more useful to users of the information if there are specific disclosure requirements. Such requirements will help to promote transparent and comparable disclosure among all resource extraction issuers, which should help further the statutory goal of promoting international transparency of payments to governments. At the same time, we have determined to leave the term ''project'' undefined to give issuers flexibility in applying the term to different business contexts depending on factors such as the particular industry or business in which the issuer operates, or the issuer's size.

[665] *See* note 42 and accompanying text.

[666] *See* note 34 and accompanying text.

[667] *See* letters from Calvert and PWYP 1.

**VI. Statutory Authority and Text of Final Rule and Form Amendments**

We are adopting the rule and form amendments contained in this document under the authority set forth in Sections 3(b), 12, 13, 15, 23(a), and 36 the Exchange Act.

**List of Subjects in 17 CFR Parts 240 and 249b**

Reporting and recordkeeping requirements, Securities.

In accordance with the foregoing, we are amending Title 17, Chapter II of the Code of Federal Regulations as follows:

## PART 240—GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934

■ 1. The authority citation for part 240 is amended by adding an authority for § 240.13q–1 in numerical order to read as follows:

**Authority:** 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z–2, 77z–3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78d, 78e, 78f, 78g, 78i, 78j, 78j–1, 78k, 78k–1, 78*l*, 78m, 78n, 78n–1, 78o, 78o–4, 78p, 78q, 78s, 78u–5, 78w, 78x, 78dd(b), 78dd(c), 78*ll*, 78mm, 80a–20, 80a–23, 80a–29, 80a–37, 80b–3, 80b–4, 80b–11, and 7201 *et seq.* and 8302; 18 U.S.C. 1350; 12 U.S.C. 5221(e)(3); and Pub. L. 111–203, Sec. 712, 124 Stat. 1376, (2010) unless otherwise noted.

* * * * *

Section 240.13q–1 is also issued under sec. 1504, Pub. L. 111–203, 124 Stat. 2220.

* * * * *

■ 2. Add § 240.13q–1 to read as follows:

**§ 240.13q–1 Disclosure of payments made by resource extraction issuers.**

(a) A resource extraction issuer, as defined by paragraph (b) of this section, shall file a report on Form SD (17 CFR 249b.400) within the period specified in that Form disclosing the information required by the applicable items of Form SD as specified in that Form.

(b) *Definitions.* For the purpose of this section:

(1) *Resource extraction issuer* means an issuer that:

(i) Is required to file an annual report with the Commission; and

(ii) Engages in the commercial development of oil, natural gas, or minerals.

(2) *Commercial development of oil, natural gas, or minerals* includes exploration, extraction, processing, and export of oil, natural gas, or minerals, or the acquisition of a license for any such activity.

## PART 249b—FURTHER FORMS, SECURITIES EXCHANGE ACT OF 1934

■ 3. The authority citation for part 249b is amended by adding an authority for § 249b.400 to read as follows:

**Authority:** 15 U.S.C. 78a *et seq.,* unless otherwise noted.

* * * * *

Section 249b.400 is also issued under secs. 1502 and 1504, Pub. L. No. 111–203, 124 Stat. 2213 and 2220.

* * * * *

■ 4. Amend § 249b.400 by:

■ a. Designating the existing text as paragraph (a); and

■ b. Adding paragraph (b).

The addition reads as follows:

### § 249b.400 Form SD, Specialized Disclosure Report

(a) * * *

(b) This Form shall be filed pursuant to Rule 13q–1 (§ 240.13q–1) of this chapter by resource extraction issuers that are required to disclose the information required by Section 13(q) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(q)) and Rule 13q–1 of this chapter.

■ 5. Amend Form SD (as referenced in § 249b.400) by:

■ a. Adding a check box for Rule 13q–1;

■ c. Revising instruction A. under ''General Instructions'';

■ d. Redesignating instruction B.2. as B.3 and adding new instructions B.2. and B.4. under the ''General Instructions''; and

■ e. Redesignating Section 2 as Section 3, adding new Section 2, and revising newly redesignated Section 3 under the ''Information to be Included in the Report''.

The addition and revision read as follows:

**Note:** The text of Form SD does not, and this amendment will not, appear in the Code of Federal Regulations.

**UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION**

**Washington, DC 20549**

FORM SD

Specialized Disclosure Report

______________________________________

(Exact name of the registrant as specified in its charter)

______________________________________

(State or other jurisdiction of incorporation)

______________________________________

(Commission file number)

______________________________________

(Address of principle executive offices)

______________________________________

(Zip code)

______________________________________

(Name and telephone number, including area code, of the person to contact in connection with this report.)

Check the appropriate box to indicate the rule pursuant to which this form is being filed:

____ Rule 13p–1 under the Securities Exchange Act (17 CFR 240.13p–1) for the reporting period from January 1 to December 31, ________.

____ Rule 13q–1 under the Securities Exchange Act (17 CFR 240.13q–1) for the fiscal year ended ________.

**GENERAL INSTRUCTIONS**

**A. Rule as to Use of Form SD.**

This form shall be used for a report pursuant to Rule 13p–1 (17 CFR 240.13p–1) and Rule 13q–1 (17 CFR 240.13q–1) under the Exchange Act.

**B. Information to be Reported and Time for Filing of Reports.**

1. * * *

2. *Form filed under Rule 13q–1.* File the information required by Section 2 of this Form on EDGAR no later than 150 days after the end of the issuer's most recent fiscal year.

3. If the deadline for filing this form occurs on a Saturday, Sunday or holiday on which the Commission is not open for business, then the deadline shall be the next business day.

4. The information and documents filed in this report shall not be deemed to be incorporated by reference into any filing under the Securities Act or the Exchange Act, unless the registrant specifically incorporates it by reference into a filing under the Securities Act or the Exchange Act.

* * * * *

**INFORMATION TO BE INCLUDED IN THE REPORT**

* * * * *

**Section 2—Resource Extraction Issuer Disclosure**

**Item 2.01 Disclosure requirements regarding payments to governments**

(a) A resource extraction issuer shall file an annual report on Form SD with the Commission, and include as an exhibit to this Form SD, information relating to any payment made during the fiscal year covered by the annual report by the resource extraction issuer, a subsidiary of the resource extraction issuer, or an entity under the control of the resource extraction issuer, to a foreign government or the United States Federal Government, for the purpose of the commercial development of oil, natural gas, or minerals. Specifically, a resource extraction issuer must file the following information in an exhibit to this Form SD electronically formatted using the eXtensible Business Reporting Language (XBRL) interactive data standard:

(1) The type and total amount of such payments made for each project of the resource extraction issuer relating to the commercial development of oil, natural gas, or minerals;

(2) The type and total amount of such payments made to each government;

(3) The total amounts of the payments, by category listed in (c)(6)(iii);

(4) The currency used to make the payments;

(5) The financial period in which the payments were made;

(6) The business segment of the resource extraction issuer that made the payments;

(7) The government that received the payments, and the country in which the government is located; and

(8) The project of the resource extraction issuer to which the payments relate.

(b) Provide a statement in the body of the Form SD that the specified payment disclosure required by this form is included in an exhibit to this form.

(c) For purposes of this item:

(1) The term *commercial development of oil, natural gas, or minerals* includes exploration, extraction, processing, and export of oil, natural gas, or minerals, or the acquisition of a license for any such activity.

(2) The term *foreign government* means a foreign government, a department, agency, or instrumentality of a foreign government, or a company owned by a foreign government. As used in Item 2.01, foreign government includes a foreign national government as well as a foreign subnational government, such as the government of a state, province, county, district, municipality, or territory under a foreign national government.

(3) The term *financial period* means the fiscal year in which the payment was made.

(4) The term *business segment* means a business segment consistent with the reportable segments used by the resource extraction issuer for purposes of financial reporting.

(5) The terms ''subsidiary'' and ''control'' are defined as provided under § 240.12b–2 of this chapter.

(6) The term *payment* means an amount paid that:

(i) Is made to further the commercial development of oil, natural gas, or minerals;

(ii) Is not de minimis; and

(iii) Includes:

(A) Taxes;

(B) Royalties;

(C) Fees;

(D) Production entitlements;

(E) Bonuses;

(F) Dividends; and

(G) Payments for infrastructure improvements.

(7) The term *not de minimis* means any payment, whether made as a single payment or a series of related payments, that equals or exceeds $100,000. In the case of any arrangement providing for periodic payments or installments, a resource extraction issuer must consider the aggregate amount of the related periodic payments or installments of the related payments in determining whether the payment threshold has been met for that series of payments, and accordingly, whether disclosure is required.

*Instructions*

1. If a resource extraction issuer makes an in-kind payment of the types of payments required to be disclosed, the issuer must disclose the payment. When reporting an in-kind payment, an issuer must determine the monetary value of the in-kind payment and tag the information as ''in-kind'' for purposes of the currency. For purposes of the disclosure, an issuer may report the payment at cost, or if cost is not determinable, fair market value and should provide a brief description of how the monetary value was calculated.

2. If a government levies a payment, such as a tax or dividend, at the entity level rather than on a particular project, a resource extraction issuer may disclose that payment at the entity level. To the extent that payments, such as corporate income taxes and dividends, are made for obligations levied at the entity level, an issuer may omit certain tags that may be inapplicable (*e.g.,* project tag, business segment tag) for those payment types as long as it provides all other electronic tags, including the tag identifying the recipient government.

3. An issuer must report the amount of payments made for each payment type, and the total amount of payments made for each project and to each government, during the reporting period in either U.S. dollars or the issuer's reporting currency. If an issuer has made payments in currencies other than U.S. dollars or its reporting currency, it may choose to calculate the currency conversion between the currency in which the payment was made and U.S. dollars or the issuer's reporting currency, as applicable, in one of three ways: (a) by translating the expenses at the exchange rate existing at the time the payment is made; (b) using a weighted average of the exchange rates during the period; or (c) based on the exchange rate as of the issuer's fiscal year end. A resource extraction issuer must disclose the method used to calculate the currency conversion.

4. A company owned by a foreign government is a company that is at least majority-owned by a foreign government.

5. A resource extraction issuer must disclose payments made for taxes on corporate profits, corporate income, and production. Disclosure of payments made for taxes levied on consumption, such as value added taxes, personal income taxes, or sales taxes, is not required.

6. As used in Item 2.01(c)(6), fees include license fees, rental fees, entry fees, and other considerations for licenses or concessions. Bonuses include signature, discovery, and production bonuses.

7. A resource extraction issuer generally need not disclose dividends paid to a government as a common or ordinary shareholder of the issuer as long as the dividend is paid to the government under the same terms as other shareholders; however, the issuer will be required to disclose any dividends paid in lieu of production entitlements or royalties.

8. If an issuer meeting the definition of ''resource extraction issuer'' in Rule 13q–1(b)(1) is a wholly-owned subsidiary of a resource extraction issuer that has filed a Form SD disclosing the information required by Item 2.01 for the wholly-owned subsidiary, then such subsidiary shall not be required to separately file the disclosure required by Item 2.01. In such circumstances, the wholly-owned subsidiary would be required to file a notice on Form SD providing an explanatory note that the required disclosure was filed on Form SD by the parent and the date the parent filed the disclosure. The reporting parent company must note that it is filing the required disclosure for a wholly-owned subsidiary and must identify the subsidiary on Form SD. For purposes of this instruction, all of the subsidiary's equity securities must be owned, either directly or indirectly, by a single person that is a reporting company under the Act that meets the definition of ''resource extraction issuer.''

9. Disclosure is required under this paragraph in circumstances in which an activity related to the commercial development of oil, natural gas, or minerals, or a payment or series of payments made by a resource extraction issuer to a foreign government or the U.S. Federal Government for the purpose of commercial development of oil, natural gas, or minerals are not, in form or characterization, one of the categories of activities or payments specified in this section but are part of a plan or scheme to evade the disclosure required under Section 13(q).

**Section 3—Exhibits**

**Item 3.01 Exhibits**

List below the following exhibits filed as part of this report.

Exhibit 1.01—Conflict Minerals Report as required by Items 1.01 and 1.02 of this Form.

Exhibit 2.01—Resource Extraction Issuer Disclosure Report as required by Item 2.01 of this Form.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the duly authorized undersigned.

---

(Registrant)

---

By (Signature and Title)*

---

(Date)

*Print name and title of the registrant's signing executive officer under his or her signature.

* * * * *

By the Commission.

Dated: August 22, 2012.

**Elizabeth M. Murphy,**

*Secretary.*

[FR Doc. 2012–21155 Filed 9–11–12; 8:45 am]

**BILLING CODE P**

**15 U.S.C. § 78c(f)**

§ 78c(f) Consideration of promotion of efficiency, competition, and capital formation

Whenever pursuant to this chapter the Commission is engaged in rulemaking, or in the review of a rule of a self-regulatory organization, and is required to consider or determine whether an action is necessary or appropriate in the public interest, the Commission shall also consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation.

**15 U.S.C. § 78l(h)**

§ 78l(h) Exemption by rules and regulations from certain provisions of section

The Commission may by rules and regulations, or upon application of an interested person, by order, after notice and opportunity for hearing, exempt in whole or in part any issuer or class of issuers from the provisions of subsection (g) of this section or from section 78m, 78n, or 78o(d) of this title or may exempt from section 78p of this title any officer, director, or beneficial owner of securities of any issuer, any security of which is required to be registered pursuant to subsection (g) hereof, upon such terms and conditions and for such period as it deems necessary or appropriate, if the Commission finds, by reason of the number of public investors, amount of trading interest in the securities, the nature and extent of the activities of the issuer, income or assets of the issuer, or otherwise, that such action is not inconsistent with the public interest or the protection of investors. The Commission may, for the purposes of any of the above-mentioned sections or subsections of this chapter, classify issuers and prescribe requirements appropriate for each such class.

**15 U.S.C. § 78m(p)**

§ 78m(p) Disclosures relating to conflict minerals originating in the Democratic Republic of the Congo

(1) Regulations

(A) In general

Not later than 270 days after July 21, 2010, the Commission shall promulgate regulations requiring any person described in paragraph (2) to disclose annually, beginning with the person's first full fiscal year that begins after the date of promulgation of such regulations, whether conflict minerals that are necessary as described in paragraph (2)(B), in the year for which such reporting is required, did originate in the Democratic Republic of the Congo or an adjoining country and, in cases in which such conflict minerals did originate in any such country, submit to the Commission a report that includes, with respect to the period covered by the report—

(i) a description of the measures taken by the person to exercise due diligence on the source and chain of custody of such minerals, which measures shall include an independent private sector audit of such report submitted through the Commission that is conducted in accordance with standards established by the Comptroller General of the United States, in accordance with rules promulgated by the Commission, in consultation with the Secretary of State; and

(ii) a description of the products manufactured or contracted to be manufactured that are not DRC conflict free ("DRC conflict free" is defined to mean the products that do not contain minerals that directly or indirectly finance or benefit armed groups in the Democratic Republic of the Congo or an adjoining country), the entity that conducted the independent private sector audit in accordance with clause (i), the facilities used to process the conflict minerals, the country of origin of the conflict minerals, and the efforts to determine the mine or location of origin with the greatest possible specificity.

(B) Certification

The person submitting a report under subparagraph (A) shall certify the audit described in clause (i) of such subparagraph that is included in such report. Such a certified audit shall constitute a critical component of due diligence in establishing the source and chain of custody of such minerals.

(C) Unreliable determination

If a report required to be submitted by a person under subparagraph (A) relies on a determination of an independent private sector audit, as described under subparagraph (A)(i), or other due diligence processes previously determined by the Commission to be unreliable, the report shall not satisfy the requirements of the regulations promulgated under subparagraph (A)(i).

(D) DRC conflict free
For purposes of this paragraph, a product may be labeled as "DRC conflict free" if the product does not contain conflict minerals that directly or indirectly finance or benefit armed groups in the Democratic Republic of the Congo or an adjoining country.

(E) Information available to the public
Each person described under paragraph (2) shall make available to the public on the Internet website of such person the information disclosed by such person under subparagraph (A).

(2) Person described

A person is described in this paragraph if—

(A) the person is required to file reports with the Commission pursuant to paragraph (1)(A); and

(B) conflict minerals are necessary to the functionality or production of a product manufactured by such person.

(3) Revisions and waivers

The Commission shall revise or temporarily waive the requirements described in paragraph (1) if the President transmits to the Commission a determination that—

(A) such revision or waiver is in the national security interest of the United States and the President includes the reasons therefor; and

(B) establishes a date, not later than 2 years after the initial publication of such exemption, on which such exemption shall expire.

(4) Termination of disclosure requirements

The requirements of paragraph (1) shall terminate on the date on which the President determines and certifies to the appropriate congressional committees, but in no case earlier than the date that is one day after the end of the 5-year period beginning on July 21, 2010, that no armed groups continue to be directly involved and benefitting from commercial activity involving conflict minerals.

(5) Definitions

For purposes of this subsection, the terms “adjoining country”, “appropriate congressional committees”, “armed group”, and “conflict mineral” have the meaning given those terms under section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

**15 U.S.C. § 78m(q)**

§ 78m(q) Disclosure of payments by resource extraction issuers

(1) Definitions

In this subsection—

(A) the term "commercial development of oil, natural gas, or minerals" includes exploration, extraction, processing, export, and other significant actions relating to oil, natural gas, or minerals, or the acquisition of a license for any such activity, as determined by the Commission;

(B) the term "foreign government" means a foreign government, a department, agency, or instrumentality of a foreign government, or a company owned by a foreign government, as determined by the Commission;

(C) the term "payment"—

(i) means a payment that is—

(I) made to further the commercial development of oil, natural gas, or minerals; and

(II) not de minimis; and

(ii) includes taxes, royalties, fees (including license fees), production entitlements, bonuses, and other material benefits, that the Commission, consistent with the guidelines of the Extractive Industries Transparency Initiative (to the extent practicable), determines are part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals;

(D) the term "resource extraction issuer" means an issuer that—

(i) is required to file an annual report with the Commission; and

(ii) engages in the commercial development of oil, natural gas, or minerals;

(E) the term "interactive data format" means an electronic data format in which

pieces of information are identified using an interactive data standard; and

(F) the term "interactive data standard" means standardized list of electronic tags that mark information included in the annual report of a resource extraction issuer.

(2) Disclosure

(A) Information required

Not later than 270 days after July 21, 2010, the Commission shall issue final rules that require each resource extraction issuer to include in an annual report of the resource extraction issuer information relating to any payment made by the resource extraction issuer, a subsidiary of the resource extraction issuer, or an entity under the control of the resource extraction issuer to a foreign government or the Federal Government for the purpose of the commercial development of oil, natural gas, or minerals, including—

(i) the type and total amount of such payments made for each project of the resource extraction issuer relating to the commercial development of oil, natural gas, or minerals; and

(ii) the type and total amount of such payments made to each government.

(B) Consultation in rulemaking

In issuing rules under subparagraph (A), the Commission may consult with any agency or entity that the Commission determines is relevant.

(C) Interactive data format

The rules issued under subparagraph (A) shall require that the information included in the annual report of a resource extraction issuer be submitted in an interactive data format.

(D) Interactive data standard

(i) In general

The rules issued under subparagraph (A) shall establish an interactive data

standard for the information included in the annual report of a resource extraction issuer.

(ii) Electronic tags

The interactive data standard shall include electronic tags that identify, for any payments made by a resource extraction issuer to a foreign government or the Federal Government—

(I) the total amounts of the payments, by category;

(II) the currency used to make the payments;

(III) the financial period in which the payments were made;

(IV) the business segment of the resource extraction issuer that made the payments;

(V) the government that received the payments, and the country in which the government is located;

(VI) the project of the resource extraction issuer to which the payments relate; and

(VII) such other information as the Commission may determine is necessary or appropriate in the public interest or for the protection of investors.

(E) International transparency efforts

To the extent practicable, the rules issued under subparagraph (A) shall support the commitment of the Federal Government to international transparency promotion efforts relating to the commercial development of oil, natural gas, or minerals.

(F) Effective date

With respect to each resource extraction issuer, the final rules issued under subparagraph (A) shall take effect on the date on which the resource extraction issuer is required to submit an annual report relating to the fiscal year of the resource extraction issuer that ends not earlier than 1 year after the date on

which the Commission issues final rules under subparagraph (A).

(3) Public availability of information

(A) In general

To the extent practicable, the Commission shall make available online, to the public, a compilation of the information required to be submitted under the rules issued under paragraph (2)(A).

(B) Other information

Nothing in this paragraph shall require the Commission to make available online information other than the information required to be submitted under the rules issued under paragraph (2)(A).

(4) Authorization of appropriations

There are authorized to be appropriated to the Commission such sums as may be necessary to carry out this subsection.

**15 U.S.C. § 78mm**

§ 78mm General exemptive authority

(a) Authority

(1) In general

Except as provided in subsection (b) of this section, but notwithstanding any other provision of this chapter, the Commission, by rule, regulation, or order, may conditionally or unconditionally exempt any person, security, or transaction, or any class or classes of persons, securities, or transactions, from any provision or provisions of this chapter or of any rule or regulation thereunder, to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors.

(2) Procedures

The Commission shall, by rule or regulation, determine the procedures under which an exemptive order under this section shall be granted and may, in its sole discretion, decline to entertain any application for an order of exemption under this section.

(b) Limitation

The Commission may not, under this section, exempt any person, security, or transaction, or any class or classes of persons, securities, or transactions from section 78*o*-5 of this title or the rules or regulations issued thereunder or (for purposes of section 78*o*-5 of this title and the rules and regulations issued thereunder) from any definition in paragraph (42), (43), (44), or (45) of section 78c(a) of this title.

(c) Derivatives

Unless the Commission is expressly authorized by any provision described in this subsection to grant exemptions, the Commission shall not grant exemptions, with respect to amendments made by subtitle B of the Wall Street Transparency and Accountability Act of 2010, with respect to paragraphs (65), (66), (68), (69), (70), (71), (72), (73), (74), (75), (76), and (79) of section 78c(a) of this title, and sections 78j-2(a), 78j-2(b), 78j-2(c), 78m-1, 78*o*-10, 78q-1(g), 78q-1(h), 78q-1(i), 78q-1(j),

78q-1(k), and 78q-1(l) of this title; provided that the Commission shall have exemptive authority under this chapter with respect to security-based swaps as to the same matters that the Commodity Futures Trading Commission has under the Wall Street Transparency and Accountability Act of 2010 with respect to swaps, including under section 6(c) of Title 7.

**15 U.S.C. § 78w(a)(2)**

§ 78w(a) Power to make rules and regulations; considerations; public disclosure

* * *

(2) The Commission and the Secretary of the Treasury, in making rules and regulations pursuant to any provisions of this chapter, shall consider among other matters the impact any such rule or regulation would have on competition. The Commission and the Secretary of the Treasury shall not adopt any such rule or regulation which would impose a burden on competition not necessary or appropriate in furtherance of the purposes of this chapter. The Commission and the Secretary of the Treasury shall include in the statement of basis and purpose incorporated in any rule or regulation adopted under this chapter, the reasons for the Commission's or the Secretary's determination that any burden on competition imposed by such rule or regulation is necessary or appropriate in furtherance of the purposes of this chapter.

**15 U.S.C. § 80a–2(c)**

§ 80a–2(c) Consideration of promotion of efficiency, competition, and capital formation

Whenever pursuant to this subchapter the Commission is engaged in rulemaking and is required to consider or determine whether an action is consistent with the public interest, the Commission shall also consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation.

**17 C.F.R. § 240.24b–2**

§ 240.24b–2 Nondisclosure of information filed with the Commission and with any exchange

Preliminary Note: Confidential treatment requests shall be submitted in paper format only, whether or not the filer is required to submit a filing in electronic format.

(a) Any person filing any registration statement, report, application, statement, correspondence, notice or other document (herein referred to as the material filed) pursuant to the Act may make written objection to the public disclosure of any information contained therein in accordance with the procedure set forth below. The procedure provided in this rule shall be the exclusive means of requesting confidential treatment of information required to be filed under the Act.

(b) The person shall omit from material filed the portion thereof which it desires to keep undisclosed (hereinafter called the confidential portion). In lieu thereof, it shall indicate at the appropriate place in the material filed that the confidential portion has been so omitted and filed separately with the Commission. The person shall file with the copies of the material filed with the Commission:

(1) One copy of the confidential portion, marked "Confidential Treatment," of the material filed with the Commission. The copy shall contain an appropriate identification of the item or other requirement involved and, notwithstanding that the confidential portion does not constitute the whole of the answer, the entire answer thereto; except that in the case where the confidential portion is part of a financial statement or schedule, only the particular financial statement or schedule need be included. The copy of the confidential portion shall be in the same form as the remainder of the material filed;

(2) An application making objection to the disclosure of the confidential portion. Such application shall be on a sheet or sheets separate from the confidential portion, and shall contain (i) an identification of the portion; (ii) a statement of the grounds of objection referring to, and containing an analysis of, the applicable exemption(s) from disclosure under the Commission's rules and regulations adopted under the Freedom of Information Act (17 CFR 200.80), and a justification of the period of time for which confidential treatment is sought; (iii) a written consent to the furnishing of the confidential portion to other government

agencies, offices or bodies and to the Congress; and (iv) the name of each exchange, if any, with which the material is filed.

(3) The copy of the confidential portion and the application filed in accordance with this paragraph (b) shall be enclosed in a separate envelope marked “Confidential Treatment” and addressed to The Secretary, Securities and Exchange Commission, Washington, DC 20549.

(c) Pending a determination as to the objection filed the material for which confidential treatment has been applied will not be made available to the public.

(d)(1) If it is determined that the objection should be sustained, a notation to that effect will be made at the appropriate place in the material filed. Such a determination will not preclude reconsideration whenever appropriate, such as upon receipt of any subsequent request under the Freedom of Information Act (5 U.S.C. 552) and, if appropriate, revocation of the confidential status of all or a portion of the information in question. Where an initial determination has been made under this rule to sustain objections to disclosure, the Commission will attempt to give the person requesting confidential treatment advance notice, wherever possible, if confidential treatment is revoked.

(2) In any case where an objection to disclosure has been disallowed or where a prior grant of confidential treatment has been revoked, the person who requested such treatment will be so informed by registered or certified mail to the person or his agent for service. Pursuant to § 201.431 of this chapter, persons making objections to disclosure may petition the Commission for review of a determination by the Division disallowing objections or revoking confidential treatment.

(e) The confidential portion shall be made available to the public at the time and according to the conditions specified in paragraphs (d)(1) and (2) of this section:

(1) Upon the lapse of five days after the dispatch of notice by registered or certified mail of a determination disallowing an objection, if prior to the lapse of such five days the person shall not have communicated to the Secretary of the Commission his intention to seek review by the Commission under § 201.431 of this chapter of the determination made by the Division; or

(2) If such a petition for review shall have been filed under § 201.431 of this chapter, upon final disposition thereof adverse to the petitioner.

(f) If the confidential portion is made available to the public, one copy thereof shall be attached to each copy of the material filed with the Commission and with each exchange.

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2012, I electronically filed the foregoing Opening Brief of Petitioners American Petroleum Institute, Chamber of Commerce of the United States of America, Independent Petroleum Association of America, and National Foreign Trade Council with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I also hereby certify that I caused 8 copies to be hand delivered to the Clerk's Office.

Service was accomplished on the following by the CM/ECF system:

Mark Pennington
penningtonm@sec.gov
Michael A. Conley
conleym@sec.gov
William K. Shirey
shireyw@sec.gov
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549

Howard M. Crystal
howardcrystal@meyerglitz.com
Meyer Glitzenstein & Crystal
1601 Connecticut Avenue, NW
Suite 700
Washington, DC 20009-1056

/s/ Eugene Scalia
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
(202) 955-8500
escalia@gibsondunn.com