No. 12-1398
Oral Argument Not Yet Scheduled

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

AMERICAN PETROLEUM INSTITUTE,
CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,
INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA, and
NATIONAL FOREIGN TRADE COUNCIL,

Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION,

Respondent.

OXFAM AMERICA, INC.,

Intervenor.

---

On Petition for Review of an Order of
the Securities and Exchange Commission

---

# BRIEF OF RESPONDENT SECURITIES AND EXCHANGE COMMISSION

---

MICHAEL A. CONLEY
Deputy General Counsel

WILLIAM K. SHIREY
Senior Litigation Counsel

THEODORE J. WEIMAN
Attorney

Securities and Exchange Commission
100 F. Street, N.E.
Washington, D.C. 20549
(202) 551-5167 (Weiman)

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties

All parties and intervenors appearing before the Commission and this Court are listed in petitioners' brief. In addition, the following have filed notices of intention to appear as *amici curiae* in this case: Senators Benjamin L. Cardin and Richard G. Lugar; Representative Edward J. Markey; and Better Markets, Inc.

### B. The ruling under review

On August 22, 2012, the Commission adopted the rule that petitioners challenge here in Disclosure of Payments by Resource Extraction Issuers, Securities Exchange Act Release 34-67717, which was published in the Federal Register at 77 FR 56,365 (Sept. 12, 2012).

### C. Related cases

Petitioners have filed suit in the U.S. District Court for the District of Columbia relating to the same claims. *See Am. Petroleum Inst. v. SEC*, No. 12-1668 (D.D.C. filed Oct. 10, 2012). That case is stayed pending a determination by this Court as to whether it possesses original jurisdiction over this petition for review.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................... vi

GLOSSARY AND ABBREVIATION CONVENTIONS .................................. xiii

PRELIMINARY STATEMENT ..................................................................... 1

JURISDICTIONAL STATEMENT ................................................................ 4

COUNTERSTATEMENT OF ISSUES ........................................................... 4

STATUTES AND REGULATIONS ............................................................... 5

COUNTERSTATEMENT OF THE CASE ....................................................... 5

A. Exchange Act Section 13(q) requires issuers to disclose payments made to foreign governments for the commercial development of oil, natural gas, or minerals. ....................................... 5

1. The "resource curse" and the potential transparency remedy ................................................................................. 6

2. The Extractive Industry Transparency Initiative was established in 2002 as a voluntary disclosure regime to address the resource curse. ................................................ 8

3. Congress concluded after several years of experience with EITI's voluntary regime that a mandatory disclosure requirement was necessary. ..................................... 10

4. In contrast to EITI, Section 13(q) requires mandatory public disclosure of detailed information about resource extraction payments to governments. ......................... 12

5. In enacting Section 13(q), Congress established "a new international standard" for mandatory public disclosure of payment information. ......................................... 15

B. The rulemaking process ................................................................. 16

**TABLE OF CONTENTS (cont'd)**

Page

1. The Commission afforded members of the public an extensive opportunity to provide comments, including data and economic analysis. .....................................16

2. The Commission declined to make certain changes that several industry commentators sought in the final rules because those changes were not consistent with either Section 13(q)'s text or transparency goals......................................................................17

   a. The Commission determined that Section 13(q) requires public disclosure of each issuer's individual payment information. ....................................17

   b. To afford issuers flexibility in applying the statutory term "project" to different business contexts, the Commission agreed with a major industry association and did not adopt a rule defining the term.............................................................19

   c. The Commission determined that exempting issuers from mandatory disclosure if such disclosure is prohibited by a host country's laws would be inconsistent with Section 13(q). .............20

3. The Commission considered the economic effects of Section 13(q) and Rule 13q-1, including the potential costs and benefits. ................................21

   a. The Commission qualitatively assessed the costs and benefits of Section 13(q) and Rule 13q-1. ...................................................................22

## TABLE OF CONTENTS (cont'd)

Page


b. Based on the data available to it, the Commission undertook a quantitative assessment of the potential direct compliance costs and potential losses that extraction issuers may experience if a host country's laws bar payment disclosure. ....................22

c. The Commission explained that the disclosure requirement's potential benefits from enhanced governmental accountability in host countries and other potential benefits could not be quantified. ....................23

STANDARD OF REVIEW ....................24

SUMMARY OF ARGUMENT ....................25

ARGUMENT ....................26

I. Petitioners have not demonstrated that the Commission acted arbitrarily or capriciously in assessing Rule 13q-1's economic implications....................26

A. The Commission reasonably assessed benefits....................27

B. The Commission reasonably assessed costs. ....................31

1. The Commission estimated the potential direct compliance costs. ....................31

2. The Commission assessed the potential costs should foreign countries bar disclosure. ....................35

3. Lacking empirical data, the Commission engaged in a qualitative assessment of other potential costs. ....................36

C. The Commission was not required to re-propose the rule. ....................37

II. The Commission did not act arbitrarily or capriciously in declining to adopt three proposals that petitioners advanced....................39

**TABLE OF CONTENTS (cont'd)**

Page


A. The Commission correctly determined that confidential submission of the payment information would be inconsistent with Section 13(q). ....................39

B. The Commission properly declined to create an exemption where payment disclosure is barred by a foreign government. ....................45

C. The Commission did not abuse its discretion in determining to provide interpretative guidance for the statutory term "project" rather than formally defining it....................50

III. Petitioners' First Amendment challenge lacks merit. ....................54

A. Petitioners waived any claim that Rule 13q-1 violates the First Amendment. ....................54

B. Section 13(q) does not implicate the First Amendment and, in any event, survives scrutiny under any standard of review. ....................54

CONCLUSION ....................64

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Cases: Page(s)

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
522 U.S. 359 (1998)....................24

*Allied-Signal, Inc. v. NRC*,
988 F.2d 146 (D.C. Cir. 1993)....................63

*Am. Bus. Ass'n v. Rogoff*,
649 F.3d 734 (D.C. Cir. 2011)....................24

*API v. OSHA*,
581 F.2d 493 (5th Cir. 1978)....................30

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*,
745 F.2d 677 (D.C. Cir. 1984)....................37

*Ass'n of Private Sector Colleges & Universities v. Duncan*,
681 F.3d 427 (D.C. Cir. 2012).................... 24-25, 28

*Bates v. City of Little Rock*,
361 U.S. 516 (1960)....................58

* *Business Roundtable v. SEC*,
647 F.3d 1144 (D.C. Cir. 2011)....................26

*Ctr. for Auto Safety v. NHTSA*,
244 F.3d 144 (D.C. Cir. 2001)....................44

* *Chamber of Commerce v. SEC*,
412 F.3d 133 (D.C. Cir. 2005)....................26, 28, 36, 37

* *Chamber of Commerce v. SEC*,
443 F.3d 890 (D.C. Cir. 2006)....................37, 38, 39

* Asterisks denote authorities principally relied upon.

Cases: Page(s)

*Charter Commc'ns, Inc. v. FCC*,
460 F.3d 31 (D.C. Cir. 2006) ..... 29-30

*Chisom v. Roemer*,
501 U.S. 380 (1991) ..... 45

*Citizens for Peace in Space v. City of Colorado Springs*,
477 F.3d 1212 (10th Cir. 2007) ..... 61

*City of Waukesha v. EPA*,
320 F.3d 228 (D.C. Cir. 2003) ..... 49

*Consumer Electric Association v. FCC*,
347 F.3d 291 (D.C. Cir. 2003) ..... 30, 31

*ConocoPhillips Co. v. EPA*,
612 F.3d 822 (5th Cir. 2010) ..... 28

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
472 U.S. 749 (1985) ..... 55

*Environmental Defense Ctr. v. EPA*,
344 F.3d 832 (9th Cir. 2003) ..... 58

* *FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ..... 27, 28, 48

*Fox v. Clinton*,
684 F.3d 67 (D.C. Cir. 2012) ..... 24, 50

*Franklin v. Kaypro Corp.*,
884 F.2d 1222 (9th Cir. 1987) ..... 40

*Gibson v. Fl. Legislative Investigation Committee*,
372 U.S. 539 (1963) ..... 58

**TABLE OF AUTHORITIES (cont'd)**


Cases: Page(s)

*Hercules Inc. v. EPA*,
938 F.2d 276 (D.C. Cir. 1991)....................52

*Inv. Co. Inst. v. Bd. of Governors of Fed. Reserve Sys.*,
551 F.2d 1270 (D.C. Cir. 1977)....................4

*John Doe No. 1 v. Reed*,
130 S.Ct. 2811 (2010)....................58

*Longman v. Food Lion, Inc.*,
197 F.3d 675 (4th Cir. 1999)....................40

*Milavetz, Gallop & Milavetz v. United States*,
130 S. Ct. 1324 (2010)....................59, 60

*Nat'l Assoc. of Home Builders v. EPA*,
682 F.3d 1032 (D.C. Cir. 2012)....................32

*Nat'l Ass'n of Manufacturers v. Taylor*,
582 F.3d 1 (D.C. Cir. 2009)....................61, 62

*Nat'l Electric Manufacturers Association v. Sorrell*,
272 F.3d 104 (2d Cir. 2001)....................54-55, 56

*Nat'l Multi Hous. Council v. EPA*,
292 F.3d 232 (D.C. Cir. 2002)....................54

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978)....................55

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*,
494 F.3d 188 (D.C. Cir. 2007)....................38

*Paris Adult Theater I v. Slaton*,
413 U.S. 49 (1973)....................62

## TABLE OF AUTHORITIES (cont'd)

Cases: Page(s)

*Pharm. Research & Mfrs. of Am. v. Thompson*,
251 F.3d 219 (D.C. Cir. 2001)........................................................ 24, 39-40

*Portland Cement Ass'n v. EPA*,
665 F.3d 177 (D.C. Cir. 2011)..........................................................24

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
487 U.S. 781 (1988)...........................................................................58, 59

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
547 U.S. 47 (2006)................................................................................57

*SEC v. Wall Street Publ'g Inst.*,
851 F.2d 365 (D.C. Cir. 1988)..........................................................58

*Schiller v. Tower Semiconductor Ltd.*,
449 F.3d 286 (2d Cir. 2006) ............................................................46

*Schreiber v. Burlington Northern, Inc.*,
472 U.S. 1 (1985)................................................................................40

*Speiser v. Randall*,
357 U.S. 513 (1958)............................................................................57

*Spirit Airlines, Inc. v. Dep't of Transp.*,
687 F.3d 403 (D.C. Cir. 2012)..........................................................60

*State of Oregon v. Watt*,
712 F.2d 584 (D.C. Cir. 1983)..........................................................32

*U.S. Dep't of Homeland Sec. v. FLRA*,
647 F.3d 359 (D.C. Cir. 2011)..........................................................48

*United States v. Weingarten*,
632 F.3d 60 (2d Cir. 2011) ...............................................................47

## TABLE OF AUTHORITIES (cont'd)

Cases: Page(s)

*United States v. Yunis*,
924 F.2d 1086 (D.C. Cir. 1991) .....47

*Wooley v. Maynard*,
430 U.S. 705 (1977) .....57

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*,
471 U.S. 626 (1985) .....58, 59, 60

Statutes and Regulations:

5 U.S.C. § 500 *et seq.* .....4, 25, 27, 57
12 U.S.C. § 1831m .....55
12 U.S.C. § 2803 .....55

Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq.*

Section 3(f), 15 U.S.C. § 78c(f) .....26
Section 12(h), 15 U.S.C. § 78*l*(h) .....46
Section 13(p), 15 U.S.C. § 78m(p) .....42
Section 13(q), 15 U.S.C. § 78m(q) ..... 2, 3, 5, 6, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 25, 26, 27, 29, 30, 39, 40, 41, 42, 43, 44, 45, 46, 47, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62
Section 23, 15 U.S.C. § 78w .....30
Section 25, 15 U.S.C. § 78y .....4

42 U.S.C. § 300j-4 .....56
42 U.S.C. § 11022 .....56
42 U.S.C. § 11023 .....56
42 U.S.C. § 11044 .....56

17 C.F.R. § 229 .....55
17 C.F.R. § 240.13q-1 ..... 2, 3, 4, 5, 9, 21, 22, 26, 27, 29, 37, 54, 59

## TABLE OF AUTHORITIES (cont'd)

Statutes and Regulations: Page(s)

17 C.F.R. § 249.308 ....................55
17 C.F.R. § 249.308a ....................55
17 C.F.R. § 249.310 ....................55

Adopting Release, Interactive Data to Improve Financial Reporting, Release No. 39-2461, Jan. 30, 2009, *published at* 74 FR 6776 (Feb. 10, 2009) ....................14

Federal Acquisition Circular 2005-49, Jan. 19, 2011, *published at* 76 FR 4188-01 (Jan. 24, 2011) ....................56

Extension of Comment Period, Release No. 34-63795, January 28, 2011, *published at* 76 FR 6111 (February 3, 2011) ....................16

Reporting Requirements on Responsible Investment in Burma, July 31, 2012, *published at* 77 FR 46,786 (Aug. 6, 2012) ....................56

Disclosure of Payments by Resource Extraction Issuers, Release No. 34-67717, *published at* 77 FR 56,365 (Sept. 12, 2012).................... 3, 6, 8, 17, 18, 19, 20, 21, 22, 23, 27, 29, 30, 31, 32, 33, 34, 35, 36, 37, 39, 44, 46, 48, 49, 50, 51, 52, 53

Other Authorities:

155 Cong. Rec. S9735-01 (Sept. 23, 2009) ....................11
156 Cong. Rec. S3648-01 (May 12, 2010) ....................16
156 Cong. Rec. S3801-02 (May 17, 2010) .......... 1, 2, 6, 7, 8, 11, 15, 44, 46, 60-61
156 Cong. Rec. S3965-03 (May 19, 2010) ....................6, 16
156 Cong. Rec. H4977-01 (June 29, 2010) ....................16
156 Cong. Rec. S5870-02 (July 15, 2010)....................2, 7, 8, 15, 44

EITI Board Paper 21-2-A "Building on Achievements" at 8 (Oct. 2012), *available at* http://eiti.org/files/Board%20Paper%2021-2-A%20Building%20on%20achievement %20-%20w%20B-F.pdf ....................45

**TABLE OF AUTHORITIES (cont'd)**

Other Authorities: Page(s)

Minutes from EITI Board Meeting, 25-26 Oct. 2012, *available at* http://eiti.org/files/Minutes-from-the-21st-EITI-Board-meeting-Lusaka.pdf ....................45

Extractive Industries Transparency Disclosure Act (H.R. 6066) ....................42, 43

Lynn M. LoPucki & Joseph W. Doherty, *Bankruptcy Fire Sales*, 106 MICH. L. REV. 1 (2007) ....................34

Mona V. Makhija et al., *Measuring Globalization of Industries Using a National Industry Approach: Empirical Evidence Across Five Countries and Over Time*, 28 J. OF INT'L BUS. STUDIES 679, 681 (1997) ....................38

President Barack Obama, Speech Before the United Nations General Assembly (Sept. 22, 2010) ....................15

Secretary of State Hillary Rodham Clinton, Speech at the Transparency International-USA's Annual Integrity Award Dinner (Mar. 22, 2012) *available at* http://www.state.gov/secretary/rm/2012/03/186703.htm ....................63

STAFF OF S. COMM. ON FOREIGN RELATIONS, 110TH CONG., THE PETROLEUM AND POVERTY PARADOX, at 11, 12 (Oct. 2008) ....................7, 10, 23, 24, 28

Transparency of Extractive Industries: High Stakes for Resource-Rich Countries, Citizens, and International Business, Hearing before the Committee on Financial Services, U.S. House of Representatives (No. 110-75) (Oct. 25, 2007) ....................10

## GLOSSARY AND ABBREVIATION CONVENTIONS

| | |
|---|---|
| APA | Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* |
| API | American Petroleum Institute |
| Br. __ | Brief for petitioners page citation |
| Commission | Securities and Exchange Commission |
| Dodd-Frank Act | Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 |
| EDGAR | Electronic Data Gathering, Analysis, and Reporting system |
| EITDA | Extractive Industries Transparency Disclosure Act of 2008 (H.R. 6066) |
| EITI | Extractive Industries Transparency Initiative |
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| FOIA | Freedom of Information Act, 5 U.S.C. § 552 |
| Government-level disclosures | Disclosures of "the type and total amount" of covered "payments made to each government" pursuant to 15 U.S.C. § 78m(q)(2)(A)(ii) |
| JA__ | Joint Appendix page citation |

| | |
|---|---|
| Project-level disclosures | Disclosures of “the type and total amount” of covered “payments made for each project” pursuant to 15 U.S.C. § 78m(q)(2)(A)(i) |
| Petitioners | Petitioners American Petroleum Institute, Chamber of Commerce of the United States of America, Independent Petroleum Association of America, and National Foreign Trade Council |
| 2008 Senate Resource Curse Report | Staff of Senate Committee on Foreign Relations, 110th Congress, The Petroleum and Poverty Paradox (Oct. 2008) |

No. 12-1398

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

AMERICAN PETROLEUM INSTITUTE,
CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,
INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA, and
NATIONAL FOREIGN TRADE COUNCIL,

Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION,

Respondent.

OXFAM AMERICA, INC.,

Intervenor.

---

On Petition for Review of an Order of
the Securities and Exchange Commission

---

BRIEF OF RESPONDENT
SECURITIES AND EXCHANGE COMMISSION

---

## PRELIMINARY STATEMENT

In July 2010, as part of the Dodd-Frank Act, Congress adopted a bi-partisan amendment that establishes "a new international transparency standard"[1] for

---

[1] 156 Cong. Rec. S3817 (May 17, 2010) (Sen. Dodd).

"public disclosure"[2] of payments to governments for the commercial development of oil, natural gas, or minerals. Codified as Section 13(q) of the Exchange Act, 15 U.S.C. § 78m(q), this provision directs the Securities and Exchange Commission to issue final rules that require each resource extraction issuer to include detailed payment information in an annual report.

A principal Congressional objective underlying Section 13(q) is to "help empower citizens to hold their governments to account for the decisions made by their governments in the management of valuable oil, gas, and mineral resources and revenues."[3] To this end, Congress intended for Section 13(q)'s mandatory disclosures to complement existing voluntary transparency efforts that "too many countries and too many companies" either had not joined or would not.[4] As a principal Congressional sponsor explained, the United States "cannot force foreign governments to treat their citizens as we would hope, but this amendment would make it much more difficult" for these governments "to hide the truth."[5]

On August 22, 2012, the Commission promulgated Rule 13q-1, 17 C.F.R. § 240.13q-1, and an amendment to Form SD to implement Section 13(q)'s

---

[2] *Id.* at S5872 (July 15, 2010) (Sen. Cardin).

[3] *Id.* at S3816 (May 17, 2010) (Sen. Lugar).

[4] *Id.* at S3815 (May 17, 2010) (Sen. Lugar).

[5] *Id.* at S3815 (May 17, 2010) (Sen. Lugar).

mandatory public disclosure requirement. *See* Disclosure of Payments by Resource Extraction Issuers, Release No. 34-67717, August 22, 2012, *published at* 77 FR 56,365 (September 12, 2012). Petitioners, ultimately unhappy with Congress's determination to compel the public disclosure of the payment information, now advance a series of meritless challenges.

Contrary to petitioners' argument that the Commission acted arbitrarily and capriciously by promulgating a rule without first determining whether Congress's sought-after transparency and accountability benefits would in fact materialize, the Commission rightly declined to second-guess the wisdom of Congress's policy determination. Moreover, in conducting its economic analysis, the Commission—which was generally dependent on industry commentators for empirical data—acted appropriately when it used the little data that they provided to quantitatively assess (and generally confirm) their claims about the potential costs of Rule 13q-1.

Further, the Commission properly rejected several proposals that petitioners advanced to weaken the mandatory disclosure requirement. In each instance, the Commission offered a reasoned basis for why it was not adopting the proposed change. For example, the Commission rejected petitioners' suggestion that they be permitted to submit the required payment information confidentially, with the Commission then aggregating all of the issuers' information together on a "per country basis," explaining that Section 13(q)'s text, structure, and purpose

demonstrate that Congress intended for public disclosure of each issuer's individual information.

Lacking meritorious APA arguments, petitioners attempt an eleventh-hour shift in strategy: they argue for the first time that the rule and the statute mandating it violate the First Amendment—an unprecedented attack on a disclosure requirement involving purely factual, non-ideological information that does not implicate any significant First Amendment interests. Tellingly, petitioners ignore *both* that regulated entities are subject to innumerable comparable federal, state, and local public reporting requirements *and* that their novel theory could have wide-ranging and potentially devastating implications for these important government programs.

**JURISDICTIONAL STATEMENT**

Section 25(a) of the Exchange Act, 15 U.S.C. 78y(a), which authorizes court of appeals review of "orders," gives this Court, rather than a district court, jurisdiction over this petition for review. *See Inv. Co. Inst. v. Bd. of Governors of Fed. Reserve Sys.*, 551 F.2d 1270, 1276-78 (D.C. Cir. 1977).

**COUNTERSTATEMENT OF ISSUES**

1. Did the Commission satisfy this Court's requirement that it consider as best it can Rule 13q-1's potential economic effects by quantifying potential costs where possible and otherwise qualitatively assessing the potential effects;

analyzing and considering commentators' cost estimates; and identifying and discussing uncertainties or limitations underlying the estimates of benefits and costs?

2. Did the Commission act reasonably when it declined to adopt three rule modifications suggested by petitioners where the Commission either (i) explained that the proposed alternative was inconsistent with Section 13(q) or (ii) advanced reasoned policy considerations for rejecting the proposal?

3. Have petitioners waived their First Amendment challenge to Rule 13q-1 because neither they nor any other commentator raised it during the rulemaking? In any event, are the required factual, non-ideological disclosures "compelled speech" in violation of the First Amendment?

## STATUTES AND REGULATIONS

The pertinent statutes and regulations are contained in the Addendum to petitioners' brief.

## COUNTERSTATEMENT OF THE CASE

### A. Exchange Act Section 13(q) requires issuers to disclose payments made to foreign governments for the commercial development of oil, natural gas, or minerals.

In July 2010, as part of the Dodd-Frank Act, Congress enacted new Exchange Act Section 13(q), also known as the Cardin-Lugar Amendment. Section 13(q) is primarily an effort by Congress to "help empower[] citizens" of

resource-rich countries through increased transparency "to hold their governments to account for the decisions involving the management of valuable oil, gas, and mineral resources and revenues."[6] 156 Cong. Rec. S3816 (May 17, 2010) (Sen. Lugar). Specifically, it imposes a new mandatory disclosure requirement on resource extraction issuers with respect to payments they make to governments for the commercial development of oil, natural gas, or minerals.

#### 1. The "resource curse" and the potential transparency remedy

As the legislative history makes clear, Section 13(q) was specifically crafted by Congress in an effort to address the "resource curse," the phenomenon whereby "oil, gas reserves, and minerals frequently can be a bane, not a blessing, for poor countries, leading to corruption, wasteful spending, military adventurism, and instability. Too often, oil money intended for a nation's poor ends up lining the pockets of the rich or is squandered on showcase projects instead of productive investments." *Id.* at S3816 (May 17, 2010) (Sen. Lugar). *See also id*. at S3976 (May 19, 2010) (Sen. Feingold) ("In far too many countries, natural resource wealth has fueled corruption and conflict rather than growth and development."). The result is that many of the world's "most wealthy mineral countries are the

---

[6] The legislative history also indicates that Congress intended for the Section 13(q) disclosures to serve as an informational tool for investors. In adopting Rule 13q-1, the Commission acknowledged that some investors may find the disclosures beneficial. 77 FR 56,397/3, 56,398/2-3, 56,399/1.

poorest countries" in terms of their citizens' quality of life. *Id.* at S5872 (July 15, 2010) (Sen. Cardin). A contributing factor in many of these countries is that "governance and accountability systems are rudimentary, at best," and "corruption, secrecy and a lack of transparency regarding public finance are pervasive." *Id.* at S3817 (May 17, 2010) (Sen. Dodd).

The resource curse in poor countries also has detrimental effects on the United States. For example, it "exacerbates global poverty which can be a seedbed for terrorism, it empowers autocrats and dictators, and it can crimp world petroleum supplies by breeding instability." *Id.* at S3816 (May 17, 2010) (Sen. Lugar).

Although there is "no simple cure for the resource curse," in recent years there has been an increased focus on the role that improved payment transparency may play in helping to combat it. STAFF OF S. COMM. ON FOREIGN RELATIONS, 110TH CONG., THE PETROLEUM AND POVERTY PARADOX, at 11, 12 (Oct. 2008) (hereinafter "SENATE RESOURCE CURSE REPORT").[7] "By giving the citizens the information about how payments are made to their country, they have a much better chance to hold their government officials accountable." 156 Cong. Rec.

[7] Section 13(q) "builds on the findings" of this report, which among other things includes case studies of countries suffering from the resource curse. 156 Cong. Rec. S3816 (May 17, 2010) (Sen. Lugar); *id.* at S3817 (May 17, 2010) (Sen. Dodd). The full 125-page report is available at: http://www.gpo.gov/fdsys/pkg/CPRT-110SPRT44727/pdf/CPRT-110SPRT44727.pdf.

S5872 (July 15, 2010) (Sen. Cardin). This may in turn help them "ensure that their country's natural resource wealth is used wisely for the benefit of the entire nation and for future generations." *Id.* at S5873 (July 15, 2010) (Sen. Cardin). *See also* 77 FR 56,366/1 ("A primary goal of such transparency is to help empower citizens of those resource-rich countries to hold their governments accountable for the wealth generated by those resources.").

Further, to the extent that increased transparency helps combat the resource curse, this may "benefit Americans at home." 156 Cong. Rec. S3816 (May 17, 2010) (Sen. Lugar). Improved governance "will improve investment climates for our companies abroad, it will increase the reliability of commodity supplies upon which businesses and people in the United States rely, and it will promote greater energy security." *Id.* (May 17, 2010) (Sen. Lugar).

#### 2. The Extractive Industry Transparency Initiative was established in 2002 as a voluntary disclosure regime to address the resource curse.[8]

In 2002, an international coalition that included various foreign governments, international organizations, and resource extraction issuers established the Extractive Industries Transparency Initiative to help combat the resource curse. EITI, which seeks to foster and improve transparency and accountability in countries rich in oil, natural gas, or minerals, established a

[8] The discussion in this section is based on the description of EITI in the adopting release. *See* 77 FR 56,366/2-3 n.14, 56,367/3 n.27.

framework for the reconciliation of company payments and government revenues from these natural resources.

The EITI framework includes several critical features:

- Countries volunteer to comply with EITI's disclosure regime. To obtain EITI compliance, a country must, among other requirements, develop a reporting template that establishes what payment information will be provided by the governments and companies operating in that country, including the degree of aggregation of data.

- To seek "EITI compliant" status, countries must also complete a reconciliation process in which company payments are matched with government revenues by an independent administrator. As part of this process, companies and the government generally each submit payment information confidentially to the administrator.

- The administrator then reconciles the information that the companies and the government provided it and produces a public report. The information disclosed in the report is determined by each country's particular EITI work plan and varies widely among countries.

At the time the Commission promulgated Rule 13q-1, only fourteen countries had achieved EITI-compliant status.

### 3. Congress concluded after several years of experience with EITI's voluntary regime that a mandatory disclosure requirement was necessary.

By 2008, Congress became aware that a mandatory disclosure regime was needed to complement the voluntary EITI regime to achieve significant international gains in payment transparency.[9] As explained in the 2008 Senate Resource Curse Report:

> United States and multilateral efforts to promote extractive industries transparency are intended to work within the bounds of the political will and technical capacity of the resource-rich countries. With their revenue windfall, some of these nations are increasingly intransigent in resisting outside pressure. This has led some to urge that the U.S. should take steps domestically to promote transparency overseas, much as the Foreign Corrupt Practices Act was U.S. domestic legislation to thwart corruption abroad. One such proposal is to mandate revenue reporting for companies listed with the Securities and Exchange Commission and working in extractives abroad.

SENATE RESOURCE CURSE REPORT at 20. This report's findings served as the basis for Section 13(q). *See supra* note 7.

Similarly, in 2009, when Senator Lugar first introduced in the Senate the provision that ultimately became Section 13(q), he explained that it was an

---

9 *See, e.g.*, Transparency of Extractive Industries: High Stakes for Resource-Rich Countries, Citizens, and International Business, Hearing before the Committee on Financial Services, U.S. House of Representatives (No. 110-75) (Oct. 25, 2007) at 7 (testimony of Ian Gary) ("EITI may make progress in some countries where political will to tackle the problem is strong and lasting, and requires the active involvement of civil society. But the initiative is weakened by its voluntary nature and will not capture many countries where problems are most severe.").

important further step in international transparency because it would “allow people to have information about the funds sent to their governments in non-EITI implementing countries.” 155 Cong. Rec. S9746 (Sept. 23, 2009) (Sen. Lugar).

The distinct role of Section 13(q) in achieving the disclosure of payments to “intransigent” governments was again emphasized during the floor debate on Dodd-Frank:

> We currently have a voluntary international standard for promoting transparency. A number of countries and companies have joined [EITI], an excellent initiative that has made tremendous strides in changing the cultural secrecy that surrounds extractive industries. But too many countries and too many companies remain outside this voluntary system.

156 Cong. Rec. S3815 (May 17, 2010) (Sen. Cardin). *See also id.* S3818 (May 17, 2010) (Sen. Dodd) (stating that “broad new requirements for greater disclosure by resource extractive companies operating around the world[] would be an important step” to complement EITI’s “voluntary program”).

### 4. In contrast to EITI, Section 13(q) requires mandatory public disclosure of detailed information about resource extraction payments to governments.

Section 13(q), unlike EITI, imposes a mandatory disclosure requirement on resource extraction issuers for payments relating to the "commercial development of oil, natural gas, or minerals."[10] Specifically, Section 13(q) directs the Commission to

> issue final rules that require each resource extraction issuer to include in an annual report of the resource extraction issuer information relating to any payment made by the resource extraction issuer, a subsidiary of the resource extraction issuer, or an entity under the control of the resource extraction issuer to a foreign government or the Federal Government for the commercial development of oil, natural gas, or minerals[.]
>
> This disclosure requirement relates to any payment that is:
>
> - "made to further the commercial development of oil, natural gas, or minerals; and
> - not de minimis; and
> - includes taxes, royalties, fees (including license fees), production entitlements, bonuses, and other material benefits, that the Commission, consistent with the guidelines of [EITI] (to the extent practicable), determines are part of the commonly recognized revenue stream for the commercial development of oil, natural gas, or minerals[.]"

---

10 Section 13(q) defines a resource extraction issuer as an issuer of securities that "(i) is required to file an annual report with the Commission" and that "(ii) engages in the commercial development of oil, natural gas, or minerals."

Section 13(q) identifies two categories of payment disclosures that resource extraction issuers must provide:

(1) "the type and total amount of [payments] made for each project of the resource extraction issuer relating to the commercial development of oil, natural gas, or minerals" (*i.e.*, project-level disclosures); and

(2) "the type and total amount of such payments made to each government" (*i.e.*, government-level disclosures). Government-level disclosures involving payments to foreign governments require an issuer to classify the payments according to which "department, agency, or instrumentality of a foreign government, or a company owned by a foreign government," received it.

Further, Section 13(q) provides that the Commission's rules "shall require that the information included in the annual report of a resource extraction issuer be submitted in an interactive data format." Section 13(q) also requires that the payment information be electronically identifiable by:

- "the total amounts of the payments, by category;"
- "the currency used to make the payments;"
- "the business segment of the resource extraction issuer that made the payments;"
- "the government that received the payments, and the country in which the government is located;" and
- "the project of the resource extraction issuer to which the payments relate[.]"

As the Commission has previously explained, disclosing information in such an interactive data format can allow investors and other members of the public to electronically search, retrieve and use the information in documents filed with the Commission. Adopting Release, Interactive Data to Improve Financial Reporting, Release No. 39-2461, Jan. 30, 2009, *published at* 74 FR 6776, 6777/2 (Feb. 10, 2009).

Section 13(q) also requires that the issuers' disclosures be made public, *see infra* Part II(A), and that, "to the extent practicable," the Commission shall make publicly available a compilation that, at a minimum, includes each issuer's individual project-level and government-level disclosures.

### 5. In enacting Section 13(q), Congress established "a new international standard" for mandatory public disclosure of payment information.

In enacting Section 13(q), Congress intended to make the United States the global "leader in creating a new standard for revenue transparency in the extractive industries." 156 Cong. Rec. S5873 (July 15, 2010) (Sen. Cardin).[11] The Senate floor discussions on the Section 13(q) amendment confirm this:

- "[W]e are creating a new standard of transparency that will apply to the world's extractive industries …." (*Id.* at S3815 (May 17, 2010) (Sen. Cardin));

- The amendment will establish "a historic transparency standard that will pierce the veil of secrecy that fosters so much corruption and instability in resource-rich countries …." (*Id.* (May 17, 2010) (Sen. Cardin)); and

- "[T]he Lugar-Cardin Amendment[] is a first step toward addressing [the resource curse] by setting a new international standard for disclosure." (*Id*. at S3817-18 (May 17, 2010) (Sen. Dodd)).

The legislative record also confirms that the Section 13(q) disclosures were to be made publicly available:

- "This [amendment] will require public disclosure of those payments." (*Id.* at S5872 (July 15, 2010) (Sen. Cardin)); and

- "This amendment would require companies listed on U.S. stock exchanges to disclose in their SEC filings extractive payments made to

---

[11] *See also* President Barack Obama, Speech Before the United Nations General Assembly (Sept. 22, 2010) ("So we are leading a global effort to combat corruption, which in many places is the single greatest barrier to prosperity, and which is a profound violation of human rights. That's why we now require oil, gas and mining companies that raise capital in the United States to disclose all payments they make to foreign governments.").

> foreign governments for oil, gas, and mining. This information would then be made public, empowering citizens in resource-rich countries in their efforts to combat corruption and hold their governments accountable." (*Id.* at S3976 (May 19, 2010) (Sen. Feingold)).[12]

### B. The rulemaking process

#### 1. The Commission afforded members of the public an extensive opportunity to provide comments, including data and economic analysis.

Following the enactment of Section 13(q), the Commission invited interested members of the public to submit pre-proposal comment letters. After considering these, the Commission proposed the rules under review here on December 15, 2010. JA1. The Commission initially provided a 45-day comment period, but subsequently extended that period for an additional 30 days to allow the public additional time to comment on the proposed rules, to respond to other comment letters, and to provide data. Extension of Comment Period, Release No. 34-63795, January 28, 2011, *published at* 76 FR 6111 (February 3, 2011). After the close of the formal comment period, the Commission continued to receive comment letters. All of these letters, including those received after the formal

---

[12] *See also, e.g.*, 156 Cong. Rec. H5199 (June 29, 2010) (Joint Explanatory Statement of the Committee of Conference) (the amendment "requires *public* disclosure to the SEC of any payment relating to the commercial development of oil, natural gas, and minerals") (emphasis added); *id.* at S3649 (May 12, 2010) (proposed "sense of Congress" accompanying amendment that became Section 13(q)) (encouraging the President to "work with foreign governments" to establish their own "domestic requirements that companies under [their jurisdiction] *publicly disclose* any payments made to a government" for resource extraction) (emphasis added).

comment period, were considered by the Commission in formulating the final rules.

The Commission received approximately 150 unique comment letters on the proposal. 77 FR 56,367/2. Many commentators, including petitioner API, wrote multiple letters commenting not just on the proposal, but on arguments that other commentators made. Generally speaking, commentators agreed that greater transparency and accountability with respect to resource extraction payments is important to help overcome the resource curse. *Id.* The commentators sharply disagreed, however, over how Section 13(q) should be interpreted and implemented to best achieve this result.

### 2. The Commission declined to make certain changes that several industry commentators sought in the final rules because those changes were not consistent with either Section 13(q)'s text or transparency goals.

#### a. The Commission determined that Section 13(q) requires public disclosure of each issuer's individual payment information.

Some industry commentators recommended that the Commission allow resource extraction issuers to make their own individual government-level and project-level disclosures to the Commission on a confidential basis, with the Commission then using that individualized information to create an anonymized "compilation" that would aggregate the information of all the issuers together on a "per-country or similarly high-level basis"; only the anonymized compilation

would be made publicly available. 77 FR 56,390/1.

The Commission rejected this approach, explaining that Section 13(q) requires public disclosure of each issuer's individual payment information. *Id.* at 56,391/1-2. The adopting release identifies a number of considerations supporting this conclusion:

- Existing Exchange Act disclosure provisions require issuers to publicly file annual, quarterly and current reports;

- Section 13(q)(3)(B)—which follows the provision that directs the Commission "to the extent practicable" to make available online a "compilation of the information" the resource extraction issuers are required to submit—makes clear that, at a minimum, any public compilation must include each issuer's individual government-level and project-level disclosures; and

- Section 13(q)(2) requires that the disclosures be submitted in an interactive data format, which suggests that Congress intended the information to be provided in a format that allows users to easily extract information most relevant to them.

*Id.* The Commission also explained that Section 13(q)'s transparency goal provides support for the conclusion that Congress intended for the issuers' individual disclosures to be made publicly available. *Id.*

**b. To afford issuers flexibility in applying the statutory term "project" to different business contexts, the Commission agreed with a major industry association and did not adopt a rule defining the term.**

As stated above, Section 13(q) requires resource extraction issuers to make project-level disclosures of payments; but Section 13(q) neither defines "project" nor requires the Commission to do so. Commentators differed on whether the Commission should define "project" and, if so, how. For example, one major industry organization expressed the view that the Commission should leave "project" undefined to allow businesses flexibility, while certain other industry commentators recommended various broad definitions. 77 FR 56,383/3-56,384/3.

The adopting release explains that the Commission determined not to define "project" to afford issuers flexibility in applying the term to different business contexts. *Id.* at 56,385/2. The adopting release further explains that, although the term "is used within the extractive industry in a variety of contexts" and thus "there does not appear to be a single agreed-upon application" to support a one-size-fits-all definition, individual issuer's Exchange Act reports and other public statements demonstrate that they understand in any particular context what constitutes their own "projects." *Id.*

The Commission provided guidance about the meaning of "project," however, explaining that issuers can generally look to the underlying contractual arrangements with a government to determine the term's application in any given

context. *Id.* at 56,385/2, 56,406/1. As the adopting release states, "[t]he contract defines the relationship and payment flows between the resource extraction issuer and the government, and therefore, we believe it generally provides a basis for determining the payments, and required payment disclosure, that would be associated with a particular 'project.'" *Id.* at 56,385/2-3, 56,406/1.

#### c. The Commission determined that exempting issuers from mandatory disclosure if such disclosure is prohibited by a host country's laws would be inconsistent with Section 13(q).

Some industry commentators recommended that the Commission grant exemptions if disclosure is prohibited by the host country's law. 77 FR 56,370/2-3. They asserted that, without such an exemption, resource extraction issuers might be foreclosed from bidding on future contracts in these countries and might also be required to sell existing projects located there, causing significant losses and impacting their competitive position. *Id.*

The Commission determined not to adopt such an exemption, however. As the adopting release explains, an exemption in these situations would be inconsistent with Section 13(q) and would undermine Congress's intent to promote international transparency. *Id.* at 56,413/1. For example, such an exemption "could undermine the statute by encouraging countries to adopt laws, or interpret existing laws, [to] specifically prohibit[] the disclosure required under the final rules." *Id.* at 56,372/3-56,373/1. Further, the adopting release explains that an

exemption may not be necessary because: (i) it is unclear from the record before the Commission that any host country's laws in fact prohibit the payment disclosure; (ii) reporting companies may be able to seek authorization from the host country in order to make the disclosures; and (iii) the widening global influence of other international transparency initiatives may discourage countries from adopting new prohibitions. *Id.* at 56,413/1-2.

#### 3. The Commission considered the economic effects of Section 13(q) and Rule 13q-1, including the potential costs and benefits.

In the proposing release, the Commission requested that commentators "provide empirical data" on the proposed rule's potential economic effects because the Commission generally lacked access to such data. JA21/3. Industry commentators responded by asserting that the rules would have several adverse economic effects, including significant direct compliance costs. *See, e.g.*, JA165 (API: rules could "place U.S. filers at a competitive disadvantage"); JA166 (API: "could harm investors, reduce competition, and impair efficiency"). But they generally did not provide data or other quantitative analysis to support their claims. 77 FR 56,399/2-3.

Nonetheless, pursuant to this Court's instruction that the Commission determine as best it can the economic implications of the rules it promulgates, the

adopting release assesses Section 13(q) and Rule 13q-1's potential effects on competition, efficiency, and capital formation. 77 FR 56,397/1-56,413/2.

### a. The Commission qualitatively assessed the costs and benefits of Section 13(q) and Rule 13q-1.

The Commission engaged in a qualitative assessment that comprehensively considered the rule's potential economic effects, as well as its potential costs and benefits. *Id.* at 56,398/2-56,408/1. This analysis discussed the economic effects of both the mandatory public disclosure requirement and various specific discretionary choices that the Commission made. *Id.*

### b. Based on the data available to it, the Commission undertook a quantitative assessment of the potential direct compliance costs and potential losses that extraction issuers may experience if a host country's laws bar payment disclosure.

In addition, where possible, the Commission sought to quantitatively assess the potential economic effects. *Id.* at 56,408/1-56,413/2. *See also id.* at 56,403/3 (explaining that the Commission was "unable to quantify the impact" of certain key discretionary choices because "reliable, empirical evidence regarding the effects is not readily available to the Commission").

Relying on firm-specific data for five firms supplied by industry commentators, the Commission engaged in a quantitative analysis of issuers' potential compliance costs to assess the industry commentators' general claims about the potential industry-wide costs. *Id.* at 56,408/1-56,413/2. Further,

although commentators generally did not provide the Commission with any data concerning the potential costs associated with projects in host countries where disclosure may be prohibited, the Commission used data from public annual filings of potential affected issuers to assess industry commentators' general claims about the potential industry-wide losses. *Id.* at 56,411/1-3.

#### c. The Commission explained that the disclosure requirement's potential benefits from enhanced governmental accountability in host countries and other potential benefits could not be quantified.

As stated in the adopting release, "Congress' goal of enhanced government accountability through Section 13(q) is intended to result in social benefits that cannot be readily quantified with any precision." *Id.* at 56,408/1. Moreover, "[u]nlike many of the Commission's rulemakings," the benefits sought here are not "ones that will necessarily generate measurable, direct economic benefits to investors or issuers." *Id.* at 56,403/2, 56,408/1; *see also id.* at 56,398/2.

The Commission's conclusion is consistent with the apparent Congressional awareness that Section 13(q)'s potential transparency benefits could not be quantified. Specifically, the 2008 Senate Resource Curse Report, which set forth the findings on which Section 13(q) was based, found that although there are "many encouraging anecdotes on the benefits of improved transparency," "there is not yet a compelling body of evidence to prove the case that improved transparency will bring improved governance and economic development."

SENATE RESOURCE CURSE REPORT at 5; *see also id.* at 13 ("[A]t this early stage in the progress of extractives transparency, it is difficult to find conclusive empirical data showing that greater transparency for resource rich countries leads to higher GDP growth.").

## STANDARD OF REVIEW

In reviewing an agency's interpretation of a statute that it is required to implement, this Court will engage in a *de novo* review "using traditional tools of statutory interpretation—text, structure, purpose, and legislative history"—to determine if the statute has an unambiguous meaning. *Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001). "This Court also reviews *de novo* a 'constitutional challenge to a statute.'" *Am. Bus. Ass'n v. Rogoff*, 649 F.3d 734, 737 (D.C. Cir. 2011).

In addition, "[t]o survive arbitrary and capricious review, an agency action must be the product of reasoned decisionmaking." *Fox v. Clinton*, 684 F.3d 67, 74-75 (D.C. Cir. 2012). Under this standard, this Court will affirm the agency's action if it is the result of a "logical and rational" process, *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998), in which the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[s]," *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (internal quotation marks omitted). This review is "fundamentally deferential." *Ass'n of*

*Private Sector Colleges & Universities v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012).

## SUMMARY OF ARGUMENT

I. Petitioners have not shown that the Commission failed to assess the rule's economic implications as best it could, nor have they shown that their quibbles with the economic analysis constitute prejudicial error that violates the APA. Further, the Commission was not required to re-propose the rule with its costs estimates because, among other reasons, the Commission used a common method of extrapolating from firm-specific to industry-wide estimates, and petitioners could have submitted data concerning costs when they had the opportunity during the rulemaking.

II. The Commission did not act arbitrarily or capriciously in rejecting the three rule modifications that petitioners sought. *First*, Section 13(q) unambiguously requires *public* disclosure of the payment information that issuers submit. *Second*, the Commission reasonably determined that providing an exemption if a host country's law bars disclosure would be inconsistent with the Congressional purpose to compel payment disclosure as to those countries that refuse to do so voluntarily. *Lastly*, the Commission did not abuse its discretion in declining to adopt a one-size-fits-all definition for the statutory term "project" in

order to provide issuers flexibility to apply the term to their various business contexts.

III. Petitioners' First Amendment challenge to Rule 13q-1 is waived because neither they nor any other commentator raised it during the rulemaking; petitioners' First Amendment challenge is therefore limited to Section 13(q). But even that challenge fails because the mandatory disclosure of purely factual, non-ideological information here is not "compelled speech" in violation of the First Amendment.

## ARGUMENT

### I. Petitioners have not demonstrated that the Commission acted arbitrarily or capriciously in assessing Rule 13q-1's economic implications.

When engaged in rulemaking under the Exchange Act, the Commission is required to "consider whether the [rule] will promote efficiency, competition, and capital formation." 15 U.S.C. 78c(f). To satisfy this requirement, the Commission must "determine *as best it can* the economic implications of the rule." *Business Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (quoting *Chamber of Commerce v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005) [*Chamber I*]) (emphasis added). Contrary to petitioners' contention, the Commission met that standard here: the adopting release considers the rule's potential economic effects by quantifying costs where possible and otherwise providing qualitative analysis; to

the limited extent that commentators provided cost estimates, the release analyzes those estimates; and the release discusses uncertainties underlying the estimates of benefits and costs.

**A. The Commission reasonably assessed benefits.**

Petitioners incorrectly contend that the Commission erred in assessing Rule 13q-1's benefits both by not relying on an empirical analysis (at 41) and by being "indeterminate" about the "Rule's effectiveness in achieving [Congress's] goal" of helping promote accountability through transparency (at 40).

As the Supreme Court has admonished, "[i]t is one thing to set aside agency action under the [APA] because of failure to adduce empirical data that can readily be obtained. It is something else to insist upon obtaining the unobtainable." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 519 (2009) (internal citation omitted). Empirical evidence regarding the social benefits that may result from the transparency and "enhanced government accountability" that Congress intended when it enacted Section 13(q) (77 FR 56,408/1) was not obtainable. For that reason, as the Commission explained, these social benefits "cannot be readily quantified with any precision." *Id.; see also id.* at 56,398/2 (explaining that these social benefits "do not appear to be ones that will necessarily generate measurable, direct economic benefits to investors or issuers").

Petitioners have not demonstrated that the Commission acted unreasonably in concluding that it could not quantify the social benefits that may result. "There are some propositions for which scant empirical evidence can be marshaled," *Fox Television Stations*, 556 U.S. at 519, and in such instances "the agency is well within its discretion to regulate on the basis of available information," *ConocoPhillips Co. v. EPA*, 612 F.3d 822, 841 (5th Cir. 2010). *See also Chamber I*, 412 F.3d at 142 ("an agency need not—indeed cannot—base its every action upon empirical data"). Indeed, the soundness of the Commission's conclusion is buttressed by both the Senate Resource Curse Report, *see supra* pp. 23-24, which also found that there is not yet empirical evidence demonstrating the benefits of payment transparency, and the fact that petitioners and other commentators did not offer either empirical data or a methodology for quantifying benefits, *cf. Duncan*, 681 F.3d at 448 (rejecting challenge to a rule where the petitioner pointed to no study or empirical data that the agency ignored).

Petitioners fare no better in their related argument (at 40) that the Commission erred by not definitively concluding that payment transparency would achieve Congress's ultimate goal of greater accountability in resource-rich countries. The absence of an express Commission determination surely caused no prejudice. Neither the petitioners nor any other commentator disputed during the rulemaking the potential benefits that enhanced transparency can have on

government accountability in resource-rich countries. Indeed, the voluntary participation of many of petitioners' members in EITI demonstrates that they themselves believe that payment transparency can contribute to better governance, helping to yield the very social benefits that Congress sought.

But in any event, where, as here, Congress makes a legislative determination that a particular regulatory approach is necessary to address a public policy issue and directs an agency to implement that specific regulatory approach, the agency's responsibility is to faithfully execute Congress's mandate. In the context of Section 13(q)'s specific mandate, the Commission's responsibility was not, as petitioners suggest, to revisit Congress's judgment about the wisdom of payment transparency, but to promulgate a rule that faithfully and effectively implements the new transparency requirement that Congress enacted. In assessing the benefits, therefore, it was both appropriate and sufficient for the Commission to focus—as it did[13]— on determining the extent to which Rule 13q-1 "contribut[es] toward speeding achievement of [the] congressional mandate." *Charter Commc'ns, Inc. v.*

---

[13] *See, e.g.*, 77 FR 56,405/1 ("should help promote comparability and support international transparency promotion efforts"); *id.* at 56,405/1 ("should help further the goal of supporting international transparency promotion efforts and enhance the effectiveness of the disclosure").

*FCC*, 460 F.3d 31, 42 (D.C. Cir. 2006) (discussing *Consumer Elec. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003)).[14]

Similarly, because Congress itself made the specific determination that transparency is a necessary means to help promote governmental accountability, Section 23(a)(2) of the Exchange Act, 15 U.S.C. § 78w(a)(2), cannot be read to authorize the Commission either to second-guess the wisdom of Congress's policy determination or to adopt petitioners' proposed changes, *see infra* Part II, where doing so would contravene Section 13(q)'s text, structure, or purpose. *See, e.g.*, 77 FR 56,402/3-56,403/1 ("[W]e believe the competitive burdens arising from the need to make the required disclosures under the final rules are necessary by the terms of, and in furtherance of the purposes of, Section 13(q)."). Neither the *general* requirement to consider efficiency, competition, and capital formation, nor the *general* requirement to ensure that Commission rules do not unnecessarily or inappropriately burden competition, permits the Commission to ignore Congress's *specific* policy judgments and statutory directives.

---

[14] Section 13(q)'s specific Congressional mandate distinguishes this case from *API v. OSHA*, 581 F.2d 493, 501 (5th Cir. 1978), which petitioners cite (at 41). There, OSHA was operating under general statutory authority that empowered it to adopt regulations "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." *Id.* at 500-02. Because Congress had not made any specific determinations about what regulatory options should be adopted, OSHA necessarily needed to demonstrate that any particular initiative would achieve the benefits that Congress broadly empowered OSHA to pursue.

### B. The Commission reasonably assessed costs.

Throughout this rulemaking, the Commission has confronted the reality that relevant data regarding costs was held by affected issuers and the Commission had a limited basis to test industry's estimates of such costs. Although the Commission expressly asked commentators to provide empirical data (*id.*), they provided very little. Nonetheless, the Commission used the limited data that commentators provided, supplemented by data from issuers' public filings and a commonly used publicly available database (Compustat®), to allow, to the extent possible, a fuller consideration of the rule's potential economic effects in order to assess industry commentators' claims about the potential industry-wide costs. *See, e.g.*, 77 FR 56,408/1-2 n.616, 56,511/1-3. *Cf. Consumer Electronic Assoc. v. FCC*, 347 F.3d 291, 302 (D.C. Cir. 2003) (suggesting agency should engage in an "independent assessment" of commentators' estimates if possible).

Generally speaking, the critical result from the Commission's empirical estimates—which petitioners largely ignore—was that, using the limited data available to it, *the Commission confirmed the industry commentators' own cost projections*.

#### 1. The Commission estimated the potential direct compliance costs.

Following this Court's directive to do what it can to assess likely costs, the Commission used the *only* direct compliance-cost data that commentators

provided—two firm-specific estimates of initial costs and three firm-specific estimates of on-going costs. 77 FR 56,408/2, 56,410/1-2. To obtain a general sense of the potential industry-wide costs, the Commission used this data to extrapolate initial and ongoing total industry-wide compliance costs to assess petitioner API's claim that such costs could potentially total hundreds of millions of dollars. *See id.* at 56,408/1-56,413/2 & n.621; *see also id.* n.532.

Significantly, the Commission's estimates of direct compliance costs were largely in line with petitioner API's projections—a fact that petitioners ignore. *See, e.g.*, 77 FR 56,410/1 ("This estimate is consistent with two commentators' qualitative estimates of initial implementation costs."); *see also, e.g., id.* at 56,411/3. Since the Commission confirmed and essentially *accepted* petitioners' cost estimates, their more specific challenges to particular components of the Commission's cost analysis fall far short of meeting their "high" burden to show prejudicial error. *Nat'l Assoc. of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012) ("[I]n view of the complex nature of economic analysis typical in the regulation promulgation process, [petitioners'] burden to show error is high."). *See also State of Oregon v. Watt*, 712 F.2d 584, 605 & n.105 (D.C. Cir. 1983) (concluding that any error with agency's cost-benefit analysis was not sufficient to warrant remand where agency used the analysis "only for generalized conclusions"

such as assessing "order of magnitude approximation" and not "for making narrow distinctions" between potential regulatory alternatives).

In any event, contrary to petitioners' contention (at 42-43), the Commission's assumption for purposes of assessing initial compliance costs that these costs vary based on an issuer's size (77 FR 56,410/1) did not render that assessment arbitrary or capricious. *First*, petitioner API actually told the Commission that the compliance efforts will vary based on issuers' size, and so petitioners cannot now claim prejudicial error. JA169 ("the relative level of effort to meet the requirements will be roughly proportional to company size"). *Second*, the Commission expressly acknowledged uncertainty about this assumption and stated that there may be "substantial fixed costs to compliance that are underestimated." 77 FR 56,410/1. *Third*, because of this and two other potential limitations to the accuracy of its estimate, the Commission concluded "that the total initial compliance costs for all issuers are likely to be near the upper bound of approximately $1 billion," *id.*, which of course was in line with petitioner API's assessment of "hundreds of millions of dollars," *id.* n.621 (quoting JA211 (API) and JA46 (ExxonMobil)).

Petitioners also erroneously contend (at 42) that the Commission "made sharply different assumptions about the total assets owned" by extraction issuers in method 1 (which estimates industry-wide compliance costs based on estimate of an

average issuer's compliance costs) and method 2 (which estimates industry-wide compliance costs based on estimates of the average small and average large issuers' compliance costs). But the Commission did not make "different assumptions" about total issuer assets; rather, as the adopting release explains, both methods relied on data from Compustat®, *id.* at 56,408/2 n.616, a comprehensive database routinely used by the Commission and others in empirical assessments involving public companies.[15] *See, e.g.*, Lynn M. LoPucki & Joseph W. Doherty, *Bankruptcy Fire Sales*, 106 MICH. L. REV. 1, 21-22 n.96 (2007). And in any event, petitioners have not demonstrated any prejudicial error, which would of course be particularly difficult for them to do because the Commission's estimates of initial compliance costs were in the same range as those petitioner API claimed during the rulemaking.

[15] Petitioners base their mistaken contention that the Commission made different assumptions about total issuer assets on the fact that the average large and small issuer compliance costs from method 2, when weighted by the respective percentages of large issuers (37%) and small issuers (63%), do not sum to the average issuer compliance cost from method 1. Br. 21, n.2. The disparity in the two figures results from two characteristics of the Compustat® data set. *First*, the Compustat ® database does not contain data for all small issuers; the percentage of small and large extraction issuers in the Compustat® data set is 48% and 52%, respectively—not the 63% and 37% actual market breakdown of large and small extraction issuers reflected in Commission's EDGAR filings. *Second*, because Compustat® lacks end-of-the-fiscal-year stock prices for some issuers, they could not be classified as either large or small issuers and were excluded from the method 2 calculation. As noted above, this database is commonly used and thus these data set characteristics are well understood and do not affect the validity of the Commission's analytical approach.

### 2. The Commission assessed the potential costs should foreign countries bar disclosure.

Petitioners erroneously claim that the Commission prejudicially underestimated the potential costs from not exempting issuers from disclosing payments to countries with laws that may preclude such disclosure. As the adopting release explains, the Commission relied on publicly available information in affected issuers' annual filings—the only data available to it because although industry commentators claimed they would suffer billions of dollars in costs without an exemption, they failed to substantiate the claim with any data or analysis. The Commission explained that it lacked sufficient data to conduct an industry-wide assessment of "the total amount of capital that may be lost" because "most filings did not provide detailed information on the extent of [issuers'] operations" in the four countries that petitioners claimed prohibit disclosure. 77 FR 56,411/2.

The Commission nonetheless estimated the potential individual costs to three issuers (*see id.* at 56,411/2-56,412/2) and relied on those estimates to conclude that the commentators' concerns that these four host country laws could add billions of dollars in costs, and "hence have a significant impact on their profitability and competitive position, appear warranted." *Id.* at 56,412/1; *see also id.* at 56,413/1 ("the results of our analysis concur with commentators"). Thus, the Commission did precisely what *Chamber I* instructs—after concluding that it

could not assess the total industry-wide costs, the Commission relied on cost estimates for individual issuers to understand the rule's economic implications. 412 F.3d at 144. But the Commission did even more: it identified a number of additional considerations that could increase the rule's costs, which further undercuts petitioners' claim that the Commission somehow failed to do all it could to understand the rule's potential economic effects. *See* 77 FR 56,412/1-56,413/1 (setting forth additional considerations that may increase the rule's costs); *see also id.* at 56,413/1 ("Unfortunately, we do not have enough data to quantify more precisely the potential losses of firms under those various circumstances.").

#### 3. Lacking empirical data, the Commission engaged in a qualitative assessment of other potential costs.

Having received no empirical data on *other* potential economic effects, the Commission was unable to quantitatively assess them. *See, e.g.*, 77 FR 56,402/1 ("In addition to direct compliance costs, we expect that the statute could result in significant economic effects."); *id.* at 56,402/1-2 (discussing potential competitive harms). But contrary to petitioners' claim (at 44), the Commission did not underestimate the total costs even though it could not quantify these other potential costs. As the adopting release makes clear, the Commission engaged in a comprehensive qualitative assessment of the rule's economic effects and included within that discussion a consideration of the total overall costs that might result,

*including those costs that the Commission could not quantify*.[16] *See Chamber I*, 412 F.3d at 142 (explaining that a general qualitative analysis is appropriate where empirical data is lacking).

**C. The Commission was not required to re-propose the rule.**

Contrary to petitioners' contention (at 45-46), the Commission correctly determined that it was unnecessary to re-notice the rule with its cost estimates because interested parties had been given an ample opportunity to "review the proposed rules, as well as the comment letters, and to provide views on the proposal, other comment letters, and data." 77 FR 56,397/2. This was the correct course for several reasons.

*First*, because its analysis relied almost entirely on data provided by public commentators, the Commission complied with the requirement that "the most critical factual material" supporting its position be made public. *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984) (cited in *Chamber of Commerce v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006) [*Chamber II*]). Indeed, the Commission accepted industry commentators' estimates of costs as correct after making its own assessment, so

[16] Petitioners ignore the Commission's qualitative assessment of Rule 13q-1's potential economic effects that is set forth in Parts B and C of the adopting release's economic analysis, 77 FR at 56,398/2-56,408/1, including the rule's potential effects on, among other things, competition.

petitioners appear now to be attacking their own estimates as too low.[17] And because the Commission generally used its industry-wide extrapolations to assess commentators' estimates, the Commission's extrapolations were at most non-prejudicial "supplementary evidence." *Chamber II*, 443 F.3d at 900.

*Second*, the extrapolations done by the Commission are quite unlike the undisclosed cost-benefit analysis in *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 193 (D.C. Cir. 2007), as the Commission used the "common method" of extrapolating from firm-specific to industry-wide estimates in the absence of other available measurements, *see, e.g.*, Mona V. Makhija *et al.*, *Measuring Globalization of Industries Using a National Industry Approach: Empirical Evidence Across Five Countries and Over Time*, 28 J. OF INT'L BUS. STUDIES 679, 681 (1997) (explaining that extrapolation from data concerning one or more prominent firms is a "common method" of making economic measurements when other measures are unavailable).

*Third*, petitioners have not established prejudice. *See Owner-Operator*, 494 F.3d at 201-02. The Commission accepted the highest cost estimates provided by petitioner API and other industry commentators, but still adopted the rule because

[17] Petitioners' objection (at 45) to the Commission's reference to a study on the effect of "fire sales" on airplane sales prices is both misguided and puzzling because: the study was used merely to "check or confirm[]" the conclusions reached based on the public data, *Chamber II*, 443 F.3d at 900, and *it supported petitioners' view that forced asset sales can lead to lower sales prices.*

it believed that the three proposals petitioners argued would reduce costs (*see infra* Part II) "would be inconsistent with Section 13(q) and would undermine Congress' intent to promote international transparency efforts." 77 FR 56,402/3; *see also id.* 56,398/2; 56,400/1-3; 56,402/3-56,403/1. Petitioners have identified no new evidence or critique of the Commission's methodology that would lead to revised cost estimates of an order of magnitude sufficient to change the Commission's conclusion as to petitioners' three proposals.

*Finally*, as this Court has made clear, a petitioner may not "withhold relevant data and blindside the agency on appeal." *Chamber II*, 443 F.3d at 904. Petitioners were in a position to submit any additional available data concerning costs or methodology during the rulemaking but chose not to do so. They should not now be allowed to prevail in this Court simply because the Commission was unable to consider data or methodology that they failed to suggest when they had the opportunity.

## II. The Commission did not act arbitrarily or capriciously in declining to adopt three proposals that petitioners advanced.

### A. The Commission correctly determined that confidential submission of the payment information would be inconsistent with Section 13(q).

The Commission properly determined based on the statutory text and other indicia of Congressional intent that Section 13(q) requires the public disclosure of the issuers' payment information. *See, e.g.*, *Thompson*, 251 F.3d at 224 (D.C. Cir.)

(courts "us[e] traditional tools of statutory interpretation—text, structure, purpose, and legislative history"—at *Chevron* step one).

The Exchange Act is fundamentally a public disclosure statute. *See generally Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 12 (1985) ("the core mechanism" is "sweeping disclosure requirements" that allow "shareholder choice"); *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999) (embodies a "philosophy of public disclosure"); *Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1227 (9th Cir. 1987) ("forc[es] public disclosure of facts"). Accordingly, the reports that public companies are required to submit under the Act—such as the annual report on Form 10-K giving a comprehensive description of a public company's performance—have always been made public. By adding a new disclosure requirement to the Act, and doing so for the undisputed purpose of fostering increased transparency and public awareness, there is thus a strong presumption that Congress intended for the disclosed information to be made public.

Petitioners seek to overcome this presumption by relying on Section 13(q)(3), which provides:

(3) PUBLIC AVAILABILITY OF INFORMATION—

> (A) IN GENERAL—To the extent practicable, the Commission shall make available online, to the public, a compilation of the information required to be submitted [by issuers under Section 13(q)(2)(A)].
>
> (B) OTHER INFORMATION—Nothing in this paragraph shall require the Commission to make available online information other than the information required to be submitted under the rules issued under paragraph (2)(A).

They contend that Section 13(q) contemplates a "two-step process for disclosure of information" under which issuers first "provide an 'annual report' confidentially to the Commission, and the Commission then make[s] publicly available—'to the extent practicable'—an aggregated 'compilation of the companies' payment information." Br. 47-48. Petitioners are wrong.

*First*, Section 13(q) does not contemplate that the compilation should be a substitute for the public disclosure of the issuers' annual reports. This is apparent because—in contrast to the "annual" reporting requirement for issuers—the statute provides that the Commission is obligated to publish a compilation only "to the extent practicable" and imposes no timeframe on the Commission for producing or subsequently updating the compilation. Indeed, if petitioners' reading were correct and the Commission were to determine that it is impracticable to publish a compilation, none of the payment information would be disclosed—plainly an

absurd result. This demonstrates that Congress must have intended public disclosure of each issuer's individual report.[18]

*Second*, even when it is practicable to publish a compilation, Section 13(q)(3) makes it clear that petitioners' proposed country-by-country "aggregation" of issuers' payment information is *neither* required *nor* an available substitute for the issuer-by-issuer disclosure of project-level and government-level payment information. Section 13(q)(3)(B) expressly provides that the Commission need include in the compilation nothing "*other than the information required to be submitted*" by issuers—*i.e.*, the issuer-by-issuer project-level and government-level disclosures. That information serves as the minimum information that the Commission *must* include in any public compilation. Moreover, because the "aggregation" of the issuers' information that petitioners propose would produce a

[18] To further support their contention that Congress intended the compilation as a substitute for disclosure of the annual reports containing the payment information, petitioners rely on two other legislative provisions—newly added Section 13(p) of the Exchange Act, 15 U.S.C. § 78m(p), which requires issuers to make certain disclosures concerning whether minerals from the Democratic Republic of the Congo are used in their products, and a 2008 bill entitled "Extractive Industries Transparency Disclosure Act" (H.R. 6066) that, although not enacted, closely resembles Section 13(q). Neither provision supports petitioners' position. Like Section 13(q), both legislative provisions require public disclosure of information through filings with the Commission and then separately provide *supplemental* mechanisms for making the disclosures publicly accessible. *Compare* Exchange Act § 13(p)(1)(E) (requiring issuers to provide information on their "Internet website"), *and* EITDA § 3(c) (requiring Commission to "provide that the information filed by all issuers … in a compiled format" on the "website of the Commission").

new, anonymized set of data that is "other information" than issuers "are required to submit," Section 13(q)(3)(B) makes plain that it is not the type of information that the Commission is required to include in the "compilation."[19]

The Commission's reading is bolstered by the structure of Section 13(q) as a whole. Section 13(q) requires issuers to file reports with the Commission disclosing detailed payment information (*e.g.*, the currency used to make the payments and the business segment of the issuer that made the payment, both electronically tagged). Yet unlike EITI—which expressly assigns a third-party administrator the role of reconciling payment information received from *both* the government and the extraction companies, and then providing a public report—the only significant responsibility that Section 13(q) assigns to the Commission is to ensure that the issuers' payment information is provided to the public. If

---

[19] For the same reason, Section 13(q)(3)(B) reveals that when Congress referred to a "compilation of information," it was *not* referring to the "aggregating" of that information into new, less detailed information. Just as a compilation of judicial opinions means the pulling together of various discrete opinions into one book, with each decision retaining its independent character within the compilation, "compilation of information" as used in Section 13(q) means pulling together in one place the actual issuer-by-issuer project-level and government-level information. Additional support for this conclusion is found in the 2008 EITDA bill, *see supra* note 18, which under a subheading identical to that in Section 13(q)(3)—*i.e.*, "Public Availability of Information"—provides that the issuers' payment information must "be compiled so that it is accessible by the public directly, and in a *compiled* format, from the website of the Commission *without separately accessing on the EDGAR system the annual reports of each issuer* filing such information." EITDA § 3(c) (emphases added).

petitioners were correct that an anonymized per-country aggregation were sufficient here, Congress would not have drafted Section 13(q) to demand that issuers disclose, or the Commission receive, so much extraneous, detailed information.[20] The only logical explanation is that petitioners are incorrect: Congress intended for each issuer's disclosed detailed payment information to be made publicly available.

Moreover, the legislative history confirms that Congress intended that the payment information would be disclosed on an issuer-by-issuer basis—not the anonymized approach that petitioners requested. This is apparent because the Congressional sponsors spoke repeatedly about *investors* having information about their companies' payments, and such information would be relevant to investors *only* if it were disclosed on an issuer-by-issuer basis. *See, e.g.*, 156 Cong. Rec. S3815 (May 17, 2010) (Sen. Cardin) ("Investors need to know the full extent of a company's exposure"); *id.* at S3816 (May 17, 2010) (Sen. Lugar) ("would empower investors to have a more complete view of the value of their holdings"); *see also id.* at S5872 (July 15, 2010) (Sen. Cardin) ("will require public disclosure

---

[20] As the Commission stated in the final release, even if the annual reports are not publicly disclosed, some of this detailed information could potentially be made available to the public pursuant to FOIA. 77 FR 56401/2 & n.562. Although petitioners challenge that assertion, the case law is clear that the application of the confidentially exemption for FOIA is determined on a case-by-case basis. *See, e.g.*, *Ctr. for Auto Safety v. NHTSA*, 244 F.3d 144, 147-48 (D.C. Cir. 2001) (describing fact-based inquiry).

of those payments"). Significantly, petitioners have not identified *any* statements in the legislative record to support their contrary interpretation. *See generally Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991) ("Congress' silence in this regard can be likened to the dog that did not bark.").

Finally, requiring disclosure of the detailed payment information is also consistent with the Congressional intent to create a new historic transparency standard that empowers citizens around the world to hold their governments, including their sub-national governments, accountable for resource extraction revenues. Indeed, the EITI Board now agrees that the aggregated data reporting that petitioners seek is inadequate: it determined in October 2012 to require at least disaggregation by company and by payment type in each EITI country, and will consider a project-level disaggregation requirement in early 2013.[21]

**B. The Commission properly declined to create an exemption where payment disclosure is barred by a foreign government.**

As previously discussed, *see supra* pp. 10-16, a principal Congressional objective underlying the enactment of Section 13(q) was to bring about a new international standard of public disclosure of resource-extraction payments,

---

[21] *See, e.g.*, EITI Board Paper 21-2-A "Building on Achievements" at 8 (Oct. 2012), available at: http://eiti.org/files/Board%20Paper%2021-2-A%20Building%20on%20achievement %20-%20w%20B-F.pdf; Minutes from EITI Board Meeting, 25-26 Oct. 2012, available at: http://eiti.org/files/Minutes-from-the-21st-EITI-Board-meeting-Lusaka.pdf.

particularly as to those "intransigent" foreign governments that were resisting pressure to voluntarily implement EITI. Necessarily included among those intransigent governments are any that may have taken the extraordinary step of actually prohibiting disclosure through laws, decrees, or other means. Particularly as to these transparency-averse countries, Section 13(q) makes it the public policy of the United States to compel disclosure of payments by requiring the issuers to disclose payment information. As Senator Lugar explained, "We cannot force foreign governments to treat their citizens as we would hope, but this amendment would make it much more difficult to hide the truth." 156 Cong. Rec. S3816 (May 17, 2010).

Given this Congressional desire, the Commission reasonably determined not to grant an exemption where foreign laws may attempt to prohibit the Section 13(q) disclosures. The Commission has "considerable regulatory discretion in this area," *Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 296 (2d Cir. 2006), and may choose to exercise its exemptive authority where "not inconsistent with the public interest or the protection of investors." Exchange Act § 12(h), 15 U.S.C. § 78*l*(h). Here, the Commission determined that an exemption involving the most intransigent countries—*i.e.*, those whose laws may expressly bar disclosure—would be inconsistent with the Congressionally identified public interest in promoting transparency in all countries. 77 FR 56,372/3-56,373/1, 56,413/1.

While this reasoned decision was within the Commission's discretion, petitioners nonetheless make several misguided arguments to demonstrate otherwise. *First*, they erroneously suggest that the Commission was obliged to grant the exemption pursuant to the *Charming Betsy* doctrine, which is a "presumption that Congress typically does not intend its laws to conflict with the law of nations." *United States v. Weingarten*, 632 F.3d 60, 67 (2d Cir. 2011). Neither the *Charming Betsy* presumption nor international comity considerations have any place here, however, as a principal Congressional purpose underlying Section 13(q) was to require the public disclosure of information that other countries are refusing to disclose voluntarily. *Cf. United States v. Yunis*, 924 F.2d 1086, 1091 (D.C. Cir. 1991) (international-law concerns are irrelevant when "the statute in question reflects an unmistakable congressional intent" to effectuate the foreign policy that allegedly implicates those concerns).

*Second*, petitioners contend that, given the potential costs that might result without such an exemption, the Commission was required to conduct an extensive analysis to verify that Congress's transparency and accountability objectives would actually be achievable in any countries that may prohibit the Section 13(q) disclosures if the relevant payment information were publicly available.[22] As

[22] Petitioners also mischaracterize the Commission's cost analysis (at 57), which merely evaluated the potential loss *if* issuers terminate all activities in those

discussed in Part I(A), *supra*, this view erroneously supposes that the Commission must assess the validity and wisdom of specific Congressional policy mandates before the Commission can execute them. *Cf. Fox Television Stations*, 556 U.S. at 519 ("Congress has made the determination that indecent material is harmful to children, and has left enforcement of the ban to the Commission. If enforcement had to be supported by empirical data, the ban would effectively be a nullity.").

*Third*, petitioners claim that in denying exemptive relief here the Commission ignored previous situations where it has granted exemptions for disclosures that were barred by foreign law. Br. 55-56. Significantly, none of those situations involved legislation expressly enacted to circumvent an intransigent foreign government's desire to avoid the disclosure. In light of this significant difference, the Commission was not required to address the previous situations where it has granted exemptions based on foreign law. *U.S. Dep't of Homeland Sec. v. FLRA*, 647 F.3d 359, 364 (D.C. Cir. 2011) (explaining that an agency is "not required to canvas the field to explain why inapplicable cases or doctrines do not apply. Our precedents do not require agencies to explain why apples are not oranges.").

*Fourth*, petitioners erroneously contend that the Commission ignored an

---

countries. 77 FR 56411/1-2, 56,413/1 & n.632. As the Commission recognized, it is unclear that denying an exemption will actually have that consequence. *Id.*

alternative that would exempt only countries that currently bar disclosure. As the adopting release demonstrates, the Commission was concerned that regimes could take advantage of such a grandfather exemption by "interpret[ing] existing laws," to bar disclosure. 77 FR 56373/1. But in any event, petitioner API *opposed* such a grandfather exemption during the rulemaking, so petitioners cannot now claim prejudicial error.[23]

*Lastly*, petitioners assert that the Commission contradicted itself by recognizing that existing international transparency efforts may discourage the spread of anti-disclosure laws while also reasoning that granting the exemption at issue here could encourage more countries to adopt such laws. But it is hardly contradictory or illogical to point out that a growing international transparency trend could be hampered were the United States to weaken its own transparency law by accommodating those intransigent countries that may seek to bar such disclosures.[24]

---

[23] *See* JA194-95 (API: "Incorporation of an exception that is tied to prohibitions that were in place prior to enactment of the Act could also result in uneven harm, with some issuers impacted and others not.").

[24] Although petitioners make passing reference to exempting disclosures prohibited "by the terms of foreign commercial contracts" (at 54), they make no argument specifically on this point and thus have waived it. *City of Waukesha v. EPA*, 320 F.3d 228, 250 n.22 (D.C. Cir. 2003). In any event, the Commission's basis for rejecting such an exemption, which is set forth in the adopting release, *see* 77 FR 56,373/1, was entirely rational.

### C. The Commission did not abuse its discretion in determining to provide interpretative guidance for the statutory term "project" rather than formally defining it.

Contrary to petitioners' contention, the Commission did not abuse its discretion in determining not to provide a formal definition of the statutory term "project"—which is used in connection with the project-level reporting requirement.

As the adopting release demonstrates, the Commission's determination was "the product of reasoned decisionmaking." *Fox*, 684 F.3d at 74-75. After considering a variety of commentator proposals for defining the statutory term, the Commission concluded that "'project' is used within the extractive industry in a variety of contexts" and thus "there does not appear to be a single agreed-upon *application* in the industry." 77 FR 56,385/2 (emphasis added). Because of the absence of an obvious one-size-fits-all definition, the Commission determined that it would be preferable not to formally define the term in order to "giv[e] issuers flexibility in applying the term to different business contexts depending on factors such as the particular industry or business in which the issuer operates, or the issuer's size." *Id.*; *see also id.* at 56,406/1. Further, the Commission observed that issuers appear to understand what constitutes "their own project[]" in any given context:

> While there does not appear to be a single agreed-upon *application* in the industry, we note that individual issuers routinely provide disclosure about *their own projects* in their Exchange Act reports and other public statements, and as such, we believe 'project' is a commonly used term whose meaning is generally understood by resource extraction issuers and investors.

*Id.* at 56,385/2 (emphases added); *see also id.* at 56,406/1.

To help mitigate the potential for "[i]nconsistent disclosure" that might result from the absence of a formal definition (77 FR 56,406/2), however, the Commission offered "guidance" to issuers in applying the term in any particular context, suggesting that they look to their "contractual arrangements with governments":

> [W]e note that resource extraction issuers routinely enter into contractual arrangements with governments for the purpose of commercial development of oil, natural gas, or minerals. The contract defines the relationship and payment flows between the resource extraction issuer and the government, and therefore, we believe it generally provides a basis for determining the payments, and required payment disclosure, that would be associated with a particular "project."

(*Id.* at 56,385/2-3 (footnote omitted); *see also id.* at 56,406/1).[25]

Notwithstanding this reasoned approach, petitioners raise several arguments seeking to support their erroneous claim that the Commission acted arbitrarily and capriciously. *First,* petitioners contend that the Commission contradicted itself

[25] Petitioners' opening brief does not mention—much less challenge—this interpretive guidance and, thus, petitioners have waived any such challenge.

when it said that the "meaning" of "project" is "generally understood by resource extraction issuers and investors" while also saying that there "does not appear to be a single agreed-upon application in the industry." *Id.* at 56,385/2, 56,406/1. Yet there is no contradiction: the Commission simply explained that issuers are already familiar with the contours of "their own projects" and thus understand how to apply the term in a given context, even though the term is used "in a variety of contexts" that no "single" definition would capture.[26] Indeed, petitioner API made this same point in a comment letter. JA185-86 ("The term 'project' is used by companies to describe a variety of different activities, depending on the context, and there is no standard, agreed-upon definition.").

*Second*, petitioners erroneously argue that, by leaving the term undefined, the Commission shirked a statutory responsibility and promulgated a vague regulation. In making this argument, petitioners ignore that:

(i) Congress did not direct the Commission to define "project," and the decision whether to define that or any other such term in the statute was thus left to the Commission's full discretion. *See, e.g.*, *Hercules Inc. v. EPA*, 938 F.2d 276, 282-83 (D.C. Cir. 1991) (agencies are not required "to define all terms contained in the statute" and have "discretion in declining to provide any

[26] For the same reason, there is no contradiction between the Commission determining that issuers generally understand the meaning of "project" and concluding that a formal definition would limit their "'flexibility' to adapt the term to different contexts." Br. 60. It was entirely logical for the Commission to reason that issuers understand the term's meaning in their specific application, but that a formal definition would be less flexible and effective than interpretive guidance.

definition of [a] term" unless the statute directs otherwise);[27] and

(ii) the Commission provided guidance that, in applying the term "project" in any specific instance, the activities and payment flows occurring under the relevant government contract would provide a basis for an issuer to determine its project.

*Finally*, petitioners erroneously contend that the Commission improperly rejected their proposal to define "project" as all resource extraction activities "carried out within a particular geologic basin or province." Br. 60. As the Commission explained, such a one-size-fits-all definition runs contrary to Section 13(q)'s emphasis on country-specific reporting because geological basins frequently run through multiple countries. 77 FR 56,406/2. This was not an arbitrary or capricious explanation.[28]

---

[27] *Compare* 15 U.S.C. 78m(q)(1)(A) ("as determined by the Commission" at the end of the definition for "commercial development of oil, natural gas, or minerals"); *id.* 78m(q)(1)(B) (same for "foreign government"); *id.* 78m(q)(1)(C)(ii) (directing the Commission to determine the components of the "payment" definition that "are part of the commonly recognized revenue stream").

[28] Petitioners confuse the project- and *government*-level reporting required by Section 13(q)(2)(A) with "reporting by both project and *country*." Br. 61 (emphasis added). Reporting payments to "each government" requires more granular disclosure than simply providing country-level disclosure as petitioners seem to claim: it involves distinguishing payments by the recipient governmental department or entity, or sub-national government, within each country.

## III. Petitioners' First Amendment challenge lacks merit.

### A. Petitioners waived any claim that Rule 13q-1 violates the First Amendment.

Petitioners' First Amendment challenge to Rule 13q-1—including petitioners' claim that the rule is not narrowly tailored to survive strict scrutiny (at 34-35)—is waived because neither petitioners nor any other commentator raised any First Amendment arguments during the rulemaking. *See, e.g.*, *Nat'l Multi Hous. Council v. EPA*, 292 F.3d 232, 233 n.2 (D.C. Cir. 2002) (refusing to consider a Fourteenth Amendment equal protection challenge to agency's interpretation of statutory term that was not raised during the rulemaking). Petitioners' First Amendment challenge is therefore limited to Section 13(q).[29]

### B. Section 13(q) does not implicate the First Amendment and, in any event, survives scrutiny under any standard of review.

Section 13(q) requires entities that are already obligated to make extensive public disclosures to also disclose payments made to governments for the commercial development of oil, natural gas, or minerals. Such mandatory disclosures of purely factual information have never been understood to compel "speech" in violation of the First Amendment. Like the "[i]nnumerable federal and state regulatory programs [that] require" factual, non-ideological disclosures, *Nat'l*

---

[29] The arguments set forth in Part III(B) nonetheless confirm that Rule 13q-1 does not violate the First Amendment.

*Elec. Mfrs. Ass'n. v. Sorrell*, 272 F.3d 104, 116 (2d Cir. 2001), Section 13(q) does not in any way restrict or otherwise infringe upon First Amendment rights.

Regulated entities like those subject to Section 13(q)'s disclosure requirement are subject to innumerable federal, state, and local reporting requirements, and the information collected is frequently made available to the public. The Commission, for example, requires public companies to disclose in publicly available annual, periodic, and current reports a wide range of information, 17 C.F.R. § 249.310, .308a, .308, such as information about their business and property, financial condition, management, executive compensation, and security ownership, *see id.* § 229.[30] As further examples:

- the Federal Deposit Insurance Corporation makes publicly available the annual reports that bank depository institutions are required to file on their management, operations, and financial condition, 12 U.S.C. § 1831m(a)(3);

- the Consumer Financial Protection Bureau requires depository banks to make publicly available extensive information on mortgage loans which were originated or purchased by that bank during each fiscal year, 12 U.S.C. § 2803;

- the Environmental Protection Agency makes publicly available numerous disclosures that regulated entities are required to file regarding the impact of their activities on the environment, *see*,

---

30 *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758, n.5 (1985) ("This Court has recognized that certain kinds of speech are less central to the interests of the First Amendment than others," including "the exchange of information about securities") (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978)).

*e.g.*, 42 U.S.C. §§ 300j-4(g)(5); 11022(e)(3), 11023(h), 11044(a);

- the Department of Defense, the General Service Administration, and NASA make publicly available information that government contractors are required to self-report regarding criminal, civil, and administrative liability in connection with federal contracts, *see* Federal Acquisition Circular 2005-49 (Jan. 19, 2011), *published at* 76 FR 4188-01 (Jan. 24, 2011); and

- the State Department is currently considering a proposal to require U.S. companies to publicly disclose their investment activities in Burma, including payments to each Burmese government entity, *see* Reporting Requirements on Responsible Investment in Burma, July 31, 2012, *published at* 77 FR 46,786 (Aug. 6, 2012).

No court (to our knowledge) has ever held that such factual, non-ideological reporting and disclosure requirements "compel speech" in violation of the First Amendment, and at least some courts have expressly rejected the "wide-ranging implications" of such arguments for these and other government programs that require public disclosure.[31]

---

[31] The Second Circuit's decision in *Sorrell* involved a disclosure requirement different from Section 13(q)'s because the Vermont law in that case directly regulated commercial speech. Yet, in upholding the regulation requiring manufacturers of products containing mercury to include a warning label on those products, the Second Circuit offered an observation that is equally relevant here: it is "neither wise nor constitutionally required" to "expose these long-established [reporting] programs to searching scrutiny by unelected courts." *Sorrell*, 272 F.3d at 116.

Nevertheless, petitioners contend that even if this Court rejects their arguments under the APA, it should take the unprecedented step of invalidating Section 13(q) because, they claim, that provision imposes a content-based regulation of speech subject to strict scrutiny. *See* Br. at 31, n.16. Petitioners' effort to constitutionalize their challenge does not advance their argument. They cite no case in which any court has ever applied such an exacting standard to laws requiring the disclosure of purely factual, non-ideological information. Instead, petitioners rely on compelled speech cases that undermine their own argument for strict scrutiny.

The unifying feature in "compelled speech" cases is that the First Amendment requires heightened scrutiny *only* where the government requires speakers (i) to endorse (or subsidize) a specific message;[32] (ii) to alter the content

[32] The disclosures of commercial payment information required by Section 13(q) are a "far cry" from the types of government-endorsed messages that have warranted strict scrutiny. *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006); *see, e.g.*, *Wooley v. Maynard*, 430 U.S. 705 (1977) (applying strict scrutiny to a state's requirement that motorists display the state motto—"Live Free or Die"—on their license plates); *Speiser v. Randall*, 357 U.S. 513, 518-19 (1958) (applying heightened scrutiny to a requirement that veterans, as a condition of receiving property tax exemption, declare that they do not advocate the forcible overthrow of government).

of their own message;[33] or (iii) to suffer an infringement of their rights to association or belief.[34]

In marked contrast, Section 13(q) requires disclosures by regulated entities of accurate, factual information regarding payments made in furtherance of their business activities. It does not require anyone to express a view or otherwise endorse a message with which he or she disagrees,[35] or to alter the content of his or

---

33 *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) (applying strict scrutiny to a requirement that, as part of a solicitation, professional fundraisers disclose to potential donors the percentage of charitable contributions collected during the previous twelve months actually turned over to charity; explaining that "[m]andating speech that a speaker would not otherwise make," even factual information, "necessarily alters the content of the [protected] speech"); *see also, e.g.*, *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 650-51 (1985) (applying heightened rational basis review to a government requirement that compelled factual disclosures in advertisements to prevent consumer deception); *SEC v. Wall Street Publ'g Inst.*, 851 F.2d 365, 373 (D.C. Cir. 1988) (same) (applying First Amendment scrutiny to a securities law disclosure requirement in the context of magazine articles).

34 *See, e.g.*, *John Doe No. 1 v. Reed*, 130 S.Ct. 2811, 2818 (2010) (applying intermediate scrutiny to a public disclosure requirement for the names on a petition seeking a referendum)); *id.* at 2839 (Thomas, J., dissenting) (arguing that strict scrutiny should apply because disclosure of the names of signatories on the petition threatens signatories' privacy interests in their political associations); *Gibson v. Fl. Legislative Investigation Committee*, 372 U.S. 539, 557 (1963) (applying heightened scrutiny to an attempt to require the disclosure of the identity and members of, and contributors to, the local and state NAACP organization); *Bates v. City of Little Rock*, 361 U.S. 516 (1960) (same).

35 *Cf. Environmental Defense Ctr. v. EPA*, 344 F.3d 832, 849 (9th Cir. 2003) ("The State may not constitutionally require an individual to disseminate an ideological message, but requiring a provider of storm sewers that discharge into national waters to educate the public about the impacts of stormwater discharge on

her own message.[36] Nor does it threaten to chill issuers' First Amendment rights of association or belief.[37]

Nor does Section 13(q) impose regulation on commercial speech by requiring warnings or disclosures in a seller's advertising as was the case in the provisions at issue in cases such as *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,* 471 U.S. 626 (1985), and *Milavetz, Gallop & Milavetz v. United States*, 130 S.Ct. 1324 (2010). Yet, even when the government does regulate commercial speech in this manner, the Supreme Court and this Court have emphasized that accurate, factual disclosure requirements do not prohibit speech and therefore are not subject even to intermediate scrutiny, much less to the strict

---

water bodies and to inform affected parties, including the public, about the hazards of improper waste disposal falls short of compelling such speech.") (internal citation omitted).

[36] Significantly, issuers are not required to disclose the payment information either as part of, or as a condition of, other communications that they desire to make. Section 13(q) and Rule 13q-1 provide for information to be filed on Form SD with the Commission and thereby disseminated to the public through the Commission's EDGAR filing system. The Supreme Court has previously indicated that this format of public distribution of factual information satisfies First Amendment scrutiny. *See Riley*, 487 U.S. at 800 (explaining that if *the state* had instead "publish[ed] the detailed financial disclosure forms it requires professional fundraisers to file," then "[t]his procedure would communicate the desired information to the public without burdening a speaker with unwanted speech during the course of a solicitation," thereby avoiding the First Amendment difficulties).

[37] At most, the disclosures may result in some lost commercial opportunities, but this surely is not the type of associational interest that the First Amendment protects.

scrutiny advocated by petitioners here. *See, e.g.*, *Zauderer*, 471 U.S. at 650 (noting that disclosure requirements do not prevent sellers "from conveying information to the public" but instead merely require sellers to provide "more information than they might otherwise be inclined to present"); *Milavetz*, 130 S. Ct. at 1340 (disclosure requirements do not prevent sellers "from conveying any additional information"); *Spirit Airlines, Inc. v. Dep't of Transp.*, 687 F.3d 403, 414 (D.C. Cir. 2012) (noting that rule requiring the most prominent cost figure in airline advertisements be the final airfare "does not prohibit airlines from saying anything").

That the mandated disclosures serve a transparency goal and contribute to the overall fund of public knowledge does not undermine the conclusion that Section 13(q) does not violate the First Amendment. Many government disclosure requirements are similarly aimed at promoting private sector and governmental accountability, but that has never been thought to undermine the constitutional validity of these common-sense public policies.

In any event, Section 13(q) survives review under any standard. The disclosure requirement serves the substantial and compelling governmental interest of enhancing resource extraction transparency through the public disclosure of payment information, thereby helping to reduce global poverty, promote better governance, and advance U.S. energy and anti-terrorism interests. *See* 156 Cong.

Rec. 3816 (May 17, 2010) (Sen. Lugar) (explaining that extractive industry transparency improves investment climates for U.S. companies abroad, increases the reliability of commodity supplies, and promotes greater energy security). And Congress's judgment that Section 13(q) is necessary to promote these governmental interests is entitled to deference. *See, e.g.*, *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1221-22 (10th Cir. 2007) ("Courts have historically given special deference to other branches in matters relating to foreign affairs, international relations, and national security; even when constitutional rights are invoked by a plaintiff.").

Petitioners erroneously assert (at 34) that Section 13(q)'s objectives are "insufficiently compelling" because "the Commission made no finding that the required disclosures would actually benefit foreign citizens by increasing the accountability of their governments." This Court has already rejected a variation on this argument, which at base rests on the false assumption that Congress may require disclosures to promote transparency and accountability only after undertaking an empirical analysis. *See, e.g.*, *Nat'l Ass'n of Manufacturers v. Taylor*, 582 F.3d 1, 15-16 (D.C. Cir. 2009). As this Court explained in *Taylor* when upholding a law that required lobbyists to make various disclosures about their clients' identity:

> At bottom, this is not a case … where Congress' justification for a statute rested on 'economic' analysis that was susceptible to empirical

> evidence. What we have instead is simply a claim that good government requires greater transparency. This is a value judgment based on the common sense of [members of Congress] ….

*Id.* (internal citations and quotation marks omitted). Similarly, although the social benefits that Section 13(q) seeks to achieve are not empirically provable, *see supra* Part I(A), that "is not a sufficient reason to find that statute unconstitutional." *Taylor*, 582 F.3d at 16 (quoting *Paris Adult Theater I v. Slaton*, 413 U.S. 49, 62 (1973)). Indeed, the voluntary participation of many of petitioners' members in EITI demonstrates that even they recognize *both* that there is a problem in these resource-rich countries *and* that transparency is a mechanism for addressing it.

Lastly, petitioners erroneously claim (at 36-37) that Section 13(q) is not narrowly tailored because there "are a range of other means the government ordinarily deploys" to promote transparency and good governance "including diplomacy, foreign aid, and support for NGOs," as well as EITI. Petitioners ignore that Congress, which was plainly aware of each of these "other means" when it enacted Section 13(q), decided that mandatory disclosure was needed not as an alternative to these existing efforts, but as a necessary complement to them. *See, e.g.*, Exchange Act Section 13(q)(2)(E) ("shall support the commitment of the Federal Government to international transparency promotion"); JA536 (letter from U.S. Agency for International Development: "Vigorous implementation of Section [13(q)] could contribute to the efficient and effective use of U.S. development

dollars and complement U.S. development strategies ….”). And Secretary of State Clinton has publicly declared just how important the Section 13(q) disclosures will be to U.S. foreign policy efforts: “[W]e do think [the Cardin-Lugar Amendment] will have a very profound effect on our ability to try to help manage some of the worst practices that we see in the extractive industry and in the relationships with governments at local and national levels around the world.”[38] These foreign policy assessments of Section 13(q)’s importance deserve deference.

* * *

Because all of petitioners’ challenges fail for the reasons discussed above, their request for vacatur must be denied. In any event, the appropriate remedy is assessed on a case-by-case basis. *See Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150 (D.C. Cir. 1993).

---

[38] Secretary of State Hillary Rodham Clinton, Speech at the Transparency International-USA’s Annual Integrity Award Dinner (Mar. 22, 2012) (available at: http://www.state.gov/secretary/rm/2012/03/186703.htm).

## CONCLUSION

For the foregoing reasons, the order of the Commission should be affirmed.

Respectfully Submitted,

MICHAEL A. CONLEY
Deputy General Counsel

WILLIAM K. SHIREY
Senior Litigation Counsel

THEODORE J. WEIMAN
Attorney

/s/ Theodore J. Weiman
Securities and Exchange Commission
100 F. Street, N.E.
Washington, D.C. 20549
(202) 551-5167 (Weiman)

January 2013

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 13,990 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-Point Times New Roman.

/s/ Theodore J. Weiman
THEODORE J. WEIMAN

January 2, 2013

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia by using the appellate CM/ECF system on January 2, 2013. I further certify that I hand delivered 8 copies of the foregoing to the Clerks' Office. Finally, I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Theodore J. Weiman
THEODORE J. WEIMAN

January 2, 2013